McCormick, Barstow, Sheppard,
Wayte & Carruth LLP
Hagop T. Bedoyan, #131285
   *hagop.bedoyan@mccormickbarstow.com*
Garrett R. Leatham, #333362
   *garrett.leatham@mccormickbarstow.com*
Garrett J. Wade, #340285
   *garrett.wade@mccormickbarstow.com*
7647 North Fresno Street
Fresno, California 93720
Telephone:     (559) 433-1300
Facsimile:     (559) 433-2300

Proposed Attorneys for RIZO-LÓPEZ FOODS INC., Debtor in Possession

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

| | |
|---|---|
| In re<br><br>RIZO-LÓPEZ FOODS, INC.,<br><br>        Debtor in Possession. | Case No. 25-25004-C-11<br><br>Chapter 11<br><br>DC Nos.: MB-01 (Omnibus Notice Appl.)<br><br>*No Hearing Required* |

**DECLARATION OF EDWIN RIZO IN SUPPORT OF CHAPTER 11 PETITION AND THE DEBTOR'S FIRST DAY MOTIONS**

      I, Edwin Rizo, hereby declare and represent as follows:

      1.     I am the CEO of RIZO-LÓPEZ FOODS, INC. (the "Debtor" or "RLF"), the debtor and debtor in possession in the above-captioned chapter 11 case. As such, I am generally familiar with the Debtor's day-to-day operations, business affairs, and books and records.

      2.     I am over eighteen years of age. I submit this declaration (the "Declaration") in support of Debtor's *Ex Parte Application For Order: (1) Modifying LBR 9014-1(d) to Allow Filing and Service of an Omnibus Notice for First Day Motions; (2) Shortening Time For Notice and Hearing on First Day Motions; and (3) Modifying LBR 9014-1(d)(5) to Allow Joining of Multiple Requests for Relief in Certain Motions* (the "Application"). Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge; my review of Debtor's books and records, relevant documents, and other information prepared or collected by Debtor's employees and/or agents; or my opinion based on my experience with Debtor's operations and

financial condition. In making my statements based on my review of Debtor's books and records, relevant documents, and other information prepared or collected by the Debtor's employees and/or agents, I have relied upon these employees recording, preparing, or collecting any such documentation and other information. If I were called to testify as a witness in this matter, I could and would competently testify to each of the facts set forth herein based upon my personal knowledge, review of documents, or opinion, except as to those matters stated upon information and belief. I am authorized to submit this Declaration on behalf of Debtor.

3. Debtor commenced this chapter 11 case (the "Case") by filing a Voluntary Petition under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code") on September 15, 2025 (the "Petition Date"). Since the Petition Date, Debtor has been managing its business and affairs as a debtor in possession pursuant to 11 U.S.C. §§ 1107 and 1108.

## I. DESCRIPTION OF RIZO-LÓPEZ FOODS

4. Debtor is a family built and run company with a strong commitment to its consumers and employees. I incorporated the Debtor in the State of California in 1990 for the purposes of selling and distributing high quality Mexican and Central American cheese products in the bay area and specifically the Mission District in San Francisco. In 1991, Debtor started making its own Mexican-style cheeses and creams. My brother, Iván Rizo, joined the company in 1995 and we opened our first production plant in Riverbank, California. After reaching capacity in Riverbank, Debtor moved its business operations in 2012 to Modesto, California to be closer in proximity to its dairy suppliers and to have ample space to grow.

5. Over the last ten years, Debtor expanded its distribution nationwide. Debtor's products can be found at grocery stores and retail deli counters throughout the country. In total, Debtor grew to more than 320 employees and producing approximately 40 million pounds of cheese and 10 million pounds of creams annually under the "Don Francisco," "Tio Francisco" and "Rizo Bros" brand names. Debtor prides itself in linking back to its rich family heritage, using Old World recipes that have been passed down for generations and traditional techniques to produce artisan-crafted, award-winning cheeses.

