1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**QUARLES & BRADY LLP**
Amelia Valenzuela, Esq. (CA BAR NO. 320428)
L. Katie Mason, Esq. (admitted *pro hac vice* )
Randy J. Pflum, Esq. (admitted *pro hac vice*)
Renaissance One
Two North Central Avenue
Phoenix, AZ  85004-2391
Telephone: 602-229-5635
Facsimile: 602-229-5690
Email:  amelia.valenzuela@quarles.com
Email:  katie.mason@quarles.com
Email:  randy.pflum@quarles.com
*Attorneys for Sargento Foods Inc. and*
*Sargento Cheese Inc.*

# UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

In re:

RIZO-LÓPEZ FOODS, INC.,

Debtor.

Case No. 25-25004-C-11

DC No.: QB-1

Date: February 25, 2026
Time: 11:00 a.m.
Dept.: C

Judge: Honorable Christopher M. Klein

**EXHIBITS IN SUPPORT OF MOTION OF SARGENTO FOODS INC. AND SARGENTO CHEESE INC. FOR ENTRY OF AN ORDER MODIFYING THE AUTOMATIC STAY TO  PERMIT CONTINUED LITIGATION IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF WISCONSIN AND TO RECOVER INSURANCE PROCEEDS**

Sargento Foods Inc. and Sargento Cheese Inc. (collectively, "Sargento"), hereby submit the

following exhibits in support of the *Motion of Sargento Foods Inc. and Sargento Cheese Inc. for*

*Entry of an Order Modifying the Automatic Stay to Permit Continued Litigation in the United States*

*District Court for the Eastern District of Wisconsin and to Recover Insurance Proceeds.*

///

///

///

///

1

QB\100662165.1

| EXHIBIT | TITLE | PAGES |
|---------|-------|-------|
| 1 | Complaint filed in the United States District Court for the Eastern District of Wisconsin (Case No. 2:24-cv-00308-PP) (the "District Court Case") styled *Sargento Foods Inc. et al. v. Rizo-Lopez Foods, Inc.* | 1-80 |
| 2 | Commercial General Liability Insurance Declaration pages | 81-104 |
| 3 | Proposed Order | 105-108 |

RESPECTFULLY SUBMITTED this 3rd day of February, 2026.

QUARLES & BRADY LLP

By  /s/ L. Katie Mason
        Amelia Valenzuela
        L. Katie Mason
        Randy J. Pflum

*Attorneys for Sargento Foods Inc.*
*and Sargento Cheese Inc.*

QB\100662165.1

# **<u>EXHIBIT 1</u>**

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| SARGENTO FOODS INC., SARGENTO CHEESE INC., | : |
| Plaintiffs, | : |
| v. | : Case No.: 2:24-cv-308 |
| RIZO-LOPEZ FOODS, INC., | : |
| Defendant. | : |

**COMPLAINT**

Plaintiffs Sargento Foods Inc. and its wholly-owned subsidiary, Sargento Cheese Inc. (collectively, "Sargento"), by and through their undersigned counsel, and for their Complaint against Defendant Rizo-Lopez Foods, Inc. ("RLF"), state and allege as follows:

**PRELIMINARY STATEMENT**

1.      This is a claim for Breach of Contract, Breach of Express Warranty, and Breach of Implied Warranties against RLF.

2.      Sargento purchased Aged Cotija Mexican Grating Cheese that RLF later recalled due to the risk of contamination with *Listeria monocytogenes* ("Recalled Product"), requiring Sargento to implement a recall and hold of finished goods that Sargento produced using the Recalled Product.  As a direct result of this recall, Sargento incurred, and continues to incur, damages it reasonably anticipates to exceed $42 million.

## **PARTIES**

3.      Sargento Foods Inc. and its wholly-owned subsidiary, Sargento Cheese Inc., are corporations organized under the laws of the State of Wisconsin, with their principal place of business located at 1 Persnickety Place, Plymouth, Wisconsin 53073.

4.      Upon information and belief, RLF is a corporation organized under the laws of the State of California, with its principal place of business located at 201 S. McClure Road, Modesto, California 95357.

## **JURISDICTION**

5.      Pursuant to 28 U.S.C. § 1332, Sargento is deemed to be a domiciliary of the State of Wisconsin.

6.      Pursuant to 28 U.S.C. § 1332, RLF is deemed to be a domiciliary of the State of California.

7.      As a result, and pursuant to 28 U.S.C. § 1332(a), this Court has jurisdiction over this matter because there is complete diversity between the parties and more than $75,000 is at stake, exclusive of interest, attorneys' fees, and costs.

## **VENUE**

8.      The contractual terms and conditions governing the parties' relationship, as discussed below, contain a valid forum selection clause, which states: "The sole jurisdiction and venue for any litigation arising out of these terms and conditions shall be an appropriate federal or state court located in the State of Wisconsin, and the parties agree not to raise, and waive, any objections or defenses based upon venue or forum non conveniens."

9.      As a result, and because this District encompasses the City of Plymouth, Sheboygan County, venue in this District and Division is appropriate for this action.

## GENERAL ALLEGATIONS

### *Agreements Between Sargento and RLF*

10.     At all times relevant hereto, RLF sold to Sargento certain cheese products in response to Sargento's purchase orders, including Aged Cotija Mexican Grating Cheese.  The purchase orders for the Recalled Product ("Purchase Orders") are attached hereto as **Exhibit 1**.

11.     Each of these Purchase Orders expressly incorporated certain Terms and Conditions (the "Terms and Conditions"):

> THIS PURCHASE ORDER IS EXPRESSLY LIMITED TO, AND EXPRESSLY MADE CONDITIONAL ON, SELLER'S ACCEPTANCE OF THE TERMS OF THIS PURCHASE ORDER AND THE TERMS AND CONDITIONS LOCATED AT  https://www.sargento.com/termsandconditions/  ("TERMS"), WHICH ARE FULLY INCORPORATED HEREIN BY THIS REFERENCE.  THE FURNISHING OF GOODS OR SERVICES CONTEMPLATED BY THIS PURCHASE ORDER CONSTITUTES ACCEPTANCE OF THE TERMS. BUYER REJECTS ANY DIFFERENT OR ADDITIONAL TERMS AND CONDITIONS.

*See* Ex. 1.

12.     The Terms and Conditions are attached hereto as **Exhibit 2**.

13.     By accepting, agreeing to, and performing pursuant to the Purchase Orders, RLF explicitly agreed to and is bound by the Terms and Conditions.

14.     Specifically, RLF explicitly agreed to and is bound by the following:

> 14.4 <u>Performance</u>. The Services, Goods, Vendor Items and Work Product: (i) conform in all respects to the description in the applicable Purchase Order; (ii) conform to all representations of and specifications provided by Vendor; (iii) shall be at least equal to industry recognized standards or codes or of the best quality if no quality is specified; (iv) upon delivery and full payment Company shall receive good title free and clear of all liens and encumbrances; (v) be merchantable, of good material and workmanship and fit and sufficient for the purposes intended; and (vi) be new, and free from defects in material and workmanship. Services, Goods, and Work Product used to correct nonconformity shall be similarly warranted.

Ex. 2 at § 14.4.

15.     Additionally, RLF explicitly agreed to and is bound by the following:

14.5 <u>Goods Specific</u>. All Goods (i) are in good operating order, in conformity with Vendor's specifications and descriptions, as described in any Documentation; (ii) and any components thereof are in new and unused condition; (iii) are free and clear of all liens, claims, and encumbrances of any kind whatsoever; (iv) are of good material and workmanship, free from defect, and are fit and sufficient for their intended purpose; (v) are not restricted or prohibited from being introduced, delivered, or shipped in commerce within the United States; (vi) shall pass all state and federal regulatory inspections; and (vii) are free of any pending or threatened lawsuits.

Ex. 2 at § 14.5.

16.      RLF similarly explicitly agreed to and is bound by the following:

14.7 <u>Incorporated Warranties</u>. All Services, Goods, Vendor Items, and Work Product shall be subject to all express and implied warranties, including, without limitation, warranties of title, merchantability and fitness.

Ex. 2 at § 14.7.

17.      Finally, RLF explicitly agreed to and is bound by the following:

14.9 <u>Compliance with Laws</u>. Vendor, and all Sub-vendors, comply with all applicable laws and regulations . . .

Ex. 2 at § 14.9.

18.      In addition, on or around August 15, 2016, RLF provided Sargento with a Continuing Product Guarantee (the "Continuing Guarantee"). A copy of the Continuing Guarantee is attached hereto as **Exhibit 3**.

19.      In the Continuing Guarantee, RLF represented and warranted to Sargento as follows:

<u>Guarantee</u>. The articles contained in any shipment or delivery by Supplier or its affiliates (a "Product") made to or on the order of Sargento° or its affiliates (collectively, "Sargento") are guaranteed, as of the date of each such shipment or delivery, (a) to not be adulterated or misbranded within the meaning of the Federal Food, Drug and Cosmetic Act, as amended (the "Act") or the Fair Packaging and Labeling Act, as amended (the "FPLA Act"), or any state or municipal law, ordinance or regulation which is identical with or substantially similar to the Act or the FPLA Act, (b) to not be an article which cannot be introduced into interstate commerce under the provisions of Sections 404 and 505 or other provisions of the Act, and (c) to otherwise comply with all federal, state and local laws.

4

Ex. 3.

20.    The Terms and Conditions also included the following indemnity provisions, to which RLF explicitly agreed:

17.1 <u>Indemnity</u>. Vendor shall indemnify, defend, and hold harmless Company and its Affiliates, subsidiaries, shareholders, members, directors, officers, employees, agents, parents, and other vendors, from and against Claims arising from or related to: (i) the Services, Goods, Vendor Items, or Work Product; (ii) Vendor" failure to meet the representations and warranties set forth herein; (iii) Vendor's breach of any terms or conditions; (iv) violation of any patent, trade secret, or other intellectual property or proprietary right due to Vendor's provision of the Services, Goods, Vendor Items, or Work Product; or (iv) bodily injury, death, personal injury, property damage and loss of use, resulting from the acts or omissions of Vendor, Vendor's Personnel, or any person for whom Vendor is legally liable.

Ex. 2 at §§ 16, 17.1.

### *The Recalled Product*

21.    On or around January 24, 2024, RLF notified Sargento that it was recalling a batch of "Aged Cotija Mexican Grating Cheese" (the "Recall") that it sold to Sargento. A copy of RLF's recall notice (the "Recall Letter") is attached hereto as **Exhibit 4**.

22.    The Recall Letter stated that RLF instituted the Recall based on the following:

We were notified by the State of Hawaii Department of Health on Wednesday, January 10, 2024, that a single 8 oz. package tested positive for *Listeria monocytogenes as part of their routine sampling program*. We immediately identified distributors who received the product in question and sent notification directing them to remove the recalled product from distribution and return or destroy any remaining product. We also directed them to notify their customers who had received the product and do the same.

*See* Ex. 4.

23.    *Listeria monocytogenes* ("*L. monocytogenes*") is an organism that can cause serious and sometimes fatal infections in young children, the frail, or elderly people, as well as others with weakened immune systems.

24.     The presence of *L. monocytogenes* in a food product renders it adulterated as a matter of law under the Federal Food, Drug & Cosmetic Act and, as such, the product cannot be legally introduced into interstate commerce or sold.

25.     In its specification sheets, and pursuant to Paragraph 14.4 of the Terms and Conditions, RLF warranted to Sargento that the Recalled Product would be tested and not shipped to Sargento unless it tested negative for *Listeria monocytogenes*:

| Microbiological Standards | |
|---|---|
| Yeast: | < 10 CFU/g |
| Mold: | < 10 CFU/g |
| Coliforms: | < 10 CFU/g |
| *E. coli:* | < 10 CFU/g |
| *Staphylococcus:* | < 10 CFU/g |
| *Salmonella:* | Negative/375g |
| *L. monocytogenes:* | Negative/125g |

A copy of RLF's specification sheet is attached hereto as **Exhibit 5**.

26.     On February 5, 2024, RLF announced that it was implementing an even broader recall of its dairy products based on information from the Federal Food & Drug Administration and the Centers of Disease Control and Prevention. A copy of RLF's Announcement is attached hereto as **Exhibit 6**.

27.     RLF's Announcement stated the following:

Based on information shared by the CDC and FDA, RLF may be a potential source of illness in an ongoing nationwide *Listeria monocytogenes* outbreak.

*See* Ex. 6 at 2.

28.     Before RLF's Recall, Sargento used the Recalled Product to produce a variety of its own cheese products (the "Finished Goods"), some of which it sold to its customers.

29.     As a direct result of RLF's Recall, Sargento was required under the Food, Drug & Cosmetic Act to implement a recall of 10,498 cases of Finished Goods it had already shipped to

customers. Additionally, Sargento was forced to put on hold 8,177 cases of Finished Goods and 54,275 pounds of bulk goods on hand.

30.     As a direct result of RLF's Recall, Sargento's Finished Goods and held bulk goods were permanently and irreversibly damaged, and Sargento was deprived of the use of its Finished Goods and the materials it used to manufacture its Finished Goods other than RLF Recalled Product.

31.     RLF's Recall also caused Sargento to incur damages and losses related to the necessary recall of Sargento's own Finished Goods, including, but not limited to, communications, shipping, storage and destruction of Finished Goods, customer credits and charges, lost profits, business interruption, damage to business reputation, and attorneys' fees.

32.     In addition, Sargento has received claims from its customers for costs, expenses and damages caused by the recall of Sargento's own products.

33.     While Sargento cannot yet fully determine the amount of damages it has suffered as a result of RLF's Recall, Sargento has documented at least $1,914,455.85 in damages to date.

34.     Upon information and belief, Sargento estimates that its damages caused by RLF's Recall will exceed $42 million.

### *Sargento's Demand for Indemnity and RLF's Refusal*

35.     Pursuant to the Terms and Conditions, on February 15, 2024, counsel for Sargento sent correspondence to RLF demanding that RLF indemnify Sargento for its losses caused by the Recalled Product, as required by the Terms and Conditions.  A copy of Sargento's February 15, 2024, correspondence is attached hereto as **Exhibit 7**.[1]

---

[1] To avoid confusion, Sargento has omitted filing the exhibits attached to this correspondence.

7

36.      To date, RLF has refused to reimburse Sargento for its costs and expenses directly caused by RLF's Recalled Product, as required by the Terms and Conditions, or to acknowledge that contractual obligation.

37.      Sargento continues to bear the cost of its damages related to the Recalled Product, which continue to accrue.

### COUNT I
### BREACH OF CONTRACT – RECALLED PRODUCT

38.      Sargento re-pleads and re-alleges its allegations contained in Paragraphs 1-37 as if separately set forth herein.

39.      The Purchase Orders, Terms and Conditions, and Continuing Guarantee constituted one or more valid contracts between Sargento and RLF.

40.      Sargento fully complied with its contractual obligations to RLF.

41.      Under the parties' contractual agreements, RLF agreed to supply Sargento with products that complied with RLF's representations and warranties and with applicable laws, which required that the products would be safe and fit for human consumption and free from *Listeria monocytogenes*.

42.      RLF's obligation to supply Sargento with products that complied with RLF's representations and warranties and with applicable laws, which required that the products would be safe and fit for human consumption and free from *Listeria monocytogenes*, formed a material part of the parties' bargain and contract.

43.      RLF materially breached its contractual obligations to supply Sargento with products compliant with RLF's representations and warranties and with applicable laws, which required that the products would be safe and fit for human consumption and free from *Listeria monocytogenes*.

8

44.     As a result of RLF's breach of contract, Sargento has incurred and continues to incur direct and consequential damages.

## COUNT II
## <u>BREACH OF CONTRACT – FAILURE TO INDEMNIFY</u>

45.     Sargento re-pleads and re-alleges its allegations contained in Paragraphs 1-44 as if separately set forth herein.

46.     The Purchase Orders, Terms and Conditions, and Continuing Guarantee constituted one or more valid contracts between Sargento and RLF.

47.     Sargento fully complied with its contractual obligations to RLF.

48.     Under the parties' contractual agreement, RLF explicitly agreed to indemnify Sargento in connection with RLF's failure to supply Sargento with products compliant with RLF's representations and warranties and with applicable laws, which required that the products would be safe and fit for human consumption and free from *Listeria monocytogenes*.

49.     RLF's obligation to indemnify Sargento formed a material part of the parties' bargain and contract.

50.     RLF's failure to indemnify Sargento constitutes a material past and continuing breach of the parties' bargain and contract.

51.     As a result of RLF's breach of contract, Sargento has incurred and continues to incur direct and consequential damages.

## COUNT III
## <u>BREACH OF EXPRESS WARRANTY</u>

52.     Sargento re-pleads and re-alleges its allegations contained in Paragraphs 1-51 as if separately set forth herein.

53.　　RLF expressly warranted in the Terms and Conditions that the products it supplied to Sargento would be "at least equal to industry-recognized standards or codes or of the best quality." Additionally, RLF expressly warranted that the products it supplied to Sargento would be "free from defect, and is fit and sufficient for its intended purpose . . . not restricted or prohibited from being introduced, delivered, or shipped in commerce within the United States . . . [and] shall pass all state and federal regulatory inspections."

54.　　Additionally, RLF expressly warranted in the Continuing Guarantee that the products it supplied to Sargento would "not be adulterated or misbranded within the meaning of the Federal Food, Drug and Cosmetic Act . . . or any state or municipal law, ordinance or regulation," and that the products would "otherwise comply with all federal, state and local laws."

55.　　Sargento relied on these express warranties as a basis for purchasing the Recalled Product from RLF and using them in the production of Sargento's Finished Goods.

56.　　RLF breached these express warranties by supplying the Recalled Product, which was not safe and fit for human consumption, was not fit and sufficient for its intended purpose, did not comply with all applicable laws, and cannot be introduced, delivered, or shipped interstate commerce.

57.　　Sargento gave timely notice to RLF of the breach of warranties.

58.　　As a direct result of RLF's breach of express warranties, Sargento has incurred and continues to incur direct and consequential damages.

