McCormick, Barstow, Sheppard,
Wayte & Carruth LLP
Hagop T. Bedoyan, #131285
 *hagop.bedoyan@mccormickbarstow.com*
Garrett R. Leatham, #333362
 *garrett.leatham@mccormickbarstow.com*
Garrett J. Wade, #340285
 *garrett.wade@mccormickbarstow.com*
7647 North Fresno Street
Fresno, California 93720
Telephone:    (559) 433-1300
Facsimile:    (559) 433-2300

Attorneys for Debtor RIZO-LÓPEZ FOODS, INC.

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

| | |
|---|---|
| In re | Case No. 25-25004-C-11 |
| RIZO-LÓPEZ FOODS, INC., | Chapter 11 |
| Debtor-In-Possession | DC No.: MB-29 |
| | Hearing |
| | Date:  April 1, 2026<br>Time: 11:00 a.m.<br>Place: Dept. C, Ct. Rm. 35, 6th Fl.<br>    United States Bankruptcy Court<br>    501 "I" Street<br>    Sacramento, CA 95814 |
| | Judge: Honorable Christopher M. Klein |

**ORDER AUTHORIZING THE SALE OF CERTAIN OF THE DEBTOR'S ASSETS FREE AND CLEAR OF LIENS AND INTERESTS AND APPROVING ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES TO FRANCISCO FOODS, LLC**

The *Motion for Entry of an Order Authorizing the Sale of Certain of the Debtor's Assets Free and Clear of Liens and Interests and Approving Assumption and Assignment of Certain Executory Contracts and Unexpired Leases* (the "Sale Motion") *to Francisco Foods, LLC* (the "Buyer") filed by Rizo-López Foods, Inc., debtor and debtor in possession in the above-referenced case ("Debtor"), came on for hearing before the Honorable Christopher M. Klein on April 1, 2026 (the "Sale

McCormick, Barstow,
Sheppard, Wayte &
Carruth LLP
7647 North Fresno Street
Fresno, CA 93720

042026-000000 16106065.1                    1

4906-5264-6557.1

Hearing"), upon due and proper notice to all interested parties. Appearances were noted on the record. All capitalized terms used but not defined in this Sale Order shall have the meaning given to them in the Motion or the Asset Purchase Agreement, attached hereto as **Exhibit 1** as revised by those certain Revised Schedules attached as **Exhibit 1** to the *Notice of Filing of Revised Schedules to the Asset Purchase Agreement dated March 6, 2026, By and Between Rizo-Lopez Foods, Inc. and Francisco Foods, LLC, or Its Designee* [Docket No. 547 & 548] (the "Purchase Agreement").

The Court has considered the Sale Motion, the Rizo Background Declaration, the Declaration of Edwin Rizo filed in support of the Sale Motion and the Declaration of Mike Bergthold in support of the Sale Motion, the arguments of counsel at the Sale Hearing, and all pleadings and evidence of record in this bankruptcy case. The Court having found that it has jurisdiction over this proceeding; that this is a core proceeding; that notice of the Sale Motion has been given to the U.S. Trustee, all creditors, all parties on the Limited-Service List (as defined in the Order Limiting Notice of Certain Motions dated October 9, 2025 [ECF 143]), any indenture trustees, any committee elected under section 1102 of the Bankruptcy Code, all equity security holders, each party to each contract or lease that the Debtor proposes to assume or reject pursuant to the Sale Motion, the U.S. attorney for the district in which this case is pending, each U.S. department, agency, or instrumentality that is listed on the schedules or that has filed a claim, and the U.S. Internal Revenue Service; that no further notice is necessary; that the relief sought in the Sale Motion is in the best interest of the Debtor, its creditors, and the estate; and that good and sufficient cause exists for such relief,

**IT IS HEREBY FOUND AND DETERMINED THAT:[1]**

A. The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following

---

[1] The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such. All findings of fact and conclusions of law announced by the Court at the Sale Hearing are hereby incorporated herein to the extent not inconsistent herewith.

McCormick, Barstow, Sheppard, Wayte & Carruth LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

042026-000000 16106065.1      2

4906-5264-6557.1

conclusions of law constitute findings of fact, they are adopted as such.

B.     The Court has jurisdiction and authority to hear and determine the Sale Motion and to grant the relief requested in the Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334.

C.     Venue of this bankruptcy case and the Sale Motion in this district, and before this Court, is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter and the relief requested in the Sale Motion is a core proceeding under 28 U.S.C. §§ 157(b), and the Court may enter a final order consistent with Article III of the United States Constitution.

D.     Proper, timely, adequate, and sufficient notice of the Sale Motion, the Sale Hearing, and the Debtor's potential assumption and assignment of executory Contracts to the Buyer, as applicable, has been provided in accordance with sections 102(1), 363, 365, 503, and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9008, and 9014, and no other or further notice of the Sale Motion, the Sale Hearing, or of the entry of this Order is required.

E.     This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).

F.     Upon entry of this Order, the Debtor has full corporate power and authority to consummate the transactions contemplated by the Purchase Agreement (the "Transaction"), including, without limitation, the sale of the Purchased Assets and the assumption and assignment to the Buyer of the Assigned Agreements (as defined herein) (collectively, the "Sale"). The Sale has been duly and validly authorized by all necessary corporate action of the Debtor and no consents or approvals, other than the approval of this Court and certain Governmental Authorities, are required for the Debtor to consummate the Transaction (subject to the terms and conditions of the Purchase Agreement, including delivery of the consents and satisfaction of the other closing conditions set forth therein).

G.     The Buyer and its Affiliates, including their ownership and operation of the Purchased Assets following the Closing Date, are not successors or mere continuations of the Debtor and there is no continuity, no common identity (except as otherwise disclosed), and no continuity of enterprise between the Buyer and its Affiliates and the Debtor. The Buyer and its Affiliates are not holding themselves out to the public as a continuation of the Debtor. The Buyer and its Affiliates are not successors to the Debtor by reason of any theory of law or equity, and the Transaction does

not amount to a consolidation, merger, or de facto merger of the Buyer and any of its Affiliates or the Debtor. The Buyer and its Affiliates will not assume or in any way be responsible for any obligation or liability of the Debtor, except as expressly provided in the Purchase Agreement.

H.    The Debtor has demonstrated good, sufficient, and sound business purposes and justifications for approval of the Debtor's assumption and entry into the Purchase Agreement and the other agreements, documents, and instruments deliverable thereunder or in connection therewith (collectively, the "Transaction Documents"), including the sale of the Purchased Assets for the purchase price of (i) $14,186,240.00 in cash to the bankruptcy estate (the "Cash Purchase Price"), plus (ii) the assumption and payment by Buyer of the debts owed to the Rizo Parties by Seller under the DIP financing facility agreement (which shall be an amount not less than $2,900,000.00) (the "DIP Loan Amount") in accordance with the Funds Flow, plus (iii) the assumption and payment by Buyer of the Wells Fargo TI Loan Agreements and all debts, fees, and expenses owed to Wells Fargo pursuant thereto (which shall be an amount not less than $2,361,374.00) (the "Wells Fargo TI Loan Amount") in accordance with the Funds Flow, plus (iv) the assumption of the Assumed Liabilities, for an aggregate amount of $19,447,614.00 (collectively, the "Purchase Price"), plus (v) the waiver of the RLF Parties' and their Affiliates' claims in the amount of $15,552,713.51 against Seller/Debtor under any Contract (including the Leases) among such parties, including related costs, fees and expenses for a total consideration of not less than $35,000,327.51 (collectively, the "Aggregate Consideration"), and (vi) the subordination of all postpetition nonresidential real property lease obligations owed by the Debtor to the RLF Parties and their Affiliates to an aggregate payment of $1,000,000.00 to the holders of general unsecured claims, as contemplated by the Purchase Agreement, the Transaction Documents, and the Sale.

I.    The Debtor's assumption of and performance under the Purchase Agreement and the Transaction Documents (i) constitutes a sound and reasonable exercise of its business judgment consistent with its fiduciary duties, (ii) provides value to and is beneficial to the Debtor's estate, and is in the best interests of the Debtor, parties in interest, and its creditors, and (iii) is reasonable and appropriate under the circumstances. Business justifications for the sale include, but are not limited to, the following: (i) the purchase price set forth in the Purchase Agreement constitutes the highest

McCORMICK, BARSTOW, SHEPPARD, WAYTE & CARRUTH LLP
7647 NORTH FRESNO STREET
FRESNO CA 93720

042026-000000 16106065.1                    4

4906-5264-6557.1

and best offer received for the Purchased Assets; (ii) the Purchase Agreement presents the best opportunity to maximize the value of the Purchased Assets; (iii) the value of the Debtor's estate will be maximized through the sale of the Purchased Assets pursuant to the Purchase Agreement; and (iv) the Buyer is expected to hire approximately 154 employees of the Debtor.

J.     Before the execution of the Purchase Agreement, the Debtor marketed the Purchased Assets for sale and such efforts afforded a full, fair, and reasonable opportunity for other entities to make higher or better offers to acquire the Purchased Assets. As of the date hereof, no higher or better offer has been made.

K.     The Purchase Agreement and the Transaction Documents were negotiated, proposed and entered into by the Debtor and the Buyer without collusion, in good faith, and as a result of arm's-length bargaining. The disclosures made by the Debtor concerning the Purchase Agreement, the Transaction Documents, and the Sale were good, complete, and accurate. The Buyer is a "good faith purchaser" under section 363(m) of the Bankruptcy Code and, as such, is entitled to protections afforded thereby with respect to the Transaction authorized by this Order (including, without limitation, any assumption and assignment of executory Contracts under section 365 of the Bankruptcy Code pursuant to the Assumption and Assignment Procedures). Neither the Debtor nor Buyer has engaged in any conduct that would cause or permit the Purchase Agreement to be avoided or costs or damages to be imposed under section 363(n) of the Bankruptcy Code. The Buyer is not an "insider" of the Debtor, as that term is defined in section 101 of the Bankruptcy Code. The Purchase Agreement and the Transaction Documents were not entered into, and the Sale is not being consummated, for the purposes of, hindering, delaying, or defrauding present or future creditors of the Debtor. All payments to be made by the Buyer in connection with the Sale have been disclosed. Neither the Debtor nor the Buyer entered into the Purchase Agreement or the Transaction Documents or the Sale (including the Transaction contemplated thereby), fraudulently, for the purpose of statutory and common law fraudulent conveyance and fraudulent transfer claims whether under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia.

L.     In the absence of a stay pending appeal issued prior to the close of the Transaction,

McCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

042026-000000 16106065.1                    5

4906-5264-6557.1

the Buyer will be (and will be deemed to be) acting in good faith within the meaning of section 363(m) of the Bankruptcy Code in closing the Transaction at any time after entry of this Order.

M.     The consideration provided by the Buyer for the Purchased Assets, including the Assigned Agreements, pursuant to the Purchase Agreement constitutes the highest and best offer for the Purchased Assets and reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possessions thereof, and the District of Columbia, including, without limitation, the Uniform Voidable Transactions Act, the Uniform Fraudulent Transfer Act, and the Uniform Fraudulent Conveyance Act, as enacted in various jurisdictions, and may not be avoided under section 363(n) of the Bankruptcy Code or any other applicable law.

N.     The consideration to be provided under the Purchase Agreement reflects the Buyer's reliance on this Order to provide the Buyer, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, with title to and possession of the Purchased Assets free and clear of all liens (as defined in section 101 of the Bankruptcy Code, and including all tax liens), claims (as defined in section 101 of the Bankruptcy Code), encumbrances, and interests (all such liens, claims, encumbrances, and interests being, collectively, "Interests") (including, without limitation, those (i) that purport to give to any party a right or option to effect any forfeiture, modification or termination of the Debtor's or the Buyer's interest in the Purchased Assets, and (ii) in respect of Taxes).

O.     The Debtor may sell the Purchased Assets, including the Assigned Agreements and Assigned Permits, free and clear of all Interests, because each entity with an Interest in any of the Purchased Assets has consented to the Sale, is deemed to have consented to the Sale, has a claim which is subject to a bona fide dispute, or could be compelled in a legal or equitable proceeding to accept a money satisfaction of such Interests.

P.     The Debtor has good and transferable title to the Purchased Assets, including, without limitation, the Assigned Agreements and Assigned Permits, and, accordingly, the transfer of the Purchased Assets and assignment of the Assigned Agreements and Assigned Permits pursuant to the Purchase Agreement shall be a legal, valid, and effective transfer of the Purchased Assets and assignment of the Assigned Agreements and Assigned Permits.

Q.     The Buyer has provided adequate assurance of future performance under the Assigned Agreements, to the extent required by section 365(b)(1)(C) of the Bankruptcy Code.

R.     The Purchased Assets sought to be sold and assigned by the Debtor to the Buyer pursuant to the Purchase Agreement constitute property of the Debtor's estate, and good title to the Purchased Assets is vested in the Debtor's estate within the meaning of section 541(a) of the Bankruptcy Code.

S.     Upon the entry of this Order, the Purchase Agreement and the Transaction Documents shall be deemed assumed and valid and binding contracts between the Debtor and the Buyer and shall be enforceable pursuant to their terms. The Sale, and the consummation thereof, shall be specifically enforceable against and binding upon (without posting any bond) the Debtor, and shall not be subject to rejection or avoidance by the foregoing parties or any other Person.

T.     (1) Each and every provision of the Assigned Agreements or applicable non-bankruptcy law that purports to prohibit, restrict, or condition, or could be construed as prohibiting, restricting, or conditioning, assignment of any Assigned Agreements has been or will be satisfied or is otherwise unenforceable under section 365 of the Bankruptcy Code. All counterparties of the Assigned Agreements that did not or do not timely file an objection to the assumption and assignment of the Assigned Agreement(s) to which they are a counterparty are deemed to consent to the assumption and assignment by the Debtor of their Assigned Agreement to the Buyer, and the Buyer shall enjoy all of the rights and benefits under each such Assigned Agreement as of the applicable date of assumption and assignment without the necessity of obtaining such counterparty's consent to the assumption or assignment thereof. All counterparties of the Assigned Agreements for which the deadline to file an objection has not passed as of the date of the entry of this Order, and that did not or do not timely file such an objection prior to the applicable deadline, shall be deemed to consent to the assumption and assignment by the Debtor of their Assigned Agreement to the Buyer as of the effective date of the assumption and assignment of such Assigned Agreement under the assumption and assignment procedures set forth in the Purchase Agreement (the "Contract Assignment Effective Date"), and the Buyer shall enjoy all the rights and benefits under each Assigned Agreement as of the applicable Contract Assignment Effective Date without the necessity

of obtaining such counterparty's consent to the assumption or assignment thereof. If an objection to a Cure Amount is timely filed with respect to an Assigned Agreement, the Debtor may wait to assume and assign or reject the applicable Contracts pending resolution of the cure objection in accordance with and subject to the provisions of this Order and the Purchase Agreement, and may remove a Contract from the list of Assigned Agreements at any time. Upon the assignment of the Assigned Agreements to the Buyer, the Assigned Agreements shall be deemed valid and binding, in full force and effect in accordance with their terms, subject to the provisions of this Order, and shall be assigned and transferred to the Buyer, notwithstanding any provision in the Assigned Agreements prohibiting or otherwise restricting assignment or transfer, and the Debtor, its estate, or any of its affiliates, predecessors, successors, or assigns, shall have no further liability or obligation under the Assigned Agreements. To the extent any Assigned Agreement is not an executory contract within the meaning of section 365 of the Bankruptcy Code, it shall be transferred to the Buyer in accordance with the terms of the Purchase Agreement.

(2) Other than with respect to the Assumed Liabilities, the Buyer shall have no liability or obligation to the Debtor, its estate, or any of its affiliates, predecessors, successors, or assigns, to any counterparty on any Assigned Agreement, and/or to any other third person for any reason at any time for any (i) defaults or breaches under any Assigned Agreement that relate to acts or omissions that occurred in the period, or otherwise arose, prior to the Contract Assignment Effective Date, and (ii) Claims, counterclaims, offsets, or defenses (whether contractual or otherwise, including, any right of recoupment) with respect to such Assigned Agreement, that relate to any acts or omissions that arose or occurred prior to the Contract Assignment Effective Date.

U. Upon the assumption and assignment (or assignment, as applicable) of the Assigned Agreements and Assigned Permits, as provided herein and in the Purchase Agreement, the Buyer shall succeed to all of the right, title and interest of the Debtor under the Assigned Agreements and Assigned Permits including, without limitation, the right to exercise renewal options which, pursuant to any provision of the applicable Assigned Agreement, Assigned Permit or applicable non-bankruptcy law, are not exercisable by assignees of the Debtor, the Court having found that such provisions, as they relate to the assumption and assignment (or assignment, as applicable) to the

McCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

042026-000000 16106065.1          8

4906-5264-6557.1

Buyer of the Assigned Agreements and Assigned Permits, are unenforceable pursuant to section 363(l), 365(e)(1), or 365(f)(3) of the Bankruptcy Code, as applicable.

V. Neither the Purchase Agreement nor the Transaction constitutes a sub rosa chapter 11 plan. The Purchase Agreement does not impermissibly restructure the rights of the Debtor's creditors nor impermissibly dictate a chapter 11 plan for the Debtor.

**IT IS HEREBY ORDERED** as follows:

1. The Sale Motion, and the relief sought therein, is hereby **GRANTED**.

2. Any objections to the Sale Motion or the relief requested therein that have not been withdrawn, waived, settled, or otherwise resolved are hereby overruled on the merits with prejudice. All persons and entities who failed to timely object are deemed to have consented to the relief granted in this Order.

3. The Debtor is authorized to sell the Purchased Assets to the Buyer according to the terms of the Purchase Agreement, attached hereto as **Exhibit 1**, subject to the modifications to such Purchase Agreement as set forth in this Order. In the event of any conflict or inconsistency between this Order and the Purchase Agreement or any other Transaction Document, the terms of this Order shall control.

4. Section 2.1(d) of the Purchase Agreement is stricken and replaced in its entirety with the following language:

"all Seller's right, title, and interest in and to the Assigned Contracts listed on the Designated Contracts Schedule [Dkt. 518] (as such schedule may be further amended from time to time); *provided, however* that notwithstanding anything to the contrary in the Purchase Agreement or the Designated Contracts Schedule (as filed or as may be amended), the Purchased Assets shall not include any of the following(collectively, the "**Excluded Insurance Policies**"):

- Alesco Risk Management Services Limited (Chubb) Marine Stock Throughput Insurance, Policy No. B1263EM0037223 (June 1, 2023-June 1, 2024 coverage);
- Arch Policy No. ZAGLB1100403 (2023-2024 coverage);
- Arch Policy No. ZAGLB1100404 (2024-2025 coverage);
- Indian Harbor Policy No. SXS0064967 (2024-2025 coverage);

McCormick, Barstow,
Sheppard, Wayte &
Carruth LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

4906-5264-6557.1

- Great American Policy No. TUU 0738671 10 (2023-2024 coverage);
- Great American Policy No. TUU 0738671 11 (2024-2025 coverage);
- Everest Policy No. XC1EX00444-231 (2023-2024 coverage);
- Everest Policy No. XC5EX01961-241 (2024-2025 coverage);
- Endurance Policy No. ELD30002726502 (2023-2024 coverage);
- Endurance Policy No. ELD30002726503 (2024-2025 coverage)

For the avoidance of doubt, the Assigned Contracts shall not include any of the Excluded Insurance Policies. The Excluded Insurance Policies are each an Excluded Asset, and the Seller does not grant, sell, convey, assign, transfer, or deliver any of the Excluded Insurance Policies to the Buyer."

5. Section 2.1(i) of the Purchase Agreement is stricken and replaced in its entirety with the following language:

"Rights to indemnification, contribution, advancement of expenses or reimbursement, or similar rights of seller; *provided however,* that the Purchased Assets shall not include any rights of indemnification, contribution, advancement of expense or reimbursement, or similar rights or other rights arising under or in any way relating to the Excluded Insurance Policies or the proceeds thereof, and all such rights shall be considered Excluded Assets."

6. Section 2.1(j) of the Purchase Agreement is stricken and replaced in its entirety with the following language:

"all Actions and rights of recovery with respect to any of the foregoing, including all Actions and rights of recovery of Seller against the RLP Parties, RLP D&Os and Buyer or any of its Affiliates; *provided however,* that the Purchased Assets shall not include any other avoidance actions or causes of action under applicable state law (including, without limitation, the law of California) and bankruptcy law against any other parties; *provided further* that, for the avoidance of doubt, the Purchased Assets shall not include causes of action or rights of recovery relating to or arising from the Excluded Insurance Policies, and all such causes of action and rights of recovery shall be considered Excluded Assets."

7. Section 2.1(k) of the Purchase Agreement is stricken and replaced in its entirety with

McCormick, Barstow,
Sheppard, Wayte &
Carruth LLP
7817 North Fresno Street
Fresno, CA 93720

042026-000000 16106065.1      10

4906-5264-6557.1

the following language:

"all insurance policies and rights thereunder and all insurance proceeds arising in connection with loss of or damage to the Purchased Assets or other loss or damage in respect of the operating of the facilities used in the Business or the Business, in each case, to the extent of any casualties occurring during the Interim Period that remain unrepaired or unrestored as of the Closing; *provided, however,* that the Purchased Assets shall not include the Excluded Insurance Policies, any proceeds thereof, or rights or claims thereunder, including, without limitation, rights or claims to any insurance proceeds of the Excluded Insurance Policies. Any and all such rights shall be considered Excluded Assets."

8. Section 2.2(a) of the Purchase Agreement is stricken and replaced in its entirety with the following language:

"all Excluded Insurance Policies, all proceeds thereof, and all rights and claims to insurance proceeds paid or payable from such Excluded Insurance Policies."

9. Section 2.5 of the Purchase Agreement is stricken and replaced in its entirety with the following language:

"**Listeria Matter**. On or after the Closing Date, Buyer shall comply with the terms of the Consent Order that are made expressly applicable to Associated Persons as that term is defined in paragraph 9 of the Consent Order related to the Listeria Matter as required to use and operate the Purchased Assets. Notwithstanding any other provision to the contrary, Buyer shall be entitled to any legal fees or costs of defense reimbursable from insurance policies (other than the Excluded Insurance Policies) or otherwise to the extent any such legal fees or costs are incurred on and after the Closing Date. Buyer does not assume any liability or responsibility under the Consent Order imposed solely on Defendants as that term is defined in the opening paragraph of the Consent Order. Seller, its Affiliate or its Representative will promptly notify Buyer of any proposed modification to the Consent Order. Seller will petition FDA for leave to ask the Court for relief from the Consent Order at the earliest time permitted under paragraph 31 of the Consent Order."

10. Pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, upon the Closing:

McCormick, Barstow,
Sheppard, Wayte &
Carruth LLP
7647 North Fresno Street
Fresno, CA 93720

042026-000000 16106065.1     11

4906-5264-6557.1

(a) the transfer of the Purchased Assets to Buyer pursuant to the Purchase Agreement shall constitute a legal, valid and effective transfer of the Purchased Assets and shall vest Buyer with all right, title, and interest in and to the Purchased Assets; and (b) the Purchased Assets shall be transferred to Buyer free and clear of all Interests, in accordance with section 363(f) of the Bankruptcy Code, and with any and all such Interests to attach to the net proceeds of the Sale with the same validity, force and effect held prepetition and prior to this Order, and pending further order of Court, subject to any rights, claims, and defenses the Debtor and all interested parties may have with respect thereto.

11.     Upon the Closing, proceeds from the Sale distributed to the bankruptcy estate comprising the Cash Purchase Price shall be paid, simultaneously with the release, discharge, and termination of all liens and security interests as described herein, in the following order: (i) first, to Wells Fargo Bank, N.A. (or its designee) or Wells Fargo Equipment Finance, Inc. (or its designee) as applicable, in the aggregate amount of $8,295,000.00, which amount shall be paid directly to Wells Fargo at Closing to pay all secured claims held by Wells Fargo against the Debtor on account of prepetition debt (the "Wells Fargo Debt"), and (ii) second, the remaining amount to the Bankruptcy Estate. In addition, (i) the Wells Fargo TI Loan Amount (which shall include all fees and expenses related to the Wells Fargo TI Loan) shall be paid to Wells Fargo by Buyer at Closing following the assumption of such Liability by Buyer and (ii) the DIP Loan Amount shall be paid to the Rizo Parties by Buyer at Closing following the assumption of such Liability by Buyer. No Sale or other disposition of the Purchased Assets may be consummated unless the proceeds distributed to the Bankruptcy Estate comprising the Cash Purchase Price are sufficient to pay all secured personal property tax obligations owed to the Stanislaus County Tax Collector, and all judgment liens owed to Blower Dempsay Corporation dba Pac West Paper and Packaging and Rexel USA, as set forth in the Motion, by the Debtor in full in cash at Closing.

12.     The procedures related to assumption and assignment of Contracts set forth below and in the Purchase Agreement are hereby approved and made a part of this Order:

   a. As of the signing date of the Purchase Agreement, the Debtor has made available to the Buyer a list of all of its Contracts that may be assumed by the Debtor and assigned to the Buyer (the "Proposed Agreements") along with the amounts proposed to be paid to the counterparties to cure all defaults under such Proposed Agreements (the "Cure Schedule" and the amounts set forth therein, the "Proposed Cure Amounts"). The Debtor shall file

McCormick, Barstow,
Sheppard, Wayte &
Carruth LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

042026-000000 16106065.1          12

4906-5264-6557.1

the Cure Schedule and give notice to the counterparties to the Proposed Agreements of the potential assumption and assignment of the Proposed Agreements and the Proposed Cure Amounts at least 14 days before the Closing Date, except to the extent that any counterparty agrees to accept less notice.

b. As of the Closing Date, each Proposed Agreement set forth on Schedule 6.2(a)-1 of the Purchase Agreement, as in effect on the Closing Date (the "Assigned Agreements Schedule" and each Proposed Agreement listed therein, an "Assigned Agreement") that is an executory contract or unexpired lease shall be deemed to have been assumed by the Debtor and assigned to the Buyer pursuant to section 365(f) of the Bankruptcy Code. Pursuant to section 365(k) of the Bankruptcy Code, the Debtor and the Debtor's estate shall be relieved from any liability for any breach of such an Assigned Agreement occurring after the Closing. As of the Closing Date, the Assigned Agreements that are not executory contracts or unexpired leases shall be deemed to have been assigned to the Buyer pursuant to section 363(b) of the Bankruptcy Code, free and clear of all Interests. The procedures for the assumption and termination of contracts and leases included in the Purchase Agreement are approved. For the avoidance of doubt, and notwithstanding anything to the contrary in this Order, in the Purchase Agreement, the Assigned Agreements Schedule, the Designated Contracts Schedule, or any other Transaction Document, the Excluded Insurance Policies, together with all proceeds thereof and rights thereunder, are Excluded Assets and shall not be sold, conveyed, assigned, delivered, or otherwise transferred to the Buyer and the Excluded Insurance Policies shall not be Assigned Agreements.

c. Pursuant to section 365 of the Bankruptcy Code, the Debtor is authorized to assume and assign the Assigned Agreements to Buyer in accordance with the procedures detailed in the Sale Motion. The Assigned Agreements, consistent with the provisions contained herein and Purchase Agreement, shall be transferred to the Buyer free and clear of all Interests, shall be valid and binding and remain in full force and effect for the benefit of Buyer in accordance with their respective terms (notwithstanding any provision in any such Assigned Agreement that prohibits, restricts, or conditions such assignment or transfer) and, pursuant to section 365(k) of the Bankruptcy Code, the Debtor shall be relieved from any further liability with respect to the Assigned Agreements after such assignment to and assumption by Buyer. Upon Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, Buyer shall be fully and irrevocably vested in all rights, title, and interest in the Assigned Agreements. The Debtor is authorized to cooperate with, and take all actions reasonably required by, Buyer to effectuate the foregoing.

d. Pursuant to sections 365(b)(1)(A)-(B) of the Bankruptcy Code and Section 6.2 of the Purchase Agreement, the Buyer shall pay to the applicable counterparty the Cure Amounts related to any Assigned Agreement (the "Cure Amounts") promptly following the Closing unless otherwise agreed upon in writing by the Buyer and the counterparty to the Assigned Agreement.

e. Upon payment of the required Cure Amount, (i) all defaults under the related Assigned Agreements required to be cured pursuant to section 365(b)(1)(A) of the Bankruptcy Code shall be deemed cured and all amounts due to the counterparties to such Assigned Agreements pursuant to section 365(b)(1)(B) on account of any pecuniary loss resulting

McCORMICK, BARSTOW, SHEPPARD, WAYTE & CARRUTH LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

from such defaults shall be deemed paid in full, and (ii) the counterparties to, and beneficiaries of, Assigned Agreements that are executory contracts or unexpired leases, including any Governmental Authority, accrediting body, or other third party, shall be forever bound by such Cure Amounts and enjoined from seeking to terminate such Assigned Agreement or enforce any other remedies under such Assigned Agreement against the Buyer on account of defaults by the Debtor, including defaults as to which, pursuant to section 365(b)(1)(A) of the Bankruptcy Code, cure is not required.

f.   Any provision in any Assigned Agreement that purports to declare a breach, default or payment right as a result of an assignment or a change of control in respect of the Debtor as it relates to the assumption of any Assigned Agreement by the Debtor and assignment of such Assigned Agreement to the Buyer is unenforceable, and all such Assigned Agreements shall remain in full force and effect, notwithstanding any other provision. No sections or provisions of any Assigned Agreement that purports to provide for additional payments, rent accelerations, assignment fees, increases, payments, deposits, security, charges or any other fees charged to the Buyer or the Debtor as a result of the assumption and assignment of the Assigned Agreements to the Buyer shall have force and effect with respect to the Transaction and assignments authorized by this Order, and such provisions are unenforceable under sections 363(l), 365(e)(1), 365(f), or 541(c)(1) of the Bankruptcy Code, as applicable.

g.   Upon the effective assignment of the Assigned Agreements and payment of the applicable Cure Amounts, the Buyer shall be deemed to be substituted for the Debtor as a party to the applicable Assigned Agreements, and the Debtor and its estate shall be relieved, pursuant to section 365(k) of the Bankruptcy Code, from any further liability under the Assigned Agreements.

h.   If a counterparty to a Proposed Agreement files an objection to the assumption or assignment of the Proposed Agreement or the Proposed Cure Amount within 14 days of the date of filing of the Cure Schedule with the Court, the Buyer may in its sole and absolute discretion do one or more of the following: (a) seek to resolve the objection through a settlement or order of the Court and then pay such Cure Amount, or (b) remove the Proposed Agreement from Schedule 6.2(a)-1 of the Purchase Agreement, rendering the contract a rejected contract and not an Assigned Agreement, including if the resolution of the objection is not satisfactory to the Buyer in its sole and absolute discretion.

i.   Regardless of whether an objection to a proposed cure amount is filed, from and after the date of the Purchase Agreement until the Closing, the Buyer may, in its sole discretion, designate any agreement of the Debtor as an Assigned Agreement, or remove any such agreement from the Assigned Agreements Schedule, in each case by providing written notice of such designation or removal to the Debtor (the "Contract Notice"), in which case the Assigned Agreements Schedule shall automatically be deemed to be amended to include or remove, as applicable, such agreement as an Assigned Agreement, in each case, without any adjustment to the Purchase Price (other than any Cure Amount).

j.   In the case of any amendment by the Buyer of the Assigned Agreements Schedule pursuant to the foregoing paragraph, or if an agreement was not included on the Cure Schedule, the Debtor shall give notice (the "Supplemental Contract Notice") to the other

McCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

042026-000000 16106065.1                    14

4906-5264-6557.1

parties to any agreement to which such amendment relates of the removal or addition of such agreement to or from the Assigned Agreements Schedule or Cure Schedule, as applicable. A counterparty to an agreement that is assumed and assigned pursuant to a Contract Notice may only object to assumption and assignment of the agreement if the agreement was not previously included on any cure notice served in this case. If the agreement was not previously included in any cure notice, the deadline to object to any Cure Amount or to assumption and assignment on any basis is the date that is 14 days after service of the Supplemental Contract Notice. For the avoidance of doubt, an agreement that is the subject of a properly filed objection may not be assumed and assigned until the objection is resolved or otherwise overruled by the Court.

k. No later than 14 days following the Closing Date, the Debtor shall file a final list of all Assigned Agreements and the final cure amounts. To the extent there are any formal or informal objections to the cure amounts, the filing shall include a description of the agreement at issue and a note that such dispute remains subject to ongoing good faith negotiations among the parties or that the parties otherwise will request a hearing.

l. Other than with respect to the Assumed Liabilities, the Buyer shall have no liability or obligation to the Debtor, its estate, or any of its affiliates, predecessors, successors, or assigns, to any counterparty on any Assigned Agreement, and/or to any other third person for any reason at any time for any (i) defaults or breaches under any such Assigned Agreement that relate to acts or omissions that occurred in the period, or otherwise arose, prior to the Contract Assignment Effective Date, and (ii) Claims, counterclaims, offsets, or defenses (whether contractual or otherwise, including, any right of recoupment) with respect to such Assigned Agreement, that relate to any acts or omissions that arose or occurred prior to the Contract Assignment Effective Date.

m. In the event of a dispute regarding any Cure Amount or the assumption and assignment of any Assigned Agreement, the Debtor shall promptly provide written notice of such dispute to the Buyer and the applicable counterparty. The parties shall use good faith efforts to resolve any such dispute prior to the Closing; provided, however, that if such dispute is not resolved prior to the Closing, the Buyer may, in its sole and absolute discretion, (a) direct the Debtor to assume and assign the Assigned Agreement subject to the resolution of the dispute by the Court, (b) direct the Debtor to remove the Assigned Agreement from the Assigned Agreements Schedule, in which case such agreement shall be deemed an Excluded Contract and not assigned to the Buyer, or (c) take such other action as may be provided in the Purchase Agreement. Following the Closing, the Debtor and the Buyer shall cooperate in good faith to provide discovery and information reasonably requested by the other party or the Court in connection with the resolution of any disputed Cure Amount or assignment issue, subject to any applicable confidentiality obligations.

13.      As of the date of entry of this Order by the Bankruptcy Court, the Gardenia Property Lease and the Modesto Property Lease (the "Leases") shall be deemed terminated upon Closing and all prepetition obligations owed by the Debtor to the lessors of the Leases will be deemed waived and released.

McCORMICK, BARSTOW, SHEPPARD, WAYTE & CARRUTH LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

042026-000000 16106065.1          15

4906-5264-6557.1

14. Any claims held by the landlords under the Leases arising from or based upon postpetition claims on the Leases shall be subordinated to the payment of $1,000,000 in cash to the general unsecured creditors pursuant to a plan of reorganization or otherwise, unless otherwise agreed upon expressly in writing by the Official Committee of Unsecured Creditors and ordered by this Court.

15. Except for Assumed Liabilities, all persons and entities (and their respective successors and assigns) including, but not limited to, all equity security holders, Governmental Authorities, lenders, trade, and other creditors, holding Interests (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated) against, in, or with respect to the Debtor or the Purchased Assets arising or accruing under or out of, in connection with, or in any way relating to, the Debtor, the Purchased Assets, the operation of the Debtor's business prior to the Closing, or the transfer of the Purchased Assets to the Buyer, hereby are forever barred, estopped, and permanently enjoined from asserting such persons' or entities' Interests in or against the Purchased Assets or the Buyer or any of the Buyer's successors or assigns. Following the Closing Date, no holder of an Interest shall interfere with the Buyer's title to or use and enjoyment of the Purchased Assets based on or related to such Interest or any actions that the Debtor has taken or may take in this chapter 11 case. Effective upon the Closing, the Buyer shall have no liability for any Interests in or against the Debtor or its estate. Without limiting the generality of the foregoing, the Buyer shall have no liability with respect to any Interests in or against the Debtor or any Purchased Assets arising out of, relating to, or connected with the Listeria outbreak pursuant to which the Debtor and the United States Department of Justice, Consumer Protection Branch, on behalf of the Food and Drug Administration, entered into that certain Consent Decree of Permanent Injunction with the FDA in the United States District Court, Eastern District of California (Case No. 2:24-cv-02624-DJC-JDP) [Doc. 9].

16. If a counterparty to an Assigned Agreement files an objection to a proposed Cure Amount, the Buyer may in its sole and absolute discretion do one or more of the following: (a) seek to resolve the objection through a settlement or order of the Court and then cause the Debtor to pay such Cure Amount, or (b) designate the applicable Executory Contract as an Excluded Contract.

including if the resolution of the objection is not satisfactory to the Buyer in its sole and absolute discretion.

17. As of the Closing Date, the Assigned Permits shall be deemed to have been assigned to the Buyer pursuant to section 363(b) of the Bankruptcy Code free and clear of all Interests. Any provision in any Assigned Permit that purports to declare a breach, default or payment right as a result of an assignment or a change of control in respect of the Debtor as it relates to the assignment of any Assigned Permit by the Debtor to the Buyer is unenforceable, and all such Assigned Permits shall remain in full force and effect, notwithstanding any other provision. No sections or provisions of any Assigned Permit that purports to provide for additional payments, assignment fees, increases, payments, deposits, security, charges or any other fees charged to the Buyer or the Debtor as a result of the assignment of the Assigned Permits to the Buyer shall have force and effect with respect to the Transaction and assignments authorized by this Order, and such provisions are unenforceable under sections 363(l), 365(e)(1), 365(f), or 541(c)(1) of the Bankruptcy Code, as applicable.