///

McCormick, Barstow,
Sheppard, Wayte &
Carruth LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

6. Debtor has won multiple awards from the American Cheese Society, United States Champion Cheese Contest, and the World Dairy Expo Championship Dairy Product Contest.

## II. RELATED ENTITIES

### A. I & E McClure, LLC

7. I & E McClure, LLC ("I & E McClure") is a California limited liability company and the owner of real property located at 201 S. McClure, Modesto, CA, APN 036-013-021. I & E McClure is owned equally by my brother, Ivan Rizo, and I either directly or indirectly through our family members and family trusts.

8. RLF is a tenant of I & E McClure at the 201 S. McClure address in Modesto, CA (the "Modesto Location"). The current lease will expire on September 30, 2027. For the year 2025, RLF pays I & E McClure $50,666 per month for rent.

### B. R.L. Gardena, LLC

9. R.L. Gardena, LLC is a California limited liability company and the owner of real property located at 14720 S. San Pedro Street in Gardena, CA 90248 (the "Gardena Location"). R.L. Gardena, LLC is owned by my brother, Ivan Rizo and me.

10. RLF is a tenant of R.L. Gardena, LLC at the 14720 S. San Pedro Street address in Gardena, CA. RLF pays R.L. Gardena, LLC $14,334 per month for rent.

## III. LISTERIA OUTBREAK

11. Around late 2023, Hawaii state officials found *listeria monocytogenes* ("Listeria") in a random sample of Debtor's aged cotija Mexican grating cheese ("Cotija Cheese") for sale, which triggered an investigation and recall. The Listeria discovered in Hawaii was also found in the Debtor's plant and has been genetically linked to a 10-year outbreak of Listeria, the cause of which had eluded public health officials, and has been allegedly linked to 26 illnesses and two deaths. After being notified by the Hawaii Department of Public Health of the Listeria outbreak, the Debtor conducted its own investigation and found Listeria on one plastic tote that was put aside and kept for future inspections and evidence. In early January of 2024, the Debtor voluntarily recalled its Cotija Cheese.

///

McCormick, Barstow,
Sheppard, Wayte &
Carruth LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

12. On February 2, 2024, Debtor was advised by the Food and Drug Administration ("FDA") and the Center for Disease Control that one of its products had been linked to a strain of Listeria. Debtor takes the importance of producing safe food extremely seriously. For the protection of its consumers, Debtor immediately suspended operations and voluntarily recalled 1200 pounds of cotija cheese sold under the brand names "Tio Francisco" and "Rizo Bros" due to potential Listeria after RLF's internal investigation into the Hawaii state officials' findings led to a discovery of Listeria on a large plastic "tote" used in the manufacture of cotija cheese. The scope of the recall was intentionally broad to err on the side of caution. For example, although Debtor had confidence in the safety of products produced in its culture room (sour cream, ricotta cheese, etc.), Debtor included these products in the recall rather than conducting a risk assessment to prevent having multiple recalls and causing confusion in the marketplace during a time when public health was the top priority.

13. After RLF's voluntary recall of the cotija, multiple governmental agencies visited the plant, including the California Department of Food and Agriculture and the FDA. The FDA made unannounced visits to the plant and swabbed numerous areas throughout the plant. Several areas tested positive for Listeria, including the previously identified tote and the bottom of a large roll-up door. The voluntary recall was carried out with the knowledge of the FDA, which also issued a press release identifying the products. The recalled products included those that had been distributed by Debtor and various distributors nationwide. Debtor's products were also incorporated into the products of other food producers, which were also subsequently recalled, and included cheeses, yogurts, and sour creams sold under numerous company brand names.

14. On February 5, 2024, in alignment with FDA guidance, RLF issued a second expanded, but voluntary, recall of all the use by dates of cheese, yogurt and sour cream ("Recalled Product"). Following this expanded recall, a number of secondary recalls were issued. RLF setup a hotline to receive customer complaints.