### COUNT IV
### <u>BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE</u>

59.　　Sargento re-pleads and re-alleges its allegations contained in Paragraphs 1-58 as if separately set forth herein.

10

60.     The Purchase Orders, Terms and Conditions, and Continuing Guarantee constituted one or more valid contracts between Sargento and RLF.

61.     As a result, and at all relevant times, contractual privity existed between RLF and Sargento.

62.     Sargento fully complied with its contractual obligations to RLF.

63.     At all relevant times, RLF knew that Sargento's intent and particular purpose for the Recalled Product was to use it as an ingredient in Sargento's own Finished Goods.

64.     At all relevant times, RLF knew that Sargento was relying on RLF's skill or judgment to select or furnish suitable products to be used as ingredients in Sargento's own Finished Goods.

65.     The Recalled Product RLF supplied, and Sargento used in the manufacture of its Finished Goods, was not fit for its particular purpose since it was not fit for human consumption, was not suitable for use in food products, and was not safe and merchantable for the particular purpose RLF knew was Sargento's intended use.

66.     RLF breached its implied warranty of fitness for a particular purpose by supplying Sargento with the Recalled Product, which was not fit for human consumption, was not suitable for use in food products, and was not safe and merchantable for the particular purpose RLF knew was Sargento's intended use.

67.     Sargento gave timely notice to RLF of its breach of implied warranty of fitness for a particular purpose.

68.     As a direct result of RLF's breach of implied warranty of fitness for a particular purpose, Sargento has incurred and continues to incur direct and consequential damages.

## COUNT V
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

69.     Sargento re-pleads and re-alleges its allegations contained in Paragraphs 1-68 as if separately set forth herein.

70.     The Purchase Orders, Terms and Conditions, and Continuing Guarantee constituted one or more valid contracts between Sargento and RLF.

71.     As a result, and at all relevant times, contractual privity existed between RLF and Sargento.

72.     Sargento fully complied with its contractual obligations to RLF.

73.     The Recalled Product supplied by RLF and used in the manufacture of Sargento's Finished Goods was neither merchantable nor fit for its ordinary purpose since it was not fit for human consumption and was not safe and suitable for use in food products.

74.     RLF breached its implied warranty of merchantability by supplying Sargento with Recalled Product that was not fit for human consumption, was not safe and suitable for use in food products, and was recalled and therefore not merchantable per se.

75.     Sargento gave timely notice to RLF of its breach of implied warranty of merchantability.

76.     As a direct result of RLF's breach of implied warranty of merchantability, Sargento has incurred and continues to incur direct and consequential damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Sargento Cheese Inc. and Sargento Foods Inc. prays for judgment against Defendant Rizo-Lopez Foods, Inc. as follows:

12

1.      This Court enters judgment against RLF and in favor of Sargento, finding that RLF breached the parties' contract agreements and ordering RLF to indemnify Sargento for its damages resulting from the Recalled Product;

2.      This Court enters judgment against RLF and in favor of Sargento finding that RLF breached the parties' contract agreements and awarding Sargento all direct and consequential damages to which it is currently and may in the future be entitled;

3.      Sargento be awarded all attorneys' fees and costs incurred herein to which it is entitled; and

4.      Sargento be awarded all such just and further relief as this Court may deem necessary and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Sargento Cheese Inc. and Sargento Foods Inc. request a trial by jury of any and all issues for which a trial by jury is available under applicable law.

13

DATED:     March 8, 2024
           Minneapolis, Minnesota

                         **FAEGRE DRINKER BIDDLE & REATH LLP**

By:      */s/ Sarah L. Brew*
         Sarah L. Brew, Esq.
         WI State Bar No. 1062661
         2200 Wells Fargo Center
         90 S. Seventh Street
         Minneapolis, Minnesota 55402
         Telephone: (612) 766-7000
         Facsimile: (612) 766-1600
         sarah.brew@faegredrinker.com

         Benjamin P. Abel, Esq.
         (pro hac vice to be sought)
         1500 K Street, N.W.
         Suite 1100
         Washington, District of Columbia 20005
         Telephone: (202) 842-8800
         Facsimile: (202) 842-8465
         benjamin.abel@faegredrinker.com

         *Attorneys for Plaintiffs Sargento Foods Inc. &*
         *Sargento Cheese Inc.*

14

# EXHIBIT 1

02/07/2024 4:20:00 PM

Sargento Cheese Inc.
One Persnickety Place
Plymouth, WI 53073
TEL: 920-893-8484



| CHANGED |
| --- |
| PURCHASE ORDER NO. |
| **4500386694** |

THE PURCHASE ORDER NUMBER MUST APPEAR ON ALL SHIPMENTS, INVOICES, ADVANCE SHIPPING NOTIFICATIONS, PACKING SLIPS, BILL OF LADING AND OTHER CORRESPONDENCES

| VENDOR NO. | DATE ORDERED | DELIVERY TERMS | PAYMENT TERMS |
| --- | --- | --- | --- |
| 303152 | 09/05/2023 | Free on board SARGENTO WI | Payment in 30 day 0.000 % |

| VENDOR ADDRESS | LOCATION OF GOODS | BUYER INFORMATION |
| --- | --- | --- |
| RIZO LOPEZ FOODS INC | RIZO LOPEZ FOODS INC | Sargento Cheese Inc. |
| 201 S MCCLURE RD | 201 S MCCLURE RD | Andy Feldmann |
| EMPIRE, CA 95319 | EMPIRE, CA 95319 | TEL: 920-892-3684 |
| TEL: 209-232-3700 | TEL: 209-232-3700 | Email: andy.feldmann@sargento.com |

| BILL TO | SHIP TO | SOLD TO |
| --- | --- | --- |
| Sargento Cheese Inc. | Kiel Production | Sargento Cheese Inc. |
| ATTN: ACCOUNTS PAYABLE | 1 Persnickety Place | One Persnickety Place |
| Invoice must be in PDF format, list PO # and send to vendorinvoices@sargento.com | Kiel , WI 53042 | Plymouth, WI 53073 |
| | | TEL: 920-893-8484 |

Any questions regarding payment, please contact accountspayable@sargento.com

PO CONFIRMATIONS: email to cheese.confirmations@sargento.com [PO# must be in subject line]
 COA REQUIRED WITH DELIVERY: Email to coas@sargento.com
 [PO# must be in subject line]

THIS PURCHASE ORDER IS EXPRESSLY LIMITED TO, AND EXPRESSLY MADE CONDITIONAL ON, SELLER'S ACCEPTANCE OF THE TERMS OF THIS PURCHASE ORDER AND THE TERMS AND CONDITIONS LOCATED AT http://www.sargento.com/termsandconditions/ ("TERMS"), WHICH ARE FULLY INCORPORATED HEREIN BY THIS REFERENCE. THE FURNISHING OF GOODS OR SERVICES CONTEMPLATED BY THIS PURCHASE ORDER CONSTITUTES ACCEPTANCE OF THE TERMS. BUYER REJECTS ANY DIFFERENT OR ADDITIONAL TERMS AND CONDITIONS.

| ITEM/ MATERIAL | DESCRIPTION | ORDER QTY/UNIT | TAX | TOTAL PRICE | DELIVERY DATE |
| --- | --- | --- | --- | --- | --- |
| 00010 5503670 | COTIJA COARSE GRTD 5LB | 40,000.000 LBS | I0 | 115,600.00 USD 289.00 USD/100 LBS | 10/16/2023 |
| | | | | | ~~10/13/2023~~ |

SARGENTO TO PICKUP FOUR DAYS PRIOR TO DELIVERY DATE

| DELIVERY LINE | | SCH. QUANTITY/UNIT | | | DELIVERY DATE |
| --- | --- | --- | --- | --- | --- |
| 0001 | | 40,000.000 LBS | | | 10/16/2023 |
| TOTAL VALUE OF ITEMS ON P.O.  USD | | | | 115600.00 | |

# EXHIBIT 2

# TERMS AND CONDITIONS

*****

THESE TERMS AND CONDITIONS SET FORTH THE TERMS UNDER WHICH YOU ("VENDOR") WILL PROVIDE SERVICES AND/OR GOODS TO SARGENTO CHEESE INC. AND/OR ITS AFFILIATES (TOGETHER "COMPANY"). IF THE COMPANY AND VENDOR HAVE EXECUTED A MASTER SUPPLY AND SERVICES ("MSSA") AGREEMENT, SUCH AGREEMENT SHALL CONTROL AND THESE TERMS AND CONDITIONS SHALL HAVE NO EFFECT. A MSSA MAY BE REQURESTED THROUGH YOUR COMPANY CONTACT. IN ALL OTHER CIRCUMSTANCES, VENDOR'S ACCEPTANCE OF THE PURCHASE ORDER IS SUBJECT TO THE TERMS AND CONDITIONS SPECIFIED HEREIN, WHICH ARE INCORPORATED HEREIN BY REFERENCE.

BY ACCEPTING AND/OR PERFORMING PURSUANT TO A PURCHASE ORDER, VENDOR AGREES THAT THESE TERMS AND CONDITIONS REPRESENT THE ENTIRE AGREEMENT BETWEEN THE PARTIES REGARDING THE GOODS AND SERVICES. COMPANY AND ITS SUBSIDIARIES AND AFFILIATES REJECT ANY ADDITIONAL OR DIFFERENT TERMS PROPOSED BY VENDOR, INCLUDING ANY ATTEMPT BY SELLER TO LIMIT OR CONDITION ITS LIABILITY. IN THE EVENT OF A CONFLICT BETWEEN, OR LIMITATION ARISING UNDER, ANY OF THE TERMS OF THIS PURCHASE ORDER AND THE TERMS OF ANY OF VENDOR'S DOCUMENTS, THE TERMS OF THIS PURCHASE ORDER SHALL PREVAIL.

*****

**1. SERVICES AND GOODS.** Vendor agrees to provide work and support to Company ("*Services*") and agrees to sell to Company certain merchandise, products, materials, and Equipment (collectively "*Goods*") as specified in one or more Purchase Orders (hereafter "*Purchase Order*" or "*PO*"). Company is not obligated to purchase any minimum amount of Services or Goods, and Company is free to purchase products and services similar to or the same as the Services, Goods, Work Product, and Vendor Items from other vendors.

**2. TERMINATION.**

2.1 Termination. Company may terminate any Purchase Order for any reason, effective upon written notice to Vendor without any financial implications to Company. Vendor may terminate a Purchase Order if (i) Company is in material breach of these terms and conditions and the breach is not cured within thirty (30) days after notification by Vendor of the breach; or (ii) Company is adjudged insolvent or bankrupt, or upon the institution of any proceedings by it seeking relief, reorganization or arrangement under any similar laws provided the condition is not remedied within sixty (60) days after filing.

2.2 <u>Effects of Termination</u>.

(a) <u>*Survival*</u>. The Sections of these terms and conditions that may reasonably be interpreted or construed as surviving expiration or termination of a Purchase Order (including but not limited to Effects of Termination; Payment Terms; Delivery; Performance; Acceptance; and Audits; Confidentiality; Work Product; Representation and Warranties; Insurance; Indemnification; and Miscellaneous) shall survive.

(b) <u>*No Effect*</u>. The expiration or the termination of a Purchase Order does not affect any licenses, assignments granted, or ownership rights regarding Services, Goods, Vendor Items, or Work Product.

(c) <u>*No Additional Fees*</u>. Upon termination, Vendor shall immediately discontinue all work and not incur any further fees or expenses without Company's prior written approval. If Company has paid in advance for any Services, Goods, or Work Product that have not been completed to Company's satisfaction as of the date of termination, Vendor shall reimburse Company all amounts paid in advance, less any amounts that have undisputedly been earned up to the date of termination, within ten (10) days of termination.

(d) <u>*Transition*</u>. Following termination, Vendor shall provide commercially reasonable effort to ensure an orderly and efficient transition. If applicable, Vendor shall provide Company with all data related to the Services and Goods within sixty (60) days and permit Company to access and retrieve such data. Company shall not be charged any costs or fees associated with the transition.

## 3. **PAYMENT TERMS**.

3.1 <u>Payments</u>. The price of Services and Goods shall be as set forth in the applicable Purchase Order. Unless otherwise set forth in the applicable PO, Vendor shall only invoice for completed Services and delivered Goods accepted by the Company, and Company shall pay all undisputed and complete invoices within ninety (90) days of receipt. Company shall not pay finance charges or other related fees or costs. Vendor shall be solely responsible for all payments due to Sub-vendors.

3.2 <u>Invoicing</u>. All invoices must include: (i) name of Vendor and "Remit to" address; (ii) Company's Purchase Order number; (iii) invoice number; (iv) invoice date; (v) description of the Services and Goods (including, if applicable, Company's part number); (vi) total invoice amount with taxes, freight, and miscellaneous/travel charges (if applicable) listed separately from labor charges; and (vii) payment terms consistent with and not additional to any provisions under these terms and conditions. All invoices shall be submitted in accordance with Company's invoicing process. Company reserves the right to reject any invoice that does not meet the above requirements and may elect to return the invoice unpaid or pay only the undisputed portion of any invoice reasonably disputed.

3.3 <u>Taxes</u>. Company shall be responsible for any applicable sales, use, value added or other similar taxes for the Services and Goods that are itemized on the applicable invoice. Vendor is liable for any income or related taxes for payments received from Company.

3.4 <u>Expenses</u>. Company agrees to reimburse for reasonable travel expenses if: (i) Vendor Personnel submit valid receipts and other appropriate documentation substantiating the expenses, including an itemized expense statement contained with Vendor's invoice; and (ii) all travel expenses are incurred in conformance with Company's then-current travel reimbursement policy.

3.5 <u>Programs</u>. Company reserves the right to make payments through Company's procurement card program, EFT, ACH, or other electronic commerce program. Vendor may not charge Company for the use of such forms of payment without Company's prior written consent.

## 4. **ORDER PROCEDURE FOR GOODS**.

4.1 <u>Non-Binding Forecasts</u>. Company may provide Vendor with a good faith projection or estimate of Company's requirements for Goods during a specified period (a "***Forecast***"). All Forecasts are approximations provided for information purposes only. Any product quantities cited in a forecast or other document, except for quantities cited in a Purchase Order as firm, are preliminary and non-binding only. Company makes no representation or warranty as to the quantity of products that it will purchase, if any.

4.2 <u>Issuance and Confirmation</u>. Company shall issue a Purchase Order to Vendor by facsimile, e-mail, EDI, or U.S. Mail. Vendor shall confirm the receipt of each Purchase Order within three (3) business days following Vendor's receipt (a "***Confirmation***"). Each Confirmation shall reference Company's Purchase Order number, confirm acceptance of the Purchase Order or advise Company of Vendor's rejection of such Purchase Order. Company may withdraw any Purchase Order prior to Vendor's Confirmation. If Vendor fails to issue a Confirmation, Vendor's start of performance will be deemed an acceptance of the Purchase Order.

4.3 <u>Right to Amend</u>. Company may, following notice to Vendor, request changes to a Purchase Order. Within three (3) business days of such request, Vendor shall submit a good faith description of such changes to the original Purchase Order. Company may then submit an amended Purchase Order reflecting all Company-accepted changes.

**5. <u>DELIVERY OF GOODS</u>**. Vendor shall obtain Company's written consent prior to arranging for shipment of Goods. Unless otherwise agreed upon, delivery terms shall be FOB Destination Location (UCC). For the avoidance of doubt, risk of loss shall not transfer to Company until delivery of the Goods at the location of delivery specified in the PO ("***Destination Location***"). Notwithstanding the foregoing, in the event the Goods are lost,

stolen, damaged, destroyed, or is otherwise made unavailable prior to Company's receipt, Vendor, at no additional expense to Company, shall utilize its best efforts to replace the Goods as soon as possible with comparable goods mutually agreed upon by the parties.

6. **SERVICES PERFORMANCE REQUIREMENTS**.

6.1 Resources. Vendor shall commit the necessary time with qualified and skilled resources and provide all necessary equipment to complete the Services and meet any milestones, specifications and timelines agreed upon by the Parties. Vendor shall ensure all worksites are maintained in a professional manner and waste and excess materials are removed at the conclusion of the Services.

6.2 Permits and Licenses. Unless otherwise agreed upon, Vendor shall obtain and maintain all appropriate permits and licenses required to perform the Services. Vendor shall also ensure that all companies and individuals separate from the Vendor that perform Services under contract to Vendor or under the direction of Vendor (hereafter "***Sub-vendors***") have obtained and maintained all appropriate permits and licenses.

6.3 Access to Company Facilities. If Company grants access to any of its facilities, Vendor shall ensure its agents, employees, and Sub-vendors (collectively "***Vendor Personnel***"), comply with all applicable safety, health and environmental requirements, and with any applicable access and work requirements, whether by law or under Company's own requirements. Without limiting the foregoing, Vendor expressly acknowledges it shall comply at all times with all Food and Drug Administration Good Manufacturing Practices (commonly known as GMPs) applicable to food manufacturing and production. Company may condition access on Vendor Personnel executing a satisfactory confidentiality agreement.

7. **CHANGE ORDERS**. No changes in the scope of the Services, Goods, or Purchase Orders shall be made except upon written order of Company. Vendor waives any change order request for adjustment to the price, performance schedule, or both unless asserted in writing. If Company desires to make any changes to any executed Purchase Order prior to shipment, Vendor shall promptly deliver to Company a proposal describing the effect of such changes on the cost, delivery, and scope of Vendor's duties and obligations under these terms and conditions. If Company accepts Vendor's proposal and elects to implement the changes, then the applicable Purchase Order shall be amended by mutually agreed upon writing, and the parties shall perform thereunder.

8. **ACCEPTANCE**.

8.1 Services. If, within ninety (90) days of the completion of Services or assignment of any Work Product Company notifies Vendor that the Services or Work Product is not satisfactory to Company, Vendor shall correct any deficiencies and redeliver corrected Services or Work Product at no additional cost to Company. If the corrected Services or Work Product are not satisfactory to Company or Vendor is unable to correct the Services or Work Product, Company may terminate the applicable Purchase Order and obtain a full refund, in which

case Company is relieved of any further duties thereunder. Any refund shall be made to Sargento within fifteen (15) business days. Nothing in this Section shall limit Company's recourse against Vendor for Services or Work Product that are later discovered to be inferior or insufficient.