18. Pursuant to (and to the maximum extent permitted by) sections 105(a) and 363(f) of the Bankruptcy Code, upon the Closing of the Purchase Agreement, the Purchased Assets, the Assigned Permits, and the Assigned Agreements shall be free and clear of all Interests, including, without limitation, any (a) liabilities, levies, claims, charges, assessments, mortgages, security interests, liens, pledges, conditional sales agreements, title retention contracts, easements, restrictions, rights of first refusal, rights of offset or recoupment, options to purchase and other encumbrances (including limitations on pledging or mortgaging any of the Purchased Assets) and contracts to create in the future any such encumbrance or suffer any of the foregoing; (b) successor, vicarious, or transferee liability against the Buyer, its Affiliates, or its members, whether known or unknown, now existing or hereafter occurring, whether fixed or contingent, based, in whole or in part, directly or indirectly, on any theory of law, relating to claims, administrative proceedings or actions brought by or on behalf of any Governmental Authority, accrediting body, or other third party relating to the operation of the Purchased Assets prior to Closing; (c) rights or options to effect any forfeiture, modification, repurchase, or termination of the Debtor's or Buyer's interest in the Assigned Agreements, the Assigned Permits, and/or Purchased Assets, regardless whether such are

claims, (d) claims under the employee benefit plans maintained by the Debtor; and (e) claims in respect of Taxes (including taxes as to which applicable returns have not yet been filed, whether or not overdue).

19.     The Transaction is fair and reasonable and has been conducted in good faith, and the transactions contemplated by the Purchase Agreement have been bargained for and undertaken by the Debtor and Buyer at arm's length and without collusion.

20.     As of the Closing Date, each of the Debtor's creditors is authorized and directed to execute such documents and take all other actions as may be necessary to release its Interests in or against the Purchased Assets, Assigned Permits, and Assigned Agreements, if any, as such Interests may have been recorded or may otherwise exist.

21.     The Sale has been and is undertaken by the Debtor and Buyer in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the sale of the Purchased Assets to Buyer, unless such authorization is duly stayed by court order pending such appeal entered prior to the consummation of the Sale. Buyer is hereby granted and is entitled to all the protections provided to a good faith buyer under section 363(m) of the Bankruptcy Code and is in all respects a good faith buyer. In the event of any stay, modification, reversal or vacation of this Order, then notwithstanding any such stay modification, reversal or vacation, all obligations incurred by the Debtor under this Order and the Purchase Agreement prior to the effective date of such stay modification, reversal or vacation will be governed in all respects by the original provisions of this Order, and Buyer shall be entitled to the rights, privileges and benefits granted in this Order with respect to all such obligations.

22.     No law of any state or other jurisdiction relating to bulk sales or similar laws shall apply in any way to the Sale, the Sale Motion, this Order, or the Transaction.

23.     The Sale of the Purchased Assets to Buyer pursuant to the Purchase Agreement will constitute a transfer for reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Voidable Transactions Act, and the Uniform Fraudulent Conveyance Act, as enacted in various jurisdictions, and all other applicable

McCORMICK, BARSTOW,
SHEPPARD. WAYTE &
CARRUTH LLP
7647 NORTH FRESNO STREET
FRESNO CA 93720

042026-000000 16106065.1                18

4906-5264-6557.1

laws and may not be avoided under section 363(n) of the Bankruptcy Code.

24.     The terms and provisions of the Purchase Agreement, the ancillary agreements entered in connection therewith and upon Closing, and this Order shall be binding in all respects upon, and shall inure to the benefit of the Debtor, its estate, its creditors, the Buyer and its affiliates, successors and assigns, and any affected third parties including, but not limited to, all persons and entities asserting an Interest in or against the Debtor's estate or any of the Assigned Agreements, Assigned Permits, and the Purchased Assets, any trustee appointed for the Debtor under any chapter of the Bankruptcy Code, and all Recording Officers, notwithstanding any subsequent appointment of any trustee(s) under any chapter of the Bankruptcy Code or conversion of this bankruptcy case to a case under chapter 7, as to which trustee(s) such terms and provisions likewise shall be binding. All of the rights and remedies of the Buyer under this Order and such agreements shall remain in full force and effect as if the case had not been dismissed or converted or a trustee had not been appointed. The Purchase Agreement and the sale may be specifically enforced against, and shall not be subject to rejection or avoidance by, the Debtor or any chapter 7 or chapter 11 trustee of the Debtor. Nothing contained in any plan confirmed in this bankruptcy case or the order confirming any such plan shall conflict with or derogate from the provisions of the Purchase Agreement or the terms of this Order. Further, the provisions of this Order and any actions taken pursuant hereto shall survive the entry of any order which may be entered confirming any plan, converting the Debtor's chapter 11 case to a case under chapter 7 of the Bankruptcy Code, or providing for dismissal of the Debtor's chapter 11 case.

25.     The Debtor is hereby authorized to cause the Debtor to assign the Assigned Permits to the Buyer free and clear of all Interests, and to execute and deliver to the Buyer such documents or other instruments as may be necessary to assign and transfer the Assigned Permits to Buyer as provided in the Purchase Agreement. Upon the Closing, Buyer shall be fully and irrevocably vested with all right, title, and interest of the Debtor in, to, and under the Assigned Permits and the Debtor shall be relieved from any further liability with respect to the Assigned Permits arising on or accruing after the Closing.

26.     No default shall exist under any Assigned Permits, and no counterparties to any

Assigned Permits shall be permitted to declare a default by any of the Debtor or the Buyer, or otherwise take action against the Buyer, as a result of any Debtor's financial condition, bankruptcy, or failure to perform any of its obligations under the relevant Assigned Permits. Any provision in an Assigned Permit that prohibits or conditions the assignment or sublease of such Assigned Permit (including, without limitation, the granting of a lien therein) or allows the counterparty thereto to terminate, recapture, impose any penalty, condition on renewal or extension, or modify any term or condition upon such assignment, constitutes an unenforceable anti-assignment provision that is void and of no force and effect. The failure of the Debtor or Buyer to enforce at any time one or more terms or conditions of any of the Assigned Permits shall not be a waiver of such terms or conditions, or of the Debtor's and Buyer's rights to enforce every term and condition of the Assigned Permits.

27.    The failure to specifically reference any particular provision of the Purchase Agreement or Transaction Documents in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Purchase Agreement and Transaction Documents be authorized and approved in their entirety, subject to the modifications to such documents set forth in this Order. In the event of any conflict or inconsistency between this Order and the Purchase Agreement or any of the Transaction Documents, this Order shall control.

28.    Effective upon the Closing Date, this Order (a) is and shall be effective as a determination that all Interests, including without limitation voluntary and non-consensual Liens, of any kind or nature whatsoever existing as to the Purchased Assets prior to the Closing Date have been unconditionally released, discharged, and terminated (with such Interests attaching to the proceeds attributable to the Purchased Assets encumbered by such Interests with the same nature, validity, priority, extent, perfection, force and effect that such Interests encumbered the Purchased Assets immediately prior to entry of this Order), and (b) is and shall be binding upon and shall govern the acts of all entities, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies or units, governmental departments or units (including any Governmental Authority, including, but not limited to and for a commercially reasonable time for the Buyer and Debtor to obtain any new license or permit, any license or permit necessary to operate the Facility as that term is defined in

the Consent Order) secretaries of state, federal, state and local officials and all other Persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to the Purchased Assets conveyed to the Buyer (all such entities being referred to as "Recording Officers"), and all recorded Interests (other than Assumed Liabilities and as otherwise provided in the Purchase Agreement) against the Purchased Assets shall be deemed stricken from such entities' records, official and otherwise. Effective as of the Closing, a certified copy of this Order may be filed with the appropriate Recording Officers to evidence cancellation of any recorded Liens (including Tax Liens) and other Interests against the Purchased Assets recorded prior to the date of the Closing. All Recording Officers shall accept for filing any and all documents and instruments necessary, advisable, or appropriate to consummate the transactions contemplated by the Purchase Agreement, subject to the payment of any filing or other fee imposed under non-bankruptcy law.

29. The provisions of this Order authorizing the Sale and transfer of the Purchased Assets free and clear of Interests (other than Assumed Liabilities expressly assumed under, or expressly permitted by, the Purchase Agreement), including the DIP Obligations, shall be self-executing, and neither the Debtor nor the Buyer shall be required to execute or file releases, termination statements, assignments, consents or other instruments in order to effectuate, consummate or implement the terms of this Order. For the avoidance of doubt, on or after the Closing Date, all entities, including, without limitation, all trustees or collateral agents, are authorized and directed to file and/or execute lien releases, including financial statement terminations, mortgage releases or other documents or agreements evidencing releases of Interests in or against the Purchased Assets (other than Assumed Liabilities and as otherwise expressly permitted by the Purchase Agreement). If any Person or entity that has filed financing statements, mortgages, mechanic's liens, or other documents or agreements evidencing Interests in or against the Purchased Assets shall not have delivered to the Debtor before the Closing Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all Interests in or against the Purchased

McCORMICK, BARSTOW, SHEPPARD, WAYTE & CARRUTH LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

042026-000000 16106065.1       21

4906-5264-6557.1

Assets that the Person or entity has or may assert with respect to the Purchased Assets, the Debtor and the Buyer, or either of them, are hereby authorized to execute and file such statements, instruments, releases, and other documents on behalf of such Person or entity with respect to the Purchased Assets. The Buyer is hereby authorized to file, register, or otherwise record a certified copy of this Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of Interests in or against the Purchased Assets. This Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, or local governmental agency, department, or office.

30. As of the Closing, as part of the consideration provided under the Purchase Agreement, Ivan Rizo and Edwin Rizo (as such term is defined in the Purchase Agreement) (collectively, the "Rizo Parties"), I&E McClure, LLC and R.L. Gardena, LLC (the "Lessors") shall be deemed to have waived any right to recovery or payment of any kind on account of their respective pre-petition claims, including, without limitation, claims related to any pre-petition secured or unsecured loans made by the Rizo Parties to the Debtor and any unpaid pre-petition lease obligations due from the Debtor to the Lessors (collectively, the "Rizo Claims"). If the Closing does not occur for any reason whatsoever, any claims held by the Rizo Parties and the Lessors against the bankruptcy estate shall be preserved in all respects.

31. Neither the Debtor nor the Buyer shall have an obligation to close the Sale until all conditions precedent in the Purchase Agreement to each of their respective obligations to close the Sale have been satisfied or waived in accordance with the terms of the Purchase Agreement.

32. The Buyer shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the Purchase Agreement, the Transaction Documents, or any other Sale-related document. The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the provisions of this Order.

33. This Order is not stayed by operation of any provision of the Bankruptcy Code or Bankruptcy Rule but shall instead be effective and enforceable immediately upon its entry. In the absence of any person or entity obtaining a stay pending appeal, the Buyer and the Debtor are free

to close the Sale under the Purchase Agreement at any time pursuant to the terms thereof.

34. The provisions of this Order are nonseverable and mutually dependent.

35. The Debtor and Buyer are authorized to take all necessary actions, including executing all appropriate documents, to effectuate the relief granted in this Order in accordance with the Sale Motion.

36. The Purchase Agreement and any related agreements may be amended, supplemented, or otherwise modified by the parties thereto and in accordance with the terms thereof, without further order of the Court; provided, however, that any such modification, amendment, or supplement that the Debtor determines, in its reasonable discretion, would have a material adverse effect on the Debtor's estate shall be filed on the Court's docket, and the effectiveness of such amendment, supplement, or modification shall be subject to an opportunity for parties in interest to object as determined by the Court.

37. If, after the Closing, either party discovers that any asset or property that should have been included in the Purchased Assets was not transferred to the Buyer, or that any asset or property that should have been excluded from the Purchased Assets was transferred to the Buyer, the parties shall cooperate in good faith to promptly transfer such asset or property to the appropriate party, at no additional cost, and to execute and deliver such documents and take such actions as may be reasonably necessary to effectuate such transfer. The Debtor shall not be required to take any action that would result in material expense or liability to its estate. In this regard, Section 2.1(q) is hereby added to Purchase Agreement, providing as follows: "any other assets that are not Excluded Assets unless Buyer provides Seller with written notice that such asset(s) should be an Excluded Asset in which event, the asset(s) shall be deemed an Excluded Asset."

38. To the extent provided by section 525 of the Bankruptcy Code, no governmental unit (as defined in section 101(27) of the Bankruptcy Code) or any representative thereof may revoke or suspend any permit, copyright, patent, trademark, or other permission relating to the operation of the Purchased Assets sold, transferred, or conveyed to the Buyer on account of the filing or pendency of this chapter 11 case or the consummation of the Sale. To the maximum extent permitted under applicable law, the Buyer shall be authorized, as of the Closing, to operate under any license, permit,

McCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

042026-000000 16106065.1      23

4906-5264-6557.1

registration, and governmental authorization or approval of the Debtor with respect to the Purchased Assets, and all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been, and hereby are, deemed to be transferred to the Buyer as of the Closing. To the extent any license or permit necessary for the operation of the Purchased Assets is determined not to be an executory contract that may be assumed and assigned under section 365 of the Bankruptcy Code, the Buyer may, in its sole and absolute discretion, apply for and obtain any necessary license or permit after the Closing Date, and such license or permit of the Debtor shall remain in place for the Buyer's benefit and use in its operations until a new license or permit is obtained.

39. All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

40. Within five (5) business days of the occurrence of the Closing, the Debtor shall file and serve a notice of the Closing in form and substance satisfactory to the Buyer; provided, however, that the failure by the Debtor to file such notice shall not affect the effectiveness of this Order, the findings and orders contained herein, or the effectiveness of the Closing.

41. The Court shall retain jurisdiction over any and all matters arising from the interpretation or implementation of this Sale Order notwithstanding the conversion, dismissal, or closure of this bankruptcy case and notwithstanding any confirmed chapter 11 plan, or order confirming such plan, providing to the contrary. This includes the Court retaining jurisdiction over any and all matters arising from the Buyer including a previously Omitted Contract on the Designated Contracts Schedule pursuant to section 6.2(e) of the Purchase Agreement and any litigation, contested matter, or other proceeding arising therefrom including pursuant to section 6.2(f) of the Purchase Agreement.    Dated: April 02, 2026

United States Bankruptcy Judge

McCORMICK, BARSTOW, SHEPPARD, WAYTE & CARRUTH LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

042026-000000 16106065.1        24

4906-5264-6557.1

EXHIBIT "1"

**ASSET PURCHASE AGREEMENT**

**DATED MARCH 6, 2026**

**BY AND BETWEEN**

**RIZO-LÓPEZ FOODS, INC.,**

**as the Chapter 11 Debtor-in-Possession and Seller**

**AND**

**FRANCISCO FOODS, LLC, or its designee,**

**as Buyer**

## ASSET PURCHASE AGREEMENT

This **ASSET PURCHASE AGREEMENT** (this "**Agreement**") is entered into effective as of March 6, 2026 (the "**Effective Date**"), by and between **Francisco Foods, LLC**, a Delaware limited liability company, or its designee ("**Buyer**"), and **RIZO-LÓPEZ FOODS, INC.**, a California corporation, as debtor and debtor in possession ("**Seller**") under Case No. 25-25004 (the "**Bankruptcy Case**") in the United States Bankruptcy Court for the Eastern District of California, Sacramento Division (the "**Bankruptcy Court**"). Seller and Buyer are together referred to as the "**Parties**" and each individually as a "**Party**." Certain terms used in this Agreement are defined in Section 1.1.

### BACKGROUND

**WHEREAS**, Seller is a company in the business of manufacturing, selling, and distributing Mexican-style cheese and dairy products (the "**Business**");

**WHEREAS**, on September 15, 2025, Seller filed a voluntary petition for relief under Chapter 11 of the United States Code (the "**Bankruptcy Code**") in the Bankruptcy Court;

**WHEREAS**, Seller commenced the Bankruptcy Case and has determined that a sale of its assets is necessary to maximize value for its estate and creditors;

**WHEREAS**, Buyer desires to purchase from Seller, and Seller desires to sell to Buyer, all of the Purchased Assets on the terms and conditions set forth herein, free and clear of all Liens, Claims, rights, Encumbrances, and interests pursuant to and in accordance with Sections 105, 363 and 365 of the Bankruptcy Code and Rules 4001, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), all as more fully set forth in this Agreement;

**WHEREAS**, as of the date hereof, Valley Milk owns 60% of the equity interest, and Rilosa, LLC (which is wholly owned by the RLF Parties indirectly) owns 40% of the equity interest, of the Buyer, which is a Delaware limited liability company;

**WHEREAS**, contingent upon the consummation of the transactions contemplated by this Agreement, I&E McClure, LLC, which is wholly owned by the RLF Parties indirectly, will contribute certain real property and assets related thereto, to the Buyer;

**WHEREAS**, in Seller's business judgment, consummation of the transaction described in this Agreement is a necessary condition to Seller's ability to maximize the value of its assets and recoveries for all holders of rights and claims against Seller and its property;

**WHEREAS**, the Parties acknowledge and agree that this Agreement was negotiated at arm's length and in good faith; and

**WHEREAS**, the Parties acknowledge and agree that this Agreement is subject to the approval of the Bankruptcy Court and will be consummated only under the Sale Order to be entered in the Bankruptcy Case.

NOW, THEREFORE, in consideration of the foregoing recitals, which are incorporated into the agreements of the Parties herein, and for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

## ARTICLE I
## DEFINITIONS

**1.1.** **Definitions**. As used in this Agreement, unless otherwise defined herein, the following terms have the following meanings (unless otherwise expressly provided herein):

"**Accounts Receivable**" means all accounts, notes, interest and other receivables of Seller, and all Claims, rights, interests and proceeds related thereto related to the provision of products or services.

"**Actions**" means any and all causes of action, lawsuits, judgments, Claims, refunds, rights of recovery, rights of set-off, counterclaims, defenses, demands, warranty claims, or similar rights of any kind or nature, whether choate or inchoate, known or unknown, now existing or hereafter acquired, contingent or noncontingent.

"**Affiliate**" means, with respect to a Person, any other Person that directly or indirectly controls, is controlled by, or is under common control with, such Person. The term "control" used in the preceding sentence means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract, or otherwise.

"**Agreement**" is defined in the Preamble.

"**Alternative Transaction**" means a transaction in which the Bankruptcy Court fails to approve the sale of the Purchased Assets to Buyer as provided hereunder and instead approves a sale of the Purchased Assets to an entity that has submitted a competing offer, and such sale closes.

"**Ancillary Agreements**" means, with respect to any Party, all agreements to which such Party is or will become a party pursuant to this Agreement, if any.

"**Assigned Contract**" is defined in Section 6.2(a).

"**Assignment and Assumption Agreement**" is defined in Section 2.9(c).

"**Associated Persons**" has the meaning given to such term in paragraph 9 of the Consent Order.

"**Assumed Liabilities**" is defined in Section 2.2.

"**Bankruptcy Case**" is defined in the Preamble.

"**Bankruptcy Code**" is defined in the Recitals.

"**Bankruptcy Court**" is defined in the Preamble.

2

"**Bankruptcy Estate**" means Seller's bankruptcy estate in the Bankruptcy Case created pursuant to 11 U.S.C. § 541(a).

"**Bankruptcy Rules**" is defined in the Recitals.

"**Bill of Sale**" is defined in Section 2.9(a).

"**Business**" is defined in the Recitals.

"**Business Day**" means any day other than a Saturday, Sunday or day on which banks are authorized or required to be closed in New York, New York.

"**Buyer**" is defined in the Preamble.

"**Buyer Released Parties**" is defined in Section 5.7.

"**Claims**" has the meaning assigned to that term by Section 101(5) of the Bankruptcy Code.

"**Closing**" is defined in Section 2.7.

"**Closing Date**" is defined in Section 2.7.

"**Consent Order**" means the Consent Decree of Permanent Injunction entered in the United States District Court for the Eastern District of California (Case No. 2:24-cv-02624-DJC-JDP) [Doc. 9].

"**Contract**" means any agreement, purchase order, license, lease, contract, arrangement, understanding or commitment, whether oral or written, express or implied, to which a Person or its assets is legally bound.

"**Cure Amounts**" means the amounts, if any, determined by the Bankruptcy Court to be necessary to cure all defaults and to pay all actual losses that have resulted from defaults by Seller pursuant to the Assigned Contracts.

"**Defendants**" has the meaning given to such term in the opening paragraph of the Consent Order.

"**DIP Loan Agreements**" means (i) that certain Postpetition Loan Agreement, dated September 16, 2025, between Seller and the RLF Parties, (ii) that certain Promissory Note, dated September 16, 2025, issued by the Seller in favor of the RLF Parties, and (iii) that certain Security Agreement, dated September 16, 2025, issued by Seller in favor of the RLF Parties.

"**Disputes**" is defined in Section 5.7.

"**Drop Dead Date**" is defined in Section 9.1(a)(v)(4).

"**Effective Date**" is defined in the Preamble.

3

"**Encumbrances**" means, to the extent not considered a Lien, any and all Claims, rights, encumbrances and interests, including mortgages, deeds of trust, liens, warehouse liens, mechanics liens, Tax Liabilities, pledges, security interests, leases, subleases, licenses, rights of way, easements, rights of first refusal or first offer, options, options to purchase, agreements to sell, rights of redemption, pledges, restrictions, covenants, violations of law, reservations, set-off rights or similar matters, whether or not of record, or encroachments of any nature whatsoever, or any conditional sale contracts, title retention contracts or other agreements or arrangements to give or to refrain from giving any of the foregoing, whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, contingent or non-contingent, material or non-material, known or unknown.

"**Excluded Assets**" is defined in Section 2.2.

"**Excluded Liabilities**" is defined in Section 2.3(a).

"**Facility**" means the facility as defined in the Consent Order.

"**FDA**" means the United States Food and Drug Administration.

"**Federal Rules of Bankruptcy Procedure**" means the Federal Rules of Bankruptcy Procedure as promulgated under 28 U.S.C. § 2075.

"**Final Order**" means an Order of the Bankruptcy Court (or any other court of competent jurisdiction) which has not been modified, amended, reversed, vacated or stayed and as to which (i) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, stay, reargument or rehearing shall then be pending or (ii) if an appeal, writ of certiorari, new trial, stay, reargument or rehearing thereof has been sought, such Order of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such Order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument or rehearing shall have expired, as a result of which such action or Order shall have become final in accordance with Bankruptcy Rule 8002; provided that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such Order, shall not cause an Order not to be a Final Order.

"**GAAP**" means generally accepted accounting principles in the United States as in effect from time to time.

"**Governing Documents**" means, for the Person in question, that Person's Certificate of Incorporation, Certificate of Formation, Bylaws, Limited Liability Company Agreement or other similar documents relating to the formation and governance of the business and affairs of such Person.

"**Governmental Authority**" means any foreign, domestic, federal, state, local or municipal government, including any subdivision, court, commission or regulatory agency; any governmental or quasi-governmental authority; and any Person exercising or entitled to exercise any administrative, executive, judicial, legislative, regulatory or taxing authority.

4

"**Governmental Permits**" means any permit issued by a Governmental Authority to operate the Facility as that term is defined in the Consent Order.

"**Indebtedness**" means, without duplication, all obligations of Seller, whether direct or indirect, absolute or contingent, matured or unmatured, liquidated or unliquidated, and whether or not reflected on Seller's financial statements: (i) all obligations for borrowed money, in respect of loans or advances or other extensions of credit; (ii) all obligations evidenced by bonds, debentures, notes or other similar instruments; (iii) all obligations in respect of letters of credit, whether or not drawn, bankers' acceptances issued for the account of Seller, and or similar credit support arrangements; (iv) lease obligations that are required to be capitalized on a balance sheet in accordance with GAAP, and all other lease obligations that are financing-type arrangements; (v) all obligations for the costs or purchase prices of any of the Purchased Assets; (vi) any debt-like obligation or financing-type arrangement in respect of the deferred purchase price of the Purchased Assets; (vii) all obligations of such Seller secured by any Lien on any of the Purchased Assets, whether or not such obligations are assumed by Buyer; (viii) all obligations of Seller as a guarantor, surety or indemnitor of, or otherwise with respect to, any indebtedness of any other Person; and (ix) any accrued interest, prepayment premiums or penalties or other fees, costs or expenses related to any of the foregoing.

"**Intellectual Property**" means all intellectual property, including: (i) inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto, and all patents, patent applications and patent disclosures, together with all reissuances, continuations, continuations-in-part, revisions, extensions and reexaminations thereof; (ii) trademarks, service marks, trade dress, logos, trade names, brand names, corporate names, domain names and other electronic communication identifications, together with all translations, adaptations, derivations and combinations thereof and including all goodwill associated therewith, and all applications, registrations and renewals in connection therewith; (iii) copyrightable works, copyrights and applications, registrations and renewals in connection therewith; (iv) trade secrets and confidential business information (including ideas, research and development, know-how, formulas, compositions, manufacturing and production processes and techniques, pass schedules, rolling schedules, technical data, designs, drawings, specifications, customer and prospective customer lists, supplier lists, pricing and cost information, and business and marketing plans and proposals); (v) all computer software (including data and related documentation); (vi) all other intellectual proprietary rights; and (vii) all copies and tangible embodiments of any of the foregoing (in whatever form or medium).

"**Interim Period**" is defined in Section 5.2.

"**Inventory**" means all inventories of supplies, ingredients, food, janitorial and office supplies, raw materials, work in progress, packaging, parts, and other disposables and consumables, including, any rights to rebates, refunds or discounts due with respect to those assets (i) located at, ordered for, or in transit to Seller's facilities or (ii) used in the operation of the Business or produced in the Business.

"**Leases**" means the commercial real property leases, dated October 1, 2010, and January 1, 2023, respectively, between I&E McClure, a California limited liability company and Seller, as amended from time to time; and the commercial real property lease, dated October 1, 2004,

between R.L. Gardena, a California limited liability company and Seller, as amended from time to time.

"**Liens**" has the meaning assigned to such term by Section 101(37) of the Bankruptcy Code and includes UCC Liens and Title Liens.

"**Limited Liability Agreement**" means the limited liability agreement of Francisco Foods, LLC, dated as the date hereof, by and among Buyer, Valley Milk, LLC and Rilosa, LLC.

"**Listeria Matter**" means the Listeria outbreak pursuant to which Seller and the United States Department of Justice, Consumer Protection Branch, on behalf of the Food and Drug Administration, entered into the Consent Order.

"**Local Bankruptcy Rules**" means the local rules of the United States Bankruptcy Court for the Eastern District of California, Sacramento Division, or any other applicable local bankruptcy rules.

"**Manager**" means, with respect to a limited liability company, the Person or Persons designated as the manager(s) or managing member(s) of such company under its Governing Documents.

"**Material Adverse Effect**" means a change, event, development or occurrence that, individually or in the aggregate, (a) would reasonably be expected to prevent or materially delay consummation of the transactions contemplated by this Agreement or (b) has or would reasonably be expected to have a material adverse effect on the use, operation, value or marketability of the Purchased Assets. Notwithstanding the foregoing, none of the following changes, events, developments or occurrences shall be deemed to constitute or be taken into account in determining whether there has been or may be a Material Adverse Effect under clause (b): (i) any actual or proposed change in law or accounting rules, including generally accepted accounting principles; (ii) the entry into this Agreement or the announcement, commencement, pendency or consummation of the transactions contemplated hereby, except to the extent arising from a breach of this Agreement by Seller; (iii) any action taken by Seller that is expressly required to be taken by this Agreement in compliance with the terms hereof; (iv) any change in general business, economic, geopolitical or financial market conditions, which do not disproportionately affect Seller relative to other industry participants; (v) acts of war or terrorism underway as of the Closing Date, which do not disproportionately affect Seller relative to other industry participants; and (vi) any natural disaster or calamity, which do not disproportionately affect Seller relative to other industry participants.

"**Memorandum of Lease**" means the Memorandum of Lease by and between Seller and I & E McClure, LLC, recorded in the County of Stanislaus on February 2, 2011, as referenced in Section 2.9(k).

"**New Employee List**" is defined in Section 5.5(a).

"**New Employees**" is defined in Section 5.5(a).

6

"**Order**" means any award, writ, injunction, judgment, order, ruling, decision, decree, directive, or similar determination entered, issued, made, or rendered by any Governmental Authority (whether judicial, administrative, or arbitral).

"**Pacific Time**" means Pacific Time Zone in the United States of America.

"**Party**" and "**Parties**" are defined in the Preamble.

"**Permits**" means all licenses, permits, franchises, privileges, certificates, rights, registrations, approvals, authorizations, consents, waivers, exemptions, releases, variances, certificates of authority, accreditations, or Orders issued by any Governmental Authority.

"**Person**" means an individual, corporation, partnership, limited liability company, limited liability partnership, trust, association, joint venture, or any other entity or organization, including any Governmental Authority.

"**Plan**" means any plan of reorganization or liquidation pursuant to Title 11 of the United States Code.

"**Purchase Price**" is defined in Section 2.6.

"**Purchased Assets**" is defined in Section 2.1.

"**Records**" means books of account, ledgers, forms, records, documents, files, invoices, vendor or supplier lists, plans and other data which are necessary to or desirable for the ownership, use, maintenance or operation of the Business, the Purchased Assets or the Assumed Liabilities and which are owned or used by Seller, including all blueprints and specifications, all design drawings and related documents, all manuals, all personnel, payroll, payroll tax and labor relations records, all environmental control records, environmental impact reports, statements, studies and related documents, handbooks, technical manuals and data, engineering specifications and work papers, all pricing and cost information, all sales records, all accounting and financial records, all sales and use tax returns, reports, files and records, asset history records and files, all data entry and accounting systems used to conduct the day-to-day operations of the Business, all maintenance and repair records, all correspondence, notices, citations and all other documents received from, sent to or in Seller's possession in connection with any Governmental Authority (including federal, state, county or regional environmental protection, air or water quality control, occupational health and safety, food manufacturing and food safety, land use, planning or zoning and any alcohol, beverage or fire prevention authorities), all minute books, stock records, tax returns and tax records, and all other books and records of Seller or its Affiliates with respect to the Business and the Purchased Assets.

"**Representatives**" means, with respect to any Person, the officers, directors, principals, employees, agents, auditors, advisors, and bankers of such Person.

"**RLF D&Os**" means any and all officers and directors of Seller as of the Closing Date, which shall include, for the avoidance of doubt: (a) Edwin Rizo, (b) Ivan Rizo, and (c) Tomas Rizo.

"**RLF Parties**" mean Ivan Rizo and Edwin Rizo.

"**Sale Hearing**" means the hearing conducted by the Bankruptcy Court to consider approval of the Sale Motion.

"**Sale Motion**" means Seller's Motion for Entry of an Order Authorizing the Sale of Certain of the Debtor's Assets Free and Clear to Buyer and any related supplemental pleadings in form and substance satisfactory to Buyer and Seller.

"**Sale Order**" means a Final Order of the Bankruptcy Court approving, inter alia, (i) the sale of the Purchased Assets to Buyer free and clear of any Encumbrances, and (ii) the assumption and assignment of the Assigned Contracts to Buyer, in the form of the Sale Order attached to the Sale Motion or otherwise in form and substance satisfactory to Buyer and Seller.

"**Seller**" is defined in the Preamble.

"**Seller Releasing Parties**" is defined in Section 5.7.

"**Tax Liabilities**" is defined in Section 2.4(m).

"**Taxes**" means all federal, state, local, and foreign taxes or similar charges, including all income, franchise, margin, real property, withholding, employment, sales, excise, and transfer taxes and any interest and penalties thereon.

"**Title Liens**" is defined in Section 2.4(d).

"**UCC Liens**" is defined in Section 2.4(c).

"**USPTO**" means the United States Patent and Trademark Office.

"**Wells Fargo TI Loan Agreements**" means that certain Promissory Note Secured by Deed of Trust, dated July 8, 2011, issued by the Seller to Wells Fargo National Association ("**Wells Fargo**"), as amended by that certain Amendment to Credit Agreement, dated June 7, 2023.

## ARTICLE II
## TRANSACTIONS AT THE CLOSING

**2.1.** **Purchased Assets**. Subject to and in reliance upon the terms and conditions of this Agreement and the Sale Order, at the Closing, Seller shall grant, sell, convey, assign, transfer and deliver to Buyer, and Buyer shall acquire from Seller, all of Seller's right, title and interest in the following assets, properties and rights of every kind and nature, whether real, personal or mixed, tangible or intangible free and clear of all Liens, Claims and Encumbrances (the "**Purchased Assets**"):

(a)     all Inventory;

8

(b) all equipment, furniture, appliances, industrial artwork, computers, computer terminals and printers, information technology systems, and office equipment, and all other tangible personal property of every kind and description listed in **Schedule 2.1(b)**;

(c) all Intellectual Property, including, without limitation, all trademarks, designs, logos, label, label artwork, label content, marketing and advertising content or materials, website content, domain names, or URLs, images, photographs, illustrations, drawings, or any other work product created for or used in connection with the Business, source code, domain names, and all goodwill associated with the Business, along with any and all (i) associated licenses and sublicenses obtained by Seller (i.e. where Seller is the licensee or sublicensee) with respect thereto and rights thereunder; (ii) rights to receive license fees and royalties (including under any executory contract that is not an Assigned Contract to the extent the counterparty continues to perform thereunder); (iii) remedies against infringements thereof and rights to protection of interests therein under the laws of all jurisdictions; and (iv) Actions, Claims, and causes of action with respect to any of the foregoing, whether accruing before, on, or after the date hereof, including all rights to and Actions, Claims, for damages, restitution, and injunctive and other legal and equitable relief for past, present, and future infringement, dilution, misappropriation, violation, misuse, breach, or default, with the right but no obligation to sue for such legal and equitable relief and to collect, or otherwise recover, any such damages; provided, however, that nothing in this Section 2.1(c) shall be deemed an assumption of any executory contract by Buyer that is not expressly an Assigned Contract;

(d) all Seller's right, title, and interest in and to the Assigned Contracts listed on the Designated Contracts Schedule;

(e) all Permits (to the extent legally transferrable) and all Governmental Permits (whether or not transferrable) (the "**Assigned Permits**");

(f) all Records except the Excluded Records;

(g) all sales, marketing and development and expansion plans, strategic plans, projections, studies, reports and other documents and data, current and past lists of customers, suppliers, vendors and sources, and all training materials and marketing brochures;

(h) without duplication of the above, all deposits and other prepaid charges and expenses, other than those specified in Section 2.2(b) below as Excluded Assets;

(i) rights to indemnification, contribution, advancement of expenses or reimbursement, or similar rights of Seller;

(j) all Actions and rights of recovery with respect to any of the foregoing, including all Actions and rights of recovery of Seller against the RLF Parties, RLF D&Os and Buyer or any of its Affiliates; provided, however, Purchased Assets shall not include any other avoidance actions or causes of actions under applicable California and bankruptcy law against other parties;

(k) all insurance policies and rights thereunder and all insurance proceeds arising in connection with loss of or damage to the Purchased Assets or other loss or damage in respect of the operation of the facilities used in the Business or the Business, in each case, to the extent of

any casualties occurring during the Interim Period that remain unrepaired or unrestored as of the Closing; provided, however, Purchased Assets shall not include the proceeds paid or payable to Seller and related rights to a defense and indemnification of legal fees and costs with respect to insurance recoveries related to the Listeria Matter as set forth in Section 2.2(a) below for any period prior to the Closing Date;

(l) all rights of Seller under any Intellectual Property assignment, work-for-hire, and assignment of inventions with current or former employees, directors, consultants, independent contractors, and agents of Seller;

(m) all Accounts Receivable relating to goods or services provided by Seller prior to, on or after the Closing Date;

(n) the goodwill relating to or associated with the Purchased Assets;

(o) all guarantees, warranties, indemnities, and similar rights in favor of Seller with respect to any of the Purchased Assets; and

(p) any other assets listed in **Schedule 2.1(p)**.

**2.2.** **Excluded Assets**. Notwithstanding anything herein to the contrary, Buyer shall not acquire, and Seller shall retain and shall not grant, sell, convey, assign, transfer, or deliver to Buyer, any interest in the following assets and properties of Seller (collectively, the "**Excluded Assets**"):

(a) All proceeds paid or payable to Seller along with a right to a defense and indemnification for legal fees and costs with respect to insurance recoveries related to the Listeria Matter for any period prior to the Closing Date;

(b) all prepaid expenses and deposits arising in connection with the Business, to the extent non-transferable, including but not limited to unused retainers paid to Seller's professionals related to the Bankruptcy Case;

(c) any cash or cash equivalents whatsoever, whether on hand, in banks or elsewhere;

(d) all Contracts that are not Assigned Contracts;

(e) the Leases, which shall be deemed terminated upon Closing; provided that all unpaid prepetition lease obligations shall be waived by the RLF Parties and any of their Affiliates.