15. On June 10, 2024, the Debtor was notified by the United States Department of Justice, Consumer Protection Branch ("USDOJ"), that on behalf of the FDA, the USDOJ would be seeking a permanent injunction against the Debtor, my nephew, Tomas Rizo, and me preventing us

from directly or indirectly receiving, preparing, processing, packing, holding, and/or distributing any articles of food at or from the Debtor's facility, unless the Debtor and its principals established that they are in compliance with the Federal Food, Drug and Cosmetic Act ("FDCA").

16. On October 7, 2024, the Debtor, my nephew and I entered into a Consent Decree of Permanent Injunction (the "Consent Decree") with the FDA in the United States District Court, Eastern District of California. The Consent Decree was entered on October 8, 2024 (Case No. 2:24-cv-02624-DJC-JDP) [Doc 9].

17. From October 2024 through March of 2025, the Debtor worked earnestly in complying with the Consent Decree and the conditions it imposed on the Debtor for the resumption of plant operations. Those conditions included the retention of outside independent expert to develop a Pathogen Control Program. On April 9, 2025, the Debtor received correspondence from the FDA informing the Debtor that all of the FDA's conditions (except for a final inspection) to restart plant operations had been satisfied.

18. From April 14, 2025 through April 17, 2025, the FDA inspected the Debtor's building, sanitation-related systems, equipment, utensils, articles of food, and relevant records contained therein to evaluate the Debtor's with the terms of the Consent Decree, the FDCA and the Current Good Manufacturing Practice, Hazard Analysis, and Risk-Based Preventive Controls for Human Food rule set forth at 21 C.F.R. Part 117.

19. As the result of the FDA inspection, the Debtor received correspondence from the FDA dated May 1, 2025, indicating that the Debtor has complied with the Consent Decree except for a) completing an employee training program; b) paying the FDA's inspection costs; and c) answering questions regarding the cleaning and sanitation of equipment you intend to sell (there was no such equipment).

20. The Debtor resolved all of the remaining concerns of the FDA and, on May 19, 2025, received written approval to resume its plant operations, including but not limited to receiving, preparing, processing, packing, holding, and/or distributing articles of food at or from the Debtor's facility.

///

21.    In an abundance of caution, Debtor opted to fully decontaminate its production plant, which was financed by the two primary shareholders of Debtor. Debtor suspended production in its production plant until remediation could be completed and new safety protocols implemented. Approximately 90% of the Debtor's employees were furloughed. The remaining staff was used for remediation in preparation for the August 2025 reopening of the plant. Additional employees were rehired recently to support the resumption of production. When the Debtor resumed operations, it restarted on a phased basis by producing only culture products and fresco cheeses.

22.    On August 5, 2025, Debtor restarted its production facility on a limited basis, while maintaining rigorous testing and monitoring protocols required under the terms of the Consent Decree, which included the supervision of a third-party expert, in Debtor's case, The Acheson Group ("TAG"). The testing and monitoring program required frequent (currently daily) environmental and finished product testing. The objective of this program is "to seek for the pathogen and destroy it." During one of the daily environmental tests (one of 20 + tests), a sample from Zone 3, not a food contact area, was found to be positive for Listeria. This is not unusual for a dairy facility. Debtor followed the protocols in place, identified the root cause and took corrective actions: The testing and monitoring system worked. On Friday, Saturday and Sunday (August 29, 30 and 31), Debtor received confirmation from the FDA's approved testing laboratory AEMTEK that all the samples tested were negative. No further Listeria had been found in the facility. As required by the Consent Decree, all findings of the monitoring programs have been reported to the FDA. FDA has not taken any additional action against Debtor. Debtor currently employs approximately 121 people in its business.

23.    Due to the recall, Debtor wrote-off accounts receivables with customers in excess of $6.7 million dollars and finished goods inventory in excess of $4 million. Debtor believes its exposure to potential liability may exceed its applicable insurance coverage. Although several lawsuits have already been filed alleging injury or damages, it is too early for Debtor to determine the total amount of potential exposure. There is also a possibility that Debtor may be subject to governmental penalties related to the recall.