8.2 <u>Goods</u>. If Company determines that the delivered Goods (i) do not conform to the make, model, or description listed in the Purchase Order; (ii) do not fully conform to the specifications or representations made by Vendor or Vendor provided documents/communications; or (iii) on visual inspection, Company determines are otherwise defective, Company may, at its option, (x) reject the nonconforming Goods and demand a refund plus any costs reasonably incurred by Company; and/or (y) require prompt correction or replacement of the nonconforming goods at Vendor's sole cost. Company's exercise of the options contained in this Section shall not limit Company's other rights available under these terms and conditions or pursuant to applicable law.

## 9. RECORDS AND AUDITS.

9.1 <u>Financial Records</u>. Vendor agrees to maintain complete and accurate financial records and internal and external audit reports related to a Purchase Order for three (3) years and for any additional time required by law ("***Retention Period***"). Records shall include the following information, as applicable: (i) the individuals who provided the Services, (ii) a description of the Services performed by each individual, (iii) the time spent by each individual in connection therewith, (iv) the date on which the Services were performed or Goods were delivered, and (v) the location where the Services were performed or Goods were produced. Company or its designee may, during the Retention Period, audit and inspect Vendor's records and other documents related to these terms and conditions, as well as Vendor's facilities used in rendering the Services or producing Goods. The audit and inspection shall be conducted during normal business hours following reasonable notice, and at no cost to the Company. Vendor agrees to reasonably cooperate in any audit or inspection and shall pay Company the amount of any overcharge identified in the audit. Company shall be entitled to rely without independent verification on the accuracy, currency and completeness of information supplied by Vendor.

9.2 <u>Documentation</u>. Vendor shall timely provide Company with any technical and user manuals and guides, promotional materials, advertising materials, informational materials, responses to requests for proposals, handouts, circulars, memoranda, demonstrations, and demonstration tapes with respect to the Goods or Services (hereafter the "***Documentation***") reasonably requested by Company.

## 10. VENDOR PERSONNEL AND SUB-VENDORS.

10.1 <u>Sub-vendors</u>. All Services, Goods, and Work Product are to be provided by employees of Vendor unless approved in advance in writing by Company. Vendor shall indemnify, defend and hold Company harmless from any and all costs and liabilities arising from the use of

Sub-vendors. Services and Goods provided by Sub-vendors shall comply with the conditions set forth herein.

10.2 <u>Satisfaction and Performance</u>. Vendor shall be responsible to the Company for the acts and omissions of Vendor Personnel. All Vendor Personnel shall have the proper skill, training, and background to provide the Services. If Company becomes dissatisfied with the performance of any Vendor Personnel, Company may notify Vendor of the details of the unsatisfactory performance, and Vendor shall remedy the problem to Company's satisfaction, including replacement of Vendor Personnel, within three (3) business days of notice. Company is not responsible for any fees or expenses arising from any change in Vendor Personnel, including any "ramp up" and "knowledge transfer" time required for replacement personnel. Company may, for any reason, demand that any Vendor Personnel cease providing Services. Vendor shall take all steps necessary to ensure the individual ceases providing Services within 24 hours and prevent the individual from re-entering the Company's premises.

## 11. <u>SYSTEM ACCESS AND SECURITY REQUIREMENTS</u>.

11.1 <u>Acceptable Use Policy</u>. Vendor shall follow Company's Acceptable Use Policy related to Company's information services environment. Company may audit Vendor's use of any Systems Vendor shall maintain and implement disaster recovery and avoidance procedures and, upon request, shall provide Company with a copy of its current disaster plan.

11.2 <u>Vendor Personnel Compliance</u>. Vendor shall be responsible for Vendor Personnel's compliance with Company's procedures, rules, and instructions while onsite. Vendor shall defend, indemnify and hold harmless Company from and against any and all claims, damages, liabilities, losses, costs and expenses (including reasonable attorneys' fees) (collectively, "***Claims***") arising or relating to (i) injuries to persons or damage to property to the extent caused by violations of Law, the willful misconduct or negligence of Vendor's Personnel; or (ii) Vendor's Personnel based on Worker's Compensation or any other employment related claims.

11.3 <u>Data Processing</u>.

(a) <u>General Requirements</u>. As a result of providing Services, Vendor may have access to certain information relating to identified or identifiable individuals ("***Personal Data***") and data maintained by the Company related to its business including but not limited to data related to finances, employees, customer, and suppliers ("***Company Data***"). Vendor shall not be entitled to use Personal Data for its own purposes and may only process Personal Data on behalf of Company and its designated Affiliates (defined below), for purposes of providing the Services. Vendor acknowledges that it shall have no right, title or interest in any Personal Data and further acknowledges and agrees that Company owns all rights, title and interest to and in all such Personal Data. "***Affiliate***" with respect to either party, means any other entity directly or indirectly controlling, controlled by or under common control with

such party, where "control" means, with respect to an entity, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such entity, whether through the ownership of voting securities (or other ownership interest), by contract or otherwise.

(b) Vendor Duties. Vendor agrees to the following specified duties concerning Personal Data and Company Data:

(1) process the Personal Data and Company Data only on the written instructions of Company;

(2) implement appropriate technical and organizational measures to protect Personal Data and Company Data against accidental or unlawful destruction or accidental loss, alteration, unauthorized disclosure or access in particular where the processing involves the transmission of data over a network, and against all other unlawful forms of processing;

(3) not permit the transmission or storage of Personal Data or Company Data outside the United States or access of such data by its employees outside the United States;

(4) ensure that Personal Data and Company Data is encrypted at all times, including at rest, and appropriately protected in transit and storage;

(5) not disclose the Personal Data or Company Data to any person unless Company has given its prior written consent to such disclosure and Vendor has procured that such person is bound by the same obligations as the Vendor hereunder;

(6) promptly notify within twenty-four (24) hours of Company of any facts known to the Vendor concerning any accidental or unauthorized disclosure or use, or accidental or unauthorized loss, damage or destruction of Personal Data or Company Data by any current or former employee, Vendor or agent of the Vendor or by any other person or third party;

(7) cooperate fully with Company if any accidental or unauthorized disclosure or use, or accidental or unauthorized loss, damage or destruction of Personal Data or Company Data by any current or former employee, Vendor or agent of Vendor or by any other person or third party, to limit the unauthorized disclosure or use, seek the return of any Personal Data, and assist in providing notice if requested by Company; and

(8) upon termination or expiration of the Services for whatever reason, or upon request by Company, Vendor shall immediately cease to process the Personal Data or Company Data and shall promptly return or destroy the same, in accordance with such instructions as may be given by Company at that time.

11.4 Unauthorized Access. Vendor uses measures consistent with accepted industry standards and all applicable laws, to ensure the security and integrity of all Company Data. In the event of a breach, Vendor will immediately notify Company of any unauthorized access of

any computerized data that compromises the security, confidentiality or integrity of Company Data (including any personally identifiable information stored or processed on behalf of Company) and any event that requires Vendor or Company to take any actions (including providing notices) under any laws.

## 12. <u>CONFIDENTIALITY</u>.

12.1 <u>Confidential Information</u>. In the performance under these terms and conditions each party may have access to private or confidential information, data or materials of the other party, including, but not limited to, trade secrets, marketing and business plans, technical information, and Personal Data of a party's employees. Disclosures made by one party ("***Discloser***") to the party receiving the private or confidential information, data or materials of the Discloser ("***Recipient***"), are pursuant to these terms and conditions. No information disclosed by Company shall be disclosed except as specifically noted herein. All Confidential Information of the Discloser will remain the exclusive property of the Discloser.

12.2 <u>Exclusions</u>. Except for Personal Data, Confidential Information does not include information, data or materials that, as proved by written records: (i) are or become a part of the public domain through no act or omission on the part of the Recipient and no violation of any obligation of nondisclosure by any third party; or (ii) are independently developed by the Recipient without reference to the Discloser's Confidential Information, as evidenced through written records created in the normal course of the Recipient's business; or (iii) are disclosed to the Recipient through a thirdparty source or series of sources without any violation of nondisclosure regarding such information, data or materials by any source(s) in the series (however, such information only becomes Confidential Information once the Recipient is aware of such breach).

12.3 <u>Duties and Nondisclosure</u>. Each party must use commercially reasonable methods, at least as substantial as the methods it uses to protect its own confidential information, data and materials of a similar nature, to maintain and cause its employees to maintain the confidentiality of the Confidential Information by not copying, publishing, disclosing to third parties (including, without limitation, Affiliates) or using the Confidential Information; except employees of a Recipient may use the Confidential Information to perform the Recipient's obligations under these terms and conditions. The disclosure of Confidential Information alone does not convey any right, title and interest to intellectual and industrial property rights recognized in any jurisdiction, including patents, trade and service marks, trade names, domain names, rights in designs, copyrights, mask work rights, trade secrets, moral rights, topography rights and rights in databases, in all cases whether or not registered or able to be registered in any particular jurisdiction in the world for the full term of such rights (including any extension or renewal of the terms of such rights, registrations and applications for registration of any of such rights, rights to apply for such rights and all rights and forms of protection of a similar nature or having equivalent or similar effect to any of such rights anywhere in the world) ("collectively ***Intellectual Property Rights***"). A Recipient may not

modify or delete any Intellectual Property Rights or proprietary rights legend appearing in the Discloser's Confidential Information. Without limiting the foregoing, the parties agree to the following specified duties:

(a) _Advise Employees_. The Recipient must advise each employee before receiving direct or indirect access to the Confidential Information of the obligations of the Recipient regarding the Confidential Information.

(b) <u>Disclosures to Agents and Sub-vendors</u>. A Recipient may share Confidential Information with: (a) its attorneys, accountants and financial advisors under an obligation of confidentiality and nondisclosure no less protective of Discloser's Confidential Information than these terms and conditions; and (b) its Sub-vendors pursuant to a written confidentiality agreement no less protective of the Discloser's Confidential Information than these requirments (a "**_Sub-vendor Confidentiality Agreement_**"), provided that in no event may an agent or Sub-vendor of a Recipient disclose Confidential Information to any other third party, with the exception of a governmental authority or court, tribunal, agency, department, commission, arbitrator, board, bureau, or instrumentality of the United States of America or any other country or territory, or domestic or foreign state agency or authority (collectively "**_Government Authority_**"). Vendor agrees to assume all liability and responsibility for such agents' and Sub-vendors' compliance with and breach of these terms.

(c) <u>Notice</u>. Upon discovery, Recipient agrees to provide Discloser immediate telephonic and written notice of a breach of any obligation of confidentiality and nondisclosure required hereunder.

(d) <u>Return of Confidential Information</u>. After Discloser's request, and after termination or expiration of the Services, Recipient must within thirty (30) days return or destroy (and certify to such destruction in writing) all Confidential Information of the Discloser, including, without limitation: (a) all tangible and electronic documents, drawings, materials, hardware, disks, tapes (to a commercially reasonable degree); and (b) all copies, notes, summaries and excerpts of any of the foregoing; and (c) all Confidential Information in the possession of any third parties to whom Recipient disclosed Confidential Information pursuant to these terms and conditions. Notwithstanding the foregoing, Recipient may retain Confidential Information as required by applicable laws or orders of a Government Authority with jurisdiction over Recipient ("**_Retention Requirements_**"), and any such uses or disclosures of Confidential Information by the Recipient will be limited to only those uses and disclosures mandated by the Retention Requirements.

12.4 <u>Disclosures Required by Law</u>. If any Confidential Information is required to be disclosed by law or order of any Government Authority having jurisdiction over the Recipient or Recipient's Sub-vendors or agents (including as necessary for a party to assert a claim in a court of competent jurisdiction), before any such disclosure the Recipient will provide notice to the Discloser reasonably sufficient to allow the Discloser the opportunity to apply for a

protective order or other restriction regarding such disclosure. If such Confidential Information is disclosed in such circumstances, such Confidential Information shall continue to constitute Confidential Information in all other circumstances.

## 13. <u>WORK PRODUCT</u>.

13.1 <u>Work Product</u>. "***Work Product***" means all tangible or intangible property, data, works of authorship (whether or not embodied in a tangible medium), formulae, artwork, sketches, software code, designs, drawings, specifications, graphics, discoveries, inventions, ideas, know-how, techniques, concepts, deliverables, and improvements produced, conceived, developed or provided by Vendor or Vendor's Personnel in the course of performing its obligations except for Vendor Items. Company contracted with Vendor to create all Work Product for Company and all Work Product is owned by Company in the entirety as: (i) a "Work Made for Hire" (to the extent permitted by Law) in which Company owns all copyrights as the author and all other Intellectual Property Rights and proprietary rights, if applicable; and (ii) the exclusive owner or assignee of all Intellectual Property Rights and proprietary rights to the Work Product. To the extent that any works within the Work Product may not be considered "Work Made for Hire" under the United States copyright laws, and to the extent that any Intellectual Property Rights and proprietary rights to the Work Product may be vested in any person other than Company, Vendor hereby irrevocably grants and assigns, and represents and covenants to cause any third party to irrevocably grant and assign, free and clear of any liens, claims or encumbrances, exclusively to Company, each and every right in the Work Product throughout the world, including all copyright, patent, trademark, trade dress, trade secret, and all other Intellectual Property Rights and proprietary rights, together with all renewals and extensions thereto, and the right to bring actions for past and future infringement. Such grant and assignment is to be in a form acceptable to Company. Work Product is deemed to be Confidential Information of Company, and Vendor is a Recipient of all such Confidential Information.

13.2 <u>License to Vendor Items</u>. "***Vendor Items***" means (i) any of Vendor's commercially available products as of the effective date of the Purchase Order; and (ii) any item in which Vendor or a third party (who has licensed rights to Vendor) owns all Intellectual Property Rights as of the Effective Date of the applicable Purchase Order. To the extent agreed-upon by the Parties, Vendor Items are not included in the definition of Work Product. If any Work Product incorporates Vendor Items, or Company's use of any Work Product would constitute a violation of any rights in the Vendor Items, Vendor grants Company an irrevocable, perpetual, non-exclusive, worldwide, transferable, sublicensable, royalty-free license in the Vendor Items to permit Company to exercise all Intellectual Property Rights and proprietary rights to the Vendor Items, as embodied in the Work Product and not separate and apart from the Work Product.

13.3 <u>Further Assurances</u>. At Company's request, Vendor shall secure for Company all rights and benefits in and to the Work Product, to protect Company's rights in the Work Product and shall appoint Company as Vendor's attorney-in-fact to enable Company to record, file

and prosecute any application for, and acquire, maintain and enforce, any Intellectual Property Rights, proprietary rights or any other rights in the Work Product throughout the universe in all languages and in all media and forms of expression and communication now or later developed. Vendor agrees to waive any and all rights of attribution and integrity Vendor may have in any of the Work Product pursuant to 17 U.S.C. §106A of the United States Copyright laws and any right of privacy or publicity for the Work Product.

13.4 <u>Return of Work Product</u>. If performance is terminated prior to completion, Vendor agrees to provide to Company (at Vendor's cost) within ten (10) days, any Work Product, including, without limitation, any Work Product in progress and any Vendor Items contained therein for which Company has paid for the same prior to termination. Company shall specify the delivery location.

**14. <u>REPRESENTATIONS AND WARRANTIES</u>**. Vendor represents and warrants that (and throughout the Term, Vendor shall notify Company of any change in the status of Vendor's compliance with the following):

14.1 <u>General</u>. Vendor: (i) is duly organized and validly existing and in good standing under the laws of its jurisdiction of organization; (ii) is qualified or licensed to do business and in good standing in every jurisdiction where such qualification or licensing is required; (iii) has the corporate power and authority to negotiate, execute, deliver and perform its obligations hereunder; (iv) it is the sole owners of all Goods or, insofar as it is not the sole owner of the Goods it has the full right and authority to transfer title and ownership of the Goods to company; and (v) is under no obligation to any third party, and is unaware of any actual or threatened litigation, that would interfere with providing the Services or Goods.

14.2 <u>Infringement</u>. The Services, Goods, Work Product, and Vendor Items do not violate any patent, trade secret, or other Intellectual Property Rights or proprietary rights of any third party, and as of the Effective Date, Vendor is unaware of any such violation or threatened litigation. To the extent that any Vendor Items are licensed to Company, it has the right to grant such licenses to Company.

14.3 <u>Malicious Code</u>. All Services, Goods, Vendor Items and Work Product are free of any time-bombs, worms, viruses, Trojan horses, protect codes, data destruct keys or other programming devices or code that might, or might be used to, access, modify, delete, damage, deactivate or disable any Work Product, Vendor Items, Services, Goods, or Company's other software, computer hardware, or data.

14.4 <u>Performance</u>. The Services, Goods, Vendor Items and Work Product: (i) conform in all respects to the description in the applicable Purchase Order; (ii) conform to all representations of and specifications provided by Vendor; (iii) shall be at least equal to industry recognized standards or codes or of the best quality if no quality is specified; (iv) upon delivery and full payment Company shall receive good title free and clear of all liens and encumbrances; (v) be merchantable, of good material and workmanship and fit and

sufficient for the purposes intended; and (vi) be new, and free from defects in material and workmanship. Services, Goods, and Work Product used to correct nonconformity shall be similarly warranted.

14.5 <u>Goods Specific</u>. All Goods (i) are in good operating order, in conformity with Vendor's specifications and descriptions, as described in any Documentation; (ii) and any components thereof are in new and unused condition; (iii) are free and clear of all liens, claims, and encumbrances of any kind whatsoever; (iv) are of good material and workmanship, free from defect, and is fit and sufficient for its intended purpose; (v) are not restricted or prohibited from being introduced, delivered, or shipped in commerce within the United States; (vi) shall pass all state and federal regulatory inspections; and (vii) are free of any pending or threatened lawsuits.

14.6 <u>Conformity with Policies</u>. Vendor shall comply with all applicable policies and procedures provided by Company, including without limitation Company's code of conduct.