(f) Seller's employee benefit plans, employment agreements, and any related liabilities to any Seller employee, including any wages, salaries, vacation or other paid time off liabilities, or termination liabilities;

(g) all claims, rights, defenses, offsets, recoupments, causes of action, credits, immunities or rights of set-off against third parties arising prior to the Closing Date with respect to the Excluded Assets or the Excluded Liabilities;

10

(h)     all claims and causes of action against third parties other than the claims and causes of action expressly included in the Purchased Assets;

(i)     all minute books, seals, stock records, tax returns, tax records, and all other books and records related to the Excluded Assets or necessary for Seller to conclude the administration of the Bankruptcy Case (the "**Excluded Records**");

(j)     all tax refunds, and all rights or other tax benefits arising from Seller's net operating losses arising prior to the Closing Date, subject to Section 9.7(c)(iii);

(k)     any assets that Buyer elects not to purchase by written notice delivered to Seller prior to the Closing Date, provided that such election shall not reduce the Aggregate Consideration (each, an "**Excluded Asset Notice**");

(l)     any other assets listed on **Schedule 2.2(l)**; and

(m)     all refundable tax credits set forth in Section 2301 of the Coronovirus Aid, relief, and Economic Security Act of 2020, Pub. L. 116 136 issued to Seller (the "**ERTC Credit**").

**2.3.     Assumption of Assumed Liabilities and DIP Loan**. At Closing, Buyer shall assume and be responsible only for liabilities under:

(a)     the Assigned Contracts, including any Cure Amounts, but only to the extent that such liabilities thereunder are required to be performed after the Closing Date, and were incurred in the ordinary course of business (collectively, the "**Assumed Liabilities**");

(b)     the debts owed to the RLF Parties by Seller under the DIP Loan Agreements in the amount set forth in Section 2.6(a); and

(c)     the outstanding amount of principal and interest owed to Wells Fargo pursuant to the Wells Fargo TI Loan Agreements.

**2.4.     Excluded Liabilities**. Except for the Assumed Liabilities, at Closing, Buyer shall not assume, and under no circumstances shall Buyer be obligated to pay, discharge, perform or assume any debt, obligation, expense or liability of Seller or any of its Affiliates (whether express or implied, fixed or contingent, known or unknown, or whether the liabilities could be asserted against or imposed upon Buyer as successors or transferees of a Seller as an acquirer of the Purchased Assets under any legal principle) (collectively, the "**Excluded Liabilities**"). Without limiting the generality of the foregoing, the Excluded Liabilities shall include, but not be limited to, the following:

(a)     Seller's or any of Seller's shareholders', members', directors', officers', affiliates', creditors' or parent or subsidiary companies' liabilities, obligations or duties whatsoever, except with respect to any Assumed Liabilities of the Assigned Contracts in accordance with Section 2.2;

(b)     any liabilities owed by Seller to its Affiliate and Seller's or its Affiliate's respective directors, managers, officers, employees, shareholders, members, agents, and representatives, including, for the avoidance of doubt, any postpetition obligations associated with the Leases;

11

provided, however, that any unpaid prepetition obligations will be waived in accordance with Section 7.7;

(c)      any and all Liens arising under the Uniform Commercial Code not otherwise described herein ("**UCC Liens**");

(d)      any and all Liens listed on any title documents of the Purchased Assets including that certain Construction Fee and Leasehold Deed of Trust with Absolute Assignment of Leases and Rents, Security Agreement and Fixture Filing dated July 8, 2011, by and among Seller, as leasehold trustor and borrower, I & E McClure, LLC, as non-borrower trustor, American Securities Company, as trustee, and Wells Fargo Bank, as beneficiary, recorded in County of Stanislaus on July 15, 2011, as recording number 2011-0058070, in connection with loan number 0262973414, as modified by that certain First Modification of Construction Fee and Leasehold Deed of Trust with Absolute Assignment of Leases and Rents, Security Agreement, and Fixture filing dated November 20, 2017, and recorded in County of Stanislaus on November 29, 2017, as recording number 2017-0088069 (collectively, "**Title Liens**");

(e)      all trade payables, accounts payable, and other current liabilities of Seller;

(f)      any liability whether asserted by any governmental entity or private person or persons of Seller or its Affiliates or representatives arising out of or resulting from its compliance or noncompliance with any law, Order, or regulation including any Claim or liability arising out of or related to the Listeria Matter, any liability for payments due to the United States Department of Agriculture Dairy Promotion Program (7 C.F.R. Part 1150), or the California Department of Food and Agriculture under either the California Checkoff program or the California Quota Implementation Plan;

(g)      all liabilities and obligations relating to or arising from any Excluded Asset;

(h)      all liabilities and obligations relating to or arising from any storage or warehouse agreement to store Inventory or any asserted warehouse lien;

(i)      any other liabilities arising out of or relating to the Business that are not Assumed Liabilities;

(j)      liabilities relating to any complaint, action, arbitration or regulatory, administrative, or government proceeding or investigation involving Seller or arising from actions of Seller or on or prior to the Closing Date;

(k)      any liability to indemnify, defend, or hold harmless any of Seller's officers, directors, employees, managers, members, or agents;

(l)      all Indebtedness of Seller other than Indebtedness that is expressly an Assumed Liability;

(m)      liabilities relating to all Taxes arising as a result of Seller's operation of the Business or ownership of the Purchased Assets prior to the Closing, and Taxes based on net income or attributable to sales or use that are assessed, accrued, or attributable for periods on or prior to

12

the Closing Date and related penalties and interest, if any ("**Tax Liabilities**"), including Taxes that have resulted in a Tax Lien;

    (n)    any liability of Seller under any contract that is not an Assigned Contract;

    (o)    any and all fees, costs and expenses (including legal fees, accounting fees, brokerage commissions, finders' fees or similar compensation to any Person) that have been incurred or that are incurred by Seller or any of its Affiliates in connection with the transactions contemplated by this Agreement or any prior attempted sale transaction or the Bankruptcy Case, including all fees, costs and expenses incurred in connection with or by virtue of the negotiation, preparation and review of this Agreement and all Ancillary Agreements and the consummation of the transactions contemplated by this Agreement and the Ancillary Agreements; provided, however this provision shall not prohibit any fees, costs or expenses from being paid from the proceeds received by or on behalf of Seller at Closing;

    (p)    any liabilities arising out of or related to assets listed in any Excluded Asset Notice; and

    (q)    any Actions or Claims arising out of, relating to, or connected with the Listeria Matter.

**2.5.**    **Listeria Matter**. On and after the Closing Date, Buyer shall comply with the terms of the Consent Order that are made expressly applicable to Associated Persons as that term is defined in paragraph 9 of the Consent Order related to the Listeria Matter as required to use and operate the Purchased Asset. Notwithstanding any other provision to the contrary, Buyer shall be entitled to any legal fees or costs of defense reimbursable from insurance or otherwise to the extent any such legal fees or costs are incurred on and after the Closing Date. Buyer does not assume any liability or responsibility under the Consent Order imposed solely on Defendants as that term is defined in the opening paragraph of the Consent Order. Seller, its Affiliate or its Representative will promptly notify Buyer of any proposed modification to the Consent Order. Seller will petition FDA for leave to ask the Court for relief from the Consent Order at the earliest time permitted under paragraph 31 of the Consent Order.

**2.6.**    **Purchase Price**.

    (a)    At the Closing, in addition to the assumption of the Assumed Liabilities, the aggregate purchase price payable by Buyer as consideration for the sale, transfer, and delivery of the Purchased Assets, shall be (i) $14,186,240 (the "**Cash Purchase Price**"), (ii) *plus* the assumption of all debts owed to the RLF Parties by Seller under the DIP Loan Agreement (which shall be an amount not less than $2,900,000) (the "**DIP Loan Amount**"), (iii) *plus* the assumption of the Wells Fargo TI Loan Agreements and all debts owed to Wells Fargo pursuant thereto (which shall be an amount not less than $2,361,374) (the "**Wells Fargo TI Loan Amount**"), and (iv) *plus* the assumption of the Assumed Liabilities, for an aggregate amount of $19,447,614 (collectively, the "**Purchase Price**"). At the Closing, as additional consideration, the Buyer shall waive the RLF Parties' and their Affiliates' rights to receive $15,552,713.51 owed by Seller under any Contract (including the Leases) among such parties, including related costs, fees and expenses, for a total consideration of not less than $35,000,327.51 (the "**Aggregate Consideration**").

(b)      At the Closing, Buyer will pay or cause to be paid in cash via wire transfer of immediately available funds, in each case, to the accounts designated in writing by the applicable payees, as memorialized in the funds flow mutually agreed to by the Parties (the "**Funds Flow Memorandum**"):

(i)      the Cash Purchase Price (i) first, to Wells Fargo in the amount of $8,295,000 to pay all claims held by Wells Fargo against Seller on account of prepetition secured debt and, (ii) second, the remaining amount to the Bankruptcy Estate; and

(ii)      the Wells Fargo TI Loan Amount to Wells Fargo.

**2.7.      Allocation of Purchase Price.**  Prior to the Closing Date, Seller and Buyer shall mutually agree to allocate the Purchase Price among the Purchased Assets in accordance the principles set forth in **Schedule 2.7** (the "Allocation Principles"); the Parties agree that the Allocation Principles comply with Section 1060 of the Internal Revenue Code of 1986, as amended (the "Code"). All tax returns and reports filed by Seller and Buyer (including Internal Revenue Service Form 8594) shall be consistent with such allocation, as shall be final and binding upon them pursuant to this Section 2.7.  This Purchase Price allocation shall be for tax purposes only and shall not have any effect on any distribution or disbursement of funds to secured or unsecured creditors in the Bankruptcy Case.

**2.8.      Closing.** The consummation and effectuation of the transactions provided for in this Agreement (the "**Closing**"), shall take place via video or telephonic conferencing and electronic exchange of signature pages, documents and funds no later than five (5) Business Days of the date that all of the conditions precedent to Closing set forth in Article VII and Article VIII have been satisfied or on such other date as the Parties may agree ("**Closing Date**").  The Closing shall be deemed to occur and be effective as of 12:01 a.m. Pacific Time on the Closing Date. Title to all Purchased Assets shall pass from Seller to Buyer at Closing, subject to the terms and conditions of this Agreement.

**2.9.      Actions of Seller at Closing.**  At the Closing, or within such other timeframes as specified below, and unless otherwise waived in writing by Buyer, Seller shall deliver or cause to be delivered to Buyer, in an organized and orderly manner, the delivery of the following, or take or cause to be taken the following actions:

(a)      at least three (3) Business Days prior to the Closing, the Funds Flow Memorandum;

(b)      a bill of sale and assignment in a form mutually agreeable to Buyer and Seller (the "**Bill of Sale**") duly executed by Seller in favor of Buyer;

(c)      an assignment and assumption agreement in a form mutually agreeable to Buyer and Seller (the "**Assignment and Assumption Agreement**") duly executed by Seller in favor of Buyer;

(d)      a trademark assignment agreement in a form mutually agreeable to Buyer and Seller (the "**Trademark Assignment**") duly executed by Seller in favor of Buyer;

14

(e)     a copy of the Sale Order, which must be in full force and effect at the time of Closing;

(f)     current contact information, passwords, logins and other information for and relating to: (i) any Purchased Asset being held, stored, maintained or otherwise by a third party; and (ii) whether such party may assert a Claim or Lien against any Purchased Asset;

(g)     such other documents or instruments as Buyer reasonably requests and are reasonably necessary to consummate the transactions contemplated by this Agreement;

(h)     notice of the filing of the Sale Motion to all Lien holders of record that the sale to Buyer of the Purchased Assets is free and clear of all Liens;

(i)     recorded releases of the Title Liens;

(j)     recorded release of the Agreement and Acknowledgment of Security Interest dated November 20, 2017, by and among Wells Fargo Bank, as bank, Seller, as debtor, and I&E McClure, LLC, as landlord, recorded in the County of Stanislaus on January 2, 2018, as recording number 2018-0000061;

(k)     recorded release of the Memorandum of Lease by and between Seller and I & E McClure, LLC, recorded in the County of Stanislaus on February 2, 2011, as recording number 2011-0009205; and

(l)     Seller authorizes Buyer to file UCC terminations and other terminations of the Liens on behalf of the Lien holders with respect to the Purchased Assets, to the extent permitted by law.

**2.10.    Actions of Buyer at Closing.** At the Closing and unless otherwise waived in writing by Seller, Buyer shall deliver or cause to be delivered to Seller the following:

(a)     the Purchase Price to the Bankruptcy Estate by wire transfer of immediately available funds to an account designated by the Bankruptcy Estate;

(b)     the Bill of Sale duly executed by Buyer;

(c)     the Assignment and Assumption Agreement duly executed by Buyer, if applicable; and

(d)     the Trademark Assignment duly executed by Seller in favor of Buyer.

**2.11.    Risk of Loss.** The risk of loss or damage to any of the Purchased Assets shall remain with Seller until the Closing Date.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Buyer that the statements contained in this Article III are true and correct as of the Effective Date and as of the Closing:

**3.1.** **Capacity, Authority and Governmental Consents**. Seller is duly organized, validly existing and in good standing under the laws of the state of its formation with the requisite power and authority to enter into this Agreement, to perform its obligations hereunder and to conduct its business as now being conducted. Subject to the entry of the Sale Order, the execution, delivery and performance of this Agreement and all Ancillary Agreements to which Seller is or will become a party and the actions to be taken by Seller in connection with the consummation of the transactions contemplated herein:

(a) are within the powers of Seller, are not in contravention of applicable law or the terms of the Governing Documents of Seller and have been duly authorized by all appropriate action;

(b) have been duly authorized by all actions and proceedings on behalf of Seller, and no other actions or proceedings on the part of Seller or its Manager(s) or equity holders are necessary; and

(c) to Seller's reasonable knowledge, will not violate any law to which Seller is subject.

**3.2.** **No Violations**. Subject to the entry of the Sale Order, the execution, delivery and performance of this Agreement and all Ancillary Agreements to which Seller is or will become a party and the actions to be taken by Seller in connection with the consummation of the transactions contemplated herein, do not and will not conflict with or result in any violation of, or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation or acceleration of any material obligation or to the loss of any material benefit under, or result in the creation of any Lien on any of the Purchased Assets, or require any authorization, consent, approval, exemption, or other action by or notice or declaration to, or filing with, any court or administrative or other Governmental Authority or any third party. This Agreement, the Plan, and the Sales Order (if obtained) are the only documents governing the right of Seller to dispose of the Purchased Assets.

**3.3.** **Assigned Contracts**. To Seller's knowledge, each Assigned Contract is legal, valid and binding on Seller and, to Seller's knowledge, any other parties thereto, in full force and effect, and free from material default by Seller and, to Seller's knowledge, any other parties thereto subject to bankruptcy, insolvency, reorganization, moratorium or other applicable laws and by general principles of equity (whether applied in proceeding at law or in equity). There does not exist any event or condition that, with or without the lapse of time or the giving of notice, would become a material breach or default or would cause the acceleration of any material obligation under any Assigned Contract. Seller has not waived any of its material rights under any Assigned Contract. To Seller's knowledge, no party to any Assigned Contracts has given notice to Seller of its intention to cancel, terminate or fail to renew such Assigned Contract.

**3.4.** **Binding Agreement**. Subject to the entry of the Sale Order, this Agreement and all Ancillary Agreements to which Seller is or will become a party are and will constitute the valid and legally binding obligations of Seller, and are and will be enforceable against Seller in accordance with the respective terms hereof or thereof, except as enforceability may be restricted, limited or delayed by applicable bankruptcy or other laws affecting creditors' rights generally and except as enforceability may be subject to general principles of equity.

**3.5.** **Condition and Sufficiency of Assets; Trademarks**.

(a) Seller has good and valid title, sole ownership, custody and control of all of the Purchased Assets with the full right to sell or dispose of the Purchased Assets subject to approval of the Bankruptcy Court.

(b) To Seller's reasonable knowledge, Seller has no undischarged obligations affecting the Purchased Assets being sold under this Agreement and no Encumbrances, liens or security interests exist against the Purchased Assets being sold under this Agreement, other than those to be discharged in the Sale Order.

(c) Seller, for itself, and any of its Affiliates is in full and complete compliance with the Consent Order.

(d) Subject to the entry of the Sale Order, Seller has the power and the right to sell, assign and transfer the Purchased Assets, free and clear of all Encumbrances.

(e) All use dates and evidence of use filed with the USPTO to support the registration of the trademarks associated with the Business is true and correct as of the date hereof.

Notwithstanding anything in this Agreement to the contrary, the sale of the Purchased Assets will be "as is" and "where is" to Buyer. Except as provided in Section 3.5(c), Seller makes no representation or warranty of any kind whatsoever with respect to the Purchased Assets or otherwise, express or implied, including any representation or warranty regarding the condition of the assets or the fitness, desirability, or merchantability thereof or suitability thereof for any particular purpose, or any business prospects, or valuation of the Purchased Assets, or the compliance of the Purchased Assets in their current or future state with applicable laws or any violations thereof. Seller shall make available to Buyer all Purchased Assets in Seller's possession, but that Seller does not have possession of all Purchased Assets, and that to the extent Seller is not in possession of a Purchased Asset, Buyer will have sole responsibility to obtain possession of the Purchased Assets; provided, however, that Seller will reasonably cooperate with Buyer's efforts to obtain possession of any such assets upon Buyer's reasonable request, but Seller shall have no obligation to incur or pay any costs in connection with any such efforts.

**3.6.** **Taxes**. To Seller's reasonable knowledge, all deficiencies for Taxes asserted, or assessments made, with respect to the Purchased Assets as a result of any examinations by any taxing authority have been fully paid. Seller is not a party to any action by any taxing authority relating to the Purchased Assets. There is no pending or threatened actions by any taxing authority with respect to the Purchased Assets. Other than personal property tax liens asserted against the Purchased Assets in favor of the Stanislaus County Tax Collector as set forth on **Schedule 3.6**, there are no Liens for Taxes upon any of the Purchased Assets (other than ad valorem real estate

Taxes for the current tax year for amounts that are not yet due and payable) nor, to Seller's knowledge, is any taxing authority in the process of imposing any Lien for Taxes on any of the Purchased Assets (other than ad valorem real estate Taxes for the current tax year for amounts that are not yet due and payable).

**3.7.**      **Benefit Plans**. To Seller's reasonable knowledge, neither Seller nor any of its Affiliates has (i) incurred or reasonably expects to incur, either directly or indirectly, any material liability under Title I or Title IV of ERISA or related provisions of the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder or applicable local law relating to any "employee pension benefit plan" (as defined in Section 3(2) of ERISA); (ii) failed to timely pay any required premiums to the Pension Benefit Guaranty Corporation; (iii) engaged in any transaction which would give rise to any material liability under Section 4069 or Section 4212(c) of ERISA; (iv) any undischarged liability with respect to any employee benefit plan that is subject to Section 302, 303, 304, or 305 of ERISA, Title IV of ERISA or Section 412, 430, 431, 432, or 436 of the Code; or (v) provides, or has an obligation to provide, any post-termination health and welfare benefits (other than as required under Sections 601 to 608 of ERISA or other applicable law).

**3.8.**      **Labor and Employment Matters**.

     (i)      To Seller's knowledge, there is no pending or threatened legal proceeding involving Seller, on the one hand, and any present or former employee(s) of Seller providing services in respect of the Purchased Assets, on the other hand, and within the last three years, no other Person, to Seller's knowledge, has threatened any claim or any legal proceeding against Seller (or, to Seller's knowledge, against any officer, director or employee of Seller) relating to applicants, employees or former employees, or independent contractors or consultants of Seller providing services in respect of the Purchased Assets, including any such claim or legal proceeding arising out of any statute, ordinance or regulation relating to wages or any other employment-related matter arising under applicable laws (including the Fair Labor Standards Act, Title VII of the Civil Rights Act of 1964, as amended, the Occupational Safety and Health Act, the Age Discrimination in Employment Act of 1967, the Americans with Disabilities Act or the Family and Medical Leave Act, the federal Worker Adjustment and Retraining Notification Act and the California Worker Adjustment and Retraining Notification Act, the California Labor Code, the California Business and Professions Code, and the California Fair Employment and Housing Act).

     (ii)      To Seller's knowledge, Seller is and, for the past three years, has been in compliance in all material respects with all applicable federal, state, and local laws pertaining to employment and employment practices to the extent they relate to applicants, employees, paid and unpaid interns, consultants, and independent contractors providing services in respect of the Purchased Assets, including all laws relating to wages or any other employment-related matter arising under applicable laws (including the Fair Labor Standards Act, Title VII of the Civil Rights Act of 1964, as amended, the Occupational Safety and Health Act, the Age Discrimination in Employment Act of 1967, the Americans with Disabilities Act or the Family and Medical Leave Act, the federal Worker Adjustment and Retraining Notification Act and the California Worker Adjustment and Retraining Notification Act, the California Labor Code, the California Business and Professions Code, and the California Fair Employment and Housing Act).

(iii)     Except as would not result in a material liability affecting the Purchased Assets, to Seller's knowledge, all individuals characterized and treated by Seller as consultants or independent contractors of Seller are and for the past three years have been properly treated as independent contractors under all applicable laws.

(iv)     To Seller's knowledge, Seller has for the past three years complied with the federal and applicable state WARN Act.

(v)     To Seller's knowledge, in the past three years, Seller has reasonably investigated all allegations of sexual or discriminatory harassment, sexual assault or other sexual misconduct, discrimination, retaliation, and any other similar misconduct by or against any current or former employees, other individual service providers or customers of Seller of which they are or were aware and have taken all reasonable corrective actions with respect to such allegations. No such allegations would reasonably be expected to result in any material loss or disrepute to Seller.

(vi)     In the past three (3) years, Seller has been in material compliance with all applicable immigration laws. To Seller's knowledge, all current employees employed to provide services to Seller are, and all former employees employed to provide services to Seller have been, authorized to work in the United States pursuant to applicable law. There are complete and accurate Form I-9s on file for all current and former employees to the extent required by applicable law.

**3.9.     Brokers**. Neither Seller nor any of its Affiliates has employed or retained any broker, finder or agent to act on its behalf in connection with this Agreement or the transactions contemplated hereby, or incurred any liability to any broker, finder or agent for any brokerage fees, finder's fees, commissions or other amounts with respect to this Agreement or the transactions contemplated hereby.

**3.10.     Full Disclosure**. No representation or warranty by Seller in this Agreement or any certificate or other document furnished or to be furnished to Buyer pursuant to this Agreement, or filed with the Bankruptcy Court in the Bankruptcy Case, contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading.

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES OF BUYER**

Buyer represents and warrants to Seller that the following statements are true and correct as of the Effective Date and as of the Closing:

**4.1.     Capacity, Authority and Consents**. Buyer is duly organized and validly existing in good standing under the laws of the state of its formation, with the requisite power and authority to enter into this Agreement, to perform its obligations hereunder, and to conduct its business as now being conducted. The execution, delivery, and performance of this Agreement and all Ancillary Agreements to which Buyer is or will become a party, and the actions to be taken by Buyer in connection with the consummation of the transactions contemplated herein:

(a)     are within the corporate powers of Buyer, are not in contravention of applicable law or the terms of the Governing Documents of Buyer and have been duly authorized by all appropriate action;

(b)     have been duly authorized by all actions and proceedings on behalf of Buyer, and no other actions or proceedings on the part of Buyer or its governing body or equity holders are necessary;

(c)     other than the approval of the Bankruptcy Court and the board of directors or managers of Buyer, do not require any approval or consent of, or filing with, any third party or any Governmental Authority; and

(d)     will not violate any law to which Buyer is subject.

**4.2.     Binding Agreement**. This Agreement and all Ancillary Agreements to which Buyer is or will become a party are and will constitute the valid and legally binding obligations of Buyer, and are and will be enforceable against Buyer in accordance with the respective terms hereof or thereof, except as enforceability may be restricted, limited or delayed by applicable bankruptcy or other laws affecting creditors' rights generally and except as enforceability may be subject to general principles of equity.

**4.3.     Financial Wherewithal**. Buyer has liquid, unrestricted cash and cash equivalents in an amount sufficient to pay the Purchase Price and consummate the transactions contemplated by this Agreement at Closing. Buyer has the resources and capabilities (financial or otherwise) to perform all of its obligations hereunder.

**4.4.     Brokers**. Neither Buyer nor any of its Affiliates has employed or retained any broker, finder or agent to act on its behalf in connection with this Agreement or the transactions contemplated hereby, or incurred any liability to any broker, finder or agent for any brokerage fees, finder's fees, commissions or other amounts with respect to this Agreement or the transactions contemplated hereby.

**ARTICLE V**
**COVENANTS OF THE PARTIES PRIOR TO CLOSING**

**5.1.     Cooperation**. Each of the Parties shall cooperate with each other, and shall use its commercially reasonable efforts to cause its respective Representatives to cooperate with each other, to provide an orderly transition of the Purchased Assets and Assumed Liabilities from Sellers to Buyer, including continuing, maintaining and obtaining any necessary licenses and Permits and Governmental Permits required by the California Department of Food and Agriculture.

**5.2.     Access**. From and after the Effective Date until the Closing or the earlier termination of this Agreement (the "**Interim Period**"):

(a)     at the reasonable request of Buyer and upon reasonable advance notice, Seller shall give or cause to be given to Buyer and the Representatives of Buyer: (i) full access to the management personnel, property, accounts, books, deeds, title papers, insurance policies, licenses,

20

agreements, contracts, commitments, logs, records and files of every character, related to the Purchased Assets; and (ii) any and all such other information related to the Purchased Assets as Buyer may reasonably request;

(b) Buyer may enter into negotiations subject to the Closing with (i) Seller's current or expired contract counterparties, which provide for the purchase or sale or license of current or future goods or services to or by Seller under a current or expired Contract, and (ii) any Governmental Authorities pursuant to which Seller's products, product candidates or services are subject, and Seller shall have no involvement in Buyer's negotiations with respect to the Contracts or such counterparties or Governmental Authorities; and

(c) The Parties and their respective Affiliates shall use reasonable efforts to take, or cause to be taken, all action and to do, or cause to be done, all things necessary or proper, consistent with applicable law, to consummate and make effective as soon as possible the transactions contemplated by this Agreement and the Ancillary Agreements, if any, including not objecting to the negotiation or entry into by Buyer with employees or former employees of Seller or its Affiliates of offer letters or employment agreements, contingent upon the Closing.

**5.3.** **Consents and Approvals**. Seller shall request, at its sole cost and expense, any and all consents and approvals necessary to consummate the transactions contemplated hereby, including the approval of the Bankruptcy Court and any consents or notices required to assign the Assigned Contracts as agreed to and set forth on the Designated Contracts Schedule.

**5.4.** **Operating Covenants**. During the Interim Period, except with the prior written consent of Buyer or as required by this Agreement or a Bankruptcy Court Order, Seller shall operate the Business only in the ordinary course of business and use its commercially reasonable efforts to maintain the Purchased Assets in the ordinary course of business consistent with past practice; provided, however, that Buyer understands and agrees that Seller's business operations are severely restricted as of and prior to the Effective Date due to a lack of liquidity.

**5.5.** **Employees**.

(a) At least three (3) Business Days prior to the Closing Date, Sellers and Buyer will mutually agree, in writing, on a list of all or substantially all of the current employees of the Business to whom Buyer will offer employment effective immediately after Closing, including all accrued but unpaid vacation balances (the "**New Employee List**"). Subject to Seller's compliance with federal and California WARN Act requirements, Seller shall terminate all employees as of the Closing Date, and Buyer shall, or shall cause an Affiliate of Buyer to, offer employment effective on the Closing Date, to each of the employees set forth on the New Employee List; provided, however, that, notwithstanding the foregoing, Buyer may, in its reasonable discretion, decline to offer employment to any employees based on Buyer's reasonable application of its standard hiring and employment practices (the employees who are offered and who accept such employment and commence employment on the Closing Date, the "**New Employees**").

(b) Seller shall have the sole responsibility, as between the Parties, for all accrued but unpaid wages, bonus, employee benefits, retention bonus, sick leave, severance, and other forms of compensation, that are due and owing to employees of Seller, including the New Employees,

on or before 12:01 AM (Pacific Time) on the Closing Date, and Buyer shall have no liability for any such payment on or after 12:01 AM (Pacific Time) on the Closing Date; provided, however, Buyer shall provide credit for accrued but unused vacation balances for services performed on or before 12:01 AM (Pacific Time) on the Closing Date contained in the New Employee List. Seller shall be responsible for satisfying obligations of Seller, to provide continuation coverage under Consolidated Omnibus Budget Reconciliation Act of 1985 or other applicable law and notice of such coverage to individuals and their eligible dependents who suffer a "qualifying event" on or before the Closing Date (and including the Closing). Sellers also shall remain solely responsible for all worker's compensation claims of any current or former employees, officers, directors, independent contractors or consultants of the Business which relate to events occurring on or prior to the Closing Date. Seller shall pay, or cause to be paid, all such amounts to the appropriate Persons as and when due.

**5.6.** **Negative Covenants**. During the Interim Period, except as required by law or as ordered by the Bankruptcy Court, and without limiting the generality of Section 5.4, Seller shall not, with respect to the Purchased Assets, without the prior written consent of Buyer:

(a)      amend, modify, reject or terminate (other than at its stated expiration date) any of the Contracts;

(b)      sell, assign, lease, convey, mortgage, license, encumber or otherwise transfer or dispose of any Purchased Assets other than the sale of Inventory in the ordinary course of business;

(c)      increase in the rate of compensation of any employee outside of the ordinary course of business; or

(d)      authorize, agree, resolve or consent to any of the foregoing.

**5.7.** **Casualty**. During the Interim Period, if any of the Purchased Assets are destroyed or damaged in whole or in part by hurricane, fire, earthquake, flood, other casualty or any other cause (each a "**Casualty**"), then Buyer shall have the option to: (a) acquire such Purchased Assets on an "as is" basis and take an assignment from Seller of all insurance proceeds payable to Seller in respect of the applicable Casualty or (b) in the event that the applicable Casualty would have a Material Adverse Effect, Buyer may terminate this Agreement and the transactions contemplated hereby.

**5.8.** **Seller Release**.

(a)      Effective upon the Closing, Seller, on behalf of itself, its Bankruptcy Estate, and its past, present and future subsidiaries, members, parents, directors, managers, officers, equity holders, divisions, Affiliates, agents, representatives, insurers, attorneys, successors and assigns, all solely in such capacity, (collectively, the "**Seller Releasing Parties**"), hereby release, remise, acquit and forever discharge (i) Buyer and its past, present and future subsidiaries, members, parents, officers, equity holders, divisions, Affiliates, agents, representatives, insurers, attorneys, successors and assigns, and each of its and their respective directors, managers, officers, employees, shareholders, members, agents, representatives, attorneys, contractors, subcontractors, independent contractors, owners, insurance companies and partners (collectively, the "**Buyer Released Parties**"), from any and all Claims, Contracts, demands, causes of action, disputes,

22

controversies, suits, cross-claims, torts, losses, attorneys' fees and expenses, obligations, agreements, covenants, damages, liabilities, costs and expenses (collectively, "**Disputes**") arising on or prior to the Closing Date, whether known or unknown, whether anticipated or unanticipated, whether claimed or suspected, whether fixed or contingent, whether yet accrued or not, whether damage has resulted or not, whether at law or in equity, whether arising out of agreement or imposed by statute, common law of any kind, nature, or description, including any Claim by way of indemnity or contribution, which any Seller Releasing Party has, may have had or may hereafter assert against any Buyer Released Party and (ii) any Claim, right or interest of Sellers (whether known or unknown, whether anticipated or unanticipated, whether claimed or suspected, whether fixed or contingent, whether yet accrued or not, whether at law or in equity, whether arising out of agreement or imposed by statute, common law of any kind, nature, or description) in the Purchased Assets; provided, that notwithstanding the foregoing, Seller Releasing Parties do not in any event release Buyer from its obligations under this Agreement or the Ancillary Agreements, including the Assumed Liabilities, or, the Limited Liability Company Agreement (and all agreements and documents entered into or executed in connection therewith). In addition, if Seller files a Plan, such Plan shall be consistent with this Agreement in all respects and will include releases and exculpation provisions in favor of Buyer Released Parties to the maximum extent permitted by law. Seller agrees, on behalf of each Seller Releasing Party, that the release in this Section 5.8 applies not only to Disputes that are presently known, suspected, or disclosed to such Seller, but also to Disputes that are presently unknown, unsuspected, or undisclosed to such Seller. Seller acknowledges that each Seller Releasing Party is assuming the risk that the facts may turn out to be different from what such Seller Releasing Party believes them to be and agrees that the release in this Section 5.8 shall be in all respects effective and not subject to termination or rescission because of such mistaken belief.

(b)        Seller Releasing Parties specifically waive and relinquish all rights and benefits afforded by Section 1542 of the California Civil Code, which provides as follows:

> **A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party.**

Each Seller Releasing Party's waiver of all rights and benefits afforded by Section 1542 is done with its understanding and acknowledgement of the significance of such a specific waiver of Section 1542. This waiver also applies to any other relevant re-codification or similar laws implemented hereafter substantially covering the subject matter of Section 1542.

## ARTICLE VI
## BANKRUPTCY COURT MATTERS

**6.1.    Bankruptcy Court Approval; Assigned Contracts; Sale Procedures.**

(a)        Seller shall diligently pursue the entry by the Bankruptcy Court of the Sale Order, which Sale Order shall be in form and substance satisfactory to Buyer in its sole and absolute discretion and shall provide for the transfer of the Purchased Assets, Assigned Contracts, Assigned Permits, and the Assumed Liabilities to Buyer free from all interests, Liens, Claims,

23

Encumbrances, and successor or transferee liability to the fullest extent permitted by Section 363 of the Bankruptcy Code.

(b)    Seller shall comply (or obtain an Order from the Bankruptcy Court waiving compliance) with all requirements under the applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Bankruptcy Court in obtaining the entry of the Sale Order.

(c)    Seller shall provide notice of hearing of the Sale Motion ("**Notice**") to each holder of any Lien, Claim, Action, Encumbrance, or interest in or against Seller or any of its assets, including each Person known or reasonably believed by Seller to have been affected by, or who may have asserted they were affected by, the Listeria Matter. The Notice shall be in form and substance satisfactory to Seller and shall inform the recipients thereof that Buyer will have no responsibility or liability for or in connection with the Listeria Matter or with respect to any Lien, Claim, Encumbrance, or interest except for Assumed Liabilities. Proof of service of the Notice will be filed with the Bankruptcy Court promptly after it is given.

(d)    With the exception of an Alternative Transaction, the terms of any other proposed Order submitted by Seller to the Bankruptcy Court shall not conflict with, supersede, abrogate, nullify or restrict the terms of this Agreement, or in any way prevent or interfere with the consummation or performance of the transactions provided herein. Buyer agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order.

(e)    In the event an appeal is taken, or a stay pending appeal is requested or reconsideration is sought, from the Sale Order, and Buyer has not also been served with papers related to such appeal, stay or reconsideration, Seller shall promptly notify Buyer of such appeal or stay request and shall provide to Buyer within one (1) Business Day a copy of the related notice of appeal or Order of stay or application for reconsideration. Seller shall also provide Buyer with written notice (and copies) of, any other or further notice of appeal, motion or application filed in connection with any appeal from or application for reconsideration of, either of such Orders and any related briefs if Buyer is not also included on such additional documents and communications.

**6.2.    Assumption of Assigned Contracts; Termination of Contracts**.

(a)    **Schedule 6.2(a)** sets forth a complete list of all executory Contracts and Leases to which Seller is a party and that are used or held exclusively for use in the operation of, or relating to, the Purchased Assets, including the Cure Amounts (each, an "**Available Contract**"). Seller has made available, or prior to the signing of this Agreement, will make available, to Buyer true and complete copies of all such Available Contracts. No later than 14 days prior to the Closing, and as part of the Sale Motion, Seller shall notify each counterparty to the Available Contract of the potential assignment and assumption of the Available Contract and the Cure Amounts. No later than seven (7) days prior to the Closing, Buyer shall designate in writing which Available Contracts from **Schedule 6.2(a)** that it desires to be assumed by Seller at the Closing and assigned to Buyer pursuant to Section 365 of the Bankruptcy Code (each, an "**Assigned Contract**"), and such Assigned Contracts shall be set forth on **Schedule 6.2(a)-1** (the "**Designated Contracts Schedule**").

24

(b)     Unless the Bankruptcy Court orders otherwise, each Assigned Contract shall be assigned to Buyer on the Closing Date. Buyer shall pay all Cure Amounts with respect to any Assigned Contract that is consensually resolved or finally determined by the Bankruptcy Court immediately following the Closing.  If any cure objection is not consensually resolved or finally determined by the Bankruptcy Court prior to the Closing Date with respect to any Assigned Contract, Seller shall assign such Assigned Contract to Buyer only upon the request of Buyer and subject to a final resolution of such cure objection or final determination by the Bankruptcy Court that is satisfactory to Buyer.  Upon either the consensual resolution or final determination by the Bankruptcy Court of such cure objection, Buyer shall (i) promptly pay to the applicable non-Seller counterparty any remaining Cure Amounts owing to such counterparty with respect to such Assigned Contract or (ii) Buyer may require, and Seller shall, remove such Assigned Contract from the Designated Contracts Schedule, whereupon such Available Contract will be an Excluded Contract (each an "**Excluded Contract**") and Buyer will have no obligation or liability with respect to such Excluded Contract.