/ / /

24. Since December of 2018, my brother and I have invested more than $13,338,484 in the Debtor, either directly or through I&E McClure, to help maintain operations, remediate problems at the cheese factory and restart operations during the week of August 4, 2025.

## IV. LAWSUITS AND OTHER CLAIMS

### A. The Commercial Customer Claims

25. RLF faces potential damages in excess of $70,000,000 due to the Listeria outbreak from several of its largest customers: Sargento, Reser's, Castle, and Amy's Kitchen. Each of these customers allege a variety of claims for damages against RLF related to the recall of the Recalled Product, including lost profits.

#### a. The Sargento Lawsuit

26. Sargento filed suit against RLF on March 8, 2024, in the United States District Court for the Eastern District of Wisconsin, alleging claims of breach of contract and breach of warranties (case no. 2:24-cv-60231). Sargento purchased goods from RLF, which later had to be recalled due to the Listeria Outbreak. Sargento claims they have documented damages of nearly $2,000,000 but believes its damages will exceed $59,000,000.

27. RLF answered the complaint, discovery was exchanged, and Tomas Rizo, as RLF's corporate representative, was deposed on February 24, 2025. Fact discovery must be completed by September 8, 2025, and expert discovery complete by November 11, 2025, with dispositive expert motions to be completed by December 23, 2025.

#### b. The Reser's Lawsuit

28. Reser's Fine Foods ("Resers") filed suit in the United States District Court for the District of Oregon for four claims under Oregon law: violation of the Oregon Unlawful Trade Practices Act, negligent misrepresentation, negligence and product liability. Resers claims approximately 3,700,000) in damages broken down into two categories: (1) reimbursements for customer claims of $2,255,109 and (2) removal and disposal costs of $1,435,249.

29. RLF filed a motion to dismiss which as of the date of this declaration has been stayed due to a stipulation between the parties and global mediation. See case no. 3:24-cv-01963, *Reser's Fine Foods, Inc. v. Rizo-Lopez Foods, Inc. et al.*

c. The Castle Claim

30. Castle Importing Inc. ("Castle") is a co-defendant in the Reser's lawsuit pending in the United States District Court for the District of Oregon. Castle has cross-claimed against RLF

31. Castle claims it is owed nearly $4,700,000 in damages, consisting of $478,000 for expenses associated with recalling, disposing, and the freight/storage costs of the recalled product; $3,500,000 in costs associated with its purchase of the recalled product; $674,336 in lost profits and customer claims of $60,000.

d. The Latitude 36 Claim

32. Latitude 36 has not filed a lawsuit against RLF due to the recall, but has purchased Recalled Goods through Castle and Sargento. It seeks $646,466 in damages.

e. The Amy's Kitchen Claim

33. Amy's Kitchen has not filed a lawsuit against RLF due to the recall. Amy's Kitchen claims it is owed nearly $3,000,000 in damages, consisting of $627,801 in lost inventory, $13,586 in disposal costs, $269,021 in recall expenses (including call center, legal fees and customer fees), and $2,054,016 in business expenses (including business interruption costs, net purchasing variance, net substitution variance and claim preparation expenses).

f. The Pacific Cheese (and Customer Sysco) Claim

34. Pacific Cheese has not filed a lawsuit against RLF due to the recall. It alleges $3,776,000 in damages.

B. **Vendor and Customer Claims**

35. In addition to the recall claims referenced above, RLF owes its 261 vendors approximately $6,104,215 and its 587 customers approximately $989,527. This is in addition to $72,587,00 that may be asserted against RLF by 5,000 to 6,000 in consumer customers who may have purchased RLF cheese and cream products.