14.7 <u>Incorporated Warranties</u>. All Services, Goods, Vendor Items, and Work Product shall be subject to all express and implied warranties, including, without limitation, warranties of title, merchantability and fitness.

14.8 <u>Background Checks</u>. A criminal background check and a social security number check has been conducted for each Vendor Personnel in accordance with applicable law prior to performing Services, and the results of such checks have been favorable/satisfactory.

14.9 <u>Compliance with Laws</u>. Vendor, and all Sub-vendors, comply with all applicable laws and regulations, including, without limitation, immigration, equal employment opportunity, nondiscrimination and workers' compensation Laws, the Fair Labor Standards Act, the Family and Medical Leave Act, the National Labor Relations Act, the Occupational Safety and Health Act of 1970, Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191, Foreign Corrupt Practices Act ("**FCPA**"), import and export laws, and the Immigration and Nationality Act, and the Immigration Reform and Control Act. At Company's request, Vendor agrees to provide necessary documentation to demonstrate compliance with all applicable laws.

14.10 <u>Debarment and Exclusion</u>. Vendor and Vendor's Personnel: (i) are not currently excluded, debarred, or otherwise ineligible to participate in the federal health care programs as defined in 42 U.S.C. § 1320a-7b(f) ("**Federal Health Care Programs**") or generally from federal procurement and non-procurement programs; (ii) are not convicted of a criminal offense related to the provision of health care items or services but not yet excluded, debarred, or otherwise declared ineligible to participate in the Federal Health Care Programs, or generally from federal procurement and nonprocurement programs; (iii) are not under investigation or otherwise aware of any circumstances which may result in such exclusion from participation in the Federal Health Care Programs, or generally from federal procurement and nonprocurement programs; ; and (iv) shall ensure compliance with the

FCPA including but not limited to ensuring that no payments of money or anything of value will be offered, promised or paid, directly or indirectly, to any foreign official, or public or political officer, to induce such official to use their influence with a foreign government or instrumentality to obtain an improper business advantage for Company; will report immediately to Company any information that may indicate there has been a payment of money or anything of value offered, promised or paid, directly or indirectly, to any foreign official, or public or political officer as described above (an "***Improper Payment***"); will, upon Company's request, certify that they have no knowledge of an Improper Payment; agree that Company may withhold payments under these terms and conditions; agree that Company may suspend or terminate Vendor upon learning information giving it a factual basis to conclude that Vendor has made or offered an Improper Payment; and agree that payments will be made to government officials or political parties only for lawful purposes, which will first be fully disclosed in writing to Company. Any breach of this Section shall give Company the right to terminate Vendor immediately for cause, without penalty to Company.

14.11 <u>Breach of Warranties</u>. If Vendor breaches any warranties contained herein, it shall be liable for and indemnify Company for all actual damages, costs, operational downtime, lost profits, incidental, exemplary, consequential, indirect and similar damages arising from or relating to said breach. Said remedies shall be in addition to, and not in lieu of, any other available remedies set forth in these terms and conditions or available at law.

## 15. <u>SOFTWARE.</u>

15.1 <u>License</u>. If Vendor provides software programs with or as part of the Services or Goods including, without limitation, a computer based operating system which includes computer software systems, programs, or components (collectively, the "***Software***"), then Vendor grants Company a fully paid, non-exclusive, and irrevocable license to use and operate the Software in perpetuity (the "***License***" ) at the locations designated by Company. The License granted herein shall enable Company, its affiliates and their respective employees, agents, customers, successors, and assigns to use the Software as provided herein. The License shall be broadly construed to assure that Company and its employees, agents, and customers enjoy the full benefit and use of the Software in support of Company's business activities.

15.2 <u>Service</u>. Vendor shall provide timely service or software access to Company (as applicable) to address defects or underperformance in Software.

15.3 <u>Copies</u>. A reasonable number of copies of the Software may also be made by Company for backup purposes, disaster recovery, testing, support and maintenance, and training. The scope of the License shall all apply to copies of the Software. Company shall reproduce on all copies of the Software made by Company any copyright, trademark, and/or trade secret designations contained on the Software.

15.4 <u>Additional Warranties</u>. In addition to the other representations and warranties set forth in these terms and conditions, if Vendor provides any software to Company, Vendor represents and warrants that (i) Vendor is the sole owner of the Software or insofar as Vendor is not the sole owner of the Software, Vendor has the full right and authority to grant to Company the License to use the Software hereunder; (ii) the Software complies with all of the descriptions and representations made by Vendor and shall be free from all program errors or defects; (iii) the Software does not contain any software routine which may disable the computer operating system of the Goods either automatically, with the passage of time or under the control of any Person; nor does it contain any other routine which may permit access by any Person, or on its own, disable, erase or otherwise harm or modify the Software any data or other software whatsoever; and (iv) Vendor will not engage in any self-help techniques or alter, disable, erase, modify, destroy or harm in any way the Software or any data related thereto.

**16. <u>INSURANCE</u>**. Vendor shall, at its own expense, maintain adequate liability coverage for the Services provided under these terms and conditions consistent with other companies in Vendor's industry. Vendor shall require all its Sub-vendors shall maintain similar adequate coverage. Vendor shall take full responsibility for any subcontractors that are not compliant with this section.

**17. <u>INDEMNIFICATION</u>.**

17.1 <u>Indemnity</u>. Vendor shall indemnify, defend, and hold harmless Company and its Affiliates, subsidiaries, shareholders, members, directors, officers, employees, agents, parents, and other vendors, from and against Claims arising from or related to: (i) the Services, Goods, Vendor Items, or Work Product; (ii) Vendor's failure to meet the representations and warranties set forth herein; (iii) Vendor's breach of any terms or conditions; (iv) violation of any patent, trade secret, or other intellectual property or proprietary right due to Vendor's provision of the Services, Goods, Vendor Items, or Work Product; or (iv) bodily injury, death, personal injury, property damage and loss of use, resulting from the acts or omissions of Vendor, Vendor's Personnel, or any person for whom Vendor is legally liable.

17.2 <u>Procedures and Rights</u>. Company shall promptly notify Vendor of a Claim. However, the failure to provide notice shall not relieve Vendor of its obligations under this Section unless the defense of the Claim is materially prejudiced thereby. Vendor shall assume defense of the Claim by representatives chosen by the Company. Company shall have the right to participate in the defense of the Claim and employ counsel at its own expense to assist in the defense of the Claim, subject to the Vendor retaining final authority and control over the conduct of the defense. Following Company's prior written consent, Vendor has the right to settle the Claim to the extent such settlement affects the rights or obligations of the Company. Company shall provide the Vendor with reasonable assistance, at Vendor's expense, as may be necessary to facilitate the defense.

17.3 <u>Failure to Defend</u>. If Vendor fails to assume the defense within ten (10) days of receipt of notice of a Claim the Company may, at the Vendor's expense: (i) assume the defense; and (ii) may, with Vendor's consent not to be unreasonably withheld or delayed, settle the Claim on behalf of the Vendor. The Vendor may assume the defense of the Claim at any time provided the defense is not materially prejudiced thereby.

17.4 <u>Pending Claims</u>. If Services, Goods, Vendor Items, or Work Product become, or in either party's reasonable opinion are likely to become, the subject of a Claim, Vendor shall procure for Company the right to continue to exercise all of its rights in the Services, Goods, Vendor Items, and Work Product as contemplated under these terms and conditions, or, with Company's prior written consent, modify or replace the Services, Goods, Vendor Items, and Work Product to eliminate any Claim, provided that the modification or replacement is functionally equivalent. If Vendor cannot do any of the foregoing, Company may terminate Vendor's performance, as to the violating Services, Goods, Vendor Items, and Work Product and Vendor shall refund to Company all fees paid for the applicable Services, Goods, Vendor Items, and Work Product. Under no circumstances shall any pending claim or dispute excuse Vendor from proceeding with its performance hereunder.

## 18. <u>MISCELLANEOUS.</u>

18.1 <u>Order of Precedence</u>. Unless the parties have executed a Master Supply and Services Agreement, these terms and conditions exclusively govern and control the Parties' respective rights and obligations regarding the purchase and sale of Services and Goods. Any additional, contrary, or different terms contained in any of Vendor's confirmations, invoices, proposals, quotes, or other communication or document, and any other attempt to modify, supersede, supplement, or otherwise alter these terms and conditions, are deemed rejected by Company and will not modify these terms and conditions or be binding on the Parties unless such terms have been fully approved in a signed writing by authorized representatives of both Parties.

18.2 <u>Independent Vendor; Subcontracting</u>. The relationship of the parties is that of independent contractors. Nothing in these terms and conditions will be construed as creating any agency, partnership, joint venture or other form of joint enterprise, employment or fiduciary relationship, and neither party will have authority to contract for or bind the other party. Each party is exclusively responsible for all obligations imposed upon employers by any applicable laws or regulation related to its respective personnel hereunder.

18.3 <u>Time is of the Essence</u>. Time is of the essence in Vendor's performance of its obligations hereunder. Vendor shall perform its obligations at its own risk and correct any deficiencies at its sole expense.

18.4 <u>Right to Set-off</u>. Company may at any time and without notice deduct or set-off from amounts due to Vendor' any claims that Company has or may have arising out of any other transaction between Company and Vendor.

18.5 <u>Notice</u>. "***Notice***" means written notice, except where specifically provided herein to the contrary. Notice shall be delivered to the address on the purchase order by: (i) certified mail, return receipt requested (or the equivalent); (ii) hand delivery with receipt acknowledged; (iii) overnight courier service that provides a delivery receipt; or (iv) transmitted by email. Notice given in accordance with this provision shall be deemed delivered: (x) when received; or (y) upon refusal of receipt. Copy of such Notice to Company shall be provided to Sargento Foods Inc., Attn: General Counsel, One Persnickety Place, Plymouth, WI 53073.

18.6 <u>Force Majeure</u>. Neither party shall be considered in default hereunder to the extent that such performance is delayed by a Force Majeure Event. A "***Force Majeure Event***" means the following: (i) acts of civil or military authority, acts of war, acts of terrorism; (ii) unforeseeable acts of blockage, embargoes or similar acts of governmental authorities; (iii) riot, insurrection, sabotage, epidemics; and (iv) severe weather events resulting in damage to Vendor which Vendor would be unable to prevent using reasonable precautions. For the avoidance of doubt, changes in economic circumstances, increases in costs, strikes, labor disputes, and default of Sub-vendors shall not qualify as a Force Majeure Event. No such interruption shall relieve Vendor of its duty to perform or give rise to any damages or additional compensation from Company. The party failing or delaying due to a Force Majeure Event agrees to give notice to the other party describing such Force Majeure Event including a good faith estimate as to the impact of such Force Majeure Event upon its responsibilities hereunder, including, but not limited to, any scheduling changes. However, should any failure to perform or delay in performance due to a Force Majeure Event last longer than thirty (30) days, or should two (2) events apply to the performance of a party during any calendar year, the party not subject to the Force Majeure Event shall be entitled to terminate performance upon written notice to the other party.

18.7 <u>Severability; Conflicts</u>. If any part of these terms and conditions is held to be unenforceable (i) the unenforceable portion must be construed as nearly as possible to reflect the original intent of the parties; (ii) the remainder of these terms and conditions shall remain in full force and effect; and (iii) the unenforceable portion shall remain enforceable in all other contexts and jurisdictions. In the event of a conflict, these terms and conditions shall control over any exhibits, addendums, purchase orders, proposals, quotations, or other document unless the relevant document, signed by both parties, expressly states that the these terms and conditions are modified for the relevant transaction.

18.8 <u>No Third-Party Beneficiaries</u>. Except as may arise regarding indemnification obligations, no third-party is a beneficiary of these terms and conditions.

18.9 <u>Non-solicitation</u>. Neither party shall directly recruit or hire or attempt to directly recruit or hire current employee(s) of the other party with whom it has had direct contact as a result of the Services and for one (1) year after the termination thereof, without the other party's prior written consent. However, this provision shall not restrict general advertisements of employment not specifically directed at any current employee(s) of the other party.

18.10 Governing Law; Construction. These terms and conditions shall be governed as to validity, interpretation, construction and effect by the laws of the State of Wisconsin, excluding its choice of law provisions. The sole jurisdiction and venue for any litigation arising out of these terms and conditions shall be an appropriate federal or state court located in the State of Wisconsin, and the parties agree not to raise, and waive, any objections or defenses based upon venue or forum non conveniens. The United Nations Convention on Contracts for the International Sale of Goods is specifically excluded from application hereunder. Singular terms shall be construed as plural, and vice versa, where the context requires, and the headings or titles of the Sections or Subsections of these terms and conditions are for convenience only and shall not be used as an aid in construction of any provision hereof.

18.11 Dispute Resolution. Prior to initiating any litigation, the Parties shall first attempt in good faith to resolve promptly any dispute by negotiation between executives who have authority to settle the controversy. However, this limitation is inapplicable to a party if the other party refuses to comply with the requirements of this Section. Company shall have the sole discretion to determine whether Vendor shall continue to provide Services or Goods during an ongoing dispute.

18.12 Remedies. Except where specifically stated to the contrary, all remedies available to Company for breach of these terms and conditions, or at law or in equity, are cumulative and may be exercised concurrently or separately, and the exercise of any one remedy shall not be deemed an election of such remedy to the exclusion of other remedies. The failure of Company at any time to require performance by Vendor of any provision hereof shall not affect the full right to require such performance thereafter, nor shall the waiver of a breach of any provision hereof be taken or held to be a waiver of any succeeding breach or as a waiver of the provision itself. Without limiting the foregoing, the Parties acknowledge that a breach, or threat of breach, would cause the other party irreparable harm, a remedy at law alone would be inadequate, and the other party shall have the right to specific performance and injunctive relief without any requirement to post a bond or other security. The prevailing party in any litigation related to these terms and conditions shall receive from the other party all costs and expenses (including reasonable attorneys' fees) incurred in such litigation.

18.13 Non-publicity. Vendor agrees to not make, publish or distribute (whether in print, electronically or otherwise) any public announcements, press releases, advertising, marketing materials or promotional materials regarding the execution or performance under these terms and conditions without prior written consent from an authorized officer of the Company.

18.14 Assignment. Vendor's obligations hereunder are not assignable, delegable, sub-licensable, or otherwise transferable by Vendor in whole or in part, without the prior written permission of Company. Any such assignment, delegation, sublicense or other transfer will be null, void, and invalid, and the purported transferee will not acquire any rights nor assume any duties hereunder.

**19. EQUIPMENT SALES ADDITIONAL TERMS**. "*Equipment*" means Goods that are machinery, multiple-component systems, vehicles, complex instruments or otherwise that will operate in Company's manufacturing facilities. In the event the Goods are Equipment, the additional terms and conditions specified in these Equipment Purchase Additional Terms shall also apply as set forth below.

19.1 Delivery and Operation Delays. Vendor agrees that time shall be of the essence in its performance.

19.2 Installation and Training. Vendor shall, as requested by Company, provide support technicians for installation and training of the Equipment, at rates and within time frames customary to Vendor's operations. All installation and training shall be subject to these terms and conditions as Services.

19.3 Acceptance Testing.

(a) Acceptance Testing Criteria. "**Acceptance Test Criteria**" means the criteria and specifications as agreed upon by the Parties. Following the successful installation, implementation, or use of Equipment, Company has the right to determine whether the Equipment: (a) met the general specifications (including operating characteristics) contained in any document, material, or representation (written or otherwise) related to the Equipment or provided by Vendor to Company; and (b) Vendor has provided the necessary training and support to enable company to install, implement, or use the Equipment in accordance with these terms and conditions.

(b) Acceptance of Equipment. When the Acceptance Test Criteria have been satisfied, Company shall deliver an acceptance certificate to Vendor. Equipment shall be deemed accepted on the date the certificate is executed or upon the completion of thirty (30) continuous days of successful and beneficial use of the Equipment in Company's production, non-testing, environment, whichever occurs first (hereinafter the "**Acceptance Date**"). Company's acceptance of Equipment shall not discharge Vendor of its obligations, representations, or warranties set forth herein.

(c) Failure to Meet Acceptance Test Criteria. If the Acceptance Test Criteria are not met, and Vendor is not able to remedy the defects in the Equipment to Company's satisfaction within ten (10) days after receiving notice thereof, Company shall be entitled to reject the Equipment as non-conforming goods and be entitled to any remedies available under these terms and conditions or by law for such non-conformance. Vendor shall be responsible for all expenses associated with the return of non-conforming goods and shall immediately refund Company all amounts paid for the same.

19.4 Upgrades and Replacement Parts. Prior to the Arrival Date and acceptance of the Equipment, if any improvements, enhancements, or upgrades are made to the Equipment or its operating software, or any newer or later models of the Equipment shall be introduced on the market by Vendor, Vendor shall promptly notify Company as to such models

manufactured, and Company shall have the right to substitute such improved, enhanced, or newer models and receive an appropriate credit for the older model at no additional cost or expense to Company. Vendor shall sell to Company at prevailing delivery and payment terms all necessary replacement parts required for the maintenance of the Equipment.

19.5 <u>Regulatory Changes</u>. If changes to the Equipment are required to comply with federal or state laws, rules, or regulations, then Vendor shall, if requested by SARGENTO, promptly develop such changes and deliver such changes to SARGENTO as part of support and maintenance services provided by Vendor to SARGENTO. Upon request, SARGENTO shall provide Vendor with a copy of such laws, rules, or regulations. This equipment will be manufactured to comply with USDA Dairy and WDA specifications.

19.6 <u>Engineer Changes</u>. If following the Acceptance Date for the Equipment SARGENTO desires to make any changes to the specifications (or operating characteristics) of the Equipment and Vendor generally does not make such changes available to its other customers, then SARGENTO shall notify Vendor of such changes and Vendor shall promptly deliver to SARGENTO a written proposal describing the cost and the scope of Vendor's duties and obligations with respect to such changes. If SARGENTO accepts Vendor's proposal and elects to implement the changes, the Equipment specifications shall be deemed amended thereby and the parties shall perform with respect to such Equipment as provided in these terms and conditions.