(c)     Nothing in this Agreement shall be construed as an attempt to assign, and Buyer shall not assume any liabilities or obligations with respect to, any Assigned Contract that by applicable law is non-assignable, or that by its terms is non-assignable without the consent of the other party or parties thereto to the extent such party or parties assert in writing that such assignment is a breach of such Assigned Contract as to which all the remedies for the enforcement thereof enjoyed by Seller would not, as a matter of law, pass to Buyer as an incident of the assignments provided for by this Agreement unless the Bankruptcy Court shall have determined that such Assigned Contract may be assigned notwithstanding the claim or objection of the counterparty that the Assigned Contract may not be assigned without its consent or approval. Seller shall, at the reasonably request and under the direction of Buyer, take all reasonable actions (including, the appointment of Buyer as attorney-in-fact for Seller) and do or cause to be done all such things as shall be reasonably necessary (i) to assure that the rights and benefits of Seller under such Assigned Contracts shall be preserved for the benefit of Buyer and (ii) to facilitate receipt of the consideration to be received by Seller in and under every such Assigned Contract, which consideration shall be held for the benefit of, and shall be delivered to, Buyer.  Nothing in this Section 6.2(c) shall be deemed a waiver by Buyer of its right to receive an effective assignment of the Purchased Assets on the Closing Date, nor shall this Section 6.2(c) be deemed to constitute an agreement to exclude from the Purchased Assets any assets described in this Section 6.2(c).

(d)     Each Available Contract (as may be amended from time to time) that is not listed on the Designated Contracts Schedule will be deemed an Excluded Contract under this Agreement and all liabilities thereunder shall be Excluded Liabilities.  Each Available Contract that Buyer, in its sole discretion, determines should be terminated on or prior to the Closing Date shall be included on **Schedule 6.2(d)**, including the Leases.

(e)     If prior to the earliest of (i) confirmation of a plan in the Bankruptcy Case, (ii) entry of an Order dismissing the Bankruptcy Case, and (iii) Closing, or entry of an Order converting the Bankruptcy Case to Chapter 7 of the Bankruptcy Code, it is discovered that a Contract should have been listed on Designated Contracts Schedule as an Assigned Contract but was not (a "**Previously Omitted Contract**"), Seller shall, promptly following the discovery thereof (but in no event later than five (5) Business Days), notify Buyer in writing of such Previously Omitted Contract (the "**Previously Omitted Contract Notice**") and provide Buyer with a copy of such Previously

Omitted Contract and its Cure Amount (if any). Buyer shall thereafter deliver written notice to Seller, no later than three (3) Business Days following the receipt of such Previously Omitted Contract Notice, stating whether Buyer elects to include such Previously Omitted Contract on the Designated Contracts Schedule. Notwithstanding the foregoing, if Seller fails to deliver such written notice, such Previously Omitted Contract will not be an Assigned Contract or appear on the Designated Contracts Schedule.

(f)　　If Buyer includes a Previously Omitted Contract on the Designated Contracts Schedule in accordance with Section 6.2(e), Seller shall file and serve a notice on the counterparty to such Previously Omitted Contract, notifying such counterparty of Seller's intention to assign such Previously Omitted Contract to Buyer, including the proposed Cure Amount (if any). Such notice shall provide such counterparty 14 calendar days to object in writing to Seller and Buyer to the assignment and assumption of its Contract (the "**Counterparty Objection**"). If such counterparty, Seller, and Buyer are unable to reach a consensual resolution regarding any Counterparty Objection, Seller will, unless otherwise agreed by Buyer, seek a hearing before the Bankruptcy Court for approval of the assumption and assignment of such Previously Omitted Contract to Buyer. If no Counterparty Objection is timely served on Seller and Buyer, then such Previously Omitted Contract shall be deemed assumed by and assigned to Buyer pursuant to the Sale Order. Seller and Buyer shall execute, acknowledge, and deliver such other instruments and take such commercially reasonable efforts as are reasonably practicable for Buyer to assume the rights and obligations under such Previously Omitted Contract. Buyer shall pay or cause to be paid all Cure Amounts for any Previously Omitted Contract that becomes an Assigned Contract for which Buyer has not paid or caused to be paid upon or before the Closing.

## ARTICLE VII
## CONDITIONS PRECEDENT TO BUYER CLOSING

Notwithstanding anything herein to the contrary, the obligation of Buyer to consummate the transactions described herein is subject to the fulfillment, as of the Closing, of the following conditions precedent unless (but only to the extent) waived in writing by Buyer on or prior to the Closing:

**7.1.　Representations and Warranties; Covenants**.

(a)　　The representations and warranties of Seller contained in Article III shall be true, complete and accurate as of the Closing Date (except for representations and warranties that address matters only as of a specific date, which representations and warranties shall continue as of the Closing Date to be true and correct as of such specific date).

(b)　　All of the covenants, agreements and other obligations in this Agreement to be complied with or performed by Seller on or before the Closing Date pursuant to the terms hereof shall have been duly complied with and performed in all material respects (without giving effect to any "materiality," "in all material respects," "Material Adverse Effect" or similar qualifiers).

(c)　　All Closing conditions as set forth in this Article VII must be satisfied prior to the Closing.

26

(d)　　　Buyer shall have received evidence or confirmation that the RLF Parties and their Affiliates waived their rights to receive $15,552,713.51 owed by Seller under any Contract (including the Leases) among such parties, including related costs, fees and expenses.

**7.2.　　Actions and Proceedings**.　No Governmental Authority shall have issued any Order or enacted any law that is then in effect and that enjoins, restrains, makes illegal or otherwise prohibits the consummation of the transactions contemplated by this Agreement, and no Action, Claim or investigation seeking to enjoin, restrain or prohibit the consummation of the transactions contemplated by this Agreement shall be pending.

**7.3.　　Material Adverse Effect**.　From the Effective Date, there shall not have occurred any Material Adverse Effect, nor shall any event or events have occurred that, individually or in the aggregate, with or without the lapse of time, could reasonably be expected to result in a Material Adverse Effect.

**7.4.　　Buyer's Due Diligence**.　Buyer has completed its due diligence investigation of the Purchased Assets, and Closing is not subject to further due diligence investigation.

**7.5.　　Bankruptcy Court Approval; No Inconsistency**.　The Sale Order shall have been entered by the Bankruptcy Court and shall not have been (a) vacated, stayed or reversed or (b) (except with the express written consent of Buyer, or as would not be adverse to Buyer in any material respect) amended, supplemented or otherwise modified.　There shall be no Order entered in the Bankruptcy Case that is inconsistent with the terms of this Agreement or the transactions contemplated hereby or thereby.　The Court shall have approved the assumption by Buyer and assignment to Seller of each Assigned Contract on terms and conditions satisfactory to Buyer in its sole discretion.

**7.6.　　Closing Deliveries**.　Seller shall have executed and delivered, or caused to have been executed and delivered, to Buyer the documents and items described in Section 2.9.

**7.7.　　Waiver and Subordination of RLF Lease Claims**.　At the Closing Date, subject to the terms of the Sale Order, the RLF Parties shall (a) waive any prepetition claims arising from the Leases and (b) consent to the subordination of any postpetition claims arising from the Leases to a $1,000,000 cash payment made to a liquidating trust for the benefit of unsecured creditors.

**7.8.　　Buyer Notification**.　Buyer, in the exercise of its sole opinion and judgment, shall have concluded, and shall have delivered written notice to Seller, that all conditions precedent to closing all of the components of the transaction that is the subject of or are related to this Agreement, including without limitation the contribution of non-Bankruptcy Estate assets to Buyer by its members, have been met and are satisfied such that all such component parts are ready to close simultaneously.

## ARTICLE VIII
## CONDITIONS PRECEDENT TO SELLER CLOSING

Notwithstanding anything herein to the contrary, the obligations of Seller to consummate the transactions described herein are subject to the fulfillment, as of the Closing, of the following

27

conditions precedent unless (but only to the extent) waived in writing by Seller on or prior to the Closing:

**8.1.** **Representations and Warranties; Covenants**.

(a) The representations and warranties of Buyer contained in Article IV shall be true, complete and accurate as of the Closing Date (except for representations and warranties that address matters only as of a specific date, which representations and warranties shall continue as of the Closing Date to be true and correct as of such specific date).

(b) All of the covenants, agreements and other obligations in this Agreement to be complied with or performed by Buyer on or before the Closing pursuant to the terms hereof shall have been duly complied with and performed in all material respects (without giving effect to any "materiality," "in all material respects," "material adverse effect" or similar qualifiers).

(c) All Closing conditions as set forth in this Article VIII must be satisfied prior to the Closing.

**8.2.** **Actions and Proceedings**. No Governmental Authority shall have issued any Order or enacted any law that is then in effect and that enjoins, restrains, makes illegal or otherwise prohibits the consummation of the transactions contemplated by this Agreement, and no Action, Claim or investigation seeking to enjoin, restrain or prohibit the consummation of the transactions contemplated by this Agreement shall be pending.

**8.3.** **Bankruptcy Court Approval, No Inconsistency**. The Sale Order shall have been entered by the Bankruptcy Court and shall not have been (a) vacated, stayed or reversed or (b) (except with the express written consent of Seller, or as would not be adverse to Seller in any material respect) amended, supplemented or otherwise modified. There shall be no Order entered in the Bankruptcy Case that is inconsistent with the terms of this Agreement or the transactions contemplated hereby or thereby.

**8.4.** **Closing Deliveries**. Buyer shall have executed and delivered, or caused to have been executed and delivered, to Seller the documents and items described in Section 2.10.

## ARTICLE IX
## ADDITIONAL AGREEMENTS

**9.1.** **Termination Prior to Closing**.

(a) Notwithstanding anything herein to the contrary, this Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Closing and in no other manner:

(i) by the mutual written consent of Buyer and Seller;

(ii) by Buyer, if Seller breaches or fails to perform in any respect any of its representations, warranties, agreements, covenants or other obligations contained in this Agreement and such breach or failure to perform would, if the Closing otherwise were to occur on

28

the date of written notice of such breach or failure to perform, give rise to the failure of a condition set forth in Section 7.1 that is incapable of being cured by the Closing Date;

(iii)      by Seller, if Buyer breaches or fails to perform in any respect any of its representations, warranties, agreements, covenants or other obligations contained in this Agreement and such breach or failure to perform would, if the Closing otherwise were to occur on the date of written notice of such breach or failure to perform, give rise to the failure of a condition set forth in Section 8.1 that is incapable of being cured by the Closing Date;

(iv)      by Buyer, in the event Seller is in default of the Consent Order before the Closing; or

(v)      by Buyer or Seller immediately upon the occurrence of any of the following events before the Closing:

1.      the Bankruptcy Court approves an Alternative Transaction;

2.      the dismissal or conversion of the Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code or the granting of relief from the automatic stay with respect to any of the Purchased Assets; or

3.      the Sale Order is not entered within 14 days after the Sale Hearing; and

4.      the Closing has not occurred by June 4, 2026 (the "**Drop Dead Date**"); provided, however, that the right to terminate this Agreement pursuant to this Section 9.1(a)(v)4 shall not be available to any Party whose material breach of any representation, warranty, covenant or agreement set forth in this Agreement has been a contributing cause of, or was a contributing factor that resulted in, the failure of the transaction contemplated by this Agreement to be consummated on or before the Drop Dead Date.

(vi)      The Party seeking to terminate this Agreement pursuant to this Section 9.1(a) (other than Section 9.1(a)(i)) shall give prompt written notice of such termination to the other Party. Buyer shall be permitted to provide any notice under this Agreement in accordance with the terms of this Agreement, notwithstanding the existence of the Bankruptcy Case or the automatic stay.

(b)      In the event of any termination of this Agreement by either Buyer or Seller as provided in Section 9.1(a), this Agreement shall forthwith become void, and there shall be no liability on the part of any Party or any of its or their Affiliates to any other Person resulting from, arising out of, relating to, or in connection with this Agreement or any other document related to the transactions contemplated herein except that all rights and obligations of the Parties set forth in this Section 9.1(b) and Article I, Article X, and the Sale Order (if entered) shall survive termination of this Agreement.

**9.2.    Post-Closing Filings and Access to Information**.  After the Closing, each Party shall promptly deliver to any other Party, upon reasonable request of such other Party, copies of any post-Closing filings, financial statements or reports regarding the Purchased Assets, the Assumed Liabilities, the Excluded Assets or the Excluded Liabilities that may be reasonably necessary for such other Party to prepare and deliver any filings or reports required to be delivered to any Governmental Authority as a result of the consummation of the transactions described herein, in each case at the sole cost and expense of the requesting Party.

**9.3.    Refunds and Remittances**.

(a)    If Seller or any of its Affiliates receive any refund or other amount in connection with a Purchased Asset or is otherwise properly due and owing to Buyer in accordance with the terms of this Agreement, Seller promptly shall remit, or shall cause to be remitted, such amount to Buyer; and

(b)    If Buyer or any of its Affiliates receives any refund or other amount in connection with an Excluded Asset or is otherwise properly due and owing to Seller or any of its Affiliates in accordance with the terms of this Agreement, Buyer promptly shall remit, or shall cause to be remitted, such amount to Seller.

**9.4.    Availability of Business Records**.  From and after the Closing, Buyer shall (i) reasonably promptly provide to Sellers and their respective Representatives (after reasonable notice and during normal business hours) access to records included in the Purchased Assets for periods prior to the Closing to the extent such access is necessary in order for Sellers (as applicable) to comply with this Agreement, the Ancillary Agreements, and the transactions contemplated hereby and thereby, applicable law or any Contract to which it is a party, for liquidation, winding up, Tax reporting or other proper purposes (as determined by the applicable Seller in good faith) and so long as such access is subject to an obligation of confidentiality acceptable to Buyer, and (ii) shall preserve such records until the latest of (A) seven (7) years after the Closing Date, (B) the required retention period for all government contact information, records or documents or (C) the conclusion of all bankruptcy proceedings relating to the Bankruptcy Case.  Such reasonable access shall include reasonable access to information in electronic form to the extent reasonably available.  Buyer acknowledges that Sellers have the right to retain originals or copies of all records included in the Purchased Assets for periods prior to the Closing.  Notwithstanding the foregoing or any other provision of this Agreement, nothing in this Agreement shall require Buyer to disclose or make available to Seller any information subject to the attorney-client, attorney work product, consulting-only expert, or similar privilege.

**9.5.    Assurances**.

(a)    Any time or from time to time following the Closing Date, if (x) any of the Parties or their respective Affiliates becomes aware that any of the Purchased Assets have not been transferred to Buyer or that any of the Excluded Assets have been transferred to a Buyer, or (y) Seller or any of Seller's Affiliates receives or otherwise possesses any asset that should have been transferred to Buyer under this Agreement, such Person shall promptly notify the other and the Parties shall, as soon as reasonably practicable, ensure that such property is transferred with any necessary prior third party consent or approval, to:

30

(i) Buyer, in the case of any Purchased Asset which was not transferred at the Closing or otherwise as set forth above; or

(ii) Seller, in the case of any Excluded Asset which was transferred at the Closing.

(b) Prior to any transfer pursuant to Section 9.5(a), the Person in receipt of or then possessing such asset shall hold such asset in trust for such other Person, shall exercise, enforce and exploit, only at the direction of and for the benefit of such other Person, any and all Claims, rights and benefits arising in connection with such asset, shall promptly pay, assign and remit to such other Person when received all monies and other consideration relating to such asset in the period after the Closing Date, and, to the extent applicable, provide the Person that should possess such asset pursuant to the terms of this Agreement a royalty-free license to use or shall otherwise be able to obtain the benefits from the asset and shall hold such asset in trust for such other Person.

**9.6. Public Announcement**. Subject to the provisions of the Bankruptcy Code and each Party's right to make such filings and disclosures as it in good faith deems necessary or appropriate in connection with the Bankruptcy Case, neither Party hereto shall make or issue, or cause to be made or issued, any public announcement or written statement concerning this Agreement or the transactions contemplated hereby, without the prior written consent of the other Party hereto (which shall be in the other Party's sole discretion), unless counsel to such Party advises that such announcement or statement is required by law (such as an obligation to disclose under federal securities laws of the United States), in which case the Parties hereto shall make reasonable efforts to consult with each other prior to such required announcement.

**9.7. Taxes; Final Sales Tax Return**.

(a) Taxes. Seller shall be responsible for all Taxes in connection with, relating to or arising out of the Business or the ownership of the Purchased Assets, or the Assumed Liabilities for Taxes that are attributable to taxable periods, or portions thereof, ending on or before the Closing, all of which Taxes shall be an Excluded Liability. All state and local sales and use Taxes, to the extent attributable to periods prior to the Closing, shall be paid or otherwise discharged by Seller. All transfer, sales, use or other such Taxes incurred solely in connection with this Agreement shall be borne and paid by Buyer when due.

(b) Proration. Personal property Taxes, real property Taxes and other similar Taxes with respect to the Purchased Assets for any taxable period (for avoidance of doubt, the fiscal year in which the Closing Date shall occur) commencing on or before the Closing Date and ending after the Closing Date (a "**Straddle Period**") shall be prorated on a per diem basis between Buyer and Seller as of the Closing Date. The amount of Taxes for a Straddle Period attributable to Sellers shall be equal to the amount of Tax for the entire Straddle Period multiplied by a fraction, the numerator of which shall be the number of days from the beginning of the Straddle Period through the Closing Date and the denominator of which shall be the total number of days in the Straddle Period.

(c)     <u>Filings and Cooperation</u>.

(i)     Seller shall be responsible for (i) filing or causing to be filed all Tax returns required to be filed by Seller with respect to the Business or the Purchased Assets with respect to taxable periods ending on or before the Closing Date and (ii) paying all Taxes of or payable by Seller with respect to the Business or the Purchased Assets for all taxable periods ending on or prior to the Closing Date and the portion of any Straddle Period ending on the Closing Date.

(ii)     Buyer shall be responsible for filing or causing to be filed the California State, Local, and District Sales and Use Tax Return and any similar Tax returns or other documents with respect to the transfer, sales, use or other such Taxes incurred solely in connection with this Agreement.

(iii)     Seller and Buyer shall: (A) provide the other with such assistance as may reasonably be requested by either of them in connection with the preparation of any Tax return, any audit or other examination by any taxing authority or any judicial or administrative proceeding with respect to Taxes; (B) retain and provide the other with any records or other information which may be relevant to such return, audit, examination or proceeding; and (C) provide the other with any final determination of any such audit or examination proceeding or determination that affects any amount required to be shown on any Tax return of the other for any period (which shall be maintained confidentially).

(iv)     Notwithstanding anything to the contrary in this Agreement, including <u>Section 2.2(j),</u> the RLF Parties shall retain all right, title and interest in and to any personal tax refunds, credits, offsets, reductions, rights, and other tax benefits or attributes arising from Seller's net operating losses arising prior to the Closing to the extent owned, claimable, credited or otherwise issued to the RLF Parties, as stockholders of the Seller, individually, or otherwise.

**9.8.     <u>Waiver of Bulk Sales Law Compliance</u>**. The Parties hereby waive compliance with the provisions of any bulk sales, bulk transfer or similar laws of any jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Purchased Assets to Buyer; it being understood that any liabilities arising out of the failure of Seller to comply with the requirements and provisions of any bulk sale, bulk transfer or similar laws of any jurisdiction which would not otherwise constitute Assumed Liabilities shall be treated as Excluded Liabilities.

**ARTICLE X**
**GENERAL PROVISIONS**

**10.1.     <u>Survival</u>**. Except as set forth in <u>Section 9.1</u>, the representations and warranties, covenants and agreements of Seller contained herein shall survive the Closing indefinitely or for the period explicitly specified therein.

**10.2.     <u>Additional Assurances</u>**. The provisions of this Agreement shall be self-operative and shall not require further agreement by the Parties except as may be herein specifically provided to the contrary; provided, however, at the request and expense of a Party, the other Party shall execute such additional instruments and take such additional action as the requesting Party may reasonably deem necessary to effectuate this Agreement. In addition, from time to time after the Closing Date, Seller and Buyer shall each execute and deliver such other instruments of conveyance and

transfer and take such other actions as the Party may reasonably request, to more effectively convey and transfer full right, title and interest to, vest in, and place Buyer in legal and actual possession of the Purchased Assets.

**10.3. Choice of Law; Venue.**

(a)      This Agreement and all disputes or controversies arising out of or relating to this Agreement or the transactions contemplated hereby (in contract or tort) shall be governed by and construed in accordance with the laws of the State of California, without regard to conflicts of law principles.

(b)      WITHOUT LIMITING ANY PARTY'S RIGHT TO APPEAL ANY ORDER OF THE BANKRUPTCY COURT, ANY AND ALL CLAIMS, ACTIONS, CAUSES OF ACTION, SUITS, AND PROCEEDINGS RELATING TO THIS AGREEMENT, THE ANCILLARY AGREEMENTS AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY SHALL BE FILED AND MAINTAINED ONLY IN THE BANKRUPTCY COURT, AND THE PARTIES HEREBY CONSENT TO THE JURISDICTION OF SUCH COURT; provided, however, that if the Bankruptcy Case has closed or the Bankruptcy Court lacks jurisdiction for whatever reason, the Parties unconditionally and irrevocably submit to the exclusive jurisdiction of the state and federal courts situated in Modesto and Sacramento California, respectively, and any appellate court from any decision thereof, for the resolution of any such claim or dispute. The Parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may have now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. A judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment.

(c)      EACH PARTY WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY ACTION, MATTER, OR PROCEEDING REGARDING THIS AGREEMENT, THE ANCILLARY AGREEMENTS, OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY OR ANY PROVISION HEREOF OR THEREOF.

**10.4. Benefit, Assignment and Third-Party Beneficiaries**. Subject to provisions herein to the contrary, this Agreement shall inure to the benefit of and be binding upon the Parties and their respective legal representatives, successors and assigns; provided, however, that no Party may assign this Agreement without the prior written consent of the other Party except that (a) Buyer may assign this Agreement and any of its rights hereunder to an Affiliate or any Buyer of substantially all of Buyer's business and (b) Buyer may collaterally assign its rights, but not its obligations, under this Agreement to any party that provides funding for the transactions hereunder as additional security for Buyer's obligations to such party, in each case, without the prior written consent of Seller. Buyer may assign ownership and title to certain of the Purchased Assets to certain designees of Buyer, such that more than one entity may own the Purchased Assets at Closing. This Agreement is intended solely for the benefit of the Parties and is not intended to, and shall not, create any enforceable third party beneficiary rights except as expressly provided herein.

**10.5. Cost of Transaction**. Except as may be provided to the contrary elsewhere herein: (a) Buyer shall pay the fees, expenses and disbursements incurred by Buyer and its Representatives

33

in connection with the subject matter hereof and any amendments hereto; and (b) Seller shall pay the fees, expenses and disbursements incurred by Seller and its Representatives in connection with the subject matter hereof and any amendments hereto.

**10.6.** <u>**Waiver of Breach**</u>.  The waiver by any Party of a breach or violation of any provision of this Agreement shall not operate as, or be construed to constitute, a waiver of any subsequent breach of the same or any other provision hereof.  Any agreement on the part of a Party to any such waiver shall be valid only if set forth in a written instrument executed and delivered by a duly authorized officer on behalf of such Party.

**10.7.** <u>**Notice**</u>.  Any notice, demand or communication required, permitted or desired to be given hereunder shall be in writing and deemed effectively given or made (a) when personally delivered, (b) on the date sent when delivered by electronic means (so long as written notice of such transmission is sent within two (2) Business Days thereafter by another delivery method hereunder) (unless not delivered on a Business Day or delivered after 5:00 p.m. Pacific Time on a Business Day, in which case such delivery shall be deemed effective on the next succeeding Business Day), (c) one (1) Business Day following the date sent if sent by overnight courier with signed receipt, or (d) when delivered by registered United States mail, with postage prepaid and return receipt requested, addressed to the addresses below or to such other address as any Party may designate, with copies thereof to the respective counsel thereof as notified by such Party.

Seller:

Rizo Lopez Foods, Inc.
c/o Edwin Rizo, CEO
201 S. McClure
Modesto, California 95351
Email: erizo@rizolopez.com With a copy (not constituting notice) to:

McCormick, Barstow, Sheppard, Wayte & Carruth LLP
7647 North Fresno Street
Fresno, CA 93720
Attn: Hagop T. Bedoyan
Email: hagop.bedoyan@mccormickbarstow.com

Buyer:

Francisco Foods, LLC
400 N. Washington Road
Turlock, CA 95380
Attn: dcaton@valleymilkca.com

With a copy (not constituting notice) to:

Frandzel Robins Bloom & Casto, L.C.
1000 Wilshire Boulevard, 19th Floor
Los Angeles, CA 90017
Attn: Michael Gomez; Michael Fletcher
Email: mgomez@frandzel.com; mfletcher@frandzel.com

With a copy (not constituting notice) to:

Foley & Lardner LLP
321 Clark Street
Suite 3000
Chicago, IL 60654
Attention: Ed Green
E-mail: EGreen@foley.com

With a copy (not constituting notice) to:

Foley & Lardner LLP
500 Woodward Avenue, Suite 2700
Detroit, MI 48226
Attention: Jake William Gordon
E-mail: Jake.Gordon@foley.com

With a copy (not constituting notice) to:

Davis Wright Tremaine LLP
560 SW 10th Avenue, Suite 700
Portland, OR 97205
E-mail: jesselyon@dwt.com
Attention: Jesse D. Lyon

**10.8.** **Severability**. In the event any provision of this Agreement is held to be invalid, illegal or unenforceable for any reason and in any respect, such invalidity, illegality, or unenforceability shall in no event affect, prejudice or disturb the validity of the remainder of this Agreement, which shall be and remain in full force and effect, enforceable in accordance with its terms.

**10.9.** **Headings**. The descriptive headings of sections and subsections of this Agreement are inserted for convenience only and do not constitute a part of this Agreement and shall not affect in any way the meaning or interpretation of this Agreement.

**10.10. Interpretation**. In the interpretation of this Agreement, except where the context otherwise requires, (a) "including" or "include" does not denote or imply any limitation and shall mean "including, without limitation," whether or not so specified, (b) "or" has the inclusive meaning "and/or", (c) "and/or" means "or" and is used for emphasis only, (d) "$" refers to United States dollars, (e) the singular includes the plural, and vice versa, and each gender includes each

other gender, (f) captions or headings are only for reference and are not to be considered in interpreting this Agreement, (g) "Section" refers to a section of this Agreement, unless otherwise stated in this Agreement, (h) "**Exhibit**" refers to an exhibit to this Agreement (which is incorporated herein by reference), unless otherwise stated in this Agreement, (i) "**Schedule**" refers to a schedule to this Agreement and incorporates any attachments thereto (which are incorporated herein by reference), unless otherwise stated in this Agreement, (j) all references to times are times in California, (k) "day" refers to a calendar day unless expressly identified as a Business Day, (l) the word "extent" in the phrase "to the extent" shall mean the degree to which a subject or other theory extends and such phrase shall not mean "if," (m) references to agreements and other documents shall be deemed to include all subsequent amendments and other modifications thereto, (n) references to statutes shall include all regulations promulgated thereunder and references to statutes or regulations shall be construed as including all statutory and regulatory provisions consolidating, amending or replacing the statute or regulation, (o) capitalized terms shall have the meaning assigned to them herein, and (p) "made available to Buyer" or similar phrases means information provided in writing to Buyer and its Representatives at least five (5) Business Days prior to the Effective Date. If any period under this Agreement expires on a day which is not a Business Day or any action is required by the terms of this Agreement to be taken on a day which is not a Business Day, such period shall expire on or such action may be deferred until, as the case may be, the next succeeding Business Day.

**10.11. Entire Agreement, Amendments and Counterparts**. This Agreement supersedes all previous contracts, agreements and understandings between the Parties regarding the subject matter hereof and, together with the Ancillary Agreements and the Exhibits and Schedules hereto, constitutes the entire agreement existing between the Parties respecting the subject matter hereof and no Party shall be entitled to benefits other than those specified herein. As between the Parties, no oral statements or prior written material not specifically incorporated herein shall be of any force and effect, and no Party is relying on any such oral statements or prior written material. All prior representations or agreements, whether written or oral, not expressly incorporated herein are superseded and no changes in or additions to this Agreement shall be recognized unless and until made in writing and signed by all Parties. This Agreement may not be modified, amended, altered or supplemented except by a written agreement executed by the Parties. This Agreement may be executed in counterparts, each and all of which shall be deemed an original and all of which together shall constitute but one and the same instrument. For purposes of this Agreement, the delivery of signed counterparts by facsimile or email transmission (including .pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, e.g., www.docusign.com) that includes a copy of the sending Party's signature is as effective as signing and delivering the counterpart in person. No Party shall be under any legal obligation to enter into or complete the transactions contemplated hereby unless and until this Agreement shall have been executed and delivered by each Party and, with respect to Seller, approved by the Bankruptcy Court.

**10.12. Time of Essence**. Time is of the essence with regard to all dates and time periods set forth in this Agreement.

(Remainder of Page Intentionally Left Blank)

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their authorized officers or managers as of the Effective Date.

**SELLER:**

**RIZO-LÓPEZ FOODS, INC.**
**a California corporation**

By: _____
     Edwin Rizo, CEO

Address:   201 S. McClure Rd.
               Modesto CA 95357
Email:     erizo@rizolopez.com
Date:      03/06/2026

Docusign Envelope ID: 6BC63B6C-C4B7-4AFF-860F-CC67DF713342

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their authorized officers or managers as of the Effective Date.

**BUYER:**

FRANCISCO FOODS, LLC, or its designee
a Delaware limited liability company

By: _____
Name: Damien Caton
Title:  Director

By: _____
Name: Melanie Youkhana
Title:  Director

By: _____
Name: Tomas Rizo
Title:  Director

By: _____
Name: Edwin Rizo
Title:  Director

SIGNATURE PAGE TO THE ASSET PURCHASE AGREEMENT

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their authorized officers or managers as of the Effective Date.

**BUYER:**

FRANCISCO FOODS, LLC, or its designee
a Delaware limited liability company

By:_____
Name: Damien Caton
Title:  Director

By:_____
Name: Melanie Youkhana
Title:  Director

By:  *Tomas Rizo*_____
Name: Tomas Rizo
Title:  Director

By:  *Edwin Rizo*_____
Name: Edwin Rizo
Title:  Director

SIGNATURE PAGE TO THE ASSET PURCHASE AGREEMENT

**SCHEDULES**

## SCHEDULE 2.1(b)
### TANGIBLE PERSONAL PROPERTY

Attachment 1 to Schedule 2.1(b) is incorporated herein by reference.

RFL Schedule 2.1b

# Rizo Lopez Foods, Inc.

## Schedule 2.1 b - Machinery, Equipment and Office Furniture

| No. | Form | Category | Description | Date Acquired | Date Sold | Cost/Basis | Reduction | Depreciation Basis | Prior Depreciation | Current Depreciation |
|---|---|---|---|---|---|---|---|---|---|---|
| 75 | Form 1120S | MACHINERY & EQUIPMENT - LA (140-03) | (1) USED FORKLIFT - LA | 1/15/2002 | | 3,000.00 | - | 3,000.00 | 3,000.00 | - |
| 109 | Form 1120S | MACHINERY & EQUIPMENT - LA (140-03) | WALK-IN COOLER, CDSG UNIT | 7/01/2003 | | 24,269.00 | - | 24,269.00 | 24,269.00 | - |
| 110 | Form 1120S | MACHINERY & EQUIPMENT - LA (140-03) | ELECTRIC PALLET JACK | 1/07/2004 | | 800.00 | - | 800.00 | 800.00 | - |
| 111 | Form 1120S | MACHINERY & EQUIPMENT - LA (140-03) | WALK-IN-COOLER 115FTX50FT | 9/23/2004 | | 109,797.00 | - | 109,797.00 | 109,797.00 | - |
| 112 | Form 1120S | MACHINERY & EQUIPMENT - LA (140-03) | COMPRESSOR 15HP | 1-Dec-04 | | 8,996.00 | - | 8,996.00 | 8,996.00 | - |
| 113 | Form 1120S | MACHINERY & EQUIPMENT - LA (140-03) | (3) PALLET JACKS | 8-Dec-04 | | 1,616.00 | - | 1,616.00 | 1,616.00 | - |
| 178 | Form 1120S | MACHINERY & EQUIPMENT - LA (140-03) | COMPRESSOR | 3/17/2006 | | 4,100.00 | - | 4,100.00 | 4,100.00 | - |
| 179 | Form 1120S | MACHINERY & EQUIPMENT - LA (140-03) | COMPRESSOR | 9/25/2006 | | 3,900.00 | - | 3,900.00 | 3,900.00 | - |
| 180 | Form 1120S | MACHINERY & EQUIPMENT - LA (140-03) | COMPRESSOR #3 | 9/26/2006 | | 5,861.00 | - | 5,861.00 | 5,861.00 | - |
| 384 | Form 1120S | MACHINERY & EQUIPMENT - LA (140-03) | (2) COPELAND COMPRESSORS | 10-Dec-08 | | 22,573.00 | - | 22,573.00 | 22,573.00 | - |
| 472 | Form 1120S | MACHINERY & EQUIPMENT - LA (140-03) | USED 2-DOOR FRIDGE | 5/07/2009 | | 1,639.00 | - | 1,639.00 | 1,639.00 | - |
| 899 | Form 1120S | MACHINERY & EQUIPMENT - LA (140-03) | RETROFIT-REFRIG SYSTEM | 4/03/2013 | | 10,000.00 | - | 10,000.00 | 10,000.00 | - |
| 900 | Form 1120S | MACHINERY & EQUIPMENT - LA (140-03) | FRZR REPAIRS/FREON RETROF | 4/03/2013 | | 50,385.00 | - | 50,385.00 | 50,385.00 | - |
| 1147 | Form 1120S | MACHINERY & EQUIPMENT - LA (140-03) | NL SERIES EOD 431203 | 5/19/2015 | | 1,073.00 | - | 1,073.00 | 1,073.00 | - |
| 1148 | Form 1120S | MACHINERY & EQUIPMENT - LA (140-03) | NL SERIEW EOD 431205 | 5/19/2015 | | 1,073.00 | - | 1,073.00 | 1,073.00 | - |
| 1149 | Form 1120S | MACHINERY & EQUIPMENT - LA (140-03) | TRANSITION PLATE | 5/19/2015 | | 2,003.00 | - | 2,003.00 | 2,003.00 | - |
| 1449 | Form 1120S | MACHINERY & EQUIPMENT - LA (140-03) | FORKLIFT PUSH BACK RACKS-LA #912 | 9/30/2020 | | 28,612.00 | - | 28,612.00 | 24,781.00 | 2,555.00 |
| 1450 | Form 1120S | MACHINERY & EQUIPMENT - LA (140-03) | REFRIDGERATOR COMPRESSOR - LA#922 | 9/30/2020 | | 7,000.00 | - | 7,000.00 | 6,061.00 | 625.00 |
| 1496 | Form 1120S | MACHINERY & EQUIPMENT - LA (140-03) | TOYOTA MAT HAND SOL SN:7A318766 | 7/31/2021 | | 4,494.00 | - | 4,494.00 | 3,491.00 | 401.00 |
| 1497 | Form 1120S | MACHINERY & EQUIPMENT - LA (140-03) | TOYOTA MAT HAND SOL SN:7A318767 | 7/31/2021 | | 4,494.00 | - | 4,494.00 | 3,491.00 | 401.00 |
| 1500 | Form 1120S | MACHINERY & EQUIPMENT - LA (140-03) | FORKLIFT HYST J30ZT SN:J160N04078F | 8/31/2021 | | 10,805.00 | - | 10,805.00 | 8,395.00 | 964.00 |
| 1613 | Form 1120S | MACHINERY & EQUIPMENT - LA (140-03) | LA COOLING SYSTEM #214 | 1-Dec-23 | | 117,405.00 | - | 117,405.00 | 66,063.00 | 14,664.00 |
| 120 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | (110) CHEESE MOLDS | 3/08/2004 | | 7,150.00 | - | 7,150.00 | 7,150.00 | - |
| 148 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | 900 & 1600 GAL TANKS | 3/08/2005 | | 8,000.00 | - | 8,000.00 | 8,000.00 | - |
| 152 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | GAULIN HOMOGENIZER | 5/10/2005 | | 20,550.00 | - | 20,550.00 | 20,550.00 | - |
| 159 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | 1000 GAL MUELLER PROC VAT | 7/19/2005 | | 18,791.00 | - | 18,791.00 | 18,791.00 | - |
| 173 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | MAQUINA AT 2500 | 2/11/2005 | | 21,692.00 | - | 21,692.00 | 21,692.00 | - |
| 283 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | VEMAG HP-10C STUFFER | 12-Dec-06 | | 322,125.00 | - | 322,125.00 | 322,125.00 | - |
| 413 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | 1000 GALLON TANK | 2/12/2008 | | 3,221.00 | - | 3,221.00 | 3,221.00 | - |
| 418 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | (2) 550 GAL PROCESSNG VAT | 4/15/2008 | | 39,792.00 | - | 39,792.00 | 39,792.00 | - |
| 442 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | 1000 Gal Processor | 1/01/2009 | | 23,012.00 | - | 23,012.00 | 23,012.00 | - |
| 444 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | Blending-4000 Gallon Tnk | 1/12/2009 | | 14,983.00 | - | 14,983.00 | 14,983.00 | - |
| 469 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | WHEY SEPARATOR INSTRUMENT | 23-Dec-09 | | 7,224.00 | - | 7,224.00 | 7,224.00 | - |
| 470 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | 75KVA TRANSFORMER | 14-Dec-09 | | 2,127.00 | - | 2,127.00 | 2,127.00 | - |
| 510 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | AIRTECH L-630 VACUUM PUMP | 1/29/2010 | | 23,493.00 | - | 23,493.00 | 23,493.00 | - |
| 512 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | TRAY MACHINE | 1/12/2010 | | 20,000.00 | - | 20,000.00 | 20,000.00 | - |
| 515 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | COTIJA TRANSPORT RACKS-5 | 1/25/2010 | | 6,383.00 | - | 6,383.00 | 6,383.00 | - |
| 516 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | AIR CHAIN HOIST 2TON 10FT | 1/12/2010 | | 5,225.00 | - | 5,225.00 | 5,225.00 | - |
| 517 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | CO2 MIXER COVER | 2/01/2010 | | 5,508.00 | - | 5,508.00 | 5,508.00 | - |
| 522 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | V MAG MACHINE HOUSING | 2/10/2010 | | 3,778.00 | - | 3,778.00 | 3,778.00 | - |
| 523 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | 15A FEEDER 115/60-NEW PRO | 1/29/2010 | | 1,278.00 | - | 1,278.00 | 1,278.00 | - |
| 525 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | PUSHER FEED ATTACHMENT | 3/19/2010 | | 3,944.00 | - | 3,944.00 | 3,944.00 | - |
| 528 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | WHEY SEPARATOR ELECT. BOX | 4/20/2010 | | 2,429.00 | - | 2,429.00 | 2,429.00 | - |
| 533 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | HOOPS - COTIJA-70 | 6/29/2010 | | 11,178.00 | - | 11,178.00 | 11,178.00 | - |
| 534 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | HOOPS - COTIJA - 60 | 6/30/2010 | | 9,581.00 | - | 9,581.00 | 9,581.00 | - |
| 537 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | SEALER WRAPPER-BELCO | 7/30/2010 | | 32,666.00 | - | 32,666.00 | 32,666.00 | - |
| 540 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | TRAY SEALER S-30 PROJ. | 8/19/2010 | | 15,610.00 | - | 15,610.00 | 15,610.00 | - |
| 541 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | CHEESE WRAPPER AND TUNNEL | 8/26/2010 | | 11,063.00 | - | 11,063.00 | 11,063.00 | - |
| 542 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | COTIJA CUTTER-ROSELL | 17-Dec-10 | | 19,734.00 | - | 19,734.00 | 19,734.00 | - |
| 550 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | AMONIA-ALARM UNIT | 6/19/2012 | | 10,838.00 | - | 10,838.00 | 10,838.00 | - |
| 551 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | AMONIA-CNDSR-EVAP ATC 905 | 6/19/2012 | | 20,086.00 | - | 20,086.00 | 20,086.00 | - |
| 552 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | RECVG-PUMPS-CREAM | 6/19/2012 | | 6,967.00 | - | 6,967.00 | 6,967.00 | - |
| 553 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | WHEY-5 PISTON HOMOGNIZR | 6/19/2012 | | 41,724.00 | - | 41,724.00 | 41,724.00 | - |
| 554 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | RECVG-TANK-SILO-15,000 G | 6/19/2012 | | 11,958.00 | - | 11,958.00 | 11,958.00 | - |
| 555 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | WHEY-TANK-SILO-25,000G | 6/19/2012 | | 21,675.00 | - | 21,675.00 | 21,675.00 | - |
| 556 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | SANITARY-HOSE PLUMBING | 6/19/2012 | | 10,000.00 | - | 10,000.00 | 3,467.00 | 256.00 |
| 557 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | RECVG-WASH BAY | 6/19/2012 | | 1,662.00 | - | 1,662.00 | 1,662.00 | - |
| 558 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | AMONIA-CONDENSER ALL | 6/19/2012 | | 22,238.00 | - | 22,238.00 | 22,238.00 | - |
| 559 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | AMONIA-MOTOR CONTROL CTR | 8/19/2012 | | 13,101.00 | - | 13,101.00 | 13,101.00 | - |
| 560 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | RECVG-TANK-SILO-50,000 G | 6/19/2012 | | 259,422.00 | - | 259,422.00 | 259,422.00 | - |
| 561 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | AMONIA-PURGER | 6/19/2012 | | 3,251.00 | - | 3,251.00 | 3,251.00 | - |
| 562 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | MISC-300 GALLON COP | 6/19/2012 | | 6,598.00 | - | 6,598.00 | 6,598.00 | - |
| 563 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | AMMONIA-UTILITY PLC | 6/19/2012 | | 5,722.00 | - | 5,722.00 | 5,722.00 | - |