C. **Secured Claims-Wells Fargo Bank and Wells Fargo Equipment Finance**

36. Debtor owes Wells Fargo Bank ("WFB") and Wells Fargo Equipment Finance ("WFEF") approximately $10,238,196 million as follows: Six Equipment Loans with WFEF ($5,020,559); A TI loan ($2,325,253); and a Revolving Line of Credit ($2,892,383). The WFB debt

McCormick, Barstow, Sheppard, Wayte & Carruth LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

is guaranteed by I & E McClure and the TI Loan is secured by a second deed of trust against the I & E McClure real property located at 201 S. McClure, Modesto, California.[1]

### D. Equipment Leases

37. RLF also leases 10 box trucks from Transco Leasing Co., Inc. dba TEC Equipment Leasing ("TEC") it uses to distribute its products. RLF has five total leases with TEC. Nine of the trucks have monthly lease amounts of $3,050 and the other has a monthly lease amount of $3,500. Each lease charges $0.127 per mile.

## V. EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASE

38. Due to the 16-month suspension of operations, Debtor had been unable to complete its contracted milk purchases. In addition, Debtor defaulted on the debt covenant requirements on its loans through Wells Fargo Bank and Wells Fargo Equipment Finance.

39. In an effort to resolve the recall claims and the bodily injury claims, Debtor had been scheduled to participate in global mediation at JAMS in Chicago with the Honorable Sidney I. Schenkier (Ret.), the assigned neutral, on July 28-29, 2025. The purpose of the global mediation was to attempt to settle various customer, bodily injury and supply chain claims arising from the Debtor's recall of products that were potentially contaminated with Listeria. However, due to the impending bankruptcy proceeding and the less than robust participation by all of its insurers, Debtor's counsel notified all parties that the mediation would not take place and, instead, the Debtor would be filing this Case.

40. Based on the foregoing factors, Debtor elected to file this chapter 11 case to allow Debtor to reorganize its financial affairs pursuant to a plan of reorganization that will allow it to resume its nationwide chain of distribution and distribute available funds to creditors.

41. RLF retained the Stapleton Group pre-petition to assist in RLF's reorganization efforts. The Stapleton Group has prepared operating budgets and projections that show that RLF is virtually break-even during the first 3 months post-petition.

---

[1] In addition, WFB has a separate loan agreement with I & E McClure in the current amount of $532,513 that is secured by the I & E McClure real property located at 201 S. McClure in Modesto, California.

McCORMICK, BARSTOW, SHEPPARD, WAYTE & CARRUTH LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

9

42.　As of June 30, 2025, RLF had approximately $22,000,000 in assets. Approximately $4,200,000 consists of current assets, including cash, and cash equivalents, accounts receivable, prepaid general and inventories. The majority of RLF's assets consist of inventory, accounts receivable, cash and fixed assets, mostly machinery and equipment, vehicles and leasehold improvements.

43.　As of September 12, 2025, the value of cash collateral was approximately $2,912,000 and consisted of the following: Bank balances of $1,000; Accounts Receivable of $1,045,000; Inventory and Packaging Materials and Ingredients of $1,866,000.

## VI.　RLF'S OBJECTIVES FOR THE REORGANIZATION CASE

44.　RLF intends to continue operations, continue to hire employees, regain its customers' confidence and trust, address the claims against it, restructure or refinance the debt with WFB and WFEF and return to profitability.

45.　My brother and I, intend to make a debtor-in-possession loan to the Debtor in an amount not to exceed $3,760,000 order to provide it the necessary capital to ramp up production, hire employees, pay professionals during the bankruptcy process, among other items.

46.　The Debtor will also seek to use the "cash collateral" of WFB and other secured creditors during the Debtor's Case.

47.　In my opinion, Debtor will suffer immediate and irreparable harm if the relief requested in the Application is not granted since it will be unable to use cash collateral, pay employees, pay for utilities, pay for insurance and have sufficient operating funds utilizing the proposed debtor in possession financing to keep its producing and selling cheese and cheese products and maintain its customer base.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge under the laws of the United States of America.

Executed on this 16th day of September 2025, in Modesto, California.

_____
Edwin Rizo

042026-000000 11928033.1