19.7 <u>Additional Warranty Period</u>. During the Equipment Warranty Period (as defined below), the Equipment shall be free from all defects in material and workmanship and shall operate in conformity with the specifications, capabilities, functions, and other descriptions and standards applicable thereto or as set forth in the Documentation or as otherwise represented to SARGENTO. For purposes of these terms and conditions, the "**Equipment Warranty Period**" for any Equipment shall be one (1) year, commencing on the Acceptance Date for the Equipment. During the Equipment Warranty Period, or any extended warranty period, Vendor shall (i) make technicians available as soon as within the time frame agreed upon by the Parties and if no time frame is specified as soon as reasonably practicable; and (ii) shall promptly correct all errors and defects with the Equipment on the Equipment at no additional fee, cost, or expense to SARGENTO. Such services shall be performed in a timely professional manner by qualified technicians familiar with the Equipment and shall conform to the highest degree of professional care observed in the industry for such services.

19.8 <u>Additional Insurance Requirements</u>. In addition to any other insurance requirements set forth above, Vendor shall provide and maintain comprehensive general liability insurance (both in minimum amounts of $1,000,000 per occurrence and $5,000,000 aggregate coverage); product liability insurance if Vendor is the manufacturer of the Equipment (in minimum amounts of $5,000,000 per occurrence and $10,000,000 aggregate coverage) or all risk property coverage or inland marine coverage for the fair market value of the replacement cost of the Equipment if Vendor is not the manufacturer of the Equipment; errors and omissions insurance (in minimum amounts of $1,000,000 per occurrence and

$3,000,000 aggregate coverage with appropriate tail coverage if such insurance is "claims made"); auto liability policy including owned and non-owned, (in minimum amounts of $1,000,000 combined single limit and $100,000 per incident for uninsured and under-insured motorist; and workers' compensation coverage with statutory limits; and employer liability coverage (in minimum amounts of $1,000,000 per incident and $1,000,000 aggregate coverage). Vendor shall maintain all insurance coverages hereunder with company or companies rated A or higher by A.M. Best that have a size requirement of "V (5)." Vendor's insurance coverage hereunder (except for workers compensation and professional liability) shall name SARGENTO and its affiliates as *additional insureds*." Vendor shall provide Company with a certificate of insurance evidencing such coverage. The certificates of insurance shall contain a provision that coverage will not be canceled, non-renewed, or materially changed without thirty (30) days' prior written notice to Company.

© SARGENTO

VIEW THE CA TRANSPARENCY ACT DISCLOSURE
AND OUR PRIVACY POLICY
VIEW THE PRIVACY NOTICE FOR CALIFORNIA RESIDENTS
VIEW THE NOTICE OF COLLECTION FOR CALIFORNIA EMPLOYEES AND APPLICANTS

SARGENTO.COM USES COOKIES · SEE OUR COOKIE NOTICE

©2024, SARGENTO ALL RIGHTS RESERVED.

# EXHIBIT 3

Case 2:24-cv-00308-PP    Filed 03/08/24    Page 1 of 2    Document 1-3



## CONTINUING PRODUCT GUARANTEE

The undersigned supplier ("Supplier"), in consideration for the purchase by Sargento Foods Inc. ("Sargento") of products or services from Supplier, represents, guarantees and agrees as follows:

Guarantee. The articles contained in any shipment or delivery by Supplier or its affiliates (a "Product") made to or on the order of Sargento or its affiliates (collectively, "Sargento") are guaranteed, as of the date of each such shipment or delivery, (a) to not be adulterated or misbranded within the meaning of the Federal Food, Drug and Cosmetic Act, as amended (the "Act") or the Fair Packaging and Labeling Act, as amended (the "FPLA Act"), or any state or municipal law, ordinance or regulation which is identical with or substantially similar to the Act or the FPLA Act, (b) to not be an article which cannot be introduced into interstate commerce under the provisions of Sections 404 and 505 or other provisions of the Act, (c) to otherwise comply with all federal, state and local laws.

Continuing Effect. This guarantee is continuing and shall be in full force and effect and shall bind Supplier with respect to each and every Product shipped or delivered or service provided to Sargento by Supplier before Sargento's receipt of Supplier's written notice of revocation thereof.

*Effective Date*: 8/15/2016

*Company*: Rizo Lopez Foods, Inc.

*Signature*:

*Title*: Quality Assurance Manager

*Print Name*: Arif Qureshi

For consideration as a Sargento Supplier, an authorized representative of the Company must sign this statement.

# EXHIBIT 4

# Rizo Lopez Foods, Inc.

January 12, 2024

Dear Customer:

This letter is to notify you Rizo Lopez Foods, Inc. has voluntarily recalled 344 cases (1,065 pounds) of our artisanal Rizo Brothers brand "Aged Cotija Mexican Grating Cheese" (8oz), UPC 72724200043 batch number 4DW-23318, because it has the potential to be contaminated with *Listeria monocytogenes*. This limited, small volume production uses a separate process than our traditional cheeses and is the only product impacted by the recall.

*No illnesses have been reported or associated with the recalled product.*

**No Tio Francisco brand products are subject to the recall.**

We were notified by the State of Hawaii Department of Health on Wednesday, January 10, 2024, that a single 8 oz. package tested positive for *Listeria monocytogenes as part of their routine sampling program.* We immediately identified distributors who received the product in question and sent notification directing them to remove the recalled product from distribution and return or destroy any remaining product. We also directed them to notify their customers who had received the product and do the same.

This is the first recall of product manufactured by Rizo Lopez Foods in more than 30 years of business. Based on the results of our routine sampling and testing program, we have no reason to believe that any other products are affected.

If you have any questions about the recall, please call us at 1-800-626-5587, ext. 126. We are committed to handling this recall in an open and transparent way. Food safety is our top priority, and we are committed to providing safe products to our customers.

Tomas Rizo
Vice President of Sales & Marketing

# EXHIBIT 5

  

## Coarse Grated Cotija - Sargento

### Description

Product Code: 652
UPC Code:  0 46100 35260 1

Hispanic/Mexican style cheese, grated.
Use sprinkled over cooked dishes,
soups, beans, corn, and salads.

Color: White
Texture: Crumbly
Flavor: Salty, Tangy

Target Weight: 5 Lbs.
Shelf Life: 180 days
Maintain Product at: 38 - 40°F

### Nutrition Facts

| Servings per container: 81 | | | Servings per container: 22 | | |
|---|---|---|---|---|---|
| **Serving Size: 1 oz (28g)** | | | **Serving Size: 100g** | | |
| Amount Per Serving | | | Amount Per Serving | | |
| **Calories: 90** | | | **Calories: 331** | | |
| | | % Daily Value* | | | % Daily Value * |
| **Total Fat:** | 7g | 9% | **Total Fat:** | 24g | 31% |
| Saturated Fat: | 4.5g | 23% | Saturated Fat: | 16g | 82% |
| Trans Fat: | 0g | | Trans Fat: | 1g | 0% |
| **Cholesterol:** | 20mg | 7% | **Cholesterol:** | 80mg | 27% |
| **Sodium:** | 500mg | 22% | **Sodium:** | 1780mg | 78% |
| **Total Carbohydrate:** | <1g | 0% | **Total Carbohydrate:** | 3g | 0% |
| Dietary Fiber: | 0g | 0% | Dietary Fiber: | <1g | 0% |
| Total Sugars: | 0g | | Total Sugars: | 2g | |
| Includes 0g Added Sugar | | 0% | Includes 0 g Added Sugar | | 0% |
| **Protein:** | 7g | | **Protein:** | 26g | |
| Vitamin D: | 0 mcg | 0% | Vitamin D: | 0 mcg | 0% |
| Calcium: | 240 mg | 20% | Calcium: | 840mg | 70% |
| Iron: | 0 mg | 0% | Iron: | 0 mg | 0% |
| Potassium: | 30 mg | 0% | Potassium: | 110mg | 0% |

*Percent Daily Values are based on a 2,000 calorie diet, Your daily values may be higher or lower depending on your calorie needs.

### Code Formats

Pack Code: 652 / XXX-YYZZZ

( product code/ XXX=batch - YY=year - ZZZ=julian date)

UPC Code:  A  BBBBB CCCCC  D
A= Check #, B= Plant ID, C= Product Code, D= Check #

### Case Information

Dimensions: 17.185 x 13.060 x 9.620 in.          Pack : 6 / 5 Lbs.
Gross Weight: 31.660 Lbs. / box          Cases / layer:     8
Net Weight: 30 Lbs.          Layer /pallet:     4
Cube: 1.249 cu. ft.          Cases / pallet:    32
*Internal RLF batch number should be printed on each product bag.*
*Batch number provided by Sargento (8 digits) should be printed on case label only.*

### Allergen Statement

Contains Milk

### Ingredient Statement

Cotija Cheese [Cultured Pasteurized Milk, Sea Salt, Enzymes], Potato Starch (To
Prevent Caking), Tapioca Starch (To Prevent Caking).

### Chemical Standards

| Moisture: | 40 - 42% |
|---|---|
| Fat (FDB): | 41 - 43% |
| pH: | 5.0 - 5.4 |
| Salt: | 4.0 - 4.5% |

### Microbiological Standards

| Yeast: | < 10 CFU/g |
|---|---|
| Mold: | < 10 CFU/g |
| Coliforms: | < 10 CFU/g |
| *E. coli:* | < 10 CFU/g |
| *Staphylococcus:* | < 10 CFU/g |
| *Salmonella:* | Negative/375g |
| *L. monocytogenes:* | Negative/125g |

*Revised: 10/13/2021*

*This spec sheet was approved by Rizo Lopez Foods Inc. Quality Assurance Manager, Operations Manager and Packaging Manager, and it is valid from the revised date stated above.*

*The information contained in this document is confidential, privileged and only for the information of the intended recipient and may not be used, published or redistributed without the prior written consent of Rizo Lopez Foods Inc.*

201 S. McClure Road, Modesto, CA 95357 • Phone 209-232-3700 • www.donfranciscocheese.com

# EXHIBIT 6

COMPANY ANNOUNCEMENT

# Rizo-López Foods, Inc. Voluntarily Recalls Dairy Products Because of Possible Health Risk

> When a company announces a recall, market withdrawal, or safety alert, the FDA posts the company's announcement as a public service. FDA does not endorse either the product or the company.
>
> Read Announcement    View Product Photos

## Summary

**Company Announcement Date:**

February 05, 2024

**FDA Publish Date:**

February 06, 2024

**Product Type:**

Food & Beverages
Dairy
Foodborne Illness

**Reason for Announcement:**

Expanded recall for potential Listeria monocytogenes contamination

**Company Name:**

Rizo Lopez Foods, Inc.

**Brand Name:**

Rizo Brothers California Creamery

**Product Description:**

Cheese, Yogurt, Sour cream

## Company Announcement

MODESTO, Calif. (February 5, 2024) – Rizo-López Foods, Inc. ("RLF") is voluntarily recalling its dairy products listed below because they have the potential to be contaminated with *Listeria monocytogenes*, an organism that can cause serious and sometimes fatal infections in young children, frail or elderly people, and others with weakened immune systems. Healthy individuals

Top ()

may suffer only short-term symptoms such as high fever, severe headache, stiffness, nausea, abdominal pain, and diarrhea. *Listeria* infection can cause miscarriages and stillbirths among pregnant women.

Based on information shared by the CDC and FDA, RLF may be a potential source of illness in an ongoing nationwide *Listeria monocytogenes* outbreak.

The recalled products were distributed nationwide by RLF and through distributors. Products also were sold at retail deli counters including, but not limited to, El Super, Cardenas Market, Northgate Gonzalez, Superior Groceries, El Rancho, Vallarta, Food City, La Michoacana, and Numero Uno Markets.

The recalled products include cheese, yogurt, and sour cream sold under the brand names Tio Francisco, Don Francisco, Rizo Bros, Rio Grande, Food City, El Huache, La Ordena, San Carlos, Campesino, Santa Maria, Dos Ranchitos, Casa Cardenas, and 365 Whole Foods Market. Representative images of the recalled products are provided below.

Consumers should check their refrigerators and freezers for any of the products listed below and dispose of them. Consumers with questions may contact the company at 1-833-296-2233, which will be monitored 24 hours a day.

This recall is being carried out with the knowledge of the U.S. Food and Drug Administration.

FDA has reason to believe that the following retail locations received dairy products that were included in the recall by Rizo-López Foods, Inc. Recalled products include Cheddar, Cotija, Freir, Fresco, Monterey, Oaxaca, Panela, and Paneer cheeses, yogurt, and sour cream. This list may not include all retail establishments that have received the recalled product or may include retail establishments that did not actually receive the recalled product. Therefore, it is important that you use the product-specific identification information, available here, in addition to this list of retail stores, when you check the food you have to see if it has been recalled.

Retail Establishments That Received Rizo-López Foods Dairy Products (/media/176692/download?attachment)

Expanded List of Products (/media/176015/download?attachment)

Link to Original Announcement (/safety/recalls-market-withdrawals-safety-alerts/rizo-lopez-foods-inc-recalls-aged-cotija-mexican-grating-cheese-8oz-because-possible-health-risk)

Link to FDA Outbreak Investigation (/food/outbreaks-foodborne-illness/outbreak-investigation-listeria-monocytogenes-queso-fresco-and-cotija-cheese-february-2024)

∧

Top ()

# Company Contact Information

**Consumers:**

📞 1-833-296-2233

**Media:**

Daren Williams

📞 209-232-3703

✉ dwilliams@rizolopez.com (mailto:dwilliams@rizolopez.com )

---

# Product Photos








Top ()





Top ()



Top ()





















⌃
Top ()







Top ()

3/4/24, 11:22 AM                    Rizo-López Foods, Inc. Voluntarily Recalls Dairy Products Because of Possible Health Risk | FDA






Top ()











Was this helpful?    [ Yes ]   [ No ]

&#9664; More Recalls, Market
Withdrawals, &
Safety Alerts (/safety/recalls-market-withdrawals-safety-alerts)

# EXHIBIT 7



faegredrinker.com

**Sarah L. Brew**
Partner
sarah.brew@faegredrinker.com
+1 612 766 7470 direct

**Faegre Drinker Biddle & Reath** LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, Minnesota  55402
+1 612 766 7000 main
+1 612 766 1600 fax

February 15, 2024

**VIA CERTIFIED MAIL AND EMAIL**

Dimas Reina
Director of Sales
Rizo Lopez Foods Inc.
201 S. McClure Rd.
Modesto, CA 95357
dreina@rizolopez.com

Re:      **Tender and Demand for Indemnity and Reimbursement of Costs and Damages
         Caused By Rizo- Lopez's Recall of Cheese Products**

Dear Mr. Reina:

I represent Sargento Foods, Inc. ("Sargento") in connection with Rizo-Lopez Foods, Inc.'s ("RLF")
recall of Rizo Brothers brand "Aged Cotija Mexican Grating Cheese" ("Recalled Product") sold to
Sargento. Sargento used the Recalled Product to produce a variety of its own cheese products
("Finished Goods"), which it was forced to recall as a result of RLF's recall. This letter constitutes
(1) a tender of defense and demand for indemnity in connection with any claims or litigation
against Sargento arising from or related to the Finished Goods, (2) a demand for immediate
reimbursement for all costs, damages and losses incurred by Sargento as a result of RLF's recall,
including property damage to and loss of use of Sargento's Finished Goods, and (3) pursuant to
the Parties' Agreement, a request for a video meeting to "attempt in good faith to resolve promptly"
Sargento's demand within **14 days of receiving this letter.**

**The Recalled Products**

As you know, on January 12, 2024, RLF notified Sargento that it was recalling a batch of "Aged
Cotija Mexican Grating Cheese," "following a positive test result for *Listeria monocytogenes*," an
organism that can cause serious and sometimes fatal infections in young children, frail or elderly
people, and others with weakened immune systems. **Exhibit A**. On February 5, 2024, RLF
implemented an even broader recall of its dairy products based on information from the Federal
Food & Drug Administration and the Centers of Disease Control and Prevention "that RLF may
be a potential source of illness in an ongoing nationwide *Listeria monocytogenes* outbreak." Rizo-
López Foods, Inc. Voluntarily Recalls Dairy Products Because of Possible Health Risk | FDA.

As a result of RLF's recall notice to Sargento, Sargento implemented a recall of 10,498 cases of products it shipped to numerous customers and put on hold 8,177 cases of products on hand and 54,275 pounds of bulk goods on hand (all included within "Finished Goods"). A list of all recalled Sargento Finished Goods, manufacture dates, amounts, and customers who received them is included as **Exhibit B**.

### RLF's Breach of Contract and Warranties

By providing Sargento with Recalled Product, RLF breached certain expressed and implied warranties that the Recalled Product would be safe, suitable, merchantable, fit for human consumption, and comply with all specifications and laws.

RLF sold the Recalled Product in response to Sargento's purchase orders, an example of which is attached as **Exhibit C**, which expressly incorporated certain Terms and Conditions, **Exhibit D**, which RLF accepted and agreed to by fulfilling the purchase orders (the "Agreement").[1] That Agreement includes multiple relevant express and implied warranties:

> 14.4 <u>Performance</u>. The Services, Goods, Vendor Items and Work Product: (i) conform in all respects to the description in the applicable Purchase Order; (ii) conform to all representations of and specifications provided by Vendor; (iii) shall be at least equal to industry recognized standards or codes or of the best quality if no quality is specified; [ ] (v) be merchantable, of good material and workmanship and fit and sufficient for the purposes intended; and (vi) be new, and free from defects in material and workmanship.

> 14.5 <u>Goods Specific</u>. All Goods (i) are in good operating order, in conformity with Vendor's specifications and descriptions, as described in any Documentation; [ ] (iv) are of good material and workmanship, free from defect, and is fit and sufficient for its intended purpose; (v) are not restricted or prohibited from being introduced, delivered, or shipped in commerce within the United States; (vi) shall pass all state and federal regulatory inspections; and (vii) are free of any pending or threatened lawsuits.