RFL Schedule 2.1b

| # | Form | Description | Item | Date | Value | | Value | Value | |
|---|---|---|---|---|---|---|---|---|---|
| 564 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | UTILITY-WATER TNK 5000GAL | 6/19/2012 | 14,322.00 | * | 14,322.00 | 14,322.00 | * |
| 566 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | AMONIA-RECEIVER VERTICAL | 6/19/2012 | 18,830.00 | * | 18,830.00 | 18,830.00 | * |
| 587 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | TRIANGLE BAGGING MACH. | 8/18/2009 | 49,230.00 | * | 49,230.00 | 49,230.00 | * |
| 588 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | AMONIA SYSTEM | 6/19/2012 | 34,880.00 | * | 34,880.00 | 34,880.00 | * |
| 589 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | AMONIA-RC-1 19M 250HP | 6/19/2012 | 18,830.00 | * | 18,830.00 | 18,830.00 | * |
| 590 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | AMONIA-RC-2 19M 250HP | 6/19/2012 | 18,830.00 | * | 18,830.00 | 18,830.00 | * |
| 591 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | AMONIA-RC-3 16S 200HP | 6/19/2012 | 18,830.00 | * | 18,830.00 | 18,830.00 | * |
| 592 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | AMONIA-RC-4 123 100HP | 6/19/2012 | 18,830.00 | * | 18,830.00 | 18,830.00 | * |
| 593 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | PASTEURIZNG-MOTOR CONTROL | 6/19/2012 | 8,670.00 | * | 8,670.00 | 8,670.00 | * |
| 594 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | AMONIA-RECIRCULATR W/ TNK | 6/19/2012 | 19,571.00 | * | 19,571.00 | 19,571.00 | * |
| 595 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | MULTIVAC VACUUM MOULD | 1/05/2010 | 3,387.00 | * | 3,387.00 | 3,387.00 | * |
| 596 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | RACK TRAYS | 2/23/2010 | 1,717.00 | * | 1,717.00 | 1,717.00 | * |
| 597 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | SS RACK MULTIVAC ROOM | 5/18/2010 | 3,360.00 | * | 3,360.00 | 3,360.00 | * |
| 600 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | MOTOR FOR STARTER TANK | 5/11/2010 | 3,026.00 | * | 3,026.00 | 3,026.00 | * |
| 603 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | 48' 1995 TRAILER | 1/13/2010 | 1,500.00 | * | 1,500.00 | 1,500.00 | * |
| 610 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | VAT-PROC.-200 GALLON | 2/09/2011 | 6,340.00 | * | 6,340.00 | 6,340.00 | * |
| 618 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | TABLE-FRESCO PRESS | 4/29/2011 | 2,404.00 | * | 2,404.00 | 2,404.00 | * |
| 622 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | FINE SAVER-STOELTING MAJO | 7/07/2011 | 15,770.00 | * | 15,770.00 | 15,770.00 | * |
| 655 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | COTIJA TABLE | 18-Dec-11 | 1,213.00 | * | 1,213.00 | 1,213.00 | * |
| 658 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | RECEIVNG-TANK-SILO-OTHER | 6/19/2012 | 26,284.00 | * | 26,284.00 | 26,284.00 | * |
| 659 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | RECEIVING BAY | 6/19/2012 | 34,354.00 | * | 34,354.00 | 34,354.00 | * |
| 660 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | RECEIVING-PUMPS | 6/19/2012 | 6,066.00 | * | 6,066.00 | 6,066.00 | * |
| 661 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | RECEIVING-SILO ALCOVES | 6/19/2012 | 52,794.00 | * | 52,794.00 | 52,794.00 | * |
| 662 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | AMONIA CONDNSR EVAP PMC62 | 6/19/2012 | 21,900.00 | * | 21,900.00 | 21,900.00 | * |
| 663 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | AMONIA-TANK NH3 DIFFUSION | 6/19/2012 | 17,022.00 | * | 17,022.00 | 17,022.00 | * |
| 664 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | AMONIA-PLATE HEAT EXCHNGR | 6/19/2012 | 64,450.00 | * | 64,450.00 | 64,450.00 | * |
| 665 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | AMMONIA COOLING TWR EQPMT | 6/19/2012 | 2,450.00 | * | 2,450.00 | 2,450.00 | * |
| 666 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | AMONIA-GLYCOL CHILLER | 6/19/2012 | 6,980.00 | * | 6,980.00 | 6,980.00 | * |
| 667 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | AMONIA-GLYCOL PIPING | 6/19/2012 | 443,360.00 | * | 443,360.00 | 153,951.00 | 11,368.00 |
| 668 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | AMMONIA GLYCOL SYST | 6/19/2012 | 6,508.00 | * | 6,508.00 | 6,508.00 | * |
| 669 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | AMONIA GLYCOL INSULATION | 6/19/2012 | 37,305.00 | * | 37,305.00 | 37,305.00 | * |
| 670 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | AMMONIA COMPRESSOR | 6/19/2012 | 80,296.00 | * | 80,296.00 | 80,296.00 | * |
| 671 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | AMMONIA GLYCOL SENSORS | 6/19/2012 | 16,538.00 | * | 16,538.00 | 16,538.00 | * |
| 672 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | AMONIA-GLYCOL TANK COVER | 6/19/2012 | 3,495.00 | * | 3,495.00 | 3,495.00 | * |
| 673 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | STEAM-BOILERS 300 HP-2 | 6/19/2012 | 453,748.00 | * | 453,748.00 | 453,748.00 | * |
| 674 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | UTILITY-KNG AIR SYST HNDL | 6/19/2012 | 26,906.00 | * | 26,906.00 | 26,906.00 | * |
| 675 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | UTILITY-WATER VALVES | 6/19/2012 | 14,709.00 | * | 14,709.00 | 14,709.00 | * |
| 677 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | UTILITY-WATER PIPING | 6/19/2012 | 232,682.00 | * | 232,682.00 | 232,682.00 | * |
| 678 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | UTILITY STEAM PIPING | 6/19/2012 | 308,847.00 | * | 308,847.00 | 308,847.00 | * |
| 679 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | UTILITY-PIPING | 6/19/2012 | 72,386.00 | * | 72,386.00 | 72,386.00 | * |
| 680 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | UTILITY-SHELL&TUBE | 6/19/2012 | 20,353.00 | * | 20,353.00 | 20,353.00 | * |
| 681 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | UTILITY-SINKS-16 | 6/19/2012 | 8,140.00 | * | 8,140.00 | 8,140.00 | * |
| 682 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | UTILITY-STEAM -VALVES | 6/19/2012 | 36,100.00 | * | 36,100.00 | 36,100.00 | * |
| 683 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | UTILITY-HOSE STATIONS | 6/19/2012 | 95,525.00 | * | 95,525.00 | 95,525.00 | * |
| 685 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | SANITARY-CIP SYSTM PIPING | 6/19/2012 | 140,552.00 | * | 140,552.00 | 140,552.00 | * |
| 686 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | UTILITY-HOSE REELS | 6/19/2012 | 6,218.00 | * | 6,218.00 | 6,218.00 | * |
| 688 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | SANITARY-CIP SYSTEM | 6/19/2012 | 23,834.00 | * | 23,834.00 | 23,834.00 | * |
| 689 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | SANITARY-PIPING VALVES | 6/19/2012 | 129,925.00 | * | 129,925.00 | 129,925.00 | * |
| 690 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | SANITARY-TNK 1000H VERTIC | 6/19/2012 | 4,032.00 | * | 4,032.00 | 4,032.00 | * |
| 691 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | SANITARY-TNK 1000G VERTIC | 6/19/2012 | 4,032.00 | * | 4,032.00 | 4,032.00 | * |
| 692 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | SANITARY-TNK 2000G VERTIC | 6/19/2012 | 7,488.00 | * | 7,488.00 | 7,488.00 | * |
| 693 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | SANITARY-TANK - 3 | 6/19/2012 | 4,200.00 | * | 4,200.00 | 4,200.00 | * |
| 694 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | SANITARY-PIPING | 6/19/2012 | 1,626,655.00 | * | 1,626,655.00 | 1,626,655.00 | * |
| 695 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | SANITARY-CIP TANK 750 GAL | 6/19/2012 | 5,714.00 | * | 5,714.00 | 5,714.00 | * |
| 696 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | HOMOGENIZER MANTON GAULIN | 6/19/2012 | 107,440.00 | * | 107,440.00 | 107,440.00 | * |
| 697 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | PASTEURIZING-PLC PANEL | 6/19/2012 | 5,585.00 | * | 5,585.00 | 5,585.00 | * |
| 700 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | PASTEURZ-SEPARATOR FRAMES | 6/19/2012 | 8,920.00 | * | 8,920.00 | 8,920.00 | * |
| 703 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | YOGURT-PROCESSOR 2000 GAL | 6/19/2012 | 106,480.00 | * | 106,480.00 | 106,480.00 | * |
| 705 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | AMONIA-THERMAL SYPHON | 6/19/2012 | 7,993.00 | * | 7,993.00 | 7,993.00 | * |
| 706 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | VAT #1 | 6/19/2012 | 51,478.00 | * | 51,478.00 | 51,478.00 | * |
| 707 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | VAT #2 | 6/19/2012 | 51,478.00 | * | 51,478.00 | 51,478.00 | * |
| 708 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | VAT #3 | 6/19/2012 | 51,478.00 | * | 51,478.00 | 51,478.00 | * |
| 709 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | VAT #4 | 6/19/2012 | 144,591.00 | * | 144,591.00 | 144,591.00 | * |
| 710 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | 4 DRAIN TABLES | 6/19/2012 | 36,815.00 | * | 36,815.00 | 36,815.00 | * |
| 711 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | DRAIN TABLE CARRIAGES | 6/19/2012 | 74,098.00 | * | 74,098.00 | 74,098.00 | * |
| 712 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | VATS | 6/19/2012 | 31,429.00 | * | 31,429.00 | 31,429.00 | * |
| 713 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | WHEY-GLYCOL CHILLER 500T | 6/19/2012 | 78,869.00 | * | 78,869.00 | 78,869.00 | * |
| 714 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | RCVG-TNK-40,000 SILO MILK | 6/19/2012 | | | | | |

RFL Schedule 2.1b

| | Form | Description | Item | Date | Value | | Value | Value | |
|---|---|---|---|---|---|---|---|---|---|
| 715 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | WHEY-TANK-BALANCE | 6/19/2012 | 6,147.00 | * | 6,147.00 | 6,147.00 | * |
| 716 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | WHEY-PLC PANEL | 6/19/2012 | 5,577.00 | * | 5,577.00 | 5,577.00 | * |
| 717 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | WHEY-PIPING | 6/19/2012 | 9,518.00 | * | 9,518.00 | 9,518.00 | * |
| 718 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | WHEY-SHELL & TUBE | 6/19/2012 | 4,841.00 | * | 4,841.00 | 4,841.00 | * |
| 719 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | WHEY-RO SYSTEM | 6/19/2012 | 455,937.00 | * | 455,937.00 | 455,937.00 | * |
| 720 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | WHEY-HTST | 6/19/2012 | 9,467.00 | * | 9,467.00 | 9,467.00 | * |
| 721 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | FINE SAVER SWECO 48 DIAM* | 6/19/2012 | 7,046.00 | * | 7,046.00 | 7,046.00 | * |
| 722 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | WHEY-PLATE HEAT EXCHGR | 6/19/2012 | 7,072.00 | * | 7,072.00 | 7,072.00 | * |
| 725 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | PACKAGNG-LABELER-BAR CODE | 6/19/2012 | 4,167.00 | * | 4,167.00 | 4,167.00 | * |
| 726 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | PACKAGNG-AIRE LABELER | 6/19/2012 | 6,156.00 | * | 6,156.00 | 6,156.00 | * |
| 727 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | PACKAGNG-METAL DETECTOR | 6/19/2012 | 5,906.00 | * | 5,906.00 | 5,906.00 | * |
| 728 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | PACKGNG-ROCHELEAU BLOW MT | 6/19/2012 | 10,737.00 | * | 10,737.00 | 10,737.00 | * |
| 730 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | COLD BOX REFRIGERATION EQ | 6/19/2012 | 287,253.00 | * | 287,253.00 | 287,253.00 | * |
| 731 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | AGING-COOLER & CONDENSER | 6/19/2012 | 14,588.00 | * | 14,588.00 | 14,588.00 | * |
| 732 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | CONTROLS FOR HTST | 6/19/2012 | 18,091.00 | * | 18,091.00 | 18,091.00 | * |
| 733 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | CONTROLS-PARTS & PROGRMG | 6/19/2012 | 717,678.00 | * | 717,678.00 | 717,678.00 | * |
| 734 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | ELECTRICAL | 6/19/2012 | 617,147.00 | * | 617,147.00 | 617,147.00 | * |
| 735 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | LAB-CHLORIDE ANALYZER | 6/19/2012 | 6,368.00 | * | 6,368.00 | 6,368.00 | * |
| 744 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | LAB-KETTLE-GROEN 100G | 6/19/2012 | 299.00 | * | 299.00 | 299.00 | * |
| 745 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | LAB-KETTLE-GROEN 20Q TABL | 6/19/2012 | 3,589.00 | * | 3,589.00 | 3,589.00 | * |
| 746 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | LAB-KETTLE-GROEN 40G JACK | 6/19/2012 | 4,486.00 | * | 4,486.00 | 4,486.00 | * |
| 747 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | LAB-FIXTURES | 6/19/2012 | 16,469.00 | * | 16,469.00 | 16,469.00 | * |
| 748 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | LAB-TABLES | 6/19/2012 | 2,404.00 | * | 2,404.00 | 2,404.00 | * |
| 749 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | UTILITY-AIR COMPRSR 25HP | 6/19/2012 | 1,486.00 | * | 1,486.00 | 1,486.00 | * |
| 750 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | UTILITY-AIR COMPRSR 60HP | 6/19/2012 | 25,646.00 | * | 25,646.00 | 25,646.00 | * |
| 752 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | UTILITY-AIR FILTRATION | 6/19/2012 | 4,012.00 | * | 4,012.00 | 4,012.00 | * |
| 753 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | UTILITY-AIR DRYER | 6/19/2012 | 5,419.00 | * | 5,419.00 | 5,419.00 | * |
| 754 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | UTILITY-AIR PIPING | 6/19/2012 | 52,505.00 | * | 52,505.00 | 52,505.00 | * |
| 755 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | UTILITY-AIR TANK | 6/19/2012 | 5,419.00 | * | 5,419.00 | 5,419.00 | * |
| 756 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | UTILITY-AIR VALVES | 6/19/2012 | 1,970.00 | * | 1,970.00 | 1,970.00 | * |
| 757 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | UTILITY-EYE WASH | 6/19/2012 | 897.00 | * | 897.00 | 897.00 | * |
| 761 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | UTILITY-PIPING VALVES | 6/19/2012 | 12,141.00 | * | 12,141.00 | 12,141.00 | * |
| 762 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | UTILITY-PLATE HEAT EXCHGR | 6/19/2012 | 11,187.00 | * | 11,187.00 | 11,187.00 | * |
| 763 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | WHEY-15000G WATER TANK | 6/19/2012 | 18,859.00 | * | 18,859.00 | 18,859.00 | * |
| 764 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | SANITARY-CIP TOTE STAND | 6/19/2012 | 1,909.00 | * | 1,909.00 | 1,909.00 | * |
| 765 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | SANITARY-CIP SYST VALVES | 6/19/2012 | 14,068.00 | * | 14,068.00 | 14,068.00 | * |
| 766 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | SANITARY-PUMPS | 6/19/2012 | 12,584.00 | * | 12,584.00 | 12,584.00 | * |
| 767 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | PASTEURIZING-EXHAUST FAN | 6/19/2012 | 4,071.00 | * | 4,071.00 | 4,071.00 | * |
| 768 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | PASTEURIZING-2 HMI PANELS | 6/19/2012 | 3,866.00 | * | 3,866.00 | 3,866.00 | * |
| 769 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | PASTEURIZING-HOPPER 4356 | 6/19/2012 | 1,295.00 | * | 1,295.00 | 1,295.00 | * |
| 770 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | PASTEURIZING-PASTEURZR 2 | 6/19/2012 | 9,028.00 | * | 9,028.00 | 9,028.00 | * |
| 771 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | PASTEURIZING-PLATFORM | 6/19/2012 | 5,180.00 | * | 5,180.00 | 5,180.00 | * |
| 772 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | PASTEURIZING-SHELL&TUBE | 6/19/2012 | 4,008.00 | * | 4,008.00 | 4,008.00 | * |
| 773 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | PASTEURIZING-TANK VENTS | 6/19/2012 | 1,832.00 | * | 1,832.00 | 1,832.00 | * |
| 774 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | PASTEURIZING-TANK BALANCE | 6/19/2012 | 6,353.00 | * | 6,353.00 | 6,353.00 | * |
| 775 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | PASTEURIZING-TNK HORIZONT | 6/19/2012 | 6,702.00 | * | 6,702.00 | 6,702.00 | * |
| 776 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | PASTEURIZING-TANK HTST | 6/19/2012 | 5,735.00 | * | 5,735.00 | 5,735.00 | * |
| 777 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | BLENDING-CATWALK | 6/19/2012 | 6,525.00 | * | 6,525.00 | 6,525.00 | 167.00 |
| 782 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | BLENDING-TANK 1000G | 6/19/2012 | 4,107.00 | * | 4,107.00 | 4,107.00 | * |
| 783 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | PACKG-CHILL BASKETS | 6/19/2012 | 39,453.00 | * | 39,453.00 | 39,453.00 | * |
| 784 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | YOGURT-BOLIS MACHINE | 6/19/2012 | 996.00 | * | 996.00 | 996.00 | * |
| 791 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | YOGURT-SCALE BUCKET FILLR | 6/19/2012 | 4,848.00 | * | 4,848.00 | 4,848.00 | * |
| 793 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | YOGURT-TANK FLAVOR #4 | 6/19/2012 | 3,263.00 | * | 3,263.00 | 3,263.00 | * |
| 794 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | PACKG-GRINDR 6K BOTTOM | 6/19/2012 | 55,761.00 | * | 55,761.00 | 55,761.00 | * |
| 795 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | YOGURT-TANK FLAVOR #2 | 6/19/2012 | 2,148.00 | * | 2,148.00 | 2,148.00 | * |
| 796 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | VATS-PNEUMATIC XFR SYST | 6/19/2012 | 344,323.00 | * | 344,323.00 | 344,323.00 | * |
| 797 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | VATS-DRAIN TABLE UV LGHT | 6/19/2012 | 14,622.00 | * | 14,622.00 | 14,622.00 | * |
| 798 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | WHEY-FINE SAVER-2 | 6/19/2012 | 16,081.00 | * | 16,081.00 | 16,081.00 | * |
| 799 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | WHEY-RO WHEY CREAM TANK | 6/19/2012 | 2,538.00 | * | 2,538.00 | 2,538.00 | * |
| 800 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | WHEY--SEPARATOR | 6/19/2012 | 6,451.00 | * | 6,451.00 | 6,451.00 | * |
| 801 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | WHEY-SEPARATOR FEED TNK | 6/19/2012 | 2,977.00 | * | 2,977.00 | 2,977.00 | * |
| 802 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | WHEY-TANK FEED | 6/19/2012 | 4,934.00 | * | 4,934.00 | 4,934.00 | * |
| 803 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | WHEY-TANK-15000 G WHEY #1 | 6/19/2012 | 27,974.00 | * | 27,974.00 | 27,974.00 | * |
| 804 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | WHEY-TANK 15000G WHEY #2 | 6/19/2012 | 25,316.00 | * | 25,316.00 | 25,316.00 | * |
| 805 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | WHEY-LOADOUT | 6/19/2012 | 13,214.00 | * | 13,214.00 | 13,214.00 | * |
| 806 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | WHEY-POT | 6/19/2012 | 4,157.00 | * | 4,157.00 | 4,157.00 | * |
| 807 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | MISC-AIR TUBE XFR SYST | 6/19/2012 | 5,936.00 | * | 5,936.00 | 5,936.00 | * |
| 809 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | MISC-CLEAN ROOM | 6/19/2012 | 2,872.00 | * | 2,872.00 | 1,002.00 | 74.00 |

RFL Schedule 2.1b

| No. | Form | Account | Description | Date | Amount | | Amount | Amount | Amount |
|---|---|---|---|---|---|---|---|---|---|
| 810 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | MISC-CLEAN ROOM | 6/19/2012 | 33,221.00 | * | 33,221.00 | 11,538.00 | 852.00 |
| 814 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | MISC-REFRIGERATION COTIJA | 6/19/2012 | 22,269.00 | * | 22,269.00 | 22,269.00 | * |
| 815 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | MISC-REFRIGERATION PANELA | 6/19/2012 | 6,000.00 | * | 6,000.00 | 6,000.00 | * |
| 816 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | MISC-ROTARY BLOWERS | 6/19/2012 | 883.00 | * | 883.00 | 883.00 | * |
| 817 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | MISC-TOTES | 6/19/2012 | 207.00 | * | 207.00 | 207.00 | * |
| 819 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | PACKGNG-CHEESE PRESS | 6/19/2012 | 10,465.00 | * | 10,465.00 | 10,465.00 | * |
| 820 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | PACKGNG-CONVEYOR | 6/19/2012 | 15,769.00 | * | 15,769.00 | 15,769.00 | * |
| 821 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | PACKGNG-CRT MACHINE | 6/19/2012 | 1,543.00 | * | 1,543.00 | 1,543.00 | * |
| 822 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | PACKGNG-CRYOVAC SHRINK | 6/19/2012 | 6,585.00 | * | 6,585.00 | 6,585.00 | * |
| 823 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | PACKGNG-COTIJA CHEESE HRP | 6/19/2012 | 2,055.00 | * | 2,055.00 | 2,055.00 | * |
| 825 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | PACKGNG-GRINDER #3 | 8/19/2012 | 18,912.00 | * | 18,912.00 | 18,912.00 | * |
| 829 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | PACKGNG-OAXACA MACHINE | 6/19/2012 | 5,924.00 | * | 5,924.00 | 5,924.00 | * |
| 830 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | PACKGNG-PLATFRM 3K GRNDR | 6/19/2012 | 1,125.00 | * | 1,125.00 | 1,125.00 | * |
| 832 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | PACKGNG-MZRLA CULINARY | 6/19/2012 | 8,450.00 | * | 8,450.00 | 8,450.00 | * |
| 835 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | PACKGNG-ROSS TRAY MACHINE | 6/19/2012 | 12,716.00 | * | 12,716.00 | 12,716.00 | * |
| 836 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | PACKGNG-SHREDDER | 6/19/2012 | 3,338.00 | * | 3,338.00 | 3,338.00 | * |
| 838 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | 8600 MACHINE FRANE | 6/14/2012 | 4,656.00 | * | 4,656.00 | 4,656.00 | * |
| 839 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | PACKGNG-TABLE | 6/19/2012 | 4,912.00 | * | 4,912.00 | 4,912.00 | * |
| 840 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | PACKGNG-TABLE LABELER | 6/19/2012 | 2,297.00 | * | 2,297.00 | 2,297.00 | * |
| 841 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | PACKGNG-TABLE ROLLING 2 | 6/19/2012 | 3,318.00 | * | 3,318.00 | 3,318.00 | * |
| 843 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | PACKGNG-VEMAG | 6/19/2012 | 13,624.00 | * | 13,624.00 | 13,624.00 | * |
| 879 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | Blending-4000G Upgrades | 6/19/2012 | 5,162.00 | * | 5,162.00 | 5,162.00 | * |
| 880 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | PACKG-MODELLER DRUM | 6/19/2012 | 6,738.00 | * | 6,738.00 | 6,738.00 | * |
| 881 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | PACKG-OAXACA PROD LINE | 6/19/2012 | 61,900.00 | * | 61,900.00 | 61,900.00 | * |
| 883 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | PACKG-RICOTTA FLOCULATION | 6/19/2012 | 34,736.00 | * | 34,736.00 | 34,736.00 | * |
| 884 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | PACKG-RICOTTA PROD LINE | 6/19/2012 | 150,251.00 | * | 150,251.00 | 150,251.00 | * |
| 886 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | CONTROLS-RICOTTA | 6/19/2012 | 3,600.00 | * | 3,600.00 | 3,600.00 | * |
| 888 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | LAB BLENDER MODEL 400C | 1/12/2012 | 1,862.00 | * | 1,862.00 | 1,862.00 | * |
| 890 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | AUTOCLAVE STERILIZER-LAB | 1/25/2012 | 12,557.00 | * | 12,557.00 | 12,557.00 | * |
| 891 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | VACUUM BOX & SEAL | 2/21/2012 | 4,725.00 | * | 4,725.00 | 4,725.00 | * |
| 893 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | V-MAG EXTRUSION TUBE | 2/15/2012 | 3,449.00 | * | 3,449.00 | 3,449.00 | * |
| 936 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | PNEUMATIC SYSTEM | 1/01/2013 | 41,208.00 | * | 41,208.00 | 41,208.00 | * |
| 938 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | VAT # 5 | 1/01/2013 | 55,145.00 | * | 55,145.00 | 55,145.00 | * |
| 939 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | GEAR BOX & MOTOR FOR VATS | 1/06/2013 | 20,737.00 | * | 20,737.00 | 20,737.00 | * |
| 940 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | FLOCK TANK-RICOTTA | 1/01/2013 | 5,375.00 | * | 5,375.00 | 5,375.00 | * |
| 943 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | GRINDER-6K BLOWER | 1/01/2013 | 4,391.00 | * | 4,391.00 | 4,391.00 | * |
| 946 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | PALLET JACK-TOYOTA ELECTR | 2/05/2013 | 4,192.00 | * | 4,192.00 | 4,192.00 | * |
| 949 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | CITY WATER BELT PROJECT | 2/18/2013 | 2,370.00 | * | 2,370.00 | 785.00 | 61.00 |
| 953 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | WHEY DRAINERS-2 | 1/01/2013 | 92,663.00 | * | 92,663.00 | 92,663.00 | * |
| 958 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | PIPING-MISC | 1/01/2013 | 6,175.00 | * | 6,175.00 | 6,175.00 | * |
| 959 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | CRYOVAC-VAC BOOST PUMP | 4/29/2013 | 14,922.00 | * | 14,922.00 | 14,922.00 | * |
| 960 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | VAT SLOPING PROJECT | 1/01/2013 | 6,695.00 | * | 6,695.00 | 6,695.00 | * |
| 961 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | MULTIVAC VACUUM PUMP | 4/30/2013 | 18,257.00 | * | 18,257.00 | 18,257.00 | * |
| 963 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | CIP SYSTEM LEVEL TRANSMIT | 5/31/2013 | 8,890.00 | * | 8,890.00 | 8,890.00 | * |
| 964 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | HOOPS-SQUARE 40LB-500 | 1/01/2013 | 65,400.00 | * | 65,400.00 | 65,400.00 | * |
| 966 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | WHEY FINE SAVER PROJECT | 1/01/2013 | 5,793.00 | * | 5,793.00 | 5,793.00 | * |
| 968 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | PIPING-RELOCATE LINES | 7/01/2013 | 8,018.00 | * | 8,018.00 | 8,018.00 | * |
| 969 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | PIPING-GLYCOL | 7/01/2013 | 4,500.00 | * | 4,500.00 | 4,500.00 | * |
| 970 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | PLATE HEAT EXCHANGER | 7/03/2013 | 3,229.00 | * | 3,229.00 | 3,229.00 | * |
| 974 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | AMMONIA CONTROL PANEL | 8/31/2013 | 5,953.00 | * | 5,953.00 | 5,953.00 | * |
| 977 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | LABEL APPLICATOR 32 OZ | 1/01/2013 | 17,766.00 | * | 17,766.00 | 17,766.00 | * |
| 982 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | PACKGNG FRINDR 3K - LEFT | 6/19/2012 | 94,724.00 | * | 94,724.00 | 94,724.00 | * |
| 990 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | CONVEYOR-CORRUGATED | 18-Nov-13 | 2,740.00 | * | 2,740.00 | 2,740.00 | * |
| 992 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | HOOPS 750 PANELA, 25 FRES | 17-Dec-13 | 3,563.00 | * | 3,563.00 | 3,563.00 | * |
| 1010 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | WHEY LOAD OUT-RICOTTA | 1/01/2014 | 18,126.00 | * | 18,126.00 | 18,126.00 | * |
| 1011 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | VA-250 GALLON TEST-USED | 1/01/2014 | 9,121.00 | * | 9,121.00 | 9,121.00 | * |
| 1012 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | FINE SAVER-INSTALL MILLER | 1/15/2014 | 37,205.00 | * | 37,205.00 | 37,205.00 | * |
| 1013 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | VEMAG/OAXACA AUGER-USED | 1/16/2014 | 13,518.00 | * | 13,518.00 | 13,518.00 | * |
| 1014 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | 2ND SWECO/FRONT/SEP-USED | 3/10/2014 | 7,403.00 | * | 7,403.00 | 7,403.00 | * |
| 1015 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | SUP BOILER#1-REPAIR DOOR | 1/28/2014 | 13,629.00 | * | 13,629.00 | 13,629.00 | * |
| 1016 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | TABLE-CHEESE ROLLER (50%) | 2/01/2014 | 3,854.00 | * | 3,854.00 | 3,854.00 | * |
| 1017 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | MOTOR-WHEY PUMP SWECO | 2/04/2014 | 4,050.00 | * | 4,050.00 | 4,050.00 | * |
| 1020 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | OAXACA/MOZZ MACHINE COMPA | 7/25/2014 | 50,861.00 | * | 50,861.00 | 50,861.00 | * |
| 1021 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | VAT-CHEESE | 13-Oct-14 | 21,521.00 | * | 21,521.00 | 21,521.00 | * |
| 1022 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | HOOPS-2,675 | 5/08/2014 | 14,705.00 | * | 14,705.00 | 14,705.00 | * |
| 1023 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | WALL TANKS/COLD WHEY-2 | 29-Oct-14 | 13,748.00 | * | 13,748.00 | 13,748.00 | * |
| 1024 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | FLEXIFAM MACHINE | 12-Oct-14 | 30,855.00 | * | 30,855.00 | 30,855.00 | * |
| 1025 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | SILO-3,000 GALLON-USED | 4/24/2014 | 9,675.00 | * | 9,675.00 | 9,675.00 | * |