> 14.7 <u>Incorporated Warranties</u>. All Services, Goods, Vendor Items, and Work Product shall be subject to all express and implied warranties, including, without limitation, warranties of title, merchantability and fitness.

> 14.9 **Compliance with Laws.** Vendor, and all Sub-vendors, comply with all applicable laws and regulations [ ].

---

[1] RLF did not, and could not, alter or abrogate the Terms & Conditions, which provide:

BY ACCEPTING AND/OR PERFORMING PURSUANT TO A PURCHASE ORDER, VENDOR AGREES THAT THESE TERMS AND CONDITIONS REPRESENT THE ENTIRE AGREEMENT BETWEEN THE PARTIES REGARDING THE GOODS AND SERVICES. COMPANY AND ITS SUBSIDIARIES AND AFFILIATES REJECT ANY ADDITIONAL OR DIFFERENT TERMS PROPOSED BY VENDOR, INCLUDING ANY ATTEMPT BY SELLER TO LIMIT OR CONDITION ITS LIABILITY. IN THE EVENT OF A CONFLICT BETWEEN, OR LIMITATION ARISING UNDER, ANY OF THE TERMS OF THIS PURCHASE ORDER AND THE TERMS OF ANY OF VENDOR'S DOCUMENTS, THE TERMS OF THIS PURCHASE ORDER SHALL PREVAIL.

In addition, on August 15, 2016, RLF provided Sargento with a Continuing Product Guarantee, attached as **Exhibit E**, which included the following representations and warranties:

> Guarantee. The articles contained in any shipment or delivery by Supplier or its affiliates (a "Product") made to or on the order of Sargento or its affiliates (collectively, "Sargento") are guaranteed, as of the date of each such shipment or delivery, (a) to not be adulterated or misbranded within the meaning of the Federal Food, Drug and Cosmetic Act, as amended (the "Act") or the Fair Packaging and Labeling Act, as amended (the "FPLA Act"), or any state or municipal law, ordinance or regulation which is identical with or substantially similar to the Act or the FPLA Act, (b) to not be an article which cannot be introduced into interstate commerce under the provisions of Sections 404 and 505 or other provisions of the Act, (c) to otherwise comply with all federal, state and local laws.

RLF also warranted, through the specification it provided to Sargento, attached as **Exhibit F**, that the Recalled Product would be tested and not shipped to Sargento unless negative for *Listeria monocytogenes*.

Finally, the parties' Agreement also included the following insurance and indemnity provisions:

> **16. <u>INSURANCE</u>**. Vendor shall, at its own expense, maintain adequate liability coverage for the Services provided under these terms and conditions consistent with other companies in Vendor's industry.

> **17.1 <u>Indemnity</u>.** Vendor shall indemnify, defend, and hold harmless Company and its Affiliates, subsidiaries, shareholders, members, directors, officers, employees, agents, parents, and other vendors, from and against Claims arising from or related to: (i) the Services, Goods, Vendor Items, or Work Product; (ii) Vendor's failure to meet the representations and warranties set forth herein; (iii) Vendor's breach of any terms or conditions; [ ] (iv) bodily injury, death, personal injury, property damage and loss of use, resulting from the acts or omissions of Vendor, Vendor's Personnel, or any person for whom Vendor is legally liable.

### <u>RLF is Expressly Liable for all of Sargento's Damages and Must Indemnity Sargento</u>

Pursuant to Section 14.11 of the Parties' Agreement, **<u>Breach of Warranties</u>**, RLF "shall be liable for and indemnify [Sargento] for **all actual damages, costs, operational downtime, lost profits, incidental, exemplary, consequential, indirect and similar damages arising from or relating to said breach**. Said remedies shall be in addition to, and not in lieu of, any other available remedies set forth in these terms and conditions or available at law."

RLF's breach of contract and warranties caused permanent and irreversible damage and loss of use to Sargento's Finished Goods, which it had to recall, resulting in damages claims against Sargento by its customers. In addition, RLF caused Sargento to incur damages and losses including, but not limited to, the cost of the Finished Goods, recall-related PR and communications, shipping, storage and destruction of Finished Goods, customer credits and charges, lost profits, business interruption, damage to business reputation, and attorneys' fees.

- 4 -                                    February 15, 2024

The following is a summary of Sargento's damages:

| Description | Amount |
|---|---|
| Finished Goods shipped to customers | $1,058,190.22 |
| Finished Goods on Hold | $584,608.89 |
| Bulk on Hold | $164,005.94 |
| Storage Costs | $5,250.00 |
| Destruction Costs | $6,984.00 |
| GMA Pallets | $3,825.50 |
| Stretch Wrap | $82.39 |
| LPN Labels | $12.08 |
| Shipping Labels | $11.83 |
| PR/communications | $90,175.00 |
| Customer Claim – Dot Foods | $1,310.00 |
| **DOCUMENTED TOTAL** | **$1,914,455.85** |
| Customer Claims - Pending | Est. $40,000,000.00+ |
| Lost Profits | TBD |
| **ESTIMATED TOTAL** | **$41,914,455.85+** |

**Supporting documentation of these damages is available for viewing on a secure file site. Please contact Tori.Regan@Faegredrinker.com to be provided with access**.

While the amount of some of Sargento's damages cannot yet be precisely determined as it waits for claims from its customers, Sargento has $1,914,455.85 in documented damages. Sargento estimates that once it receives and reviews all claims from its customers, its demand for reimbursement will exceed $42 million. Sargento is moving with all due speed to determine its total monetary claim and will provide a more detailed summary and supporting documentation via the secure site as soon as it is available.  In the meantime, RLF should review the current information on the secure site in order to meet its contractual requirement to promptly resolve Sargento's claim.

In addition, while Sargento has not received consumer complaints of illness, nor is it aware that any of its customers have, it faces the potential for personal injury and class action litigation by consumers of the Finished Goods ("Litigation"). Sargento therefore tenders its defense, and the defense of its customers, in any such Litigation to RLF and demands that RLF immediately acknowledge that it must defend and indemnify Sargento and its customers in connection with such Litigation.

**Demand for Information and Prompt Claim Resolution**

Based on the above, Sargento requests that, as soon as possible, RLF:

(1) Give immediate notice under all of its potentially applicable insurance policies and provide a copy of this letter to each of its applicable insurance carrier(s);

(2) Provide Sargento with copies of all potentially applicable insurance policies, including any endorsements, riders, and exclusions applicable thereto; and

(3) Provide any and all communications RLF has had, or has in the future, with its insurers, including any notice letters, reservation of rights letters, acceptances or denials of

coverage, and any other related correspondence that potentially affects Sargento's demand for indemnity and defense and claim for property and recall-related damages.

(4) Agree to a video meeting to occur **within 14 days of receiving this letter** between RLF and Sargento to "attempt in good faith to resolve promptly" Sargento's demand for damages, pursuant to Section 18.11 of the Parties' Agreement, **Dispute Resolution**.

While Sargento hopes that this demand can be resolved promptly without litigation, it will not hesitate to commence suit to pursue its contractual rights. Sargento is confident that it will be able to easily prove RLF's breach of contract and warranties and Sargento's directly resulting damages. In addition, Section 18.12 of the Parties' Agreement, **Remedies**, provides that "**the prevailing party in any litigation related to these terms and conditions shall receive from the other party all costs and expenses (including reasonable attorneys' fees) incurred in such litigation**."

**Acknowledgement and Response**

Please promptly acknowledge receipt of this letter by **February 22, 2024,** and confirm that you have provided a copy of this letter and attachments to all your applicable insurance carrier(s).

Nothing in this letter is intended as or constitutes an admission or any waiver or limitation on Sargento's rights or remedies.

If have any questions, or wish to discuss this further, please do not hesitate to contact me.

Very truly yours,

Sarah L. Brew
Partner

Enclosures

cc:    Chad Hamilton, Sargento General Counsel, EVP Legal and Government Affairs
        chad.hamilton@sargento.com

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

| | ) |
|---|---|
| Sargento Foods Inc., Sargento Cheese Inc. | ) |
| | ) |
| _Plaintiff(s)_ | ) |
| v. | ) Civil Action No. 2:24-Cv-308 |
| | ) |
| Rizo-Lopez Foods, Inc. | ) |
| | ) |
| _Defendant(s)_ | ) |

### SUMMONS IN A CIVIL ACTION

To: _(Defendant's name and address)_　　Rizo-Lopez Foods, Inc.
201 S. McClure Road
Modesto, CA 95357

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you receive it) – or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12(a)(2) or (3) – you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or the plaintiff's attorney, whose name and address are:　　Sarah L. Brew
2200 Wells Fargo Center
90 S. Seventh Street
Minneapolis, Minnesota 55402

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

_GINA M. COLLETTI, CLERK OF COURT_

Date: _____

_____
_Signature of Clerk or Deputy Clerk_

AO 440 (Rev. 06/12) Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4(l))*

This summons and the attached complaint for *(name of individual and title, if any):*

_____

were received by me on *(date)* _____ .

☐ I personally served the summons and the attached complaint on the individual at *(place):*

_____

_____ on *(date)* _____ ; or

☐ I left the summons and the attached complaint at the individual's residence or usual place of abode with *(name)*

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

☐ I served the summons and the attached complaint on *(name of individual)* _____

who is designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

☐ I returned the summons unexecuted because _____ ; or

☐ Other *(specify):* _____

_____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____0.00_____

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

JS 44 (Rev. 10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

Place an "X" in the appropriate box (required): ☐ Green Bay Division  ☒ Milwaukee Division

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Sargento Foods, Inc., Sargento Cheese Inc. | Rizo-Lopez Foods, Inc. |
| **(b)** County of Residence of First Listed Plaintiff  Sheboygan, WI  *(EXCEPT IN U.S. PLAINTIFF CASES)* | County of Residence of First Listed Defendant  Stanislaus, CA  *(IN U.S. PLAINTIFF CASES ONLY)*  NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED. |
| **(c)** Attorneys *(Firm Name, Address, and Telephone Number)*  Sarah L. Brew, 2200 Wells Fargo Center, 90 S. Seventh Street, Minneapolis, Minnesota 55402, (612) 766-7000 | Attorneys *(If Known)* |

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1 U.S. Government Plaintiff
☐ 2 U.S. Government Defendant
☐ 3 Federal Question *(U.S. Government Not a Party)*
☒ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
| Student Loans | ☐ 340 Marine | Injury Product | | New Drug Application | ☐ 470 Racketeer Influenced and |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | | ☐ 840 Trademark | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 880 Defend Trade Secrets | ☐ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | Act of 2016 | (15 USC 1681 or 1692) |
| ☒ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | Act | | ☐ 485 Telephone Consumer |
| ☒ 190 Other Contract | Product Liability | ☐ 380 Other Personal | ☐ 720 Labor/Management | **SOCIAL SECURITY** | Protection Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ |
| | ☐ 362 Personal Injury - | Product Liability | ☐ 751 Family and Medical | ☐ 863 DIWC/DIWW (405(g)) | Exchange |
| | Medical Malpractice | | Leave Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement | | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | Income Security Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 870 Taxes (U.S. Plaintiff | Act |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | or Defendant) | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party | ☐ 899 Administrative Procedure |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | 26 USC 7609 | Act/Review or Appeal of |
| | Employment | **Other:** | ☐ 462 Naturalization Application | | Agency Decision |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | ☐ 950 Constitutionality of |
| | Other | ☐ 550 Civil Rights | Actions | | State Statutes |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from Another District *(specify)*
☐ 6 Multidistrict Litigation - Transfer
☐ 8 Multidistrict Litigation - Direct File

| VI. CAUSE OF ACTION | Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:  28 U.S.C. 1332  Brief description of cause:  Breach of contract, breach of express warranty, breach of implied warranties |
|---|---|

| VII. REQUESTED IN COMPLAINT: | ☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P. | DEMAND $ | CHECK YES only if demanded in complaint:  JURY DEMAND: ☒ Yes ☐ No |
|---|---|---|---|

| VIII. RELATED CASE(S) IF ANY | *(See updated instructions):* | JUDGE _____ | DOCKET NUMBER _____ |
|---|---|---|---|

| DATE  03/07/2024 | SIGNATURE OF ATTORNEY OF RECORD  /s/ Sarah L. Brew |
|---|---|

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

Case 2:24-cv-00308-PP    Filed 03/08/24    Page 1 of 2    Document 1-9

JS 44 Reverse (Rev. 10/20)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

## Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)    Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

   **(b)    County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

   **(c)    Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.      Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked**. (See Section III below; NOTE: federal question actions take precedence over diversity cases.)**

**III.     Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.     Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions,
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File.  (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket. **PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**V.      Origin.** Place an "X" in one of the seven boxes.

**VI.     Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.    Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.   Related Cases.** This section of the JS 44 is used to reference related pending and previously filed cases, if any. If there are related cases, insert the docket numbers and the corresponding judge names for such cases and file a Notice of Related Action pursuant to Civil L.R. 3(b).

**Date and Attorney Signature.** Date and sign the civil cover sheet.

## **<u>EXHIBIT 2</u>**

| | **Policy Number** |
|---|---|
| | **ZAGLB1100403** |

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**
**SUPPLEMENTAL DECLARATIONS**

# ARCH INSURANCE COMPANY

Named Insured   RIZO LOPEZ FOODS, INC.          Effective Date:  01-01-23

12:01 A.M., Standard Time

Agent Name  GIDDINGS, CORBY, HYNES, INC.          Agent No.  36410

**Item 1.**  Business Description:

**Item 2.**  Limits of Insurance

| Coverage | | Limit of Liability | |
|---|---|---|---|
| Aggregate Limits of Liability | | $    2,000,000 | Products / Completed Operations Aggregate |
| | | $    2,000,000 | General Aggregate (other than Products / Completed Operations) |
| Coverage A -   Bodily Injury and Property Damage Liability | | $    1,000,000 | any one occurrence subject to the Products / Completed Operations and General Aggregate Limits of Liability |
| | Damage To Premises Rented To You | $      300,000 | any one premises subject to the Coverage A occurrence and the General Aggregate Limits of Liability |
| Coverage B -   Personal and Advertising Injury Liability | | $    1,000,000 | any one person or organization subject to the General Aggregate Limits of Liability |
| Coverage C -   Medical Payments | | $       10,000 | any one person subject to the Coverage A occurrence and the General Aggregate Limits of Liability |

**Item 3.**  Retroactive Date

Coverage A of this Insurance does not apply to "bodily injury" or "property damage" which occurs before the

Retroactive Date, if any, shown here:  _____

(Enter Date or "None" if no Retroactive Date applies)

**Item 4.**  Form of Business and Location of Premises

Forms of Business: CORPORATION
Location of All Premises You Own, Rent or Occupy:
   **See Schedule of Locations**

**Item 5.**  Forms and Endorsements

Form(s) and Endorsement(s) made a part of this policy at time of issue:
   **See Schedule of Forms and Endorsements**

**Item 6.**  Premiums

| Coverage Part Premium: | ██████████████ |
|---|---|
| Other Premium: | |
| Total Premium: | ██████████████ |

THESE DECLARATIONS ARE PART OF THE POLICY DECLARATIONS CONTAINING THE NAME OF THE INSURED AND THE POLICY PERIOD.
**FAIC-SKLBUS-CGLDEC (6/01)**

**Policy Number**
**ZAGLB1100404**

COMMERCIAL GENERAL LIABILITY COVERAGE PART
SUPPLEMENTAL DECLARATIONS

# ARCH INSURANCE COMPANY

Named Insured   RIZO LOPEZ FOODS, INC.

Effective Date:  01-01-24
12:01 A.M., Standard Time

Agent Name  GIDDINGS, CORBY, HYNES, INC.

Agent No.  36410

**Item 1.**  Business Description:

**Item 2.**  Limits of Insurance

| Coverage | | Limit of Liability | |
|---|---|---|---|
| Aggregate Limits of Liability | | $ 2,000,000 | Products/Completed Operations Aggregate |
| | | $ 2,000,000 | General Aggregate (other than Products/Completed Operations) |
| Coverage A - | Bodily Injury and Property Damage Liability | $ 1,000,000 | any one occurrence subject to the Products/Completed Operations and General Aggregate Limits of Liability |
| | Damage To Premises Rented To You | $ 300,000 | any one premises subject to the Coverage A occurrence and the General Aggregate Limits of Liability |
| Coverage B - | Personal and Advertising Injury Liability | $ 1,000,000 | any one person or organization subject to the General Aggregate Limits of Liability |
| Coverage C - | Medical Payments | $ 10,000 | any one person subject to the Coverage A occurrence and the General Aggregate Limits of Liability |

**Item 3.**  Retroactive Date

Coverage A of this Insurance does not apply to "bodily injury" or "property damage" which occurs before the Retroactive Date, if any, shown here: _____

(Enter Date or "None" if no Retroactive Date applies)

**Item 4.**  Form of Business and Location of Premises

Forms of Business: CORPORATION
Location of All Premises You Own, Rent or Occupy:
    **See Schedule of Locations**

**Item 5.**  Forms and Endorsements

Form(s) and Endorsement(s) made a part of this policy at time of issue:
    **See Schedule of Forms and Endorsements**

**Item 6.**  Premiums

| | |
|---|---|
| Coverage Part Premium: | ██████████ |
| Other Premium: | |
| Total Premium: | ██████████ |

THESE DECLARATIONS ARE PART OF THE POLICY DECLARATIONS CONTAINING THE NAME OF THE INSURED AND THE POLICY PERIOD.
**FAIC-SKLBUS-CGLDEC (6/01)**

CONFIDENTIAL



SOMPO
INTERNATIONAL

# Endurance American Specialty Insurance Company
### (Wilmington, Delaware)

**Policy No.**  ELD30002726502
**Renewal of**:  ELD30002726501

## COMMERCIAL EXCESS LIABILITY DECLARATIONS PAGE

**1. NAMED INSURED AND ADDRESS:**
Rizo Lopez Foods, Inc.
Per Underlying Insurance
PO Box 1689
Empire, CA 95319

**2. POLICY PERIOD:**
12:01 a.m. Standard Time at the address of the
Insured shown at the left
**From:** 01/01/2023     **To:** 01/01/2024

**IN RETURN FOR PAYMENT OF THE PREMIUM AND SUBJECT TO ALL TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

**PRODUCER'S NAME AND ADDRESS:**
RSG Specialty, LLC dba RT Specialty
5410 East High St
Suite 200
Phoenix, AZ 85054

**3. PREMIUM:**
Total Advance Premium ▮
Service Charge ▮
Taxes ▮
Surcharge ▮
Total ▮

**BASIS OF PREMIUM:**  Non-Auditable  (X)     Auditable  ()

In the event of cancellation by the Named Insured, the company will receive and retain no less than ▮
as a policy minimum earned premium.