RFL Schedule 2.1b

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1026 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | SILO-4,000 GALLON | 4/24/2014 | 12,900.00 | * | 12,900.00 | 12,900.00 |
| 1028 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | MULTIVAC MOLDS | 4/25/2014 | 7,741.00 | * | 7,741.00 | 7,741.00 |
| 1029 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | PACKAGING EQUIPMENT-USED | 6/01/2014 | 35,164.00 | * | 35,164.00 | 35,164.00 |
| 1030 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | LABEL PRINTER-M CLASS 421 | 5/19/2014 | 2,384.00 | * | 2,384.00 | 2,384.00 |
| 1031 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | LABEL PRINTER-M CLASS 421 | 5/19/2014 | 2,322.00 | * | 2,322.00 | 2,322.00 |
| 1032 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | PLC EXPENSION-VAT ROOM | 7/15/2014 | 19,081.00 | * | 19,081.00 | 19,081.00 |
| 1033 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | CLARIFIER-ALFA LAVAL DMRP | 9/19/2014 | 131,414.00 | * | 131,414.00 | 131,414.00 |
| 1034 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | ELECT-PLANT INSTRUMENTS | 7/01/2014 | 26,590.00 | * | 26,590.00 | 26,590.00 |
| 1035 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | ELECTRIC-VFD/S | 1-Oct-14 | 16,448.00 | * | 16,448.00 | 16,448.00 |
| 1036 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | ELECTRICAL-MAINTENANCE | 9/01/2014 | 9,943.00 | * | 9,943.00 | 9,943.00 |
| 1037 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | TABLE-PRESS | 6/01/2014 | 4,699.00 | * | 4,699.00 | 4,699.00 |
| 1038 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | TABLE-EXTRUDER | 6/01/2014 | 6,084.00 | * | 6,084.00 | 6,084.00 |
| 1039 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | TANK-CULT INSTALL IN HTST | 6/01/2014 | 4,446.00 | * | 4,446.00 | 4,446.00 |
| 1040 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | RICOTTA COOL TUBS-GLYCOL | 8-Oct-14 | 39,233.00 | * | 39,233.00 | 39,233.00 |
| 1043 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | ELECTRICAL-PROD MOTORS | 9/01/2014 | 28,731.00 | * | 28,731.00 | 28,731.00 |
| 1044 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | CONVEYOR-DEAD ROLLER16FT2 | 7/01/2014 | 10,488.00 | * | 10,488.00 | 10,488.00 |
| 1045 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | DRYER-COMPRESSED AIR | 7/22/2014 | 15,122.00 | * | 15,122.00 | 15,122.00 |
| 1046 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | TANK-WHY CREAM REC-OAXACA | 1/07/2014 | 36,463.00 | * | 36,463.00 | 36,463.00 |
| 1048 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | TRAILER-FLAT BED-CUL BX R | 7/15/2014 | 3,000.00 | * | 3,000.00 | 3,000.00 |
| 1049 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | PALLET TRUCK-ELEC WALKIE | 7/31/2014 | 4,304.00 | * | 4,304.00 | 4,304.00 |
| 1050 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | HOOP WASHER-UPGRADE CONTR | 7/31/2014 | 8,507.00 | * | 8,507.00 | 8,507.00 |
| 1051 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | FT 5 MILK TO RICOTTA | 9/03/2014 | 1,240.00 | * | 1,240.00 | 1,240.00 |
| 1052 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | AGING ROOM | 1-Oct-14 | 11,724.00 | * | 11,724.00 | 11,724.00 |
| 1053 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | VAT-CHEESE#5 MILK HEATER | 15-Oct-14 | 16,917.00 | * | 16,917.00 | 16,917.00 |
| 1055 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | SANITIZE HOSES-DRAIN TABL | 31-Oct-14 | 3,083.00 | * | 3,083.00 | 3,083.00 |
| 1056 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | HOOPS-5, 280 | 30-Oct-14 | 17,424.00 | * | 17,424.00 | 17,424.00 |
| 1057 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | MOTOR-20HP PAST-HTST RM | 31-Oct-14 | 3,475.00 | * | 3,475.00 | 3,475.00 |
| 1059 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | MILK/HTST TO FLAVOR TANK5 | 25-Nov-14 | 7,456.00 | * | 7,456.00 | 7,456.00 |
| 1060 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | COMPRESSOR-40 HP - FREON2 | 23-Nov-14 | 8,704.00 | * | 8,704.00 | 8,704.00 |
| 1062 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | EXHAUST FAN-BY PRODUCT RM | 1-Dec-14 | 9,646.00 | * | 9,646.00 | 9,646.00 |
| 1063 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | CONVEYOR BELT-OAXACA-CO2 | 1-Dec-14 | 12,339.00 | * | 12,339.00 | 12,339.00 |
| 1065 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | ELECTRICAL EQUIPMENT | 1/01/2015 | 180,959.00 | * | 180,959.00 | 180,959.00 |
| 1067 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | WAUKESHA PUMP SN26814R200 | 2/24/2015 | 3,057.00 | * | 3,057.00 | 3,057.00 |
| 1069 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | OAXACA CHEESE GRIDS-100 | 8/24/2015 | 8,195.00 | * | 8,195.00 | 8,195.00 |
| 1071 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | BAGGING MACHINE | 3/23/2015 | 17,600.00 | * | 17,600.00 | 17,600.00 |
| 1073 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | FREEZER-34-22JRV CHEST | 3/07/2015 | 3,781.00 | * | 3,781.00 | 3,781.00 |
| 1074 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | PNEUMATIC SYSTEM BLOWER | 3/26/2015 | 6,410.00 | * | 6,410.00 | 6,410.00 |
| 1075 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | FREEZER34-22JRV-SN8006512 | 3/31/2015 | 3,781.00 | * | 3,781.00 | 3,781.00 |
| 1076 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | MAGMETER FLOW SYSTEMS | 4/27/2015 | 9,993.00 | * | 9,993.00 | 9,993.00 |
| 1078 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | FLEXIFAM MACHINE | 5/06/2015 | 27,950.00 | * | 27,950.00 | 27,950.00 |
| 1079 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | BAX SYSTEM-LAB | 7/28/2015 | 55,348.00 | * | 55,348.00 | 55,341.00 |
| 1081 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | RO SYSTEM FILTER MEMBRANE | 6/12/2015 | 60,971.00 | * | 60,971.00 | 60,971.00 |
| 1082 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | FORKLIFT CROWN RC5540 | 6/04/2015 | 21,525.00 | * | 21,525.00 | 21,525.00 |
| 1083 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | RICOTTA BLEND TANK #2 | 7/30/2015 | 1,022.00 | * | 1,022.00 | 1,022.00 |
| 1084 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | TANK-2000 G CREAM SN9725 | 6/26/2015 | 24,663.00 | * | 24,663.00 | 24,663.00 |
| 1086 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | TANK-COP | 7/27/2015 | 3,221.00 | * | 3,221.00 | 3,221.00 |
| 1087 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | CHEESE PRESS-8 | 8/19/2015 | 15,405.00 | * | 15,405.00 | 15,405.00 |
| 1088 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | TANK-WALKER SILO 30,000 G | 7/27/2015 | 73,347.00 | * | 73,347.00 | 73,339.00 |
| 1089 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | CITY WATER PIPING-RICOTTA | 7/31/2015 | 2,750.00 | * | 2,750.00 | 2,750.00 |
| 1090 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | PIPING RAW/CIP FLOWPANEL | 7/31/2015 | 3,520.00 | * | 3,520.00 | 3,520.00 |
| 1091 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | INSTALLED SET TANK#3 | 7/31/2015 | 8,910.00 | * | 8,910.00 | 8,910.00 |
| 1092 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | MILK HTST TO FLAVOR TANK | 1/11/2015 | 3,720.00 | * | 3,720.00 | 3,720.00 |
| 1094 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | SALT WHEY LINE | 2/10/2015 | 2,035.00 | * | 2,035.00 | 2,035.00 |
| 1097 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | REDUCE FOAM IN WHEY | 4/01/2015 | 2,500.00 | * | 2,500.00 | 2,500.00 |
| 1098 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | TANK-WHEY CREAM RECOVERY | 2/11/2015 | 1,243.00 | * | 1,243.00 | 1,243.00 |
| 1100 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | RICOTTA COOLING SYSTEM | 1/07/2015 | 1,665.00 | * | 1,665.00 | 1,665.00 |
| 1101 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | CLARIFIER-ALFA LAVALDMRPX | 5/28/2015 | 98,004.00 | * | 98,004.00 | 97,995.00 |
| 1103 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | SEPARATOR-510 SKIM | 4/06/2015 | 24,994.00 | * | 24,994.00 | 24,994.00 |
| 1104 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | SWECO-NEW SILO SALT LINE | 3/30/2015 | 24,793.00 | * | 24,793.00 | 24,793.00 |
| 1105 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | RICOTTA FLOCK TANK INJECT | 2/20/2015 | 3,400.00 | * | 3,400.00 | 3,400.00 |
| 1106 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | RICOTTA BAG DRYER | 7/29/2015 | 5,941.00 | * | 5,941.00 | 5,941.00 |
| 1107 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | WALL TANKS FOR COLD WHEY2 | 1-Dec-15 | 23,966.00 | * | 23,966.00 | 23,966.00 |
| 1108 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | CHEESE TOWERS | 1-Dec-15 | 260,680.00 | * | 260,680.00 | 260,680.00 |
| 1110 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | PIPING-BLEND CREAM TO BAL | 8/26/2015 | 3,500.00 | * | 3,500.00 | 3,500.00 |
| 1111 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | PIPING-HOT WTR SUPPLY | 8/27/2015 | 9,200.00 | * | 9,200.00 | 9,200.00 |
| 1112 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | PIPING-CIP WYWTEM CONT. P | 8/27/2015 | 2,805.00 | * | 2,805.00 | 2,805.00 |
| 1113 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | OAXACA MACHINE REPAIRS | 8/28/2015 | 15,735.00 | * | 15,735.00 | 15,735.00 |
| 1114 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | COMPRESSED AIR LEAD DET. | 9/01/2015 | 4,515.00 | * | 4,515.00 | 4,515.00 |

RFL Schedule 2.1b

| ID | Form | Account | Description | Date | Value | * | Value | Value | * |
|---|---|---|---|---|---|---|---|---|---|
| 1115 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | INKJET CODER | 9/09/2015 | 12,917.00 | * | 12,917.00 | 12,917.00 | * |
| 1116 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | PIPING-CIP SYST, SKID #3 | 9/09/2015 | 5,720.00 | * | 5,720.00 | 5,720.00 | * |
| 1117 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | SCRUBBER-EAGLE CT90BT85 M | 9/18/2015 | 10,074.00 | * | 10,074.00 | 10,074.00 | * |
| 1118 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | SILO TANK - 50K RAW MLK F | 9/18/2015 | 13,069.00 | * | 13,069.00 | 13,069.00 | * |
| 1120 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | PLATE HEAT EXCHANGER T20 | 20-Oct-15 | 22,877.00 | * | 22,877.00 | 22,877.00 | * |
| 1121 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | MOTOT-200 HP REBUILD | 16-Nov-15 | 8,340.00 | * | 8,340.00 | 8,340.00 | * |
| 1123 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | BOILER-300HP W&D M, 3300D | 30-Nov-15 | 136,574.00 | * | 136,574.00 | 136,574.00 | * |
| 1124 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | ROT. MACH, OLD RIV, 8600B | 3-Dec-15 | 141,734.00 | * | 141,734.00 | 141,734.00 | * |
| 1125 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | LACTICYTE SOMATIC CELL CO | 4-Dec-15 | 4,065.00 | * | 4,065.00 | 4,065.00 | * |
| 1126 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | HOOPS-CHEESE SMALL BOX | 7-Dec-15 | 19,280.00 | * | 19,280.00 | 19,280.00 | * |
| 1127 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | HOOPS-CHEESE ROUND 4 | 9-Dec-15 | 27,795.00 | * | 27,795.00 | 27,795.00 | * |
| 1128 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | MOZZ MLD MACH, DRUMS ETC | 16-Dec-15 | 23,921.00 | * | 23,921.00 | 23,921.00 | * |
| 1129 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | MICRO GAP PLATE-9, VALV 1 | 31-Dec-15 | 8,701.00 | * | 8,701.00 | 8,701.00 | * |
| 1151 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | CROWN LIFT TRUCK RC3020 | 6/01/2015 | 17,475.00 | * | 17,475.00 | 17,475.00 | * |
| 1155 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | THERMALINE HEAT EXCHANGER | 1/05/2016 | 5,553.00 | * | 5,553.00 | 5,553.00 | * |
| 1157 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | CRYOVAC MACHINE-#3008 | 1/29/2016 | 63,925.00 | * | 63,925.00 | 63,925.00 | * |
| 1158 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | THERMALINE PUMP-#3081 | 1/28/2016 | 40,639.00 | * | 40,639.00 | 40,639.00 | * |
| 1159 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | (106) HEAT TRANSFR PLATES | 1/29/2016 | 13,559.00 | * | 13,559.00 | 13,559.00 | * |
| 1160 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | BELL MARK THERMAL PRINTER | 1/29/2016 | 34,231.00 | * | 34,231.00 | 34,231.00 | * |
| 1161 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | TRANSITION BOX | 3/16/2016 | 5,183.00 | * | 5,183.00 | 5,183.00 | * |
| 1162 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | HEATER UNIT AND DUCTING | 3/16/2016 | 22,238.00 | * | 22,238.00 | 22,238.00 | * |
| 1163 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | DENEST/HEAT SEAL -#3092 | 2/02/2016 | 251,414.00 | * | 251,414.00 | 251,414.00 | * |
| 1165 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | QAXACA CHEESE MACHINE | 2/22/2016 | 8,502.00 | * | 8,502.00 | 8,502.00 | * |
| 1166 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | SCALE SYSTEM/WEIGH-#3065 | 6/02/2016 | 122,190.00 | * | 122,190.00 | 122,177.00 | * |
| 1167 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | PINEER SHLL TBE/HEAT HEX | 2/26/2016 | 6,600.00 | * | 6,600.00 | 6,600.00 | * |
| 1168 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | (4) DRIVE STANDS | 2/16/2016 | 1,169.00 | * | 1,169.00 | 1,169.00 | * |
| 1169 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | 6000 GALLON TANK | 2/16/2016 | 24,000.00 | * | 24,000.00 | 24,000.00 | * |
| 1170 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | TEFLON COATING 6LB FORMS | 2/19/2016 | 10,000.00 | * | 10,000.00 | 10,000.00 | * |
| 1171 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | DMRPX 610g-34C SEPARATOR | 3/04/2016 | 33,834.00 | * | 33,834.00 | 33,834.00 | * |
| 1173 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | MACHINE PIPING | 3/24/2016 | 3,575.00 | * | 3,575.00 | 3,575.00 | * |
| 1175 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | MOZZ BLOCK MOLDER-#3089 | 31-Dec-16 | 108,000.00 | * | 108,000.00 | 104,143.00 | * |
| 1176 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | RETROFIT MULTIVAC R230 | 4/01/2016 | 5,323.00 | * | 5,323.00 | 5,323.00 | * |
| 1177 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | PACKAGNG EXTEND SIDE BELT | 4/14/2016 | 10,045.00 | * | 10,045.00 | 10,045.00 | * |
| 1178 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | EQUIPMENT SALES TAX | 4/19/2016 | 13,207.00 | * | 13,207.00 | 13,207.00 | * |
| 1179 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | RETROFIT MUTIVAC R230 | 5/04/2016 | 11,662.00 | * | 11,662.00 | 11,662.00 | * |
| 1180 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | (6) CHAMBER CRYOVAC PROJ | 6/01/2016 | 8,852.00 | * | 8,852.00 | 8,852.00 | * |
| 1181 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | AGROPECUAR GR-EQUIPMENT | 5/18/2016 | 16,000.00 | * | 16,000.00 | 16,000.00 | * |
| 1184 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | GASKET TOP COVER | 5/27/2016 | 2,842.00 | * | 2,842.00 | 2,842.00 | * |
| 1186 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | MARKEM-IMAJE PRINTER | 6/15/2016 | 14,314.00 | * | 14,314.00 | 14,314.00 | * |
| 1189 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | NEW DRUM SCRAPER | 6/17/2016 | 2,857.00 | * | 2,857.00 | 2,857.00 | * |
| 1192 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | NEW DELRIN CUTTING BLOCKS | 6/17/2016 | 6,819.00 | * | 6,819.00 | 6,819.00 | * |
| 1194 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | ALFA 500 SERIES SERVICE | 6/29/2016 | 17,457.00 | * | 17,457.00 | 17,457.00 | * |
| 1195 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | WHEY UF SYSTEM-#3075 | 7/26/2016 | 675,680.00 | * | 675,680.00 | 675,613.00 | * |
| 1198 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | EXTNSION MOLDS-TIRAS MACH | 8/01/2016 | 6,073.00 | * | 6,073.00 | 6,073.00 | * |
| 1199 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | REPAIR HOMOGENIZER | 8/08/2016 | 15,426.00 | * | 15,426.00 | 15,426.00 | * |
| 1200 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | REBUILD VACUUM PUMP | 8/19/2016 | 13,970.00 | * | 13,970.00 | 13,970.00 | * |
| 1201 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | WEIGH PRICE LABELER-#3097 | 8/23/2016 | 46,810.00 | * | 46,810.00 | 46,810.00 | * |
| 1202 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | FAB BOTTOM DISTRIBUT TANK | 9/01/2016 | 3,620.00 | * | 3,620.00 | 3,620.00 | * |
| 1204 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | SHANKLIN SHRNK WRAP-#3060 | 9/16/2016 | 37,000.00 | * | 37,000.00 | 37,000.00 | * |
| 1205 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | ALPMA STACKTURNER-#3086 | 31-Dec-16 | 89,339.00 | * | 89,339.00 | 86,149.00 | * |
| 1206 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | NEW WATT EQUIPMENT | 9/16/2016 | 6,238.00 | * | 6,238.00 | 6,238.00 | * |
| 1208 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | PACKAGER-5000/10-#3107 | 31-Dec-16 | 96,055.00 | * | 96,055.00 | 92,627.00 | * |
| 1238 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | CREAMOPROT-#3085 | 31-Dec-16 | 851,291.00 | * | 851,291.00 | 820,902.00 | * |
| 1239 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | WATER STRETCH/COOLR-#3018 | 5/25/2016 | 260,474.00 | * | 260,474.00 | 260,448.00 | * |
| 1240 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | CHEESE TOWERS-#3079 | 31-Dec-16 | 110,117.00 | * | 110,117.00 | 106,185.00 | * |
| 1241 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | TRAY SEALER REBLD-#3105 | 31-Dec-16 | 8,873.00 | * | 8,873.00 | 8,558.00 | * |
| 1242 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | GRK YOGURT SEPARATE-#3106 | 31-Dec-16 | 11,910.00 | * | 11,910.00 | 11,486.00 | * |
| 1243 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | BOILER ROOM | 23-Nov-16 | 29,488.00 | * | 29,488.00 | 29,488.00 | * |
| 1244 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | PANELA HOOPS | 5-Dec-16 | 3,600.00 | * | 3,600.00 | 3,600.00 | * |
| 1245 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | CONSULTING -VARIOUS PROJ | 6-Dec-16 | 6,480.00 | * | 6,480.00 | 6,480.00 | * |
| 1246 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | NEW SCRUBBER | 28-Dec-16 | 12,473.00 | * | 12,473.00 | 12,473.00 | * |
| 1248 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | REBUILD VACUUM PUMP | 8/25/2016 | 3,948.00 | * | 3,948.00 | 3,948.00 | * |
| 1252 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | CHEESE TOWERS-#3079 | 7/31/2017 | 691,941.00 | * | 691,941.00 | 691,941.00 | * |
| 1253 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | CREAMOPROT-#3085 | 7/31/2017 | 12,062.00 | * | 12,062.00 | 12,062.00 | * |
| 1254 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | CHEMICAL INJECTION-#3108 | 7/31/2017 | 27,451.00 | * | 27,451.00 | 27,451.00 | * |
| 1255 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | CO2 NITROGEN UPGRADE-3082 | 7/31/2017 | 45,911.00 | * | 45,911.00 | 45,911.00 | * |
| 1256 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | BOILER REPLACEMENT-#3098 | 7/31/2017 | 76,592.00 | * | 76,592.00 | 76,592.00 | * |
| 1258 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | REPOSADO L-BAR PRO#3060 | 1/01/2017 | 22,221.00 | * | 22,221.00 | 22,221.00 | * |

RFL Schedule 2.1b

| ID | Form | Description | Asset | Date | Amount | | Amount | Amount | Amount |
|---|---|---|---|---|---|---|---|---|---|
| 1259 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | SURVEILLANCE EQUIPMENT | 8/01/2017 | 46,394.00 | - | 46,394.00 | 46,394.00 | - |
| 1281 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | MACHINERY-SALES TAX | 5/01/2017 | 13,863.00 | - | 13,863.00 | 13,863.00 | - |
| 1282 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | ULTRA VACUUM PUMP | 5/01/2017 | 8,891.00 | - | 8,891.00 | 8,891.00 | - |
| 1283 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | ANSER U2 INJET PRINTER | 9/01/2017 | 4,900.00 | - | 4,900.00 | 4,900.00 | - |
| 1286 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | FOSS SCAN ANALYZER | 31-Dec-17 | 87,100.00 | - | 87,100.00 | 87,100.00 | - |
| 1288 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | TOWER CONVEYOR #722 | 1/01/2018 | 52,745.00 | - | 52,745.00 | 52,745.00 | - |
| 1289 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | QA STUDIO #725 | 4/25/2018 | 16,277.00 | - | 16,277.00 | 16,277.00 | - |
| 1290 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | HOOP WASHER #703 | 4/25/2018 | 27,845.00 | - | 27,845.00 | 27,845.00 | - |
| 1291 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | OAXACA EXPANSION #702 | 5/24/2018 | 280,405.00 | - | 280,405.00 | 280,376.00 | - |
| 1292 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | SILO INSTALLATION #724 | 5/24/2018 | 138,705.00 | - | 138,705.00 | 52,880.00 | 6,935.00 |
| 1293 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | 30,000G SKIM SILO #784 | 5/24/2018 | 178,136.00 | - | 178,136.00 | 67,916.00 | 8,907.00 |
| 1294 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | SAFELINE METAL DETECT#801 | 5/24/2018 | 24,860.00 | - | 24,860.00 | 24,860.00 | - |
| 1295 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | CREAM RECOVERY #803 | 5/24/2018 | 18,077.00 | - | 18,077.00 | 18,077.00 | - |
| 1296 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | CHEST FREEZER | 7/09/2018 | 3,535.00 | - | 3,535.00 | 3,535.00 | - |
| 1300 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | NEW FORKLIFT | 3/07/2018 | 10,681.00 | - | 10,681.00 | 10,681.00 | - |
| 1302 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | COJITA DISINTEGRATOR | 8/07/2018 | 25,465.00 | - | 25,465.00 | 25,465.00 | - |
| 1304 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | FOSS FT1 | 31-Oct-18 | 107,491.00 | - | 107,491.00 | 107,491.00 | - |
| 1305 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | THERMO KING MD-200 REFRIG | 30-Nov-18 | 4,506.00 | - | 4,506.00 | 4,506.00 | - |
| 1306 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | THERMO KING MD-200 REFRIG | 30-Nov-18 | 4,506.00 | - | 4,506.00 | 4,506.00 | - |
| 1309 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | FLOOR SCRUBBER | 6/30/2018 | 13,062.00 | - | 13,062.00 | 13,062.00 | - |
| 1310 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | YALE SUP FORKLIFT | 30-Nov-18 | 25,351.00 | - | 25,351.00 | 25,351.00 | - |
| 1311 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | AMJET A350i DEMO PRINTER | 9/30/2018 | 8,973.00 | - | 8,973.00 | 8,973.00 | - |
| 1312 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | YOG TO SR CR. PIPING #717 | 4/30/2018 | 13,140.00 | - | 13,140.00 | 13,140.00 | - |
| 1313 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | MOLECULAR DETECTION INSTR | 8/31/2018 | 15,634.00 | - | 15,634.00 | 15,634.00 | - |
| 1314 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | LCE SCALE WEIGHT #812 | 1-Nov-18 | 28,980.00 | - | 28,980.00 | 28,980.00 | - |
| 1315 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | INDOOR SURVEILLANCE SYS. | 1-Nov-18 | 176,000.00 | - | 176,000.00 | 176,000.00 | - |
| 1317 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | FLOW METER | 31-Oct-18 | 5,286.00 | - | 5,286.00 | 5,286.00 | - |
| 1318 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | SALES TAX | 4/30/2018 | 2,147.00 | - | 2,147.00 | 2,147.00 | - |
| 1319 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | UV3500 MACHINE | 4/30/2018 | 82,499.00 | - | 82,499.00 | 82,492.00 | - |
| 1320 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | CONVEYOR MODERN PACK #713 | 31-Dec-18 | 43,290.00 | - | 43,290.00 | 43,290.00 | - |
| 1321 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | EXACT WEIGHT CUTTER #711 | 31-Dec-18 | 75,150.00 | - | 75,150.00 | 75,150.00 | - |
| 1322 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | MULTIVAC #810 | 31-Dec-18 | 298,180.00 | - | 298,180.00 | 298,180.00 | - |
| 1323 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | POWER DIST. UPGRADE #824 | 31-Dec-18 | 47,106.00 | - | 47,106.00 | 47,106.00 | - |
| 1327 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | AMJET AX350i DEMO PRINTER | 8/31/2018 | 9,027.00 | - | 9,027.00 | 9,027.00 | - |
| 1339 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | CHEESE CONVEYER PH.2-#813 | 2/28/2019 | 42,935.00 | - | 42,935.00 | 41,020.00 | 1,915.00 |
| 1340 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | RALLADO BLOWER-#820 | 2/28/2019 | 40,894.00 | - | 40,894.00 | 39,071.00 | 1,823.00 |
| 1341 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | NEW REISER TRAY LN.#821 | 2/28/2019 | 58,682.00 | - | 58,682.00 | 58,682.00 | - |
| 1343 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | CLARK WPX 45-PALLET JACK | 2/28/2019 | 4,525.00 | - | 4,525.00 | 4,323.00 | 202.00 |
| 1344 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | CLARK WPX 45-PALLET JACK | 2/28/2019 | 3,878.00 | - | 3,878.00 | 3,704.00 | 174.00 |
| 1345 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | SWECO ENERGY SEP. UNIT | 1/31/2019 | 14,917.00 | - | 14,917.00 | 14,252.00 | 665.00 |
| 1346 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | FORKLIFT BATTERY | 1/31/2019 | 6,433.00 | - | 6,433.00 | 6,433.00 | - |
| 1347 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | BARCD PORTPRINTER(4) | 2/28/2019 | 5,400.00 | - | 5,400.00 | 5,400.00 | - |
| 1348 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | FLOOR SCRUBBER | 2/28/2019 | 2,705.00 | - | 2,705.00 | 2,585.00 | 120.00 |
| 1349 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | COLD BOX RAMP | 2/28/2019 | 1,500.00 | - | 1,500.00 | 1,432.00 | 68.00 |
| 1350 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | LCE EXACT WT-FNLPMT#812 | 2/28/2019 | 10,220.00 | - | 10,220.00 | 9,764.00 | 456.00 |
| 1351 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | CLARK PALLET TRUCK-MODEL | 3/31/2019 | 4,525.00 | - | 4,525.00 | 4,525.00 | - |
| 1352 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | EVAPORATIVE COOLER | 3/31/2019 | 3,093.00 | - | 3,093.00 | 2,954.00 | 139.00 |
| 1353 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | DECORATIVE APP. ST. 1000 | 3/31/2019 | 7,546.00 | - | 7,546.00 | 7,546.00 | - |
| 1354 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | FILTER FOR RO SYST. MEMBR | 3/31/2019 | 20,554.00 | - | 20,554.00 | 20,554.00 | - |
| 1356 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | FRESCO GRINDER CONV. #826 | 4/30/2019 | 24,178.00 | - | 24,178.00 | 23,100.00 | 1,078.00 |
| 1357 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | FRESCO BAGGER #805 | 4/30/2019 | 6,705.00 | - | 6,705.00 | 6,406.00 | 299.00 |
| 1358 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | 34-25JRV FREEZER CHEST | 4/30/2019 | 4,513.00 | - | 4,513.00 | 4,312.00 | 201.00 |
| 1359 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | RICOTTA CHEESE REWRK #726 | 4/30/2019 | 43,896.00 | - | 43,896.00 | 41,939.00 | 1,957.00 |
| 1360 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | ZEBRA TC25AJ SCANNERS(2) | 4/30/2019 | 1,956.00 | - | 1,956.00 | 1,869.00 | 87.00 |
| 1363 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | NEW HTST PROJECT #902 | 6/30/2019 | 220,154.00 | - | 220,154.00 | 210,336.00 | 9,818.00 |
| 1364 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | CONDENSATE RECOVERY #905 | 6/30/2019 | 43,964.00 | - | 43,964.00 | 42,003.00 | 1,961.00 |
| 1365 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | PLT. WATER SYSTEM #906 | 6/30/2019 | 13,084.00 | - | 13,084.00 | 12,499.00 | 585.00 |
| 1366 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | WHEY YIELD ANALISIS #908 | 6/30/2019 | 29,000.00 | - | 29,000.00 | 29,000.00 | - |
| 1367 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | SALT WHEY FINE SAVER #911 | 6/30/2019 | 15,521.00 | - | 15,521.00 | 15,521.00 | - |
| 1370 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | AMMONIA COMPRESSOR REBLD | 6/30/2019 | 18,043.00 | - | 18,043.00 | 18,043.00 | - |
| 1371 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | CLARIFIER&SEPARATOR #709 | 7/31/2019 | 264,730.00 | - | 264,730.00 | 252,922.00 | 11,808.00 |
| 1372 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | THERMALPRINTERS&BATTERIES | 7/31/2019 | 4,097.00 | - | 4,097.00 | 3,914.00 | 183.00 |
| 1373 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | FRESCO CASING LINE #706 | 7/31/2019 | 405,712.00 | - | 405,712.00 | 387,617.00 | 18,095.00 |
| 1374 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | CHEESE HOOPS | 7/31/2019 | 13,211.00 | - | 13,211.00 | 13,211.00 | - |
| 1377 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | WASTE WATER TANKS (2) | 8/31/2019 | 5,197.00 | - | 5,197.00 | 4,966.00 | 231.00 |
| 1378 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | WET POLYMER FEEDER | 8/31/2019 | 16,630.00 | - | 16,630.00 | 16,630.00 | - |
| 1379 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | BARCODE PRINTERS (4) | 8/31/2019 | 2,968.00 | - | 2,968.00 | 2,968.00 | - |
| 1380 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | BARCODE SCANNERS (3) W/PR | 31-Oct-19 | 5,272.00 | - | 5,272.00 | 5,272.00 | - |

RFL Schedule 2.1b

| ID | Form | Category | Asset | Date | Amount | | Amount | Amount | Amount |
|---|---|---|---|---|---|---|---|---|---|
| 1384 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | PARKING LOT CAMERA | 30-Nov-19 | 5,205.00 | * | 5,205.00 | 5,205.00 | * |
| 1385 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | BARCODE SCANNERS | 30-Nov-19 | 2,925.00 | * | 2,925.00 | 2,925.00 | * |
| 1388 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | SOUP RECOVERY UTILIZ #70 | 31-Dec-19 | 42,700.00 | * | 42,700.00 | 40,795.00 | 1,905.00 |
| 1389 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | CIP EXPANSION PROJ #710 | 31-Dec-19 | 70,356.00 | * | 70,356.00 | 67,218.00 | 3,138.00 |
| 1390 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | HORIZ TANK RAW AREA #808 | 31-Dec-19 | 38,977.00 | * | 38,977.00 | 37,239.00 | 1,738.00 |
| 1391 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | OAXACA ELEVATOR #903 | 31-Dec-19 | 25,815.00 | * | 25,815.00 | 24,663.00 | 1,152.00 |
| 1392 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | METAL DETECTORS (2) | 31-Dec-19 | 59,753.00 | * | 59,753.00 | 57,089.00 | 2,664.00 |
| 1393 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | METAL DETECTOR | 31-Dec-19 | 21,794.00 | * | 21,794.00 | 20,821.00 | 973.00 |
| 1394 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | PLC SWITCH UPGRADE #927 | 31-Dec-19 | 37,821.00 | * | 37,821.00 | 37,821.00 | * |
| 1395 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | VAT 5 COOLING BED #924 | 31-Dec-19 | 20,772.00 | * | 20,772.00 | 19,845.00 | 927.00 |
| 1419 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | CHEESE HOOPS | 31-Dec-19 | 10,305.00 | * | 10,305.00 | 9,845.00 | 460.00 |
| 1420 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | OAXACO EXPANSION | 31-Dec-19 | 250,477.00 | * | 250,477.00 | 250,477.00 | * |
| 1421 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | BASE PRODUCT RECOVERY #705 | 1/31/2020 | 609,666.00 | * | 609,666.00 | 528,031.00 | 54,443.00 |
| 1422 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | NEW RICOTTA COOLING TANK #718 | 1/31/2020 | 15,460.00 | * | 15,460.00 | 13,390.00 | 1,381.00 |
| 1423 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | CIP SYSTEM OPTIMIZATION #719 | 4/30/2020 | 162,178.00 | * | 162,178.00 | 140,461.00 | 14,482.00 |
| 1424 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | COMAT RICOTTA EQUIP #819 | 1/31/2020 | 63,767.00 | * | 63,767.00 | 55,228.00 | 5,694.00 |
| 1425 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | MULTIVAC-PHASE 2 #907 | 1/31/2020 | 123,879.00 | * | 123,879.00 | 107,290.00 | 11,062.00 |
| 1426 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | SILO EXPANSION #913 | 6/30/2020 | 552,910.00 | * | 552,910.00 | 478,876.00 | 49,375.00 |
| 1427 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | CUT & WRAP COP TANK #914 | 1/31/2020 | 5,722.00 | * | 5,722.00 | 4,956.00 | 511.00 |
| 1428 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | COLD BOX #915 | 5/31/2020 | 99,581.00 | * | 99,581.00 | 86,248.00 | 8,893.00 |
| 1429 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | RICOTTA EXPANSION | 4/30/2020 | 385,775.00 | * | 385,775.00 | 334,119.00 | 34,450.00 |
| 1430 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | OAXACA BRINE CIP SYST #919 | 4/30/2020 | 27,026.00 | * | 27,026.00 | 23,408.00 | 2,413.00 |
| 1431 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | CRYOVAC CONVEYER #923 | 2/29/2020 | 47,622.00 | * | 47,622.00 | 41,246.00 | 4,253.00 |
| 1432 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | PANEER PROJECT #928 | 4/30/2020 | 164,475.00 | * | 164,475.00 | 142,452.00 | 14,688.00 |
| 1433 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | RICOTTA COOLING VAT AND CONV #002 | 8/31/2020 | 118,441.00 | * | 118,441.00 | 102,581.00 | 10,577.00 |
| 1434 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | WASTE RECOVERY POT #004 | 4/30/2020 | 7,662.00 | * | 7,662.00 | 6,635.00 | 684.00 |
| 1435 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | FOSS DAIRY SCAN #011 | 6/30/2020 | 37,290.00 | * | 37,290.00 | 32,297.00 | 3,330.00 |
| 1436 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | ELECTRICAL EXP -RAW #016 | 8/31/2020 | 204,649.00 | * | 204,649.00 | 177,247.00 | 18,275.00 |
| 1437 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | 19FT ELECTRIC SCISSOR LIFT | 2/29/2020 | 4,275.00 | * | 4,275.00 | 3,703.00 | 382.00 |
| 1438 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | DATAMAX M-4210 II PRINTERS(2) | 2/29/2020 | 3,148.00 | * | 3,148.00 | 2,727.00 | 281.00 |
| 1439 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | FREEZER CHEST | 2/29/2020 | 5,022.00 | * | 5,022.00 | 4,349.00 | 448.00 |
| 1440 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | IPHONE W/BARCODE SCANNER(3) | 2/29/2020 | 4,210.00 | * | 4,210.00 | 3,647.00 | 376.00 |
| 1441 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | PALLET JACK MODEL-MPB045 | 3/31/2020 | 4,525.00 | * | 4,525.00 | 3,919.00 | 404.00 |
| 1442 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | PLC MACHINE | 4/30/2020 | 45,339.00 | * | 45,339.00 | 39,269.00 | 4,049.00 |
| 1443 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | PRESSURE WASHER | 4/30/2020 | 5,432.00 | * | 5,432.00 | 4,704.00 | 485.00 |
| 1444 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | PURADIGM AIR PURIFIERS(3) | 4/30/2020 | 4,197.00 | * | 4,197.00 | 3,635.00 | 375.00 |
| 1445 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | REFRIGERATOR FOR LAB | 5/31/2020 | 3,714.00 | * | 3,714.00 | 3,218.00 | 332.00 |
| 1446 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | TABLE TOP CONVEYER | 1/31/2020 | 11,083.00 | * | 11,083.00 | 9,599.00 | 990.00 |
| 1447 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | WAUKESHA PUMP MODEL 220-U1 | 3/31/2020 | 14,103.00 | * | 14,103.00 | 12,214.00 | 1,259.00 |
| 1448 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | YALE IC 42 FORKLIFT | 2/29/2020 | 14,558.00 | * | 14,558.00 | 12,608.00 | 1,300.00 |
| 1451 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | MIYOKO VEGAN CHEESE #019 | 31-Oct-20 | 27,322.00 | * | 27,322.00 | 23,664.00 | 2,440.00 |
| 1452 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | GEA MILK SEPARATOR #925 | 31-Dec-20 | 972,701.00 | * | 972,701.00 | 842,455.00 | 86,862.00 |
| 1453 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | DELL POWEREDGE T340 TOWER SERVER | 2/28/2020 | 3,235.00 | * | 3,235.00 | 2,802.00 | 289.00 |
| 1454 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | MODEL 1900Z LIDDING MACHINE | 1-Dec-20 | 18,464.00 | * | 18,464.00 | 15,992.00 | 1,649.00 |
| 1455 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | SALT LUMP BREAKER | 16-Nov-20 | 6,886.00 | * | 6,886.00 | 5,963.00 | 615.00 |
| 1456 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | LACTICHECK MILK ANALYZER | 31-Oct-20 | 4,494.00 | * | 4,494.00 | 3,892.00 | 401.00 |
| 1457 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | ZEBRA MOBILE PRINTERS (3) | 8/03/2020 | 2,250.00 | * | 2,250.00 | 1,950.00 | 201.00 |
| 1458 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | BARCODE SCANNER | 8/03/2020 | 1,758.00 | * | 1,758.00 | 1,523.00 | 157.00 |
| 1459 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | AMMONIA CONDENSER REPLACEMENT | 31-Dec-20 | 203,050.00 | * | 203,050.00 | 175,861.00 | 18,132.00 |
| 1471 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | COMBINATION SCALE #929 | 1/31/2021 | 273,236.00 | * | 273,236.00 | 212,276.00 | 24,373.00 |
| 1472 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | RICOTTA MIX TANK UPGRADE #006 | 2/28/2021 | 20,017.00 | * | 20,017.00 | 15,551.00 | 1,786.00 |
| 1473 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | OAXACA PACK OFF #014 | 2/28/2021 | 35,024.00 | * | 35,024.00 | 27,210.00 | 3,124.00 |
| 1474 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | 50K GALLON SILO #017 | 2/28/2021 | 230,941.00 | * | 230,941.00 | 179,418.00 | 20,600.00 |
| 1475 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | PLC GATEWAY EXPANSION #020 | 2/28/2021 | 15,053.00 | * | 15,053.00 | 11,694.00 | 1,343.00 |
| 1476 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | REISER TRAY LINE #022 | 2/28/2021 | 51,302.00 | * | 51,302.00 | 39,857.00 | 4,576.00 |
| 1477 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | RAW POWDER BLENDER #028 | 2/28/2021 | 5,133.00 | * | 5,133.00 | 3,988.00 | 458.00 |
| 1478 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | PHASE II SEPARATOR CIP LOOP #029 | 2/28/2021 | 30,705.00 | * | 30,705.00 | 23,855.00 | 2,739.00 |
| 1479 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | 12.5K GAL. ACID/WHEY SILO REM #036 | 2/28/2021 | 59,593.00 | * | 59,593.00 | 46,298.00 | 5,316.00 |
| 1480 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | 20K GALLON MILK SILO #037 | 2/28/2021 | 96,535.00 | * | 96,535.00 | 74,998.00 | 8,611.00 |
| 1481 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | 30K GALLON MILK SILO #038 | 2/28/2021 | 46,998.00 | * | 46,998.00 | 36,513.00 | 4,192.00 |
| 1482 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | EPI 9230 LABELING SYSTEM #930 | 2/28/2021 | 32,655.00 | * | 32,655.00 | 25,369.00 | 2,913.00 |
| 1483 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | RAW BLEND PROC. POWDER REMOVAL #023 | 3/31/2021 | 12,125.00 | * | 12,125.00 | 9,420.00 | 1,082.00 |
| 1484 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | DAIRY CONV-2 LN RS REISER INS. #040 | 3/31/2021 | 40,216.00 | * | 40,216.00 | 31,244.00 | 3,587.00 |
| 1485 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | INFEED BLENTECH 1-20 #003 | 6/30/2021 | 2,008.00 | * | 2,008.00 | 1,560.00 | 179.00 |
| 1486 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | BP CHEESE VAT #012 | 6/30/2021 | 43,226.00 | * | 43,226.00 | 33,582.00 | 3,856.00 |
| 1487 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | MIXER GRINDER:CBS FOOD EQUIPMENT | 6/30/2021 | 19,310.00 | * | 19,310.00 | 15,001.00 | 1,722.00 |
| 1488 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | TOUCH SCREEN OMRON: ROSS IND. | 6/30/2021 | 9,098.00 | * | 9,098.00 | 7,067.00 | 812.00 |
| 1492 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | INDUSTRIAL INKJET PRINTER MK-G1000 | 6/30/2021 | 10,848.00 | * | 10,848.00 | 8,428.00 | 968.00 |