**4. LIMITS OF INSURANCE:**
$ 10,000,000     Each Occurrence Limit
$ 10,000,000     Aggregate Limit (Where Applicable)

These Limits of Insurance apply in excess of the "underlying limits of insurance" indicated in Item 5. of the
Declarations.

**5. UNDERLYING INSURANCE:**     See attached schedule

**6. FORMS AND ENDORSEMENTS** applicable to all Coverage Forms and made part of this policy at time of issue
are listed on the attached Forms and Endorsements Schedule EXL 0101.

_Authorized Representative_

**ISSUING OFFICE:**
725 South Figueroa Street, Suite 2100
Los Angeles, CA 90017

**NOTE: SEE ENCLOSED NOTICE FOR "SURPLUS LINES NOTIFICATION"**

Confidential - Subject to Protective Order

RLF_SAR_001135

EXL 0001 0615

# SCHEDULE OF UNDERLYING POLICIES

| Carrier, Policy Number and Period | Type of Coverage | Limits of Insurance |
|---|---|---|
| Great American Insurance Company<br>01/01/2023 - 01/01/2024 | Umbrella | $ 10,000,000 Each Occurrence<br>$ 10,000,000 General Aggregate<br>$ 10,000,000 Products/Completed Operations Aggregate<br>Excess of Primary |
| | | |
| Everest Insurance Company<br>01/01/2023 - 01/01/2024 | Excess | $ 10,000,000 Each Occurrence<br>$ 10,000,000 General Aggregate<br>$ 10,000,000 Products/Completed Operations Aggregate<br>Excess of $ 10,000,000 |
| | | |

Endurance American Specialty Insurance Company

RLF_SAR_001138
EXL 0102 0606

Confidential - Subject to Protective Order



# Endurance American Specialty Insurance Company
### (Wilmington, Delaware)

**Policy No.**      ELD30002726503
**Renewal of:**    ELD30002726502

## COMMERCIAL EXCESS LIABILITY DECLARATIONS PAGE

| | |
|---|---|
| **1. NAMED INSURED AND ADDRESS:**<br>Rizo Lopez Foods, Inc.<br>Per Underlying Insurance<br>PO Box 1689<br>Empire, CA 95319 | **2. POLICY PERIOD:**<br>12:01 a.m. Standard Time at the address of the Insured shown at the left<br>**From:** 01/01/2024      **To:** 01/01/2025 |
| **IN RETURN FOR PAYMENT OF THE PREMIUM AND SUBJECT TO ALL TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.** | **PRODUCER'S NAME AND ADDRESS:**<br>RSG Specialty, LLC dba RT Specialty<br>5410 East High St<br>Suite 200<br>Phoenix, AZ 85054 |

**3. PREMIUM:**

| | |
|---|---|
| Total Advance Premium | ■ |
| Service Charge | ■ |
| Taxes | ■ |
| Surcharge | ■ |
| Total | ■ |

**BASIS OF PREMIUM:** Non-Auditable   (X)     Auditable   ( )

In the event of cancellation by the Named Insured, the company will receive and retain no less than ■ as a policy minimum earned premium.

**4. LIMITS OF INSURANCE:**

| | |
|---|---|
| $ 10,000,000 | Each Occurrence Limit |
| $ 10,000,000 | Aggregate Limit (Where Applicable) |

These Limits of Insurance apply in excess of the "underlying limits of insurance" indicated in Item 5. of the Declarations.

**5. UNDERLYING INSURANCE:**      See attached schedule

**6. FORMS AND ENDORSEMENTS** applicable to all Coverage Forms and made part of this policy at time of issue are listed on the attached Forms and Endorsements Schedule EXL 0101.

_Eric Yates_

Authorized Representative

**ISSUING OFFICE:**
725 South Figueroa Street, Suite 2100
Los Angeles, CA 90017

**NOTE: SEE ENCLOSED NOTICE FOR "SURPLUS LINES NOTIFICATION"**

RLF_SAR_000867

# SCHEDULE OF UNDERLYING POLICIES

| Carrier, Policy Number and Period | Type of Coverage | Limits of Insurance |
|---|---|---|
| Indian Harbor Insurance Company<br>On File with Company<br>01/01/2024 - 01/01/2025 | Excess | $ 1,000,000 Each Occurrence<br>$ 1,000,000 Aggregate<br>Excess of Primary |
| | | |
| Great American Insurance Company<br>01/01/2024 - 01/01/2025 | Umbrella | $ 9,000,000 Each Occurrence<br>$ 9,000,000 General Aggregate<br>Excess of $ 1,000,000 |
| | | |
| Everest Insurance Company<br>01/01/2024 - 01/01/2025 | Excess | $ 10,000,000 Each Occurrence<br>$ 10,000,000 General Aggregate<br>$ 10,000,000 Products/Completed Operations Aggregate<br>Excess of $ 10,000,000 |
| | | |

RLF_SAR_000871

Endurance American Specialty Insurance Company　　　　　EXL 0102 0606

Confidential - Subject to Protective Order

# COMMERCIAL EXCESS LIABILITY DECLARATIONS
# CALIFORNIA

## EVEREST INDEMNITY INSURANCE COMPANY
100 Everest Way
Warren, NJ 07059
1-800-438-4375

**POLICY NUMBER:** XC1EX00444-231          **RENEWAL OF:** XC1EX00444-221

**PRODUCER NAME:**   RSG Specialty, LLC
**ADDRESS:**   11811 N. Tatum Blvd. Ste 4010
Phoenix, AZ 85028

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

**ITEM 1.**   **NAMED INSURED:** Rizo Lopez Foods, Inc

**ADDRESS:** PO Box 1689, Empire, CA 95319

**ITEM 2:**   **POLICY PERIOD:  FROM** 01/01/2023 **TO** 01/01/2024
12:01 A.M. STANDARD TIME AT THE ADDRESS OF THE NAMED INSURED SHOWN ABOVE.

**ITEM 3.**   **COVERAGE:** Commercial Excess Liability

**ITEM 4.**   **LIMITS OF INSURANCE:**
The Limits of Insurance, subject to all the terms of this Policy, are:
$10,000,000 Each Occurrence
$10,000,000 Annual Aggregate(s), Where Applicable (as defined in the "First
Underlying Insurance" Policy(ies)) Excess of Underlying Insurance.

**ITEM 5.**   **"UNDERLYING INSURANCE"**

**A.  Underlying Insurance Policy(ies)**
**Insurer**                                    **Policy No.**          **Policy Period**

As per attached Schedule of Underlying Insurance

**B.  Other Underlying Insurance Policy(ies)**
**Insurer**                                    **Policy No.**          **Policy Period**

As per attached Schedule of Underlying Insurance

ECVS EX DEC 009 01 21                                    Page 1 of 3

**ITEM 6.     POLICY PREMIUM:**

████████████████████████████████████████

| Estimated Exposure | Rate Per | Audit Period |
|---|---|---|
| N/A | N/A | N/A |

**ITEM 7.     NOTICES**
In the event of an occurrence, claim or "suit", send all pertinent facts to:

Everest National Insurance Company
Warren Corporate Center
100 Everest Way, Warren, NJ 07059
1-800-438-4375

**ITEM 8.     FORMS AND ENDORSEMENTS APPLICABLE TO THIS POLICY ON THE ORIGINAL DATE OF ISSUE:**

| | |
|---|---|
| ECVS EX DEC 003 05 06 | SCHEDULE OF UNDERLYING INSURANCE |
| ECVS EX DEC 009 01 21 | COMMERCIAL EXCESS LIABILITY DECLARATIONS CALIFORNIA |
| EDEC 114 03 99 | SCHEDULE OF FORMS AND ENDORSEMENTS |
| ILU 004 01 08 | SCHEDULE OF TAXES, SURCHARGES OR FEES |
| EN IL 20 MU 01 21 | ADVISORY NOTICE TO POLICYHOLDERS REGARDING TRADE OR ECONOMIC SANCTIONS |
| EIL 00 502 03 07 | COMPANY SIGNATURE PAGE (EVEREST INDEMNITY INSURANCE COMPANY) |
| EIL 00 514 01 08 | COMMON POLICY CONDITIONS – CALIFORNIA |
| EUM 00 522 02 07 | COMMERCIAL EXCESS LIABILITY COVERAGE FORM |
| CU 21 33 01 15 | EXCLUSION OF CERTIFIED ACTS OF TERRORISM |
| EUM 00 513 05 09 | EXCLUSION – VIOLATION OF STATUTES THAT GOVERN E-MAILS, FAX, PHONE CALLS OR OTHER METHODS OF SENDING MATERIAL OR INFORMATION |
| EUM 21 609 04 06 | EXCLUSION - LEAD |
| EUM 21 707 02 07 | EXCLUSION – RADIOACTIVE MATERIAL OR EQUIPMENT |
| EUM 21 764 06 06 | EXCLUSION - E.R.I.S.A. |
| EUM 21 767 06 06 | EXCLUSION – WAR |
| EUM 21 874 04 09 | EXCLUSION – COVERAGE PROVIDED BY UNDERLYING INSURANCE AT SUB-LIMITS |
| EUM 21 902 05 14 | EXCLUSION – ACCESS OR DISCLOSURE OF CONFIDENTIAL OR PERSONAL INFORMATION |
| EUM 22 528 05 06 | EXCLUSION – CONTINUOUS OR PROGRESSIVE INJURY OR DAMAGE |
| EUM 24 601 07 18 | EXCLUSION – UNMANNED AIRCRAFT ENDORSEMENT |
| EIL 01 510 07 08 | POLLUTION CHANGES |
| EUM 03 315 03 20 | COMMUNICABLE DISEASE EXCLUSION |
| EUM 21 797 06 06 | AUTO EXCLUSION OF TERRORISM COVERAGE |
| EUM 21 813 02 07 | EXCLUSION – PRODUCTS RECALL |
| EUM 21 827 04 09 | EXCLUSION – REAL PROPERTY IN THE CARE, CUSTODY OR CONTROL OF THE INSURED |

ECVS EX DEC 009 01 21                                        Page 2 of 3

THESE DECLARATIONS, TOGETHER WITH THE COMMON POLICY CONDITIONS AND COVERAGE FORM(S) AND ANY ENDORSEMENT(S) COMPLETE THE ABOVE NUMBERED POLICY.

The foregoing discloses all hazards insured hereunder known to exist at the inception date of this Policy, unless otherwise stated herein by endorsement on this Policy.

COUNTERSIGNED _____    BY _____
                              DATE                              AUTHORIZED REPRESENTATIVE



ECVS EX DEC 009 01 21                                         Page 3 of 3

CONFIDENTIAL

**COMMERCIAL EXCESS LIABILITY POLICY**
**SCHEDULE OF UNDERLYING INSURANCE**

| Named Insured: | Rizo Lopez Foods, Inc | Effective Date: | 1/1/2023 |
|---|---|---|---|
| Policy Number: | XC1EX00444-231 | Issuing Company: | Everest Indemnity Insurance Company |

The declarations, schedule(s), and all terms and conditions complete this insurance Policy.

**Type of Policy or Coverage**
**and**
**Insurer, Policy Number and Policy Period**       **Limits of Insurance**

**A. "First Underlying Insurance" Policy(ies)**

| | | | |
|---|---|---|---|
| Coverage: | Umbrella Liability | | |
| Carrier | Great American Insurance Company | $ 10,000,000 | Each Occurrence/Annual |
| Policy # | TUU 0738671 10 | $ 10,000,000 | Aggregate, Where Applicable |
| Policy Period: | 1/1/2023 - 1/1/2024 | | |

**B. Other "Underlying Insurance" Policy(ies)**

Date of Issue:      January 11, 2023      Authorized Representative:

CONFIDENTIAL

# COMMERCIAL EXCESS LIABILITY DECLARATIONS CALIFORNIA

## EVEREST INDEMNITY INSURANCE COMPANY
100 Everest Way
Warren, NJ 07059
1-800-438-4375

**POLICY NUMBER:** XC5EX01961-241      **RENEWAL OF:** XC5EX01961-231

**PRODUCER NAME:** RSG Specialty, LLC
**ADDRESS:** 5410 E. High Street Suite 200
Phoenix, AZ 85054

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

**ITEM 1.**    **NAMED INSURED:** Rizo Lopez Foods, Inc
**ADDRESS:** PO Box 1689
Empire, CA 95319

**ITEM 2:**    **POLICY PERIOD: FROM** <u>01/01/2024</u> **TO** <u>01/01/2025</u>
12:01 A.M. STANDARD TIME AT THE ADDRESS OF THE NAMED INSURED SHOWN ABOVE.

**ITEM 3.**    **COVERAGE:** Commercial Excess Liability

**ITEM 4.**    **LIMITS OF INSURANCE:**
The Limits of Insurance, subject to all the terms of this Policy, are:
<u>$10,000,000</u> Each Occurrence
<u>$10,000,000</u> Annual Aggregate(s), Where Applicable (as defined in the "First Underlying Insurance" Policy(ies)) Excess of Underlying Insurance

**ITEM 5.**    **"UNDERLYING INSURANCE"**

**A. Underlying Insurance Policy(ies)**

| **Insurer** | **Policy No.** | **Policy Period** |
|---|---|---|
| As per attached Schedule of Underlying Insurance | | |

**B. Other Underlying Insurance Policy(ies)**

| **Insurer** | **Policy No.** | **Policy Period** |
|---|---|---|
| As per attached Schedule of Underlying Insurance | | |

ECVS EX DEC 009 01 21      Page 1 of 4

CONFIDENTIAL

**ITEM 6.** **POLICY PREMIUM:**

| Advanced Premium | Minimum Premium | Minimum Earned Premium |
|---|---|---|
| ████████ | ████████ | ████████ |

| Estimated Exposure | Rate Per | Audit Period |
|---|---|---|
| NA | NA | NA |

**ITEM 7.** **NOTICES**
In the event of an occurrence, claim or "suit", send all pertinent facts to:

Everest National Insurance Company
Warren Corporate Center
100 Everest Way, Warren, NJ 07059
1-800-438-4375



ECVS EX DEC 009 01 21　　　　　　　　　　　　　　Page 2 of 4

CONFIDENTIAL

**COMMERCIAL EXCESS LIABILITY POLICY**
**SCHEDULE OF UNDERLYING INSURANCE**

| Named Insured: | Rizo Lopez Foods, Inc | Effective Date: | 01/01/2024 |
|---|---|---|---|
| Policy Number: | XC5EX01961-241 | Issuing Company: | Everest Indemnity Insurance Company |

The declarations, schedule(s), and all terms and conditions complete this insurance Policy.

| Type of Policy or Coverage and Insurer, Policy Number and Policy Period | | Limits of Insurance | |
|---|---|---|---|
| **A. "First Underlying Insurance" Policy(ies)** | | | |
| Coverage: | Excess Liability | | |
| Carrier | Great American Insurance Company | $ 9,000,000 | Each Occurrence |
| Policy # | TUE 0738671 11 | $ 9,000,000 | Aggregate |
| Policy Period: | 01/01/2024 - 01/01/2025 | | |
| **B. Other "Underlying Insurance" Policy(ies)** | | | |
| Coverage: | Umbrella Liability | | |
| Carrier | Indian Harbor Insurance Company | $ 1,000,000 | Each Occurrence |
| Policy # | ZAGLB1100404 | $ 1,000,000 | Aggregate |
| Policy Period: | 01/01/2024 - 01/01/2025 | | |

| Date of Issue: | January 18, 2024 | Authorized Representative: |
|---|---|---|

CONFIDENTIAL

* T8 * 01/05/2023 * TUU-0738671-10-01    GREAT AMERICAN INSURANCE CO

248311
**GAI 6001 (Ed. 06 97)**

**Policy No.** TUU  0-73-86-71 - 10
**Renewal Of** TUU  0-73-86-71 - 09

## THE PROTECTOR COMMERCIAL UMBRELLA DECLARATIONS PAGE

| 1.  NAMED INSURED AND ADDRESS: | 2.  POLICY PERIOD: |
|---|---|
| RIZO LOPEZ FOODS, INC.<br>P.O. BOX 1689<br>EMPIRE, CA  95319 | 12:01 A.M. Standard Time at the address of the Named Insured shown at left.<br>From  01-01-2023   To  01-01-2024 |

| IN RETURN FOR PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY. | PRODUCER'S NAME AND ADDRESS:<br>AG PROVIDERS<br>INSURANCE SERVICES, LLC<br>P.O. BOX 3231<br>MODESTO, CA  95353 |
|---|---|

Insurance is afforded by:
   GREAT AMERICAN INSURANCE COMPANY

**3.  PREMIUM:**   Commercial Umbrella Premium   
                            Personal Umbrella Premium   $
                            Total Advance Premium
                            Service Charge              $
                            Taxes                       $
                            Surcharge                   $
                            Total

In the event of cancellation by the Named Insured, the company will receive and retain no less than $ 44,033.          as a policy minimum premium.

**BASIS OF PREMIUM:**   Non-Auditable ( X )    Auditable (  )

**4.  LIMITS OF INSURANCE:**   $ 10,000,000.   Each Occurrence
                                      $ 10,000,000.   General Aggregate (Where Applicable)
                                      $ 10,000,000.   Products-Completed Operations Aggregate

**5.  SELF-INSURED RETENTION:**   $ 10,000.

**6.  FORMS AND ENDORSEMENTS** applicable to all Coverage Forms and made part of this Policy at time of issue are listed on the attached Forms and Endorsements Schedule, GAI 6013 (Ed. 06/97).