RFL Schedule 2.1b

| # | Form | Category | Description | Date | Value 1 | | Value 2 | Value 3 | Value 4 |
|---|------|----------|-------------|------|--------|---|--------|--------|--------|
| 1493 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | POWERFLEX AC DRIVE/ETHERNET ADAPTER | 6/30/2021 | 3,944.00 | * | 3,944.00 | 3,065.00 | 352.00 |
| 1494 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | ELECTRIC POWERED GX GANGWAY LLC | 8/31/2021 | 44,800.00 | * | 44,800.00 | 34,807.00 | 3,996.00 |
| 1495 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | COLUSSI HOOP WASHER | 9/30/2021 | 374,455.00 | * | 374,455.00 | 290,914.00 | 33,401.00 |
| 1498 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | MANF OAXACA 90 DEG CONV NORC CONST | 7/31/2021 | 15,817.00 | * | 15,817.00 | 12,288.00 | 1,411.00 |
| 1499 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | CTX TEXTURE ANAL AMETEK BROOKFIELD | 7/31/2021 | 18,798.00 | * | 18,798.00 | 14,605.00 | 1,677.00 |
| 1501 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | CONDENSATE RECOVERY #111 | 8/31/2021 | 20,590.00 | * | 20,590.00 | 15,996.00 | 1,837.00 |
| 1502 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | HEAT EXCH. SN:AGC12344-01 PLT. RACK | 9/30/2021 | 32,124.00 | * | 32,124.00 | 24,957.00 | 2,865.00 |
| 1503 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | MOBCOMPZEBTC57 SN:20358522502037 | 31-Oct-21 | 2,707.00 | * | 2,707.00 | 2,103.00 | 241.00 |
| 1504 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | MOBCOMPZEBTC57 SN:20358522502040 | 31-Oct-21 | 2,707.00 | * | 2,707.00 | 2,103.00 | 241.00 |
| 1505 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | DRY WAREHOUSE STAGING #039 | 9/30/2021 | 87,967.00 | * | 87,967.00 | 68,340.00 | 7,847.00 |
| 1506 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | 60K RAW MILK SILO 208 #103 | 9/30/2021 | 153,928.00 | * | 153,928.00 | 119,587.00 | 13,730.00 |
| 1507 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | WASTEWATER SAF UPG. #926 | 9/30/2021 | 27,116.00 | * | 27,116.00 | 21,067.00 | 2,419.00 |
| 1508 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | RAW ROOM COOLING #115 | 31-Oct-21 | 47,206.00 | * | 47,206.00 | 36,674.00 | 4,211.00 |
| 1514 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | BLENTECH JACKET HEATING & COOLING | 31-Dec-21 | 20,435.00 | * | 20,435.00 | 15,876.00 | 1,823.00 |
| 1515 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | FIBER CABLG PRODTN AUTOMATION #116 | 31-Dec-21 | 63,609.00 | * | 63,609.00 | 49,418.00 | 5,674.00 |
| 1522 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | 30K CREAM SILO 1301 #106 | 1/31/2022 | 39,711.00 | * | 39,711.00 | 27,305.00 | 3,546.00 |
| 1523 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | KLONDIKE DOUBLE-O VATS | 1/31/2022 | 34,500.00 | * | 34,500.00 | 23,722.00 | 3,081.00 |
| 1524 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | ERECTASTEP PLATFORM SYSTEM | 2/28/2022 | 5,739.00 | * | 5,739.00 | 3,946.00 | 512.00 |
| 1525 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | CHILL BASKETS | 3/31/2022 | 19,560.00 | * | 19,560.00 | 13,449.00 | 1,747.00 |
| 1526 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | CIP & WASTEWATER IMPR. #102 | 4/30/2022 | 109,566.00 | * | 109,566.00 | 75,338.00 | 9,784.00 |
| 1527 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | 40 LB. 2 STAGE PNEUMATIC CUTTER | 4/30/2022 | 45,417.00 | * | 45,417.00 | 31,229.00 | 4,056.00 |
| 1535 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | DOCK DOOR ELECTRICAL #125 | 5/31/2022 | 12,640.00 | * | 12,640.00 | 8,854.00 | 1,121.00 |
| 1536 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | LKH40 3X2 CENT PUMP W/20 HP MOTOR | 5/31/2022 | 8,759.00 | * | 8,759.00 | 6,135.00 | 777.00 |
| 1538 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | METAL DETECTOR 14X7S-EPB INTER. | 6/30/2022 | 40,444.00 | * | 40,444.00 | 28,330.00 | 3,587.00 |
| 1539 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | ELGI-EGRD REFRIGERATED DRYER | 6/30/2022 | 28,831.00 | * | 28,831.00 | 20,196.00 | 2,557.00 |
| 1541 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | 15k CREAM SILO 1300 | 8/31/2022 | 34,070.00 | * | 34,070.00 | 22,984.00 | 3,169.00 |
| 1542 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | INSULATION UPGRADE | 8/31/2022 | 7,025.00 | * | 7,025.00 | 4,739.00 | 653.00 |
| 1545 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | CIP PROG. & EFFICIENCY OPTIMIZATION | 9/30/2022 | 44,336.00 | * | 44,336.00 | 29,909.00 | 4,123.00 |
| 1547 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | COMPRESSOR REPLACEMENT | 9/30/2022 | 10,350.00 | * | 10,350.00 | 6,982.00 | 963.00 |
| 1548 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | AC MOTOR REPAIR | 9/30/2022 | 4,432.00 | * | 4,432.00 | 2,991.00 | 412.00 |
| 1549 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | WEG MOTOR | 9/30/2022 | 11,384.00 | * | 11,384.00 | 7,679.00 | 1,059.00 |
| 1554 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | REDUCTION FLOOR MTD GEARSET | 31-Oct-22 | 5,797.00 | * | 5,797.00 | 3,760.00 | 582.00 |
| 1555 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | 750 GALLON SAFE TANK FOR SULFURIC | 31-Oct-22 | 5,672.00 | * | 5,672.00 | 3,678.00 | 569.00 |
| 1556 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | LAB AC UNIT #140 | 31-Oct-22 | 26,346.00 | * | 26,346.00 | 17,088.00 | 2,645.00 |
| 1557 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | COMPRESSOR RC1 REBUILD #139 | 31-Oct-22 | 38,412.00 | * | 38,412.00 | 24,914.00 | 3,857.00 |
| 1558 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | FRESCO BLAST COOLER UPGRADE #137 | 31-Oct-22 | 246,446.00 | * | 246,446.00 | 159,845.00 | 24,743.00 |
| 1559 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | ELECTRIC JACK (3) | 30-Nov-22 | 17,816.00 | * | 17,816.00 | 11,555.00 | 1,789.00 |
| 1565 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | OAXACA INTEGRATION #001 | 1-Dec-22 | 39,005.00 | * | 39,005.00 | 25,298.00 | 3,916.00 |
| 1566 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | MILK STANDARDIZATION #107 | 1-Dec-22 | 22,962.00 | * | 22,962.00 | 14,893.00 | 2,305.00 |
| 1567 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | CULTURE ROOM EXPANSION #104 | 1-Dec-22 | 15,616.00 | * | 15,616.00 | 10,128.00 | 1,568.00 |
| 1569 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | CURD TABLE DRAIN SCREEN | 1-Dec-22 | 11,250.00 | * | 11,250.00 | 7,297.00 | 1,130.00 |
| 1571 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | METAL DETECTOR | 31-Dec-22 | 10,475.00 | * | 10,475.00 | 8,326.00 | 1,146.00 |
| 1572 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | WORLDWIDE ELECTRIC MOTOR | 31-Dec-22 | 6,378.00 | * | 6,378.00 | 5,070.00 | 698.00 |
| 1573 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | SCALE-RICE LAKE 480 | 31-Dec-22 | 4,220.00 | * | 4,220.00 | 3,354.00 | 462.00 |
| 1575 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | PALLET JACK YALE MPE060 | 1/01/2023 | 12,887.00 | * | 12,887.00 | 7,252.00 | 1,610.00 |
| 1576 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | MUELLER 2,000 GALLON DOME-TOP, CONE | 1/01/2023 | 16,727.00 | * | 16,727.00 | 9,412.00 | 2,089.00 |
| 1577 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | BREDDO 200 GALLON JACKETED LIKWIFIE | 1/01/2023 | 15,998.00 | * | 15,998.00 | 9,002.00 | 1,998.00 |
| 1579 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | FRESCO/PANELA AUTOMATION #025 | 2/01/2023 | 2,310,050.00 | * | 2,310,050.00 | 1,299,665.00 | 288,525.00 |
| 1580 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | INKJET PRINTER | 2/01/2023 | 12,695.00 | * | 12,695.00 | 9,038.00 | 1,462.00 |
| 1581 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | METAL DETECTOR 16X10S-EPB INTERN | 3/01/2023 | 36,313.00 | * | 36,313.00 | 20,433.00 | 4,535.00 |
| 1582 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | GLYCOL ISOLATION #205 | 3/01/2023 | 8,521.00 | * | 8,521.00 | 4,795.00 | 1,064.00 |
| 1583 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | SEW MOTOR 3 HP | 3/01/2023 | 2,360.00 | * | 2,360.00 | 1,328.00 | 295.00 |
| 1584 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | ELECTRIC JACK S/N: 3312101240 | 3/01/2023 | 8,954.00 | * | 8,954.00 | 5,039.00 | 1,118.00 |
| 1585 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | BOILER IMPROVEMENT 3098 | 5/15/2023 | 31,686.00 | * | 31,686.00 | 17,830.00 | 3,958.00 |
| 1589 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | BOILER-300HP W&D M. 3300D REPAIR | 4/01/2023 | 43,814.00 | * | 43,814.00 | 24,654.00 | 5,472.00 |
| 1590 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | PLANT AIR UPGRADE #154 | 4/01/2023 | 116,627.00 | * | 116,627.00 | 65,626.00 | 14,567.00 |
| 1591 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | RC3 COMPRESSOR REBUILD #202 | 4/01/2023 | 32,279.00 | * | 32,279.00 | 18,164.00 | 4,032.00 |
| 1592 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | TRUCK CHARGING STATIONS #206 | 4/01/2023 | 57,746.00 | * | 57,746.00 | 41,115.00 | 6,652.00 |
| 1593 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | MINI-HD FLOOR SCRUBBER | 9/08/2023 | 14,826.00 | * | 14,826.00 | 8,343.00 | 1,852.00 |
| 1594 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | CHEESE TOWER IMPROVEMENT #3079 | 23-Oct-23 | 27,100.00 | * | 27,100.00 | 15,250.00 | 3,385.00 |
| 1595 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | PALLET JACKS MODEL B210-F45L | 22-Nov-23 | 16,990.00 | * | 16,990.00 | 9,561.00 | 2,122.00 |
| 1601 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | REISER REPAK MODEL RE #113 | 9/01/2023 | 2,618,545.00 | * | 2,618,545.00 | 1,473,456.00 | 327,056.00 |
| 1602 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | CREAMOPROT STAND ALONE CIP #119 | 1-Dec-23 | 7,794.00 | * | 7,794.00 | 4,386.00 | 973.00 |
| 1603 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | FRESCO BUCKET #204 | 1-Dec-23 | 12,745.00 | * | 12,745.00 | 7,171.00 | 1,592.00 |
| 1606 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | 2020 TETRA PAK SEPARATOR MODEL W40 | 1-Dec-23 | 178,764.00 | * | 178,764.00 | 100,590.00 | 22,328.00 |
| 1609 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | SANI-FAB 3 TANK CIP SYSTEM | 1-Dec-23 | 14,560.00 | * | 14,560.00 | 8,194.00 | 1,819.00 |
| 1610 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | DOUBLE O VAT 50,000 LB MODEL | 1-Dec-23 | 90,384.00 | * | 90,384.00 | 50,859.00 | 11,289.00 |
| 1611 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | DOUBLE O VAT 50,000 LB MODEL | 1-Dec-23 | 90,384.00 | * | 90,384.00 | 50,859.00 | 11,289.00 |

RFL Schedule 2.1b

| Asset # | Form | Account | Description | Date | Cost | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 1612 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | FPEC S/S WHEY DRAINING BELT CONVEYR | 1-Dec-23 | 58,407.00 | * | 58,407.00 | 32,865.00 | 7,295.00 |
| 1614 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | 2016 JL SCISSORLIFT MODEL 1930ES | 29-Dec-23 | 7,012.00 | * | 7,012.00 | 3,945.00 | 876.00 |
| 1615 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | ELECTRIC STEAM BOILER | 1/31/2024 | 12,681.00 | * | 12,681.00 | 4,918.00 | 2,218.00 |
| 1616 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | DRAIN TABLE UPGRADE | 2/14/2024 | 10,457.00 | * | 10,457.00 | 4,055.00 | 1,829.00 |
| 1617 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | CYLINDER AIR | 2/26/2024 | 29,384.00 | * | 29,384.00 | 11,395.00 | 5,139.00 |
| 1626 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | APPCO | 9/30/2025 | 14,681.00 | * | 14,681.00 | 1,572.00 | 3,745.00 |
| 1627 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | CAL BOILER | 9/30/2025 | 10,782.00 | * | 10,782.00 | 1,155.00 | 2,750.00 |
| 1628 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | SPIN CLEAR | 9/30/2025 | 4,329.00 | * | 4,329.00 | 464.00 | 1,104.00 |
| 1632 | Form 1120S | MACHINERY & EQUIPMENT - MCLURE 140-20-00 | TILLAMOOK CREDITS | 31-Dec-16 | (32,340.00) | (32,340.00) | * | * | * |
| 872 | Form 1120S | OFFICE & COMPUTER eQUIP-LOS ANGELES | 4 SECURITY CAMERAS | 27-Nov-12 | 1,350.00 | * | 1,350.00 | 1,350.00 | * |
| 1145 | Form 1120S | OFFICE & COMPUTER eQUIP-LOS ANGELES | CUBICLES-4 USED | 7/27/2015 | 3,500.00 | * | 3,500.00 | 3,500.00 | * |
| 1355 | Form 1120S | OFFICE & COMPUTER eQUIP-LOS ANGELES | OFFICE&COMPUTER EQUIP. LA | 3/31/2019 | 4,264.00 | * | 4,264.00 | 4,264.00 | * |
| 1416 | Form 1120S | OFFICE & COMPUTER eQUIP-LOS ANGELES | LA NETWORK EQUIPMENT | 31-Dec-19 | 17,781.00 | * | 17,781.00 | 16,989.00 | 792.00 |
| 1470 | Form 1120S | OFFICE & COMPUTER eQUIP-LOS ANGELES | LA NETWORK EQUIPMENT | 31-Dec-20 | 4,433.00 | * | 4,433.00 | 3,839.00 | 396.00 |
| 1210 | Form 1120S | OFFICE & COMPUTER EQUIP-MCLURE-142-20-00 | GSS 3MP IR BULLET CAMERA | 3/15/2016 | 4,477.00 | * | 4,477.00 | 4,477.00 | * |
| 1211 | Form 1120S | OFFICE & COMPUTER EQUIP-MCLURE-142-20-00 | COMPUTER SOFTWARE | 6/23/2016 | 3,600.00 | * | 3,600.00 | 3,600.00 | * |
| 1219 | Form 1120S | OFFICE & COMPUTER EQUIP-MCLURE-142-20-00 | BROCADE SWITCH | 11-Oct-16 | 2,356.00 | * | 2,356.00 | 2,356.00 | * |
| 1220 | Form 1120S | OFFICE & COMPUTER EQUIP-MCLURE-142-20-00 | DELL E-PORT REPLICATOR | 11-Oct-16 | 165.00 | * | 165.00 | 165.00 | * |
| 1221 | Form 1120S | OFFICE & COMPUTER EQUIP-MCLURE-142-20-00 | SHADOWPROTECT SOFTWARE | 14-Oct-16 | 1,895.00 | * | 1,895.00 | 1,895.00 | * |
| 1222 | Form 1120S | OFFICE & COMPUTER EQUIP-MCLURE-142-20-00 | NETWORK CARD | 14-Oct-16 | 619.00 | * | 619.00 | 619.00 | * |
| 1224 | Form 1120S | OFFICE & COMPUTER EQUIP-MCLURE-142-20-00 | POWEREDGE SERVER | 14-Oct-16 | 51,807.00 | * | 51,807.00 | 51,807.00 | * |
| 1226 | Form 1120S | OFFICE & COMPUTER EQUIP-MCLURE-142-20-00 | CISCO FIREWALL SOFTWARE | 18-Oct-16 | 10,044.00 | * | 10,044.00 | 10,044.00 | * |
| 1227 | Form 1120S | OFFICE & COMPUTER EQUIP-MCLURE-142-20-00 | COMPUTER LOWVOLT MATERIAL | 21-Oct-16 | 10,064.00 | * | 10,064.00 | 10,064.00 | * |
| 1228 | Form 1120S | OFFICE & COMPUTER EQUIP-MCLURE-142-20-00 | PLANTRONICS HEADSET | 28-Oct-16 | 287.00 | * | 287.00 | 287.00 | * |
| 1229 | Form 1120S | OFFICE & COMPUTER EQUIP-MCLURE-142-20-00 | MAILBOX MIGRATION SOFTWRE | 28-Oct-16 | 1,134.00 | * | 1,134.00 | 1,134.00 | * |
| 1249 | Form 1120S | OFFICE & COMPUTER EQUIP-MCLURE-142-20-00 | TELEPHONE SYSTEM | 28-Nov-16 | 54,144.00 | * | 54,144.00 | 54,144.00 | * |
| 1269 | Form 1120S | OFFICE & COMPUTER EQUIP-MCLURE-142-20-00 | TELEPHONE SYSTEM | 1/23/2017 | 8,439.00 | * | 8,439.00 | 8,439.00 | * |
| 1270 | Form 1120S | OFFICE & COMPUTER EQUIP-MCLURE-142-20-00 | SERVER LICENSING | 1/17/2017 | 810.00 | * | 810.00 | 810.00 | * |
| 1271 | Form 1120S | OFFICE & COMPUTER EQUIP-MCLURE-142-20-00 | SERVER | 1/30/2017 | 262.00 | * | 262.00 | 262.00 | * |
| 1274 | Form 1120S | OFFICE & COMPUTER EQUIP-MCLURE-142-20-00 | ARIF LAPTOP | 3/24/2017 | 1,499.00 | * | 1,499.00 | 1,499.00 | * |
| 1275 | Form 1120S | OFFICE & COMPUTER EQUIP-MCLURE-142-20-00 | SERVER | 3/30/2017 | 4,521.00 | * | 4,521.00 | 4,521.00 | * |
| 1277 | Form 1120S | OFFICE & COMPUTER EQUIP-MCLURE-142-20-00 | COMPUTER EQUIPMENT | 17-Oct-17 | 712.00 | * | 712.00 | 712.00 | * |
| 1278 | Form 1120S | OFFICE & COMPUTER EQUIP-MCLURE-142-20-00 | SERVER | 31-Dec-17 | 2,000.00 | * | 2,000.00 | 2,000.00 | * |
| 1328 | Form 1120S | OFFICE & COMPUTER EQUIP-MCLURE-142-20-00 | HR COPIER - ALTALINK | 9/30/2018 | 10,928.00 | * | 10,928.00 | 10,928.00 | * |
| 1336 | Form 1120S | OFFICE & COMPUTER EQUIP-MCLURE-142-20-00 | COMPUTER ENCLOSURES | 1/31/2019 | 7,420.00 | * | 7,420.00 | 7,420.00 | * |
| 1383 | Form 1120S | OFFICE & COMPUTER EQUIP-MCLURE-142-20-00 | DELL OPT 3060 DSKTOPS (4) | 30-Nov-19 | 3,366.00 | * | 3,366.00 | 3,366.00 | * |
| 1461 | Form 1120S | OFFICE & COMPUTER EQUIP-MCLURE-142-20-00 | THERMAL CAMERA PRODUCTION ENTRANCE | 4/30/2020 | 9,091.00 | * | 9,091.00 | 9,091.00 | * |
| 1462 | Form 1120S | OFFICE & COMPUTER EQUIP-MCLURE-142-20-00 | THERMAL CAMERA FRONT OFFICE ENTRANC | 5/31/2020 | 9,565.00 | * | 9,565.00 | 9,565.00 | * |
| 1516 | Form 1120S | OFFICE & COMPUTER EQUIP-MCLURE-142-20-00 | ZT411 INDUSTRIAL PRINTERS (6) | 31-Dec-21 | 11,490.00 | * | 11,490.00 | 10,829.00 | 661.00 |
| 1540 | Form 1120S | OFFICE & COMPUTER EQUIP-MCLURE-142-20-00 | HP ELITEBOOK NOTEBOOK (2) | 7/31/2022 | 4,381.00 | * | 4,381.00 | 3,577.00 | 495.00 |
| 1550 | Form 1120S | OFFICE & COMPUTER EQUIP-MCLURE-142-20-00 | HP ELITEBOOK NOTEBOOK | 9/30/2022 | 2,051.00 | * | 2,051.00 | 1,674.00 | 232.00 |
| 1551 | Form 1120S | OFFICE & COMPUTER EQUIP-MCLURE-142-20-00 | AEGIS GAMING DESKTOP COMPUTER | 9/30/2022 | 1,714.00 | * | 1,714.00 | 1,400.00 | 194.00 |
| 1552 | Form 1120S | OFFICE & COMPUTER EQUIP-MCLURE-142-20-00 | DELL OPTIPLEX 7000 DESKTOP COMPUTER | 9/30/2022 | 2,601.00 | * | 2,601.00 | 2,123.00 | 294.00 |
| 1568 | Form 1120S | OFFICE & COMPUTER EQUIP-MCLURE-142-20-00 | CARLSON SERVER UPGRADE | 1-Dec-22 | 12,000.00 | * | 12,000.00 | 9,538.00 | 1,313.00 |
| 1574 | Form 1120S | OFFICE & COMPUTER EQUIP-MCLURE-142-20-00 | LAPTOP/COMPUTERS | 31-Dec-22 | 5,581.00 | * | 5,581.00 | 3,620.00 | 560.00 |
| 1596 | Form 1120S | OFFICE & COMPUTER EQUIP-MCLURE-142-20-00 | FREEZER CHEST | 8/31/2023 | 4,968.00 | * | 4,968.00 | 3,538.00 | 572.00 |
| 1597 | Form 1120S | OFFICE & COMPUTER EQUIP-MCLURE-142-20-00 | ALTALINK PRINTER C8145H2 | 9/30/2023 | 12,627.00 | * | 12,627.00 | 8,990.00 | 1,455.00 |
| 1598 | Form 1120S | FURNITURE & FIXT.-LA(144-03) | LA OFFICE CUBICLES | 18-Oct-23 | 5,070.00 | * | 5,070.00 | 2,854.00 | 633.00 |
| | | | | | 33,762,959.00 | (32,340.00) | 33,795,299.00 | 29,216,271.00 | 1,483,144.00 |

**Items in CIP Projects not capitalized**

| GL | GL Desc. | Balance | Detail |
|---|---|---|---|
| 140-20-100 | Machinery & Equip - Clearing | $ 151,181 | Auction Equipment MPE Desings and consulting 2023-2025 |
| 140-20-110 | RO Reclaim | 129,394 | Membranes and Installantion 2021 -2023 |
| 140-20-113 | Reiser Repak Model RE | 95,048 | Faith Consulting for installation of Cutter, pick and place robots in 2025 |
| 140-20-114 | ECI (Deacom) ERP Conversion | 118,301 | ERP Software Subscription License |
| 140-20-203 | 630 Vacuum Pump Rebuild | 39,317 | Americore Invoices in 2023 |
| 140-20-208 | Oaxaca Extension & Chute | 14,891 | Oaxaca extention and chute fabrication by NorCal in 2023 |
| 140-20-209 | Ricotta Storage Tank 1 | 23,718 | Ricotta storage tank electrical parts, welding and fabrication in 2023 |
| 140-20-211 | Fire Alarm | 85,133 | Fire alarm update to meet Fire Marshall compliance |
| 140-20-212 | Unstacker - Phase 2 (Fresco/Panela) | 327,070 | ETI payments fro Robot, Cage and unstacking of multimolds |
| 140-20-213 | Cut & Place - Phase 2 (Reiser) | 38,615 | Reiser room parts and fabrication of tables, conveyors, air drops, etc. |
| 140-20-215 | 50,000 Lb OO Vats (Cacique Auction) | 6,818 | Double O Vats bought in Cacique Auction |
| 140-20-216 | Tetra Pak Separator (Cacique Auction) | 4,500 | Tetra Pak Separator bought in Cacique Auction |
| 140-20-220 | Curd Production Expansion | 72,844 | Related to the planning, rigging and transport of WI drain belt |
| 140-20-221 | New Shred Line | 24,681 | Related to shred line scale |
| 140-20-222 | Plant Restart | 384,018 | Expenses related to MPE, Sprouse and NorCal for restart in 2024/2025 |
| 140-20-223 | Shred Line Scale | 97,685 | Cost of shred line scale and installation |
| 140-20-224 | Wisconsin Drain Belt | 243,301 | Wisconsin drain belt installation and commisioning expenses |
| 140-20-225 | Oaxaca Line Improvements | 30,925 | Improvements to the auger and feeding system into Oaxaca cookers |
| 140-20-226 | Tower Cheese Line Improvements | 5,376 | Installation of cylinders |
| | **TOTAL** | $ 1,892,816 | |

## SCHEDULE 2.1(p)
## OTHER PURCHASED ASSETS

Solely to the extent transferrable or assignable pursuant to applicable law and related Contracts without consent, penalty or fee, and in connection with the consummation of the transactions contemplated by this Agreement, any distribution, dividend, or captive fund payment paid, or caused to be paid, to, or for the benefit of, Seller or any of its Affiliates by the GLC Captive, the RST Captive, and the Contrarian Captive.

Attachment 1 to Schedule 2.1(p) is incorporated herein by reference.