CONFIDENTIAL

RLF_SAR_001024
95

\* T8 \* 01/05/2023 \* TUU-0738671-10-01     GREAT AMERICAN INSURANCE CO

248311

**GAI 6003**
(Ed. 06 97)

## SCHEDULE A - SCHEDULE OF UNDERLYING INSURANCE

| Carrier, Policy Number and Period | Type of Coverage | Limits of Insurance |
|---|---|---|
| **a)** ARCH INSURANCE COMPANY<br>POL: ZAWCI9406806<br>1/1/23 TO 1/1/24 | Employers Liability | Bodily Injury By Accident<br>$ 1,000,000.   each accident<br>Bodily Injury By Disease<br>$ 1,000,000.   policy limit<br>$ 1,000,000.   each employee |
| **b)** ARCH INSURANCE COMPANY<br>POL: ZACAT1200703<br>1/1/23 TO 1/1/24 | Automobile/Garage<br>( X ) Any Automobile<br>(   ) Owned Automobile Only<br>(   ) Specifically Designated Automobile<br>(   ) Hired Automobile<br>(   ) Non-owned Automobile<br>(   ) Garage Liability<br>( X ) DEFENSE OUTSIDE THE LIMIT | (   ) Split Limit<br>Bodily Injury Liability<br>$         each person<br>$         each accident<br>Property Damage Liability<br>$         each accident<br>( X ) Combined Single Limit<br>$ 1,000,000.   each accident<br>(   ) Garage Operations<br>$   Auto only each accident<br>$   Other than auto each accident<br>$   Other than auto aggregate |
| | (   ) Garagekeepers Liability | $   each location |

GAI 6003 (Ed. 06/97) PRO      (Page 1 of 2)

CONFIDENTIAL

| Carrier, Policy Number and Period | Type of Coverage | Limits of Insurance |
|---|---|---|
| c) (    ) | Comprehensive General Liability including | (    ) Split Limit |
| | | Bodily Injury Liability |
| | (    ) Products-Completed Operation Liability | $                    each occurrence |
| | | $                    aggregate |
| | (    ) Broad Form Endorsement | Property Damage Liability |
| | | $                    each occurrence |
| | (    ) | $                    aggregate |
| | | (    ) Combined Single Limit |
| | (    ) | $                    each occurrence |
| | | $                    aggregate |
| OR | OR | OR |
| ( X )  ARCH INSURANCE COMPANY  POL: ZAGLB1100403  1/1/23 TO 1/1/24 | Commercial General Liability | $2,000,000.    General Aggregate Limit |
| | ( X ) Occurrence Form | $2,000,000.    Products-Completed Operation Aggregate Limit |
| | (    ) Claims-Made Form | |
| (X) DEFENSE OUTSIDE THE LIMIT | (    ) | $1,000,000.    Personal and Advertising Injury Limit |
| Retroactive Date | | $1,000,000.    Each Occurrence Limit |
| d) | | |

CONFIDENTIAL

R * T8 * 01/16/2024 * TUE 0738671 11 00       Great American Insurance Company
248311

**TAU 9501 (Ed. 11 97)**

**Policy No.** TUE  0738671    - 11
**Renewal Of** TUU  0738671    - 10

## EXCESS LIABILITY POLICY DECLARATIONS

| ITEM 1. NAMED INSURED AND MAILING ADDRESS: | ITEM 2. POLICY PERIOD: |
|---|---|
| RIZO LOPEZ FOODS, INC.<br>P.O. BOX 1689<br>MODESTO, CA 95353 | 12:01 A.M. Standard Time at the mailing address of the Named Insured shown at left.<br>From 01/01/2024 To 01/01/2025 |
| IN RETURN FOR PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY. | AGENT'S NAME AND ADDRESS:<br>HUB INTERNATIONAL INSURANCE SERVICES<br>4335 NORTH STAR WAY<br>SUITE D<br>MODESTO, CA 85356 |

Insurance is Afforded by Company indicated below:
GREAT AMERICAN INSURANCE COMPANY
(A capital stock corporation)

**ITEM 3. POLICY PREMIUM:**                    **POLICY MINIMUM PREMIUM:**

██████████

**PREMIUM BASIS:** ( X ) Flat  ( ) Auditable          ██████████

**ITEM 4. LIMITS OF INSURANCE:**
The Company's Liability under this policy will not exceed the following limit: 100 percent of "loss" excess of Underlying Insurance stated in **Item 5.** of the Declarations, but for no greater than:
$ 9,000,000.   Each Occurrence
$ 9,000,000.   Aggregate Limit (where applicable)

**ITEM 5. SCHEDULE OF UNDERLYING INSURANCE:**

| First Underlying Insurance Policy<br>Insurer, Policy No., Policy Period | Applicable Limit | |
|---|---|---|
| INDIAN HARBOR INSURANCE COMPANY<br>POLICY: SXS0064967, 1/1/24-1/1/25 | $ 1,000,000.<br>$ 1,000,000. | Each Occurrence<br>Aggregate Limit<br>(where applicable) |

| Other Underlying Insurance (Excess of First Underlying Insurance Policy) | Applicable Limit | |
|---|---|---|
| N/A | $ N/A<br>$ N/A | Each Occurrence<br>Aggregate Limit<br>(where applicable) |

**ITEM 6. FORMS AND ENDORSEMENTS** applicable to all Coverage Forms and made part of this policy at time of issue are listed on the attached Forms and Endorsements Schedule, TAU 9997 (Ed. 11/97).

Countersigned _____ By _____
                Date                    Authorized Representative

TAU 9501 (Ed. 11/97) PRO          (Page 1 of 1)

CONFIDENTIAL

 

**Regulatory Office**
Dept: Regulatory
505 Eagleview Blvd., Suite 100
Exton, PA 19341-1120
Telephone: 800-688-1840

Insurance Company Providing Coverage: INDIAN HARBOR INSURANCE COMPANY

# Excess Liability Policy Declarations

| | | | | | |
|---|---|---|---|---|---|
| **Policy Number:** | SXS0064967 | | **Renewal or Replacement of:** | New Policy | |

**Item 1.**    **Named Insured:**    RIZO LOPEZ FOODS, INC.

               **Address:**        PO BOX 1689
                                     EMPIRE, CA 95319

**Item 2.**    **Policy Period:**    From:    January 1, 2024      To:    January 1, 2025
                                  12:01 A.M. Standard time at the Named Insured's address stated above.

**Item 3.**    **Limits of Insurance:**    $   1,000,000      Each Occurrence
                                        $   1,000,000      Aggregate Limit(s) (where applicable)

**Item 4.**    **Underlying Insurance:**    *Please see attached Schedule of Underlying Insurance.*

**Item 5.**    **Premium is Payable:**    ██████████    Policy Premium
                                $   Rejected    Premium for Certified Acts of Terrorism
                                ██████████    Total Policy Premium
                                $   NA    Surcharge/Fee
                                ██████████    **Total Amount Due**

**Item 6.**    **Form(s) and Endorsement(s) made a part of this policy at time of issue:**

| Endorsement Number | Endorsement Title |
|---|---|
| PN CW 02 0119 | Privacy Policy |
| PN CW 01 0123 | Fraud Notice |

SLEXDEC 1219          © 2019 X.L. America, Inc. All Rights Reserved.          Page 1
                            May not be copied without permission.

| PN CW 05 0519 | U.S. Treasury Department's Office Of Foreign Assets Control ("OFAC") |
| --- | --- |
| PN CA 05 0120 | California Surplus Lines Notice |
| PN CA 02 0119 | Important Information to Policyholders - California |
| IL MP 9104 0314 IHIC | In Witness - Indian Harbor Insurance Company |
| CXU 300 0116 | Schedule of Underlying Insurance |
| CXU 050 0509 | Excess Liability Policy |
| CXU 623 0509 Endorsement No. 001 | Employment-Related Practices Liability Exclusion |
| CXU 654 0509 Endorsement No. 002 | No-Fault, Uninsured or Underinsured Motorist Exclusion |
| CXU 659 0813 Endorsement No. 003 | Violation of Communication or Information Law Exclusion |
| CXU 904 0115 Endorsement No. 004 | Exclusion of Certified Acts of Terrorism and Exclusion of Other Acts of Terrorism Committed Outside the United States |
| SLX 400 1013 Endorsement No. 005 | Amendment To Insuring Agreement |
| CXU 449 0916 Endorsement No. 006 | Multinational Coverage Endorsement |
| CXU 670 0320 Endorsement No. 007 | Access or Disclosure of Confidential or Personally Identifiable Information and Data-Related Liability Exclusion |
| CXU 633 0509 Endorsement No. 008 | Lead Exclusion |
| CXU 650 0509 Endorsement No. 009 | Silica or Silica-Related Dust Exclusion |
| CXU 652 0509 Endorsement No. 010 | Total Pollution Exclusion |
| CXU 657 0509 Endorsement No. 011 | War Exclusion |
| CXU 628 0509 Endorsement No. 012 | Fungi or Bacteria Exclusion |
| CXU 625 0509 Endorsement No. 013 | Exterior Insulation and Finishing System / Direct Exterior Finishing System Exclusion |
| SLX 405 0514 Endorsement No. 014 | Minimum Earned Premium |
| CXU 424 0119 Endorsement No. 015 | Duties in the Event of an Occurrence, Claim or Suit Amendatory Endorsement |
| CXU 440 0715 Endorsement No. 016 | Issuance of the Excess Liability Policy Prior to Receipt of the Controlling Underlying Policy Endorsement |
| MANUSXS 0178 0116 Endorsement No. 017 | Product Recall Exclusion |
| SLX 408 0719 Endorsement No. 018 | Lead Excess Amendatory |

CONFIDENTIAL                                                                          RLF_SAR_000699
                                                                                                              100

| CXU 697 0623 Endorsement No. 019 | PFAS / PFOA / PFOS Exclusion |
| CXU 709 0623 Endorsement No. 020 | Communicable Disease Exclusion with Foodborne Illness Exception |
| CXU 715 0623 Endorsement No. 021 | Sub-Limited Coverage Exclusion |
| XL-CASOP 0118 Endorsement No. 022 | Service of Process |

**Item 7.** **Producer Name:** RSG Specialty, LLC operating as RT Specialty

     **Address:**  5410 E. High Street
           Suite 200
           Phoenix, AZ 85054



              Authorized Representative

THESE DECLARATIONS TOGETHER WITH THE COMMON POLICY CONDITIONS, COVERAGE PART COVERAGE FORM(S) AND FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.

**Date Issued:**  01/17/2024



SLEXDEC 1219     © 2019 X.L. America, Inc.  All Rights Reserved.     Page 3
           May not be copied without permission.

# IN WITNESS

## INDIAN HARBOR INSURANCE COMPANY

REGULATORY OFFICE
505 EAGLEVIEW BOULEVARD, SUITE 100
DEPARTMENT:  REGULATORY
EXTON, PA  19341-1120
PHONE:  800-688-1840

It is hereby agreed and understood that the following In Witness Clause supercedes any and all other In Witness clauses in this policy.

All other provisions remain unchanged.

IN WITNESS WHEREOF, the Company has caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless countersigned by a duly authorized representative of the Company.

_____
Joseph A. Tocco
President

_____
Toni Ann Perkins
Secretary

IL MP 9104 0314 IHIC

©2014 X.L. America, Inc.  All rights reserved.  May not be copied without permission.

CONFIDENTIAL

Effective Date:     January 1, 2024           Issue Date:     01/17/2024

Attached to and forming part of Policy No.:      SXS0064967

Issued To:     RIZO LOPEZ FOODS, INC.

By:            Indian Harbor Insurance Company

*This endorsement changes the policy. Please read it carefully.*

This endorsement modifies insurance provided under the following:

# Schedule of Underlying Insurance

**Excess Liability Policy**

It is agreed that Item 4. Underlying Insurance, of the Declarations is completed as follows:

**Item A.  CONTROLLING UNDERLYING POLICY**

| | | |
|---|---|---|
| Coverage: | General Liability | |
| Insurer: | Arch Ins Co | |
| Policy Number: | ZAGLB1100404 | |
| Policy Period: | January 1, 2024 to January 1, 2025 | |
| | $  1,000,000 | Each Occurrence |
| | $  2,000,000 | General Aggregate |
| | $  2,000,000 | Products-Completed Operations Aggregate |
| | $  1,000,000 | Personal and Advertising Injury Limit |

**Item B.  ALL UNDERLYING INSURANCE**

| | | |
|---|---|---|
| Coverage: | General Liability | |
| Insurer: | Arch Ins Co | |
| Policy Number: | ZAGLB1100404 | |
| Policy Period: | January 1, 2024 to January 1, 2025 | |
| | $  1,000,000 | Each Occurrence |
| | $  2,000,000 | General Aggregate |
| | $  2,000,000 | Products-Completed Operations Aggregate |
| | $  1,000,000 | Personal and Advertising Injury Limit |

Defense expenses are in addition to the limits

| | | |
|---|---|---|
| Coverage: | Auto Liability | |
| Insurer: | Arch Ins Co | |
| Policy Number: | ZACAT1200704 | |
| Policy Period: | January 1, 2024 to January 1, 2025 | |
| | $  1,000,000 | Combined Single Limit |

Defense expenses are in addition to the limits

CONFIDENTIAL                                                   RLF_SAR_000702

103

Coverage:         Employers Liability (All States)
Insurer:          Arch Insurance Company
Policy Number:    ZAWCI9406807
Policy Period:    January 1, 2024 to January 1, 2025
          $    1,000,000         Bodily Injury by Accident - Each Accident
          $    1,000,000         Bodily Injury by Disease - Policy Limit
          $    1,000,000         Bodily Injury by Disease - Each Employee
          Defense expenses are in addition to the limits

In any jurisdiction, state, or province where the amount of Employers Liability Insurance provided by the Underlying Insurer(s) is by law "Unlimited", the underlying Employers Liability limit(s) shown in the above schedule do not apply and no coverage shall be provided for Employers Liability under this policy.


All other terms, conditions, definitions and exclusions of this policy remain unchanged.

CONFIDENTIAL                                                                 RLF_SAR_000703
                                                                                        104

## **EXHIBIT 3**

**QUARLES & BRADY LLP**
Amelia Valenzuela, Esq. (CA Bar No. 320428)
L. Katie Mason, Esq. (admitted *pro hac vice* )
Randy J. Pflum, Esq. (admitted *pro hac vice*)
Renaissance One
Two North Central Avenue
Phoenix, AZ 85004-2391
Telephone: 602-229-5635
Facsimile: 602-229-5690
Email: amelia.valenzuela@quarles.com
Email: katie.mason@quarles.com
Email: randy.pflum@quarles.com
*Attorneys for Sargento Foods Inc. and*
*Sargento Cheese Inc.*

## UNITED STATES BANKRUPTCY COURT

### EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

|  |  |
|---|---|
| In re: | Case No. 25-25004-C-11 |
| RIZO-LÓPEZ FOODS, INC., | DC No.: QB-1 |
| Debtor. | Date: February 25, 2026<br>Time: 11:00 a.m. PST<br>Dept.: C |
|  | Judge: Honorable Christopher M. Klein |

**[Proposed] ORDER GRANTING MOTION OF SARGENTO FOODS INC. AND SARGENTO CHEESE INC. FOR ENTRY OF AN ORDER MODIFYING THE AUTOMATIC STAY TO PERMIT CONTINUED LITIGATION IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF WISCONSIN AND TO RECOVER INSURANCE PROCEEDS**

      Having considered the motion of Sargento Foods Inc. and Sargento Cheese Inc., on behalf of themselves and their successors, assigns, and subrogees (collectively "Sargento") for entry of an *Order Modifying the Automatic Stay to Permit Continued Litigation in the United States District Court for the Eastern District of Wisconsin and to Recover Insurance Proceeds* and the Court having found that the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409; this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(G); and the Court having authority to under 11 U.S.C. § 362(d) to order relief from the automatic stay; and due and proper notice of the Motion having been

QB\100667120.1

provided under the circumstances and in accordance with the Federal Rules of Bankruptcy Procedure and the Local Rules, and it appearing that no other or further notice need be provided; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion is in the best interests of the Debtor, its estate, creditors, and all parties in interest; and upon all of the proceedings had before the Court and after due deliberation thereon and sufficient cause appearing therefor;

**IT IS HEREBY ORDERED**;

1.     The *Motion of Sargento Foods Inc. and Sargento Cheese Inc. for Entry of an Order Modifying the Automatic Stay to Permit Continued Litigation in the United States District Court for the Eastern of Wisconsin and to Recover Insurance Proceeds* filed at Docket No. _____ is granted.

2.     The automatic stay imposed by Section 362(a) of Title 11 of the United States Bankruptcy Code 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") is hereby modified under 11 U.S.C. § 362(d)(1) as to Sargento, and its agents, successors, assignees, and subrogees, to prosecute the action pending against the Debtor, and any other defendants, in the United States District Court for the Eastern District of Wisconsin (Case No. 2:24-cv-00308-PP) (the "District Court Case") styled *Sargento Foods Inc. et al. v. Rizo-Lopez Foods, Inc.* and proceed with all necessary actions to adjudicate the District Court Case through final judgment, including against the Debtor and any non-debtor defendants.

3.     For purposes of this order, any judgment entered in the District Court Case shall liquidate Sargento's proofs of claims filed in the above-entitled Bankruptcy case, but any action on behalf of Sargento to enforce the judgment against the Debtor or its assets shall remain subject to the automatic stay.

4.     The automatic stay is modified so that Sargento may assert all remedies to seek or to obtain recovery from the proceeds of any applicable insurance policies of the Debtor and from any other non-debtor parties.

5.     This Order is effective immediately, and the fourteen (14) day stay period imposed

QB\100667120.1

by Fed. R. Bank. P. 4001(a)(4) is waived.

6.     This Order shall be binding on any subsequently appointed trustee in this Bankruptcy case.

7.     This Court shall retain jurisdiction to resolve any disputes or controversies arising from this Order.

Dated:


_____
Christopher M. Klien
United States Bankruptcy Court

3

QB\100667120.1