## Attachment 1 to Schedule 2.1(p)

| Nc | Form | Category | Description | Date Acquired | Date Sold | Cost/Basis | Reduction | Depreciation Basis | Prior Depreciation | Current Depreciation |
|----|------|----------|-------------|---------------|-----------|-----------|-----------|-------------------|-------------------|---------------------|
| 138 | Form 1120S | VEHICLES - MODESTO (146-01) | VEH #47: 2005 HINO VALLEY | 1/27/2005 | | 58,088.00 | - | 58,088.00 | 58,088.00 | - |
| 1251 | Form 1120S | VEHICLES - MODESTO (146-01) | TRUCK #152 | 29-Dec-16 | | 36,014.00 | - | 36,014.00 | 36,014.00 | - |
| 1261 | Form 1120S | VEHICLES - MODESTO (146-01) | VEHICLE #13012 (Mario) | 7/01/2017 | | 13,742.00 | - | 13,742.00 | 13,742.00 | - |
| 1262 | Form 1120S | VEHICLES - MODESTO (146-01) | UTILITY TRAILER | 27-Nov-17 | | 13,041.00 | - | 13,041.00 | 13,041.00 | - |
| 1263 | Form 1120S | VEHICLES - MODESTO (146-01) | UTILITY TRAILER | 28-Nov-17 | | 14,120.00 | - | 14,120.00 | 14,120.00 | - |
| 1301 | Form 1120S | VEHICLES - MODESTO (146-01) | UTILITY TRAILER | 5/01/2018 | | 18,129.00 | - | 18,129.00 | 18,129.00 | - |
| 1329 | Form 1120S | VEHICLES - MODESTO (146-01) | THERMO KING T680R-50 | 31-Oct-18 | | 19,827.00 | - | 19,827.00 | 19,827.00 | - |
| 1330 | Form 1120S | VEHICLES - MODESTO (146-01) | THERMO KING T680R-50 | 31-Oct-18 | | 19,827.00 | - | 19,827.00 | 19,827.00 | - |
| 1337 | Form 1120S | VEHICLES - MODESTO (146-01) | THERMO KING T580r-50#46 | 1/31/2019 | | 18,495.00 | - | 18,495.00 | 18,495.00 | - |
| 1467 | Form 1120S | VEHICLES - MODESTO (146-01) | TESLA MODEL 3 | 3/31/2020 | | 65,038.00 | - | 65,038.00 | 65,038.00 | - |
| 1517 | Form 1120S | VEHICLES - MODESTO (146-01) | ELECTRIC TRAILERS (3) | 31-Dec-21 | | 6,000.00 | - | 6,000.00 | 5,654.00 | 346.00 |
| 1543 | Form 1120S | VEHICLES - MODESTO (146-01) | MERCEDES BENZ S560 | 8/31/2022 | | 59,999.00 | - | 59,999.00 | 48,984.00 | 6,780.00 |
| 1570 | Form 1120S | VEHICLES - MODESTO (146-01) | 2022 BMW I7 | 1-Dec-22 | | 156,058.00 | - | 156,058.00 | 124,035.00 | 17,073.00 |
| 1599 | Form 1120S | VEHICLES - MODESTO (146-01) | 2015 HYUNDAI TRAILER VR2480202-PRS | 9/18/2023 | | 46,521.00 | - | 46,521.00 | 33,123.00 | 5,359.00 |
| 482 | Form 1120S | VEHICLES - SAN JOSE (146-02) | VEH 63 2010 MITS F180 | 6/30/2009 | | 71,866.00 | - | 71,866.00 | 71,866.00 | - |
| 573 | Form 1120S | VEHICLES - SAN JOSE (146-02) | FORD TRANSIT CONNECT | 14-Oct-10 | | 21,119.00 | - | 21,119.00 | 21,119.00 | - |
| 1375 | Form 1120S | VEHICLES - SAN JOSE (146-02) | THERMAL KING T580R-50 #61 | 7/31/2019 | | 18,495.00 | - | 18,495.00 | 18,495.00 | - |
| 1376 | Form 1120S | VEHICLES - SAN JOSE (146-02) | THERMAL KING T580R-50 #63 | 7/31/2019 | | 18,495.00 | - | 18,495.00 | 18,495.00 | - |
| 1386 | Form 1120S | VEHICLES - SAN JOSE (146-02) | INSTL BOX&REEFER TRK#2101 | 31-Dec-19 | | 22,004.00 | - | 22,004.00 | 22,004.00 | - |
| 1465 | Form 1120S | VEHICLES - SAN JOSE (146-02) | THERMOKING T58OR-50 #21103 | 6/30/2020 | | 22,235.00 | - | 22,235.00 | 22,235.00 | - |
| 1466 | Form 1120S | VEHICLES - SAN JOSE (146-02) | THERMOKING T58OR-50 #51 | 1/31/2020 | | 18,797.00 | - | 18,797.00 | 18,797.00 | - |
| 856 | Form 1120S | VEHICLES - LA (146-03) | VEH #144-12 TOYOTA CAMRY | 8/08/2012 | | 23,641.00 | - | 23,641.00 | 23,641.00 | - |
| 925 | Form 1120S | VEHICLES - LA (146-03) | VEH 74-2014 HINO 195H | 7/29/2013 | | 68,081.00 | - | 68,081.00 | 68,081.00 | - |
| 1491 | Form 1120S | VEHICLES - LA (146-03) | TRUCK 81 2015 MITS | 5/31/2021 | | 4,433.00 | - | 4,433.00 | 4,179.00 | 254.00 |
| 1528 | Form 1120S | VEHICLES - LA (146-03) | TRUCK 85 | 4/30/2022 | | 6,685.00 | - | 6,685.00 | 5,530.00 | 770.00 |
| 1537 | Form 1120S | VEHICLES - LA (146-03) | TRUCK #20102 2020 ISUZU | 6/30/2022 | | 55,940.00 | - | 55,940.00 | 47,196.00 | 6,360.00 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1578 | Form 1120S | VEHICLES - LA (146-03) | TRUCK #22101 2022 ISUZU | 1/01/2023 | 74,120.00 | - | 74,120.00 | 52,773.00 | 8,539.00 |
| 486 | Form 1120S | VEHICLES - VALLEY (146-04) | VEH 62 2010 MITS FE180 | 6/30/2009 | 71,866.00 | - | 71,866.00 | 71,866.00 | - |
| 986 | Form 1120S | VEHICLES - VALLEY (146-04) | MITSUBISHI 2012 JL6CCHS57 | 16-Oct-13 | 70,850.00 | - | 70,850.00 | 70,850.00 | - |
| 1417 | Form 1120S | VEHICLES - VALLEY (146-04) | THERMAL KING T580R #62 | 31-Dec-19 | 18,512.00 | - | 18,512.00 | 18,512.00 | - |
| 1468 | Form 1120S | VEHICLES - VALLEY (146-04) | THERMOKING T58OR-50 #53 | 6/30/2020 | 18,815.00 | - | 18,815.00 | 18,815.00 | - |
| 1469 | Form 1120S | VEHICLES - VALLEY (146-04) | THERMOKING T58OR-50 #72 | 7/31/2020 | 18,815.00 | - | 18,815.00 | 18,815.00 | - |
| 646 | Form 1120S | vehicles - valley (146-06) | 2011 FORD TRANSIT VAN | 4/05/2011 | 32,761.00 | - | 32,761.00 | 32,761.00 | - |
| 929 | Form 1120S | vehicles - valley (146-06) | VEH 77-2012 MITSU FE180 | 15-Nov-13 | 70,850.00 | - | 70,850.00 | 70,850.00 | - |
| 930 | Form 1120S | vehicles - valley (146-06) | VEH 78-2012 MITSU FE180 | 15-Nov-13 | 70,849.00 | - | 70,849.00 | 70,849.00 | - |
| 1463 | Form 1120S | vehicles - valley (146-06) | THERMOKING T58OR-50 #21104 | 6/30/2020 | 22,182.00 | - | 22,182.00 | 22,182.00 | - |
| 1464 | Form 1120S | vehicles - valley (146-06) | THERMOKING T58OR-50 #21106 | 6/30/2020 | 22,470.00 | - | 22,470.00 | 22,470.00 | - |
| 1489 | Form 1120S | vehicles - valley (146-06) | TRUCK 79 2015 MITS | 5/31/2021 | 3,251.00 | - | 3,251.00 | 3,064.00 | 187.00 |
| 1490 | Form 1120S | vehicles - valley (146-06) | TRUCK 80 2015 MITS | 5/31/2021 | 3,251.00 | - | 3,251.00 | 3,064.00 | 187.00 |
| 1529 | Form 1120S | vehicles - valley (146-06) | TRUCK 82 | 4/30/2022 | 12,899.00 | - | 12,899.00 | 10,671.00 | 1,486.00 |
| 1530 | Form 1120S | vehicles - valley (146-06) | TRUCK 83 | 4/30/2022 | 13,207.00 | - | 13,207.00 | 10,924.00 | 1,521.00 |
| 1586 | Form 1120S | vehicles - valley (146-06) | 2010 FORD ECONOLINE VAN #13002 | 5/31/2023 | 18,000.00 | - | 18,000.00 | 12,816.00 | 2,074.00 |
| | | Leased Truck | Isuzu FTR | 30-Jul-25 | 163,628.40 | | | | |
| | | Leased Truck | Chevrolet LCF 5500 XD | 30-Jul-25 | 144,759.60 | | | | |
| | | Leased Truck | Chevrolet LCF 5500 XD | 30-Jul-25 | 144,759.60 | | | | |
| | | Leased Truck | Chevrolet LCF 5500 XD | 30-Jul-25 | 144,759.60 | | | | |
| | | Leased Truck | Chevrolet LCF 5500 XD | 30-Jul-25 | 144,759.60 | | | | |
| | | Leased Truck | Chevrolet LCF 5500 XD | 30-Jul-25 | 144,759.60 | | | | |
| | | Leased Truck | Chevrolet LCF 5500 XD | 30-Jul-25 | 144,759.60 | | | | |
| | | Leased Truck | Chevrolet LCF 5500 XD | 30-Jul-25 | 144,759.60 | | | | |
| | | Leased Truck | Mack MD6 | 30-Jul-25 | 163,628.40 | | | | |
| | | Leased Truck | Chevrolet LCF 5500 XD | 30-Jul-25 | 144,759.60 | | | | |
| | | Leased Truck | 2018 International Series 4300 | 15-Aug-25 | 50,000.00 | | | | |
| 168 | Form 1120S | L/H impr. Los Angeles | CONCRETE FLOOR | 2/28/2005 | 6,460.00 | - | 6,460.00 | 3,465.00 | 166.00 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 405 | Form 1120S | L/H impr. Los Angeles | IRON DOORS | 1/09/2008 | 3,500.00 | - | 3,500.00 | 1,616.00 | 90.00 |
| 851 | Form 1120S | L/H impr. Los Angeles | BATHROOM TILES | 4/11/2012 | 15,000.00 | - | 15,000.00 | 5,278.00 | 385.00 |
| 852 | Form 1120S | L/H impr. Los Angeles | VIDEO CAMERAS | 27-Nov-12 | 3,100.00 | - | 3,100.00 | 3,100.00 | - |
| 853 | Form 1120S | L/H impr. Los Angeles | OFFICE & WAREHOUSE REPAIR | 27-Nov-12 | 4,855.00 | - | 4,855.00 | 1,628.00 | 124.00 |
| 1131 | Form 1120S | L/H impr. Los Angeles | INT OFF. WALL, DR. & WIND | 2/26/2015 | 3,731.00 | - | 3,731.00 | 1,044.00 | 96.00 |
| 1132 | Form 1120S | L/H impr. Los Angeles | INT. OFFICE WALL | 3/24/2015 | 1,080.00 | - | 1,080.00 | 302.00 | 28.00 |
| 1133 | Form 1120S | L/H impr. Los Angeles | SIX SPACE WORK AREA | 4/14/2015 | 2,588.00 | - | 2,588.00 | 707.00 | 66.00 |
| 1134 | Form 1120S | L/H impr. Los Angeles | DINING ROOM AREA | 4/19/2015 | 2,791.00 | - | 2,791.00 | 771.00 | 72.00 |
| 1135 | Form 1120S | L/H impr. Los Angeles | THREE SPACE WK. AREA | 4/18/2015 | 3,070.00 | - | 3,070.00 | 846.00 | 79.00 |
| 1136 | Form 1120S | L/H impr. Los Angeles | INSTALL SINK IN DINING AR | 5/21/2015 | 1,400.00 | - | 1,400.00 | 382.00 | 36.00 |
| 1137 | Form 1120S | L/H impr. Los Angeles | PAINTING | 9/04/2015 | 1,420.00 | - | 1,420.00 | 371.00 | 36.00 |
| 1287 | Form 1120S | L/H impr. Los Angeles | SEAL TIGHT ROOFING | 1/30/2017 | 26,500.00 | - | 26,500.00 | 6,084.00 | 679.00 |
| 1600 | Form 1120S | L/H impr. Los Angeles | LA ROOF REPAIR #152 | 31-Oct-23 | 134,861.00 | - | 134,861.00 | 7,638.00 | 3,458.00 |
| 585 | Form 1120S | L/H Impr. McClure 150-20-000 | WRHSE CONV. TO CHEESE PRO | 6/19/2012 | 33,590.00 | - | 33,590.00 | 11,660.00 | 861.00 |
| 741 | Form 1120S | L/H Impr. McClure 150-20-000 | MCCLURE LHI IN SERV 6/12 | 6/19/2012 | 6,926,772.00 | - | 6,926,772.00 | 2,405,177.00 | 177,602.00 |
| 846 | Form 1120S | L/H Impr. McClure 150-20-000 | MCCLURE LHI | 6/19/2012 | 1,361,764.00 | - | 1,361,764.00 | 472,850.00 | 34,916.00 |
| 894 | Form 1120S | L/H Impr. McClure 150-20-000 | ENGINEERING/DRAFTING/INSP | 6/19/2012 | 62,067.00 | - | 62,067.00 | 21,546.00 | 1,591.00 |
| 896 | Form 1120S | L/H Impr. McClure 150-20-000 | CAPITALIZED INTEREST | 6/19/2012 | 68,619.00 | - | 68,619.00 | 23,821.00 | 1,759.00 |
| 932 | Form 1120S | L/H Impr. McClure 150-20-000 | SAFETY LADDERS-ROOF | 15-Oct-13 | 3,195.00 | - | 3,195.00 | 1,001.00 | 82.00 |
| 933 | Form 1120S | L/H Impr. McClure 150-20-000 | GUTTER IN LOAD OUT BAY | 2/27/2013 | 4,927.00 | - | 4,927.00 | 1,623.00 | 126.00 |
| 934 | Form 1120S | L/H Impr. McClure 150-20-000 | BIRD PROOF NETTING | 6/02/2013 | 4,000.00 | - | 4,000.00 | 4,000.00 | - |
| 999 | Form 1120S | L/H Impr. McClure 150-20-000 | AGING ROOM WALLS | 8/04/2014 | 19,655.00 | - | 19,655.00 | 5,733.00 | 504.00 |
| 1233 | Form 1120S | L/H Impr. McClure 150-20-000 | REPAIR/SEAL SIDEWALK | 2/21/2016 | 6,000.00 | - | 6,000.00 | 4,183.00 | 355.00 |
| 1234 | Form 1120S | L/H Impr. McClure 150-20-000 | CONCRETE RETAINING WALL | 8/03/2016 | 9,809.00 | - | 9,809.00 | 6,131.00 | 654.00 |
| 1235 | Form 1120S | L/H Impr. McClure 150-20-000 | CO2/N2 GAS MIXER | 8/05/2016 | 6,286.00 | - | 6,286.00 | 6,286.00 | - |
| 1236 | Form 1120S | L/H Impr. McClure 150-20-000 | BOILER ROOM GUTTER | 23-Oct-16 | 8,836.00 | - | 8,836.00 | 2,090.00 | 227.00 |
| 1237 | Form 1120S | L/H Impr. McClure 150-20-000 | HVAC PARTS-NEW UNIT | 31-Oct-16 | 254.00 | - | 254.00 | 64.00 | 7.00 |

| Asset | Form | Account | Description | Date | Amount | | Amount | Value | Value |
|---|---|---|---|---|---|---|---|---|---|
| 1264 | Form 1120S | L/H Impr. McClure 150-20-000 | GUARD POST INSTALLATION | 1/12/2017 | 2,275.00 | - | 2,275.00 | 520.00 | 58.00 |
| 1266 | Form 1120S | L/H Impr. McClure 150-20-000 | VAC PUMP AIRLINE | 5/10/2017 | 5,692.00 | - | 5,692.00 | 5,692.00 | - |
| 1267 | Form 1120S | L/H Impr. McClure 150-20-000 | CONDUVITVITY SENSORS | 6/22/2017 | 7,134.00 | - | 7,134.00 | 7,134.00 | - |
| 1297 | Form 1120S | L/H Impr. McClure 150-20-000 | AIR INTAKE LOUVERS | 7/09/2018 | 17,027.00 | - | 17,027.00 | 3,259.00 | 437.00 |
| 1298 | Form 1120S | L/H Impr. McClure 150-20-000 | FLOOR RESTORATION | 7/09/2018 | 9,500.00 | - | 9,500.00 | 1,820.00 | 244.00 |
| 1299 | Form 1120S | L/H Impr. McClure 150-20-000 | NEW HR OFFICE | 7/09/2018 | 4,618.00 | - | 4,618.00 | 880.00 | 118.00 |
| 1331 | Form 1120S | L/H Impr. McClure 150-20-000 | FLOOR RESTORATION | 31-Oct-18 | 6,875.00 | - | 6,875.00 | 1,269.00 | 176.00 |
| 1332 | Form 1120S | L/H Impr. McClure 150-20-000 | FLOOR RESTORATION | 30-Nov-18 | 8,724.00 | - | 8,724.00 | 1,596.00 | 224.00 |
| 1333 | Form 1120S | L/H Impr. McClure 150-20-000 | EXT. PERIMETER FENCE-#822 | 31-Dec-18 | 13,549.00 | - | 13,549.00 | 6,883.00 | 801.00 |
| 1334 | Form 1120S | L/H Impr. McClure 150-20-000 | ADMIN OFFICE TILE INSTALL | 31-Dec-18 | 29,028.00 | - | 29,028.00 | 5,239.00 | 744.00 |
| 1335 | Form 1120S | L/H Impr. McClure 150-20-000 | ADMIN OFFICE TILE -PART2 | 1/31/2019 | 10,264.00 | - | 10,264.00 | 1,831.00 | 263.00 |
| 1342 | Form 1120S | L/H Impr. McClure 150-20-000 | BREAKROOM TILE FLOOR#904 | 2/28/2019 | 30,901.00 | - | 30,901.00 | 5,446.00 | 792.00 |
| 1361 | Form 1120S | L/H Impr. McClure 150-20-000 | TILE INSTALL-PROD. OFFICE | 5/31/2019 | 9,188.00 | - | 9,188.00 | 1,563.00 | 236.00 |
| 1362 | Form 1120S | L/H Impr. McClure 150-20-000 | EPOXY ON PRODUCTION FLOOR | 5/31/2019 | 21,728.00 | - | 21,728.00 | 3,691.00 | 557.00 |
| 1382 | Form 1120S | L/H Impr. McClure 150-20-000 | PARKING LOT SPACES | 31-Oct-19 | 8,474.00 | - | 8,474.00 | 1,347.00 | 217.00 |
| 1387 | Form 1120S | L/H Impr. McClure 150-20-000 | INSTL URETHANE FLOORING | 31-Dec-19 | 25,000.00 | - | 25,000.00 | 3,873.00 | 641.00 |
| 1460 | Form 1120S | L/H Impr. McClure 150-20-000 | OFFICE REMODEL | 30-Nov-20 | 77,397.00 | - | 77,397.00 | 10,168.00 | 1,984.00 |
| 1513 | Form 1120S | L/H Impr. McClure 150-20-000 | PARTS ROOM EXPANSION 6-20 #021 | 31-Dec-21 | 153,537.00 | - | 153,537.00 | 15,912.00 | 3,937.00 |
| 1518 | Form 1120S | L/H Impr. McClure 150-20-000 | CHAINLINK FENCE | 31-Dec-21 | 5,621.00 | - | 5,621.00 | 582.00 | 144.00 |
| 1519 | Form 1120S | L/H Impr. McClure 150-20-000 | FLOORING SYSTEM | 31-Dec-21 | 25,538.00 | - | 25,538.00 | 2,647.00 | 655.00 |
| 1520 | Form 1120S | L/H Impr. McClure 150-20-000 | TURNSTILE GATE PROJECT #027 | 31-Dec-21 | 64,753.00 | - | 64,753.00 | 6,709.00 | 1,660.00 |
| 1521 | Form 1120S | L/H Impr. McClure 150-20-000 | WINDOW UPGRADE #035 | 31-Dec-21 | 19,604.00 | - | 19,604.00 | 2,033.00 | 503.00 |
| 1531 | Form 1120S | L/H Impr. McClure 150-20-000 | PARKING LOT ENTRY 11-20 #031 | 1/31/2022 | 130,708.00 | - | 130,708.00 | 13,270.00 | 3,351.00 |
| 1532 | Form 1120S | L/H Impr. McClure 150-20-000 | FLOOR REPAIR 11-20 #033 | 1/31/2022 | 70,638.00 | - | 70,638.00 | 7,171.00 | 1,811.00 |
| 1533 | Form 1120S | L/H Impr. McClure 150-20-000 | COIL-R REPACEMENT COIL | 4/30/2022 | 56,507.00 | - | 56,507.00 | 5,375.00 | 1,449.00 |
| 1534 | Form 1120S | L/H Impr. McClure 150-20-000 | MAINTENANCE OFFICE EXP. #124 | 5/31/2022 | 87,373.00 | - | 87,373.00 | 8,122.00 | 2,240.00 |
| 1544 | Form 1120S | L/H Impr. McClure 150-20-000 | PARKING LOT IMPROVEMENTS | 8/31/2022 | 19,371.00 | - | 19,371.00 | 1,678.00 | 497.00 |
| 1553 | Form 1120S | L/H Impr. McClure 150-20-000 | PAINTING WALLS IN PRODUCTION AREA | 9/30/2022 | 8,940.00 | - | 8,940.00 | 6,031.00 | 831.00 |

| ID | Form | Category | Description | Date | Amount | | Amount | Amount | Amount |
|---|---|---|---|---|---|---|---|---|---|
| 1560 | Form 1120S | L/H Impr. McClure 150-20-000 | FLOOR IMPROVEMENT | 30-Nov-22 | 33,330.00 | - | 33,330.00 | 2,672.00 | 855.00 |
| 1564 | Form 1120S | L/H Impr. McClure 150-20-000 | TRUCK AC ELECTRIC STATIONS | 1-Dec-22 | 104,425.00 | - | 104,425.00 | 8,143.00 | 2,677.00 |
| 1587 | Form 1120S | L/H Impr. McClure 150-20-000 | WALL PAINTING | 5/19/2023 | 10,819.00 | - | 10,819.00 | 6,088.00 | 1,351.00 |
| 1588 | Form 1120S | L/H Impr. McClure 150-20-000 | RELOCATION CAMERA POLE & LIGHTING | 5/04/2023 | 9,700.00 | - | 9,700.00 | 6,906.00 | 1,117.00 |
| 1604 | Form 1120S | L/H Impr. McClure 150-20-000 | MCC ROOM #135 | 1-Dec-23 | 36,237.00 | - | 36,237.00 | 1,897.00 | 929.00 |
| 1605 | Form 1120S | L/H Impr. McClure 150-20-000 | 2023 FLOORING IMPROVEMENTS | 1-Dec-23 | 33,364.00 | - | 33,364.00 | 1,746.00 | 855.00 |
| 1625 | Form 1120S | L/H Impr. McClure 150-20-000 | NEUDECK | 2/28/2025 | 17,757.00 | - | 17,757.00 | 1,554.00 | 1,619.00 |
| 1629 | Form 1120S | L/H Impr. McClure 150-20-000 | PANELA ROOM FLOOR COATING | 30-Nov-25 | 10,383.00 | - | 10,383.00 | 130.00 | 1,026.00 |
| 1630 | Form 1120S | L/H Impr. McClure 150-20-000 | GUTTER WORK | 30-Nov-25 | 7,800.00 | - | 7,800.00 | 98.00 | 771.00 |
| 1631 | Form 1120S | L/H Impr. McClure 150-20-000 | BREAK ROOM IMPROVEMENTS | 30-Nov-25 | 5,009.00 | - | 5,009.00 | 63.00 | 495.00 |
| 47 | Form 1120S | Amortization | ORGANIZATION COST | 1/01/1991 | 21,233.00 | - | 21,233.00 | 21,233.00 | - |
| 48 | Form 1120S | Amortization | NEW PLANT-ENVIRON FEE | 5/27/1996 | 1,750.00 | - | 1,750.00 | 1,750.00 | - |
| 606 | Form 1120S | Amortization | SEWAGE RIGHTS -11/2010 | 6/19/2012 | 80,000.00 | - | 80,000.00 | 71,996.00 | 5,333.00 |
| 743 | Form 1120S | Amortization | SEWAGE RIGHTS | 6/19/2012 | 1,441,616.00 | - | 1,441,616.00 | 1,297,458.00 | 96,108.00 |
| 1260 | Form 1120S | Amortization | LOAN FEES | 31-Dec-17 | 28,294.00 | - | 28,294.00 | 22,632.00 | 2,829.00 |
| 1324 | Form 1120S | Amortization | GRAPHIC PRINTING PLATE 1 | 31-Dec-18 | 2,788.00 | - | 2,788.00 | 2,788.00 | - |
| 1325 | Form 1120S | Amortization | GRAPHIC PRINTING PLATE 2 | 31-Dec-18 | 3,512.00 | - | 3,512.00 | 3,512.00 | - |
| 1326 | Form 1120S | Amortization | GRAPHIC PRINTING PLATE 3 | 31-Dec-18 | 4,716.00 | - | 4,716.00 | 4,716.00 | - |

## SCHEDULE 2.2(l)
## OTHER EXCLUDED ASSETS

1.  Any captive program and all related policies, governing documents and agreements, including, but not limited to:

    a.  The GLC Group Captive Agree and Accepted Statement, dated April 15, 2025, and any insurance policy, Contract, and documents related thereto entered into between RST Captive Program with RST Rc Holdings, LLC, RST Rc, LLC, Seller and any other party thereto (the "GLC Captive").

    b.  The RST Group Captive Agree and Accepted Statement, dated April 15, 2025, and any related Insurance Policy, Contracts and documents related thereto entered into between RST Rc Holdings, LLC, RST Rc, LLC, the Seller, and any other party thereto (the "RST Captive").

    c.  Any Contract, policy, or other document entered into in connection with the Pareto Health Contrarian captive program (the "Contrarian Captive").

2.  All of Seller's rights and ownership interest in and to Riverbank Land, LLC.

3.  The following insurance policies:

    a.  Alesco Risk Management Services Limited (Chubb) Marine Stock Throughput Insurance, Policy No. B1263EM0037223 (June 1, 2023-June 1, 2024 coverage);

    b.  Arch Policy No. ZAGLB1100403 (2023-2024 coverage);

    c.  Arch Policy No. ZAGLB1100404 (2024-2025 coverage);

    d.  Indian Harbor Policy No. SXS0064967 (2024-2025 coverage);

    e.  Great American Policy No. TUU 0738671 10 (2023-2024 coverage);

    f.  Great American Policy No. TUU 0738671 11 (2024-2025 coverage);

    g.  Everest Policy No. XC1EX00444-231 (2023-2024 coverage);

    h.  Everest Policy No. XC5EX01961-241 (2024-2025 coverage);

    i.  Endurance Policy No. ELD30002726502 (2023-2024 coverage); and

    j.  Endurance Policy No. ELD30002726503 (2024-2025 coverage).

## SCHEDULE 2.7

### PURCHASE PRICE ALLOCATION

The Purchase Price, together with all liabilities and other amounts required to be included in the purchase price of the Purchased Assets shall be allocated among the Purchased Assets for U.S. federal income tax purposes and for purposes of applicable provisions of state or local Tax Law using the methodology set forth below. For purposes hereof, the following classification of assets shall be construed in accordance with Treasury Regulations § 1.338-6.

| | | |
|---|---|---|
| Class I Assets | Cash and Cash Equivalents | N/A |
| Class II Assets | Actively Traded Personal Property and Certificates of Deposit | Net book value as of immediately before Closing |
| Class III Assets | Accounts Receivable and Other Class III Assets | Net book value as of immediately before Closing |
| Class IV Assets | Inventories and Supplies and other Class IV Assets | Book value |
| Class V Assets | Furniture, Fixtures and Equipment, Leasehold Improvements and other Class V Assets | Tangible personal property: $1,250,000<br><br>All other Class V Assets: $13,581,996 |
| Class VI Assets | Licenses, permits, trade name and other Section 197 Intangibles (excluding goodwill and going concern value) | Net book value as of immediately before Closing |
| Class VII Assets | Goodwill and Going Concern Value | The remainder, after the allocations to assets in Classes I through VI above. |

## SELLER DISCLOSURE SCHEDULE 3.6

### PERSONAL PROPERTY TAX LIENS

1. Personal Property Tax Lien No. 41929 held by the Stanislaus County Tax Collector relates to years 2024 – 2025.

2. Personal Property Tax Lien No. 42023 held by the Stanislaus County Tax Collector relates to years 2024 – 2025.

## SCHEDULE 6.2(a)
## AVAILABLE CONTRACTS

| Contract | Type of lease/contract | COUNTERPARTY WITH WHOM THE DEBTOR HAS AN EXECUTORY CONTRACT OR UNEXPIRED LEASE NAME | Pre-Petition Cure Amount | Post-Petition Cure Amount |
|---|---|---|---|---|
| Marketing & Sales Agreement | Commission sales | Acosta Sales & Marketing (Inter-Mtn.) | - | - |
| Business Insurance Policy | Excess Liability 2nd layer - Excess Liability $3M x $2M | Admiral Insurance Company | - | - |
| Service Agreement | Pest Control | Advance Integrated Pest Control | - | 600.00 |
| Marketing & Sales Agreement | Commission sales | Advantage Fresh | 14,101.58 | - |
| Service Agreement | 3rd Party Laboratory Services | AEMTEK, Inc | 28,600.56 | - |
| Consulting Agreements | Food Safety and Employee training | Alchemy Systems | - | - |
| Marketing & Sales Agreement | Commission sales | Alexandre Zarrag | 7,046.24 | - |
| No agreement | Milk CDFA compliance | Amal Singh | - | - |
| Consulting Agreements | CalARP Ammonia compliance | Apcco - Applied Process Cooling Corp | 44,124.91 | 7,118.62 |
| Business Insurance Policy | Cyber - Content/Fines&Assmt/ Crisis/Extorsion - Policy No. C-4LQ2-221343-CYBER-2024 | Arch Specialty Insurance Company | - | - |
| Business Insurance Policy | Business Auto Liab/Phys.Damage - Policy No. ZACAT1200705 | Arch through Garnet | - | - |
| Business Insurance Policy | Bodily injury by accident/disease - Policy No. ZAWCI9406808 | Arch through Garnet | - | - |
| Communications Vendor | Internet and Mobile Communications | ATT | - | - |

| | | | | |
|---|---|---|---|---|
| Software License Agreement | Web hosting | AWS Amazon Web Services, Inc. | - | - |
| Business Insurance Policy | Excess Liability 1st layer - Excess Liability Lead $2M | AXIS Surplus Insurance Company | - | - |
| Freight Vendor | Freight to transport PL Goods | Badger State Western Inc | - | - |
| Ingredient Vendor | Cheese Ingredients | Batory Foods | - | 2,614.21 |
| Marketing & Sales Agreement | Commission sales | Beach City Sales | 1,693.86 | - |
| Business Insurance Policy | General Liability Policy | Berkley Assurance Company | - | - |
| Business Insurance Policy | General Liability - Commercial including products | Berkley Specialty Insurance Company | - | - |
| Business Insurance Policy | Recall expns, customer expns, loss profit - Policy No. Quote-contracted by end Jul/25 | BerkleySpecialty-Dual/Swiss Re/Talbot/G.American | - | - |
| Ingredient Vendor | Cheese Packaging Materiasls | Berry Global, Inc. | 29,304.54 | 8,944.93 |
| Packing Material Vendor | Cheese Label Vendor | Blue Fox Labels | 34,387.60 | - |
| Milk Supply Agreement | Milk Contract | Blue Sky | - | - |
| Car Loan | Financing of Car | BMW Financial Service | - | - |
| Distributor/Distribution Agreements | Distributor agreement for Fiesta chain in Texas | C&S Wholesale Grocers | - | - |
| Maintenance Agreement | Boiler maintenance | California Boiler | 20,740.90 | - |
| Milk Supply Agreement | Milk Contract | CDI | - | - |
| Maintenance Agreement | Fire system monitoring and inspection | Central Valley Fire Protection, Inc. | - | - |
| Business Insurance Policy | Products Recall Policy | Certain Underwriters at Lloyds; Summit Specialty Insurance Company; Arch Specialty Insurance Company | - | - |
| Procurement Agreement | Sanitation Chemicals Provider | Chemco Products Company | 270,822.81 | - |
| Chemical Vendor | Sanitation Chemicals Provider | ChemStation of Northern California | 4,203.39 | - |
| Ingredient Vendor | Cheese Ingredients | Chr. Hansen, Inc. | 48,281.60 | - |

| | | | | |
|---|---|---|---|---|
| Business Insurance Policy | Building, Personal Ppty Business Income - Policy No. 3608-38-20 DAL | Chubb | - | - |
| Business Insurance Policy | Content/Fines&Assmt/ Crisis/Extorsion - Policy No. C-4LQ2-221343-CYBER-2025 | Coalition Cyber | - | - |
| Collaboration Agreement | Production of private label products and customer sharing | Coloardo Ranchers, Inc. | - | - |
| Business Insurance Policy | Life Dental Vision Insurance | Colonial Life | - | - |
| Engagement Agreement | Storm Water Compliance | Condor Earth Technologies, Inc. | - | - |
| Engagement Agreement | CalArp/Waste Water Compliance | Condor Earth Technologies, Inc. | - | - |
| Insurance Captive | Health Captive | Contrarian Captive | - | - |
| Service Agreement | Security and Surveillance | CrimeGuard | 11,940.32 | - |
| Maintenance Agreement | Packing Equipment maintenance | Cryovac, Inc. | 78,775.01 | - |
| Maintenance Vendor | Maintenance for Scales | D.K. Stephens Enterprises | 802.55 | - |
| Distributor/Distribution Agreements | Distributor for Florida | Dairy DSD | - | - |
| Service Agreement | Data, Information & Technology & Services Agreements | Data Path | - | - |
| Equipment Lease | Photocopier lease | De Lange Landen Financial Services | - | 218.27 |
| Consulting Agreement | Pension Benefits Advisor | Delta Pacific Investment Manageent | - | - |
| Milk Supply Agreement | Milk Contract | DFA | 199,836.50 | - |
| Professional Fees | Bk Notification Services | Donlin, Recano & Company, LLC. | - | - |
| ERP Agreement | Deacom ERP Implementation | ECI Software Solutions, Inc | 87,504.18 | - |
| Service Agreement | Pest Control | Ecolab | 5,916.96 | 239.55 |
| PL Vendor | Desserts Vendor | El Alteno Inc | - | 1,920.10 |

| | | | | |
|---|---|---|---|---|
| PL Vendor | Meats Vendor | El Grande Chicharrones | - | 7,349.90 |
| Rebate Agreement | Rebate agreement for customer purchases | El Super / Chedraui USA | - | - |
| Maintenance Agreement | Maintenance software license | EMAINT ENTERPRISES, LLC | - | - |
| Supply agreement | Parts, supplies and PPE provider | Fastenal | - | 1,011.95 |
| Maintenance Vendor | Maintenance Services | Faust Controls | 2,520.00 | 6,640.00 |
| Supplies Vendor | Production Supplies | First Choice Industrial Supply Inc. | 25,978.66 | 35,334.53 |
| Financing Agreement | Insurance Financing | First Insurance Funding | - | - |
| Utilities | Garbage Disposal Services | Gilton Solid Waste | - | 4,979.62 |
| Insurance Captive | Auto and General Liability Captive | GLC Captive | - | - |
| Website Hosting Services Agreements | Web hosting | GoDaddy.com | - | - |
| Freight Vendor | Transports Cheese to Dist.Center | Gonzalo Godinez | 85,189.00 | 20,300.00 |
| Business Insurance Policy | Product Recall Policy | Great American E&S Insurance | - | - |
| Milk Supply Agreement | Milk Contract | HCC Hilmar Cheese | 5,426.89 | - |
| Service Agreement | Copyright Lawyers | Herranen Law | - | - |
| Maintenance Agreement | Fire Alarm System compliance | HSF, Inc - Houston Fire Systems | 159.00 | - |
| Professional Fees | FDA Lawyer | Hyman, Phelps & McNamara, P.C. | - | 29,859.50 |
| Real Property Lease | Real Property Lease - 201 South McClure Rd, Modesto, CA 95357-0519 | I&E McClure, LLC | 560,730.35 | 227,997.00 |
| Equipment Lease | Photocopier lease | Inland Business Systems | - | - |
| Maintenance Vendor | Floor Coating Services | Innovative Industrial Coatings, Inc., | - | - |
| Marketing & Sales Agreement | Commission sales | Jim Lines & Associates (JLA) | 3,339.44 | - |
| Private Label Agreement | Engages third-party to produce product using the Rizo Lopez brand | Jimenes Food, Inc | 168,377.42 | 27,856.00 |

| | | | | |
|---|---|---|---|---|
| Private Label Agreement | Engages third-party to produce product using the Rizo Lopez brand | Jimenez Mexican Foods Inc. | 697,566.70 | - |
| Service Agreement | 3rd Party Laboratory Services | JL Analytical Laboratories/Institute for Environmental Health, Inc. | - | 1,931.20 |
| Administrative Services | Modesto staff accounting adm | JMG Services LLC | - | - |
| 401(k) Plan Agreement | 401(k) Administrator | John Hancock Life Insurance Company (U.S.A.) Retirement Plan Services | - | - |
| Ingredient Vendor | Cheese Ingredients | John's Salt Services, Inc | 48,739.88 | - |
| Gas Vendor | Gas Vendor for Cheese Packaging | JS West Propane Gas | - | - |
| Service Agreement | CPA Accounting Services | Juarez & Co. | - | 30,136.55 |
| Service Agreement | Insurance Coverage Counsel | K&L Gates | - | - |
| Business Insurance Policy | General Liability - Premises only | Kinsale Insurance Company | - | - |
| Business Insurance Policy | General Liability Premises only - Policy No. 0100348619-0 | Kinsale/Lexington/G.Amer/Markel | - | - |
| Private Label Agreement | Production of private label products for third-party | Lacteos Corval PL | - | - |
| Business Insurance Policy | Mgmt Liab D&O EPL 3rd Pty Liab Fiduciary - Policy No. LPP715873 | Landmark America | - | - |
| Packing Material Vendor | Cheese Packaging Materials | Landsberg Orora | 124,862.05 | - |
| Milk Supply Agreement | Milk Contract | Legacy Milk Coop | 73,499.25 | - |
| Business Insurance Policy | Excess Liability 4th layer - Excess Liability $5M x $10M | Lexington Insurance Company | - | - |
| Business Insurance Policy | Perishable food/Inventory/In-transit | Lloyds Underwriter Syndicates 510/KLN | - | - |
| Outsourcing Agreement | Staffing | Lunas Merchandising | 14,310.54 | - |
| Professional Fees | BK Counsel | McCORMICK BARSTOW LLP | - | 111,291.88 |

| | | | | |
|---|---|---|---|---|
| License Agreement | Microsoft Office | Microsoft | - | - |
| License Agreement | Microsoft Power BI | Microsoft | - | - |
| Maintenance Vendor | Packing Equipment maintenance | Modern Packaging LLC | 11,970.25 | - |
| Maintenance Vendor | Engineering Services | MPE Services, Inc. | 53,107.45 | 11,329.84 |
| PL Vendor | Meats Vendor | Mr Pachanga, Inc | - | 116,153.10 |
| Business Insurance Policy | Auto Liability Insurance | National Casualty Company | - | - |
| Business Insurance Policy | Workers Comp Insurance | National Fire & Marine Insurance Co | - | - |
| Ingredient Vendor | Cheese Ingredients | Nelson Jameson, Inc. | 70,150.89 | - |
| Maintenance Agreement | Equipment maintenance and fabrication | NorCal Construction | 321,080.43 | 52,972.09 |
| HR Services | HR Onboarding Test Services | Occupational Health Centers | 9,028.00 | 1,264.00 |
| Payroll Provider Agreement | Payroll provider | OnePoint HRO | - | - |
| Software License Agreement | Firewall License | Palo Alto | - | - |
| Consulting Agreement | Pension Benefits Advisor | Pension Management Consultants, Inc | - | - |
| Milk Supply Agreement | Milk Contract | PGMP Pacific Gold | - | 1,870,000.00 |
| Marketing & Sales Agreement | Commission sales | Pinnacle Solutions | - | - |
| Truck Lease | 22ft - 2018 International Series 4300 Refrigerated Box Truck | Premier Food Delights | - | 722.04 |
| Equipment Lease | Mailing postage service | Quadient | - | - |
| Maintenance Vendor | Gutter Maintenace and Installation | Quality Home Improvement | 7,800.00 | - |
| Consulting Agreement | ERTC Federal Tax Refunds | R&D Incentives Group | 548,510.17 | - |
| Software License Agreement | Firewall License | Redgate | - | - |
| Marketing & Sales Agreement | Commission sales | Results Marketing and Sales Ltd | - | - |
| Real Property Lease | Real Property Lease - 6625 2nd St, Riverbank, CA 95367-2336 | RL Gardena LLC | 146,808.65 | 64,503.00 |

| | | | | |
|---|---|---|---|---|
| Administrative Services | Gardena staff accounting adm | RM Rivera Computer Support | - | - |
| Insurance Captive | Workers Compensation Captive | RST Captive | - | - |
| License Agreement | Wireless Support | Ruckus | - | - |
| Marketing & Sales Agreement | Commission sales | Sage Marketing LLC | - | - |
| Software License Agreement | Accounting Software | Sage Software Inc. | - | - |
| Business Insurance Policy | Health Insurance | SBMA | - | - |
| Business Insurance Policy | Excess Liability 3rd layer - Excess Liability $5M x $5M | Scottsdale Insurance Company | - | - |
| Service Agreement | Temperature Control Monitoring | SensoScientific | - | 919.62 |
| Procurement Agreement | Fuel Card Provider | Shell Fleet Cards | 15,172.67 | - |
| PL Vendor | PL Cheese | Specialty Cheese Company, Inc | - | 85,303.77 |
| Marketing & Sales Agreement | Commission sales | Spinzo Market Services, L.L.C. | 485.13 | - |
| Professional Fees | Financial Advisor | Stapleton Group | - | 109,205.20 |
| Freight Vendor | Sludge Hauling | Sun Valley Transport, Inc. | - | 4,762.00 |
| Distributor/Distribution Agreements | Master Vendor Agreement | Super King / B&V Enterprises, Inc. | - | - |
| Business Insurance Policy | Product Recall Policy | Swiss Re Corporate Solutions Capacity Insurance | - | - |
| Software License Agreement | Remote Access Software | Teamviewer | - | - |
| Truck Lease | Distribution Truck Lease | TEC Equipment Leasing/Transco Leasing | 94,874.34 | - |
| Software License Agreement | Mobile Access License | Telerik | - | - |
| Consulting Agreement | Third party food safety expert | The Acheson Group | - | 21,354.13 |
| Marketing & Sales Agreement | Commission sales | Tomas Trujillo | - | - |
| Business Insurance Policy | Perishable food/Inventory/In-transit - Policy No. HRN25104725 | Underwriters at Lloyd's London | - | - |

| Uniform provider | Uniform Provider | UniFirst Corporation | 7,556.61 | 2,615.98 |
|---|---|---|---|---|
| Equipment Rental | Forklift, Scissor lift Rental | United Rentals NorthamericaInc | 3,801.67 | 5,216.56 |
| Business Insurance Policy | Product Recall Policy | Upland Specialty Insurance Company | - | - |
| Gas Vendor | Gas for Forklifts | WestAir Gases & Equipment Inc | - | 385.91 |
| Software License Agreement | Visualization Tools License | Zebra BI | - | - |

|  |  |  | 3,989,128.95 | 2,873,051.05 |
|---|---|---|---|---|

**SCHEDULE 6.2(a)-1**
**ASSIGNED CONTRACTS**

Assigned Contracts will be provided and **Schedule 6.2(a)-1** will be populated no later than the Closing Date in accordance with Section 6.2(a).

## SCHEDULE 6.2(d)
## TERMINATED CONTRACTS

Terminated Contracts will be provided and **Schedule 6.2(d)** will be populated no later than the Closing Date in accordance with Section 6.2(d).